IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No.: 3:21-CV 00039

| | |
|---|---|
| RAY KIFER JR.<br><br>    Plaintiff,<br><br>v.<br><br>DAVID SCOTT BURROUGHS ET AL.,<br><br>    Defendants. | PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

I.    **Summary of the Argument**

Defendants' Motion for Summary Judgment should be denied because the record is replete with evidence that on March 7, 2018, Defendants David Spencer, Jimmy Williams, Kyle Beam and Josh Beam knowingly and/or recklessly aided and abetted David Burroughs in his scheme to frame Ray Kifer with drug offenses, thereby violating Kifer's Due Process and Fourth Amendment rights. Defendants Spencer, Kyle Beam, Josh Beam and Williams, all knew (or reasonably should have known) that Burroughs set up Kifer and failed to act to prevent the false arrest despite this knowledge. Their failure was in reckless disregard of Kifer's constitutional rights.

Moreover, the evidence is undisputed that other law enforcement officers who were similarly situated did the opposite of defendants under the circumstances, refuting Defendants' attempt to suggest "any reasonable officer" would have acted as they did. This attempt should be flatly and swiftly rejected.

As this court is aware, in ruling on a motion for summary judgment, "**the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor**." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.,* 597 F.3d 570, 576 (4th Cir. 2010) quoting *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999)(emphasis added). Summary judgment is appropriate only "**if the movant shows that there is no genuine dispute as to

**any material fact and the movant is entitled to judgment as a matter of law.**" Fed. R. Civ. P.

56(a).

III.     <u>**Factual Overview**</u>

A.   <u>Defendants Were Aware That Burroughs Had Become a Loose Cannon.</u>

It was well-known throughout the Anson County Sheriff's Department that David

Burroughs was emotionally unstable after his breakup with Lela Vang in January 2018.  Burroughs

at times broke down in tears at work, and the break-up affected his eating and sleeping. (SBI pp

004, 006).[1]  "Everyone and their brother" was aware of how upset he was. (JW pp 86-87).[2]

Burroughs' often complained to his entire shift he "was pissed about the breakup." (DS pp 21,55)[3]

Burroughs even lamented about Vang's relationship with her boyfriend, Ray Kifer, Jr., with wives

and relatives of the officers in the Anson County Sheriff's Department.  (VB pp 65-66).[4] Sergeant

Vance Bennett testified Burroughs would talk about this to "anybody who would listen." (VB p

66).     Burroughs repeatedly pulled up Kifer's photograph on the North Carolina Offender

Database, CJLEADS (Criminal Justice Law Enforcement Automated Data Services). He "ran his

mouth" about Kifer, boasting that if he was not in law enforcement, he would "beat Kifer's ass."

(SBI p 004) Burroughs drove around Kifer's neighborhood, surveilling his whereabouts, and one

evening, Burroughs snuck up to the  home Kifer shared with Lela Vang and made an audio

recording of them having sex.  (SBI p 005) (LV pp 61-62)[5]  (RK pp 28-29).[6] Sergeant Willoughby

---

[1] "SBI" refers to the State Bureau of Investigation file produced in discovery.  Excerpts from the file, followed by references to page numbers, are attached as Exhibit A to this brief.
[2] "JW" refers to the deposition of Jimmy Williams, followed by references to page number. A complete copy of the transcript is attached as Exhibit B to this brief.
[3] "DS" refers to the deposition of David Spencer, followed by references to page number. A complete copy of the transcript is attached as Exhibit C to this brief.
[4] "VB" refers to the deposition of Vance Bennet, followed by references to page number. A complete copy of the transcript is attached as Exhibit D to this brief.
[5]  "LV" refers to the deposition of Lela Vang, followed by references to page number. A complete copy of the transcript is attached as Exhibit E to this brief.
[6]  "RK" refers to the deposition of Ray Kifer, Jr. A complete copy of  the transcript is attached as Exhibit F.

eventually switched Burroughs' patrol zone to keep him away from Vang. (SBI pp 005-006).

    B. <u>Burroughs Plan to Frame Kifer Becomes Obvious.</u>

On March 6, 2018, Burroughs reached out to ACSO officer Mario El Kobersy. Burroughs claimed that his "cousin" told him he had witnessed someone putting drugs in the trunk of Ray Kifer's car, by the spare tire. (ME pp 51-52).[7] Burroughs provided El Kobersy with a photograph of a car similar to Kifer's. (ME p 63). He detailed the specific time of day and route the car would travel, and also told El Kobersy that Lela Vang would be in the car. (ME pp 52-53).

Given the level of detail Burroughs provided, and the circumstances that El Kobersy and everyone else knew surrounding the breakup with Vang, El Kobersy believed Burroughs "was just trying to cause the guy a problem because he's dating this girl." (ME p 56). El Kobersy was so suspicious that he asked Burroughs to text him the information to create a written record of what Burroughs had asked him to do. (ME p 55).

El Kobersy then told drug detective Jimmy Williams *exactly* what Burroughs told him and that "something don't feel right with this." (ME p 56). Williams agreed this was "fishy as hell." (ME p 56) Indeed, as Defendants acknowledge, "Williams thought the information was 'too good to be true' and 'it sounded like a setup.'" (JW p 88). Williams told El Kobersy: "*don't stop that fucking car.*" (JW p 87). Williams then said he would handle the situation "in the morning." (JW p 56). But Williams took no other action that evening, or the next morning. He did not call Burroughs. (JW p 89). He did not attempt to contact Kifer. He did nothing to investigate this apparent "setup." (JW pp 111-12). He did not report the situation to his supervisor, nor to the Sheriff, as the Policies and Procedure Manual required. (JW pp 88-91, 94, 119-120).

Between 8:00 and 9:00 a.m. the next day, Deputy Darius Ellison put a note in the mailbox

---

[7] "ME" refers to the deposition of Mario El Kobersy, followed by references to page number. A complete copy of the transcript is attached as Exhibit G to this brief.

of the other ACSO drug detective, Josh Beam. (JB pp 87, 90-91).[8] The note gave details about "a car" that would be driving along Ansonville-Polkton Road that afternoon with drugs in the trunk and included Kifer's name. (JW p 100) (JB pp 87,100, 101). Josh Beam and Williams conferred first thing in the morning and when Beam shared the note, Williams said he received the same information the night before. (JW p 100). Josh Beam then "twisted his head" and gave a look like "I'm finding this hard to swallow." (JW p 100). Williams told Josh Beam they needed to check into the information *before* the car was stopped. (JW p 99). They both agreed they needed to talk to Ellison for more information. (JB p 88).

They then met Ellison at a Citgo gas station around 10:00 a.m. (JB p 89). Ellison told them the tip came from Burroughs who said it came from a CI. (JW pp 103-105). This caused "alarms going off…in our heads" that said "something's not legit about this." (JW p 105). They told Ellison "not to pursue it…to *stay away from it*," and that they would take care of it. (JW p 104, 106).

Anson County is rural and small. Both Josh Beam and Williams knew Ray Kifer Jr. Neither Williams nor Beam knew him to be involved in any drug activity. (JW p 109) (JB pp 57, 59). Williams and J. Beam left the meeting with Ellison at the Citgo in the late morning. They did nothing to further investigate what they both believed to be Burroughs' attempt to set-up Ray Kifer (JW pp 111-12). They did not interview David Burroughs about his alleged "tip." (JW p 107). They did not do anything to investigate Burroughs' alleged informant. (JW pp 115-116). They did not go to Kifer's house for a knock-and-talk or ask Kifer for consent to search his car. (JB p 112, 123). They did not try to contact Ray Kifer at all. (JB p 123).

Despite their "alarm bells," and belief that Burroughs was attempting to "setup" Kifer, Williams and Josh Beam did not warn any of the other Sheriff's deputies on patrol duty that day

---

[8] "JB" refers to the deposition of Josh Beam, followed by references to page number. A complete copy of the transcript is attached as Exhibit H to this brief.

of what they believed was going on, nor did they direct them not to stop a car that matched the description Burroughs gave to Ellison and El Kobersy. Neither Josh Beam nor Williams reported their concerns about the information they had learned from El Kobersy and Ellison to their supervisor, Chief Deputy Howell, nor to the Sheriff. (JW p 109, 111-112) (JB pp 123-24) This was a violation of the Anson County Policies and Procedures Manual. (ACSO manual policy 1.05).[9] Instead, despite the immediate threat of this setup being carried out, Williams and Josh Beam drove nearly 20 miles away from the location where Burroughs wanted Kifer's car stopped, to conduct a "routine" attempt to identify homes where suspected gang members might be living. (MD Int. p 4)[10] (JB pp 198-99) (JW p 111). There was no imminent need for this diversion from preventing the set-up that was being implemented by Burroughs. (MD Int. p 4).

C. Burroughs Recruits Kyle Beam and Spencer to Effectuate His Scheme

Having failed to recruit El Kobersy or Ellison, Burroughs tried unsuccessfully to recruit Polkton police chief Timothy Hutchinson to carry out his scheme. (TH 44-45).[11] Then, with time running out on the alleged "tip," Burroughs sought out Kyle Beam. Burroughs called K. Beam to "meet up" on the morning of March 7, 2018. (KB pp 33-34). Burroughs told K. Beam about his alleged "tip." (KB p 34). Beam had never known Burroughs to work with drug informants or to be involved in big drug investigations (KB pp 35-36). Kyle Beam knew that Burroughs had unsuccessfully asked others to stop Kifer's car, and initially put off Burroughs. (KB pp 108).

Burroughs then turned to Deputy David Spencer to help him. Burroughs called Spencer at 2:36 p.m. on March 7, 2018, on Spencer's personal cell phone, while Spencer was on duty at the

---

[9] Anson County Sheriff's Office Policy 1.05, a copy attached as exhibit I to this brief.
[10] "MD Int." refers to Monty Dugger's answer to written deposition questions, followed by reference to page number. A complete copy is being attached as exhibit J to this brief.
[11] "TH" refers to the deposition of Timothy Hutchinson, followed by references to page number. A complete copy of the transcript is attached as Exhibit K to this brief. It appears Burroughs was initially trying not to use his friends at the ACSO, Kyle Beam and David Spencer, to avoid suspicion focusing on him after Kifer was arrested.

Child Support Office with Sergeant Vance Bennett. (DB phone records)[12] (VB pp 55-57); Spencer answered on speakerphone, but quickly took the call off speaker once Burroughs started giving him information about stopping Kifer's car. (VB p 57)

In the six-minute-long call at 2:36 p.m., Burroughs gave Spencer the car model and license plate of Kifer's car, and told Spencer the car would be back and forth on Ansonville-Polkton Road between 3:15 and 4 p.m. (SBI interview of Spencer)[13] Burroughs specified he would find drugs in the trunk of Kifer's car. (SBI interview of Spencer, *Id.*) Burroughs then explained that Vang and Kifer would be in the car. (DS p 53). All these details "threw up red flags" for Spencer. (DS 53-54) Notably, it was ACSO practice that an unusual tip involving a car transporting serious drugs be sent to experienced detectives in the drug unit. (JW pp 79-80, 108, 176)(ME p 47).

Despite this practice, and the red flags, right after this call from Burroughs, Spencer *left his assignment at the child support office* in search of Kifer's car. (DS p 55) He did not inform any supervisor, including Sgt. Bennett, who was with him at the Child Support Office, nor the Sheriff. (DS p 68) Spencer did not even ask Bennett if he could leave his assignment at the Child Support Office, nor did he tell Bennett what Burroughs had asked him to do. (DS p 68). (VB pp 60-61).

D. <u>Spencer Stops Ray Kifer at Burroughs' Request.</u>

Sometime before 3:00 p.m., Spencer found what he was looking for: Kifer's car driving along Ansonville-Polkton Road just as Burroughs' indicated it would be. He began to tail the car while in his marked Anson County Sheriff's vehicle. (ACSO 0002)[14] (LV 19-20). Vang was driving the car. (LV p 20) (RK pp 35, 37) Kyle Beam testified that Spencer called him when he first saw

---

[12] "DB phone records" David Burroughs' highlighted phone records. Copy attached as Exhibit L to this brief.
[13] SBI interview of David Spencer, a copy attached as Exhibit M to this brief.
[14] ACSO Incident Report, Exhibit N to this brief.

Kifer's car, and Beam told Spencer to call Burroughs for advice. (KB 81)[15]. That is not true.

As it turned out, Burroughs called Spencer at 2:47 p.m. Spencer told Burroughs if he pulled over the car with Lela in it, then Lela would get arrested. (DB phone records; interview with Burroughs ACSO 00013-14,[16]). After this conversation with Burroughs, Spencer did not stop Kifer's car.

Burroughs next call was to Kyle Beam, at 2:59 p.m. The two had a 4-minute conversation. (DB phone records; KB phone records[17]) Presumably, Burroughs told K. Beam that Spencer had agreed to stop Kifer's car when it headed back along the road, because at some point after this call, K. Beam headed to the area where Spencer was to stop Kifer (KB p 81).

At 3:23 p.m., Burroughs made a 5-minute call to David Spencer. Spencer then returned to Ansonville-Polkton Road.[18] At 3:42 p.m., Spencer "blue-lighted [Kifer's car] *as soon as I turned onto Ansonville-Polkton Road. Soon as I got on Ansonville-Polkton Road* and seen that from the rear it looked like the car that Burroughs had described, *I initiated my blue lights at that point.* (incident report Ex. N) (DS p 88) (emphasis added).[19]

Kifer pulled over right away. (RK p 40). Spencer asked for Kifer's license and walked back to his patrol car. (RK p 43). While in his patrol car, Spencer got in touch with Kyle Beam and told him he was "fixing to ask for consent" to search Kifer's car. (KB p 56) When Spencer

---

[15] "KB" refers to the deposition of Kyle Beam, followed by references to page number. A complete copy of the transcript is attached as Exhibit O to this brief.

[16] ACSO interview of David Burroughs. Copy attached as Exhibit P to this brief.

[17] "KB phone records" Kyle Beam's highlighted phone records. Copy attached as Exhibit Q to this brief.

[18] He did this even though this area was "way out of [his] zone" (DS p 96). Polkton police chief Hutchinson, testified that he "thought it was odd' for Spencer to be making a stop in that part of the county where he didn't normally answer calls (TH pp 50-51).

[19] Spencer later claimed that he observed "a" car "travelling over the posted speed limit, and cross the center line, so he initiated his blue lights." (DS pp 33, 83, 84). Kifer has denied speeding at the time Spencer stopped him, noting that having just seen Spencer tail his car – it was not likely he was even going 5 mph over the limit. (RK 108), and Spencer *did not give Kifer a ticket for speeding.* (DS p 84). Kifer has also denied crossing the center line. (RK p 108). Although Spencer did give Kifer a ticket for this, he "voided" this ticket when he realized his stop of Kifer was the subject of an internal investigation.

walked back to the car, he told Kifer he smelled marijuana and asked for consent to search. Kifer told Spencer it wasn't possible he smelled marijuana; nonetheless, faced with this accusation and with no way to lawfully leave, Kifer agreed to let Spencer search. (RK p 44) Spencer then placed Kifer in the back of his patrol car. (RK p 45)

Kyle Beam, having previously been told by Burroughs of the plan, and having been told by Burroughs 40 minutes earlier (at 2:59 p.m.) that Spencer planned to stop Kifer's car, soon arrived. Spencer and K. Beam immediately began to search the trunk of Kifer 's car. (KB pp 57-58). This is despite Kyle Beam's testimony that, contrary to Spencer's claim, Kyle Beam *did not smell any marijuana*.[20] (KB p 60). Within minutes, Spencer pointed to a package under the spare tire storage compartment, exactly where Burroughs told him to look, and said to K. Beam in a confirmatory manner, "there it is!" (KB p 59). Beam pulled a black envelope containing neatly divided packets of various narcotics out of the trunk, from underneath the tire storage. Kyle Beam testified the package looked "a little too organized for something around here." (KB pp 64-65).

Despite (a) the reality that Ray Kifer was not known to ACSO officers to be involved in drugs or other criminal activity (ME p 51)(JW pp 92, 110-111), (b) that David Burroughs did not work in the drug unit at ACSO (JW p 94), (c) that David Burroughs was not known to work with any confidential informants or to be involved in big drug busts (KB pp 35-36)(ME p 54)(JW p 94), (d) that Kyle Beam was not aware of anyone within the A Squad being involved in developing a confidential informant (KB p 43), (e) the "red flags" raised by Burroughs' extremely detailed tip, (f) the well-known relationship between Burroughs and Lela Vang, (g) Burroughs' well-known outrage at Lela's relationship with Kifer, (h) the drug packet that was "too organized," and (i) the

---

[20] Despite not smelling any marijuana, contrary to Spencer's alleged assertion, and despite what he knew about Burroughs' plan from his earlier calls with Burroughs, Kyle Beam did nothing to question the alleged basis for the search and took no action to intervene to prevent Spencer's violation of Kifer's constitutional rights.

practice that serious drug tips were supposed to go to the drug unit, Spencer and Kyle Beam approached Kifer with handcuffs and told him he was being arrested. (RK p 47). Neither Spencer nor Kyle Beam would give Kifer a reason for his arrest. (RK pp 48-49). This evidence, viewed in the light most favorable to Plaintiff, as required, creates a reasonable inference that Spencer and Kyle Beam knew or reasonably should have known that they were aiding and abetting Burroughs' plan to frame Kifer.

E. Williams and Josh Beam Fail to Intervene to Protect Kifer.

Meanwhile, at some point the same day, Williams and Josh Beam were joined on their shift by federal agent Jose Manolito "Monty" Dugger. (JW p 55) Dugger was in the car with Williams and Josh Beam when they heard on the radio that Kifer's car had been stopped. (JW 118). Williams said out loud, "Oh, shit!" (JW p 118). Williams, Josh Beam and Dugger then headed to the scene. (JW p 123) Williams and Josh Beam concealed from Agent Dugger their knowledge of the suspicious actions of Burroughs as well as their belief that this stop was a set up. (MD Int. p 5)

When they arrived on scene, Kifer was in handcuffs. (JW p 125). Neither Williams nor Josh Beam told Kifer why he was being arrested. (JW 126-127) They put Kifer in their unmarked Ford Explorer and told him they were going to the Sheriff's Department. (JW p 129) Instead, they stopped at an unmarked, nondescript building with an airstrip. (JW 132-133). Josh Beam got out of the SUV and went into the building. Kifer felt like his "life was in danger" and that "something bad was about to happen." (RK p 109). Josh Beam returned with something in his hand that Kifer could not see. (RK p 53). They then drove to the Sheriff's office. Kifer described the ride as "very tense, very intense." (RK pp 109-10).

Upon arrival at the ACSO, Kifer was read his Miranda rights. (p 5-7 tpt Kifer

interrogation).[21] He was then interrogated for nearly an hour by Dugger, an experienced federal agent, while Williams sat across from him, and Josh Beam sat next to him. (screen shots from video of interrogation from 16:34:40 to 17:39:30).[22]  While Kifer was interrogated, Williams held handcuffs in his hands and repeatedly opened and closed them in front of Kifer. (JW 159-160; screen shots at 17:07).

Twice during the interrogation, Kifer brought up David Burroughs, and shared that Burroughs was "very angry" that Kifer was dating Lela.  (p 26, p 33 tpt Kifer Interrogation). Despite this, and the obvious relevance of the connection, Williams and Josh Beam continued to conceal from Agent Dugger the "alarm bells" relating to Burroughs' alleged tip and the stop of Kifer's car. (Dugger interrogatories p 5). Neither Williams nor Beam stopped the interrogation. (JW p 160).

F. <u>Federal Agent Dugger Recognizes the Set-Up and Calls a Halt to the Processing of Kifer.</u>

Eventually, Dugger began to doubt that Kifer knew about the drugs. (MD Int. p 5). He asked Williams (or Beam) to come out into the hall with him.  Once in the hall, Williams (or Beam)[23] then disclosed *for the first time* that Burroughs - the spurned ex-boyfriend of Lela Vang, who was now dating Kifer – was the source of the tip.  (MD Int p 6). Dugger immediately told them they needed to do an internal investigation and let Kifer go. (MD Int. p 6).

Although Beam falsely claimed he "left the interview room at 5:03 p.m. because he had reason to believe that they needed to let Kifer go and pursue a further investigation," (JB p 164), and further claimed *he* informed the Sheriff of the Burroughs' connection, (JB p 173), Beam's testimony is directly contradicted by the sworn statements of Dugger, *that he (Dugger) stopped*

---

[21] Transcript of Ray Kifer, Jr.'s interrogation a copy attached as Exhibit R to this brief.
[22] Screen shots of video from interrogation of Ray Kifer, Jr, a copy attached as Exhibit S to this brief.
[23] Many months later, Dugger was not sure which of the two had finally informed him of this.

the interrogation, that the first time Beam or Williams told him the tip was from Burroughs *was right after he stopped the interrogation, and that it was Dugger who advised the Sheriff* that an internal investigation should be done. (MD Int. p 7).

Kifer was taken to the magistrate.  (RK p 61). Kifer was told he would not be charged immediately, but that the investigation was ongoing (KR p 61). This left Kifer in legal limbo.

Dugger then went to Sheriff Reid and told him he needed an investigation *conducted by an independent agency outside of the ACSO*. (MD Int 7). Sheriff Reid asked Dugger to do the investigation, but Dugger correctly explained he could not since he had interrogated Kifer. (MD Int. p 7). Reid then inexplicably put ACSO Lt. Brian Tice in charge of an investigation that was not in the least independent of the ACSO. (LR p 129)[24] (BT p 41). [25] Then, despite Williams and Josh Beam's participation in the arrest and interrogation of Kifer and their knowledge of Burroughs apparent attempt to set Kifer up, and their knowing or reckless conduct in furthering Burroughs plan, *Williams and Josh Beam were assigned* to the internal investigative team. (BT p 62) (JW p 171). They did not recuse themselves.

Spencer was then interviewed as part of the internal investigation. (BT pp 50-53). In a written statement to Internal Affairs just four hours after the stop and arrest of Kifer, Spencer (after a phone call with Kyle Beam) concealed material information of his own involvement in Burroughs' scheme: Spencer *did not include any information about the "red flags"* he had noted during his phone conversation with Burroughs at the Child Support Office (DS pp 76-78)  Spencer also concealed crucial details regarding the sequence of events before the stop and search, including that he and Burroughs spoke to each other at least three times between 2:46 p.m. and

[24] "LR" refers to the deposition of Landric Reid, followed by reference to page number.  A complete copy of the transcript is attached as Exhibit T to this brief.
[25] "BT" refers to the deposition of Brian Tice, followed by references to page number. A complete copy of the transcript is attached as Exhibit U to this brief.

3:23 p.m. that day. (DS p 99, DB phone records). At 7:11 p.m., while alone in a room writing his statement, Spencer placed a 4-minute call to Kyle Beam (KB phone records), presumably for advice on what to write. Spencer also wrote "void" over the traffic citation he had written Kifer for crossing the center line. Spencer never cited Kifer for speeding. (DS pp 90-91).

During the ACSO internal investigation, Burroughs admitted he put drugs in Kifer's car. (BT p 71; JW p 182). At that point, the investigation by ACSO stopped and the SBI was called in. (JW pp 182-183). SBI Special Agent Brandon Blackman was assigned the case. (LR pp 138-139).

G. The Coverup Continues.

During the SBI Investigation, Josh Beam concealed from SBI Agent Blackman what he learned from Darius Ellison the morning before Kifer's arrest. (JB pp 185-186). Jimmy Williams concealed from Agent Blackman what he learned from Mario El Kobersy the night before Kifer's arrest (JW pp 173, 181). David Spencer concealed from SBI Agent Blackman his phone calls with Burroughs; he also gave conflicting accounts of the events leading up to the stop. (see footnotes 18,19). Kyle Beam concealed from Agent Blackman his phone calls with Burroughs before (and after) Kifer's arrest, and that he thought the drugs looked too organized. (KB p 186 ).

David Burroughs was not charged with any crime until April 2019, *more than a year after Kifer was arrested.* (SBI records) During that entire time, Kifer believed he was still in jeopardy. (RK p 60).

H. The ACSO Failed to Train and Supervise Its Officers.

At the time of the subject events, ACSO had a Policy and Procedures Manual, a copy of which was kept in Sheriff Reid's office, as well as other supervisors' offices. (LR p 68). In 2018, Section 1.05 of the Manual provided as follows:

1.05 - Duty to Report Violations of laws, Ordinances, Rules and Directives
Employees knowing of *or suspecting* other employees of violating laws, ordinances,

Sheriff's Office rules, directives, special orders, or standard operating procedures *shall* report the same to their supervisor. If an employee believes the information is of such a nature or gravity, official channels may be bypassed and the information may be reported directly to the Sheriff. (emphasis added) (Exhibit I).

Sheriff Reid's predecessor, Sheriff Tommy Allen, *required all law enforcement officers* to read the Anson County Policy and Procedure Manual, as well as every update to the manual, then sign an affirmation that they had read and understood the policies and procedures. (JW pp 41-43). Sheriff Reid eliminated that policy and practice. (LR pp 19, 66-67) (JW p 41). Once Sheriff Reid took office, there was no yearly training on the manual. (LR p 65-66). There was no regular training or in-service training "about how to handle a situation when [officers] suspect a fellow law enforcement officer might be involved in misconduct." (JW pp 45-46) (LR p 184). As of April 20, 2022, when Mario El Kobersy was deposed, *there had still been no training of that sort.* (ME 30). More egregiously, Sheriff Reid was aware that the North Carolina Legislature, through Senate Bill 300, had specifically identified officer misconduct as a public policy concern that needed to be addressed through a duty to intervene. (LR pp 10-11). But Reid just expected his law enforcement officers to "use common sense." (LR p 37).

Simply put, the failure of Defendants to intervene to prevent the violation of Ray Kifer's constitutional rights was a direct and predictable result of the failure of Sheriff Reid to properly train and supervise the officers in the ACSO. (JW pp 120, 130-131).

## IV. ARGUMENT

### A. Defendants Motion for Summary Judgment as to Count I Should be Denied

Defendants attempt to defeat Count I with a strawman argument: only David Burroughs actually obtained and planted illegal drugs in Ray Kifer's car, so only Burroughs is liable. But Count I of the Complaint is not based on a claim "that Spencer and Kyle Beam planted drugs in Kifer's trunk." D.E. 52, p 10. Rather Count I alleges that Spencer and Kyle Beam conspired with

and/or knowingly or recklessly aided and abetted David Burroughs' scheme to frame Ray Kifer. D.E. 36, ¶¶ 271-273. There is ample evidence – direct and circumstantial - to support this claim.

Defendants do not contend, nor could they, that participating in a scheme to frame an innocent person with serious drug offenses does not violate that person's due process rights under the Fourteenth Amendment. Such a claim "is rooted in substantive due process." *White v. Wright*, 150 Fed. Appx. 193, 199 (4th Cir.) (2005)(unpublished). Indeed, as the *Wright* Court recognized: "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit . . . . Actions taken in contravention of this prohibition necessarily violate due process." 150 Fed. Appx. at 198, quoting *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004). See also, *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir.2000) (recognizing the right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"); *Moran v. Clarke*, 296 F.3d 638, 643-45 (8th Cir.2002) (*en banc*) (concluding that "evidence that [the plaintiff] was investigated, prosecuted, suspended without pay, demoted and stigmatized by falsely-created evidence" reflected conscience-shocking behavior prohibited by substantive due process).

To accomplish his goal of causing Kifer's false arrest, Burroughs needed more than the mere act of planting drugs – he needed the assistance of other officers. It is undisputed that he received this necessary assistance from Defendants Spencer and Kyle Beam. The only inquiry as to Count I is whether sufficient facts and justifiable inferences exist for a reasonable jury to conclude that Spencer and Kyle Beam knowingly and/or recklessly *aided and abetted and/or conspired with David Burroughs to frame Ray Kifer by stopping, searching and arresting Ray*

*Kifer* for the drugs Burroughs had planted in his car. [26] Defendants simply ignore the significant direct and circumstantial evidence that Spencer and Kyle Beam knew, or reasonably should have known, that Burroughs was attempting to frame Kifer with possession of dangerous drugs.

Spencer was directed by Burroughs to leave his posted assignment that day, travel to a place in the county that was outside his assigned area of patrol, hold off on stopping a car that was supposedly carrying drugs until Burroughs ex-girlfriend was no longer in the car, and then stop the car and search a specific location in the trunk, beneath a spare tire, where the drugs would be found in pristine condition. Under these circumstances, the "red flags" even Spencer admitted recognizing at the time, putting aside his covert actions at the child support office and his multiple conversations with Burrough leading up to the stop and arrest, create at a minimum sufficient evidence for a jury to find that Spencer knew, or reasonably should have known, that Burroughs was engaging in a scheme to violate Kifer's constitutional rights by framing him for a drug offense. Spencer did what Burroughs asked him to do, while others whom Burroughs approached recognized that Burroughs was attempting to frame Ray Kifer and refused.

Whether Kyle Beam knew or reasonably should have known that Burroughs was attempting to frame Ray Kifer when he aided and assisted in Kifer's arrest depends on the conversations Beam had with Burroughs in the minutes before the stop, his knowledge that Burroughs did not have any drug informants and that Kifer was not known to be involved with drugs, Beam's observation that the packaging of the drugs and Burroughs' knowledge of their location in the car was too precise, and Beam's subsequent coverup of all this during the SBI investigation.

---

[26] It is well-established that "an agreement may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1192 (11th Cir. 2011)**.**

All these circumstances support a justifiable inference that David Spencer and Kyle Beam knew or reasonably should have known that Burroughs was attempting to set Kifer up on the morning of March 7, 2018. There is more than sufficient evidence for a jury to find that Defendants Spencer and Kyle Beam conspired with fellow ACSO deputy David Burroughs by knowingly and/or recklessly aiding and abetting the scheme to stop Ray Kifer as part of Burroughs' plan to frame Kifer for the possession of drugs Burroughs planted in Kifer's car. Their knowing and reckless participation in a scheme to deprive an innocent man of his liberty makes them liable under the first claim in the Amended Complaint. *See Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 532 (E.D.N.Y. 2021) (material issues of fact precluded summary judgment on conspiracy allegation against Suffolk County defendants based, *inter alia* on evidence that " defendants, at a minimum, tacitly agreed with [the other defendants] to support this false narrative" and that "various Suffolk County defendants committed one or more overt acts in furtherance of this conspiracy by, *inter alia, falsely arresting plaintiff, and providing false or incomplete evidence to the District Attorney's Office* as part of a malicious prosecution of plaintiff)"(emphasis added).[27]

**B.    Defendants Motion for Summary Judgment as to Count II Should be Denied.**

Defendants Spencer and Kyle Beam essentially ask this court to decouple the substantive due process right not to be subjected to conduct that "shocks the conscience," as alleged in Count I, from the right to be free from unreasonable searches and seizures, as alleged in Count II. In this

---

[27] Defendants attempt to argue that this claim should be dismissed because "Plaintiff was never criminally charged with any drug offense," despite the fact that he was arrested and interrogated for this offense, and that the specter of such charges being brought hung over his head for a year, deserves little response. Mr. Kifer was, in the words of the court in *Allen v. Deel*, 4:20-cv-38-TTC-RSB (W.D. Va. 2021) deprived of his "liberty" as a result of Defendants' violation of his Due Process and Fourth Amendment rights. Moreover, the quoted language from *McDonough v. Smith*, ___ U.S.___, 139 S. Ct. 2149, 2156 (2019) is irrelevant because that case simply dealt with the accrual of a malicious prosecution claim in light of the applicable statute of limitations.

case these two constitutional rights are inextricably linked.

Thus, in Defendants' Memorandum, Defendant Spencer pretends that he just happened to be patrolling on Ansonville-Polkton Road at 3:43 p.m. on March 7, 2018, when he simply observed "a car" allegedly "travelling over the posted speed limit, and cross the center line, so he initiated his blue lights." D.E.52, p 6. And Kyle Beam just popped by to assist. But, in fact, the evidence completely ignored by Defendants squarely contradicts this made-up scenario. Their knowing and reckless participation in a scheme to deprive Kifer of his liberty, as set forth in the previous argument and fact section, made them knowing participants in violating Kifer's Due Process and Fourth Amendment rights.

Defendants Spencer and Kyle Beam further argue that the portion of Plaintiff's second cause of action that alleges an unlawful search and seizure must be dismissed because Kifer "consented" to the search. This claim ignores the fact that the "consent" was the direct fruit of the unlawful stop, and of Spencer's false claim that he could smell marijuana in the car.

Having already been deprived of his freedom of movement by the unlawful stop, and having been told (falsely) that an officer smelled the odor of marijuana emanating from his car, Kifer understood that he was not free to leave, as would any reasonable person in Kifer's position. Neither Spencer nor Kyle Beam informed Kifer of his right to remain silent, nor his right to refuse to provide consent to the search.

As a matter of Fourth Amendment law, Defendants' "consent argument" must be rejected. If the stop violated Kifer's Due Process and Fourth Amendment rights, so too did the search and seizure of the drugs they knew or reasonably should have known that Burroughs had planted.[28]

---

[28] Under these circumstances, at a minimum, it is a question for the jury whether Kifer's "consent" to search his car was in fact voluntary or was instead the direct and intended result of the unlawful stop of his car.

*Wong-Sun v. United States*, 371 U.S. 471,485 (1963); *United States v. Goodling*, 695 F.2d 78, 84 (4th Cir. 1982)(evidence recovered following unlawful seizure was tainted and thus inadmissible fruit of the seizure, even though defendant consented to search).

**C.    Defendants' Motion for Summary Judgment as to Count III Should be Denied.**

Defendants claim that Count III should be dismissed because they found the drugs they knew or reasonably should have known had been planted by Defendant Burroughs in exactly the location he planted them so, the Defendants reason, they had probable cause to arrest Kifer for the drugs Burroughs had planted.

In a breathtaking display of circular reasoning, Defendants argue that even if they knowingly agreed to assist Burroughs by arresting Kifer for the drugs they knew Burroughs had planted in his car, they can escape liability for this outrageous and unconstitutional conduct by relying on the fact that the drugs were found exactly where Burroughs told them the drugs would be found – in the trunk where he planted them.  Enough said about the validity of that claim.

**D.    Defendants' Motion for Summary Judgment on Count IV Should Be Denied.**

The Fourth Circuit has recognized that liability based on a failure to intervene is "premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them."   *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002). This duty "attaches when an officer observes *or has reason to know that a constitutional violation [is being] committed by other officers* and possesses a realistic opportunity to intervene to prevent the harm from occurring." *Id*. at 203-04 (internal quotation omitted)(emphasis added).

That Defendants Spencer, Kyle Beam, Josh Beam and Jimmy Williams failed to intervene to protect the constitutional rights of Ray Kifer is not in dispute.  Not only did they do nothing to protect Kifer from Burroughs' scheme, at various times they actively aided and abetted Burroughs

in framing Kifer, as set forth above. Once again, therefore, the only material factual issue is whether the evidence set forth above would support a finding by the jury that Defendants knew or reasonably should have known that Burroughs was engaged in a scheme to violate Ray Kifer Jr.'s constitutional rights. Plaintiff respectfully incorporates his arguments with regards to Counts I-III in support of his failure to intervene claim as to Count IV.

With regard to Spencer and Kyle Beam, Plaintiff respectfully incorporates his recitation of the facts related to Counts I-III, as set forth in pages 13-18 above. Not only did Spencer and Kyle Beam actively assist Burrough in achieving his illegal goal, but both officers chose to do so rather than intervening to protect Kifer's constitutional rights, as the policies and procedures manual and the United States Constitution required. The claim against Spencer and Kyle Beam for failing to intervene should proceed to trial.

As for Defendants Williams and Josh Beam, given their knowledge of the circumstances presented on March 7, 2018, and from the information provided to them by El-Kobersy and Ellison, it is hardly surprising that these two Defendants actively discussed that very morning whether Burroughs was in the process of setting up Kifer. They then held a meeting with Darius Ellison for more information, concluded that Burroughs was attempting to set Kifer up, *and ordered Ellison not to stop Kifer's car.*

Moreover, when they heard that Spencer had stopped Kifer's car, their immediate reaction, "oh shit," was a dead giveaway. They knew exactly what was happening. But despite this, when Williams and Josh Beam arrived at the scene of the stop, they did absolutely nothing to protect Kifer from Spencer's and Kyle Beam's unconstitutional conduct. Instead, they placed him, handcuffed, in an unmarked car without telling him why, drove him to a remote location before bringing him to the Sheriff's office, sat around him in an interrogation room in close quarters,

opening and closing a set of handcuffs while a federal agent threatened him with prison, and concealed from the federal agent the key facts of which they were aware until the federal agent, finally realizing that something was very amiss, stopped the process after more than an hour of this terrorizing conduct. It is difficult to imagine a clearer case of two supervisors failing to intervene to protect a citizen they took an oath to protect, in direct violation of the ACSO policies and procedures manual and their constitutional duties, and instead choosing to directly participate in the unconstitutional conduct themselves. The claims against Williams and Josh Beam for failing to intervene should also proceed to trial.

"Summary judgment is seldom appropriate in cases in which particular states of mind are decisive elements of claim or defense, because state of mind is so often proved by inferences from circumstantial evidence and by self-serving direct evidence." *Magill v. Gulf & Western Industries, Inc.*, 736 F.2d 976, 979 (4th Cir. 1984). Indeed, "[i]n general, if 'an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.'" *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016), quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

There is a genuine issue of material fact as to whether Defendants knew or reasonably should have known that Burroughs was attempting to frame Ray Kifer. If a jury so concludes, the Defendants violated Kifer's constitutional rights by failing to intervene to stop the unconstitutional conduct they knew or reasonably should have known was occurring.

E.  **Defendants' Qualified Immunity Defense Should be Rejected.**

Defendants do not claim that the due process right not to be framed by law enforcement officers acting in concert, aiding and abetting one another, and/or conspiring with one another was

not "clearly established" in March 2018. Rather, they again claim ignorance of the facts of which they were clearly aware and farcically argue that "any reasonable officer when confronted with this situation would have chosen the same path."

With regard to Spencer and Josh Beam, the evidence that they knew or reasonably should have known that they were, at a minimum, aiding and abetting Burroughs scheme has already been thoroughly discussed, and need not be repeated here.[29] On its own, this evidence forecloses their contention that they are entitled to qualified immunity for having "arguable probable cause." *See Moroughan*, 514 F. Supp. 3d at 541 (rejecting qualified immunity where there was evidence "the Suffolk County defendants knew that the version of the events provided by DiLeonardo and Bienz was completely lacking in credibility, and that they then fabricated evidence and/or withheld exculpatory in crediting DiLeonardo's unjustified use of force" on plaintiff; "there would be a lack of even arguable probable cause for plaintiff's arrest and prosecution, and no reasonable officers would disagree on the unconstitutionality of such conduct").

But there is another reason to reject qualified immunity for Spencer and Kyle Beam: the direct evidence of what a "reasonable officer" faced with the same situation "should have done." Or, more accurately, what they did do. Mario El-Kobersy not only refused Burroughs' request to stop Kifer's car because he suspected it was a set-up to get back at Kifer and Vang, he also reported Burroughs' request to the drug investigators and called it "fishy." Darius Ellison similarly refused Burroughs' request, left a note about it for the drug investigators, and met with them the next morning to share the details. Combined with the circumstantial evidence of what Spencer and

---

[29] To support their argument regarding Spencer and Beam, Defendants create a completely false "Hobson's Choice:" they could either let Kifer go with drugs in the car, performed an internal investigation on the side of the road, or arrested Kifer. Defendants leave unsaid what they *should* have done: seized the drugs, asked Kifer (a local man they knew) to meet them at the police station, and initiated an internal investigation once they got to the station. Defendants' failure to note this obvious option underscores their failure to do what a "reasonable officer" in the same situation should have done. Qualified immunity does not protect them in this circumstance.

Kyle Beam knew, this evidence of what a "reasonable officer" in the same situation as Spencer and Kyle Beam actually did makes it clear that the jury should determine if Spencer and Kyle Beam are entitled to qualified immunity.

With regard to Williams and Josh Beam, Defendants concede that based on the information they possessed, they *"informed Ellison not to stop the car"* on the morning of March 7, 2018, despite the "tip" that there were drugs in the trunk. In short, they knew exactly what Burroughs was trying to do. And, when they heard that Spencer had stopped Kifer's car, their immediate reaction was to say, "oh shit." Yet they proceeded to arrest Kifer and subject him to an in-custody interrogation.

On the other hand, when Agent Dugger, a reasonable officer, finally discovered what Josh Beam and Williams had concealed from him, he did what "any reasonable officer in their situation" should have done at the scene: he paused the arrest processing of Kifer and initiated an investigation into the circumstances. Given this clear evidence of what a "reasonable officer' in the exact same situation actually did, it is for jury to determine if Williams and Josh Beam are entitled to qualified immunity.

**F.    Anson County's Motion to Dismiss Count V Should be Denied.**

Defendant Anson County first repeats the argument it made in opposition to Plaintiff's Motion to Amend the Complaint, claiming it cannot be held liable for the unconstitutional acts and policies of the Anson County Sheriff.[30]   District Judge Reidinger's opinion in *Wilcoxson v Buncombe County*, a 2014 case in which Defendants' counsel and Plaintiff's counsel were attorneys of record, thoroughly and correctly analyzes why a county is legally responsible for the

---

[30] As a practical matter, the County's argument makes no sense. The County funds the Anson County Sheriff's Department. A verdict against the Sheriff's Department would therefore have to be paid from funds allocated by the County to the Sheriff's Department. It is therefore the County, not the Sheriff's office, that has the financial incentive to make sure its defenses to the *Monell* claim are fully litigated.

unconstitutional policies of the Sheriff elected by the citizens of that county; it is the elected Sheriff who is the final policymaker for law enforcement matters in a county. *Wilcoxson,* 129 F. Supp. 3d 308. See also *S. Ry. Co. v. Mecklenburg Cty.,* 231 N.C. 148, 151 (1949) (sheriff is chief law enforcement officer for the county). Defendants cite irrelevant cases that pre-date *Wilcoxson* or that deal with personnel matters, not law enforcement policies.

The question here, as in *Wilcoxson,* is whether the Sheriff is the county's final policymaker *for law enforcement purposes* in the context of a claim under *Monell.* The answer is simple: the Sheriff *is* the county's final policymaker for law enforcement purposes. Indeed, there is no rational argument to the contrary. If the Sheriff isn't the county's final policymaker for law enforcement purposes, than who is? There can be no other answer to this question than the Sheriff.

Next, Defendant County again asks this court to find that the statute of limitations bars Plaintiff's *Monell* claim. In repeating their previously unsuccessful argument, Anson County simply ignores the well-established rule that a claim "accrues" at such time as the facts necessary to assert the claim are known to the plaintiff. See *Wilson v. Williams,* No. 7:19-CV-00822, 2020 WL 2945558, at *3 (W.D.Va. June 3, 2020) (claim accrues "when the plaintiff knows enough about the harm done to him to bring his lawsuit").

Plaintiff did not know sufficient facts at the time of the filing of the original complaint to allege a *Monell* claim. What Plaintiff only learned in discovery was that Sheriff Landric Reid (a) did not require his employees to read the policy and procedure manual (as his predecessor had required), (b) did not train his employees on the need to read the policy and procedure manual, and (c) did not train his employees on how to enforce or act upon the policies included in the policy and procedure manual. These latter, operative facts were not learned until the depositions of Mario El Kobersy on April 20, 2022, Jimmy Williams on May 18, 2022, and Sheriff Landric Reid on May

25, 2022. Thus, it was only at this time that Plaintiff had knowledge of the requisite "factual content," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) to "identify[] the specific policy or custom" for a *Monell* claim based on a failure to train. *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987), *cert. denied sub nom.*, *City of Fayetteville v. Spell*, 484 U.S. 1027 (1988). *See Johnson v. Baltimore Police Dep't*, 452 F.Supp.3d 283, 309 (D. Md. 2020)("a plaintiff must provide factual allegations about the specific deficiencies in the [department's] training to state a failure to train claim").

Moreover, during the depositions of Josh Beam and Jimmy Williams, Plaintiff learned of specific facts concerning how they failed to intervene to stop Burroughs' scheme to violate Plaintiff's constitutional rights. These depositions revealed that the Sheriff's failure to train was the root cause of Beam's and Williams' inaction, and thus was "the moving force behind the particular constitutional violation." *Jones v. Chapman*, No. ELH–14–2627, 2015 WL 4509871, at *12 (D.Md. July 24, 2015). It would have been sanctionable to allege a *Monell* failure to train claim at the outset of this case without these crucial facts, and only with "naked assertions." *Bell Atlantic Corp v. Twombly,* 550 U.S. 544, 557 (2007).

Finally, Plaintiff has properly and sufficiently alleged a *Monell* claim based on a failure to train. Defendants mistakenly reference case law that focuses on pattern and practice claims. These cases are irrelevant. The facts supporting the *Monell* claim in this matter are plain: there was a known risk of Sheriff employees violating the law; therefore, policy 1.05 directed all ACSO employees what to do when such violations of the law were suspected; Sheriff Reid did not train on this policy – as was done by his predecessor; Ray Kifer Jr. suffered the known harm as a result of this failure to train. It is for a jury to decide whether Reid's policy of relying on "common sense" rather than training demonstrates such deliberate indifference to the harm that

would likely result from the failure to train that Anson County should be held liable.

**G.      The State Tort Claims Should Not be Dismissed**

In their discussion of Plaintiff's state tort claims, Defendants mischaracterize the allegations properly pled in the Amended Complaint and ignore facts established in discovery. Plaintiff will briefly address Defendants' arguments in the order in which they are made.

First, contrary to Defendant's argument, Plaintiff's tort claim against Sheriff Reid's estate is not based upon Reid's involvement in Plaintiff's stop or arrest. Rather, it is based upon Reid's grossly negligent and reckless conduct in failing to require his subordinates to read the Policy and Procedure Manual *and* in failing to require that they be trained with regard to how to proceed if they suspected that a fellow officer had planted drugs on an innocent person.

Next, Defendants' argument that Plaintiff's state false arrest claims against them should be dismissed fails for the same reasons as set forth in response to their motion for summary judgment on the parallel federal claim.

Third, Defendants' public official immunity defense fails because a jury is entitled to determine if their conduct was "so reckless or so manifestly indifferent to the consequences…to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent." *Foster v. Hyman*, 197 N.C. 189, 192, 148 S.E. 36, 38 (1929).

Finally, Defendants misapply the public duty doctrine. The public duty doctrine provides protection for governmental bodies and for officers *sued in their official capacity*. It is not a barrier to a lawsuit against someone in that person's individual capacity. *Murray v. County of Person*, 191 N.C. App. 575 (2008). Moreover, the public duty doctrine is limited in scope. It is a barrier to lawsuits for failure of the law enforcement agency to protect the plaintiff from harm by third parties. It is not a barrier to lawsuits for harm caused directly to citizens by members of the public

agency. *Smith v. Jackson County Bd. of Educ.*, 168 N.C. App. 452 (2005).

**Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be summarily denied.

Respectfully submitted this 10th day of February, 2023.

/s/ Sonya Pfeiffer
Sonya Pfeiffer, NC Bar No. 37300
David Rudolf, NC Bar No.:  8587
Joseph Lattimore, NC Bar No.: 46910
Rudolf Widenhouse
225 East Worthington Ave.
Charlotte, NC 28203
704-333-9945
Fax: 704-335-0224
Email: spfeiffer@rudolfwidenhouse.com
dsrudolf@rudolfwidenhouse.com
jlattimore@rudolfwidenhouse.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished on

February 10, 2023 to the following CM/ECF electronic notice parties via CM/ECF:


Sean Perrin
Sean.perrin@wbd-us.com
Attorney for Defendants J. Beam, K. Beam, D. Spencer
and J. Williams

Scott MacLatchie
smaclatchie@hallboothsmith.com
Attorney for David Burroughs


/s/ Sonya Pfeiffer
Sonya Pfeiffer