**Exhibit**

**F**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 3:21-CV 39


RAY KIFER, JR.                    )
                                  )
                  Plaintiff,      )
                                  )
      vs.                         )
                                  )
DAVID SCOTT BURROUGHS, ET AL.     )
                                  )
                  Defendants.     )
                                  )
--------------------------------

---

VIDEO CONFERENCE DEPOSITION
OF
RAY KIFER, JR.

---


TAKEN VIA VIDEO CONFERENCE AT THE OFFICES OF:
CHAPLIN AND ASSOCIATES, INC.
132 JOE KNOX AVENUE, SUITE 100-G
MOORESVILLE, NC 28117


03-30-22
10:09 O'CLOCK A.M.

---

Gretchen Wells
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

2

REMOTE APPEARANCES

FOR THE PLAINTIFF RAY KIFER, JR.:
    Sonya Pfeiffer, Esquire
    Joseph P. Lattimore, Esquire
    RUDOLF WIDENHOUSE
    225 East Worthington Avenue, Suite 100
    Charlotte, NC 28203
    spfeiffer@rudolfwidenhouse.com
    drudolf@rudolfwidenhouse.com

FOR THE DEFENDANTS DAVID SPENCER, KYLE
BEAM, JOSH BEAM AND JIMMY WILLIAMS:

    Sean F. Perrin, Esquire
    WOMBLE BOND DICKINSON (US), LLP
    301 South College Street, Suite 3500
    Charlotte, NC 28202
    Sean.Perrin@wbd-us.com

FOR THE DEFENDANT DAVID SCOTT BURROUGHS:

    Scott MacLatchie, Esquire
    HALL BOOTH SMITH, P.C.
    11215 North Community House Road
    Suite 750
    Charlotte, NC 28277
    smaclatchie@hallboothsmith.com

    OTHER APPEARANCES

    Suzette Woolsey, Rudolf Widenhouse
    Jimmy Williams
    Josh Beam

---

4

STIPULATIONS

    Pursuant to Notice and/or consent of the parties,
the deposition hereon captioned was conducted at the
time and location indicated and was conducted before
Gretchen Wells, Notary Public in and for the County of
Iredell, State of North Carolina at Large.

    Notice and/or defect in Notice of time, place,
purpose and method of taking the deposition was waived.
Formalities with regard to sealing and filing the
deposition were waived, and it is stipulated that the
original transcript, upon being certified by the
undersigned court reporter, shall be made available for
use in accordance with the applicable rules as amended.

    It is stipulated that objections to questions
and motions to strike answers are reserved until the
testimony, or any part thereof, is offered for evidence,
except that objection to the form of any question shall
be noted herein at the time of the taking of the
testimony.

    Reading and signing of the testimony was requested
prior to the filing of same for use as permitted by
applicable rule(s).

---

3

I N D E X

STIPULATIONS                                        4
EXAMINATION
    By Mr. Perrin                                   6
    By Ms. Pfeiffer                               108

ADJOURNMENT                                       112
REPORTER CERTIFICATE                              113
WITNESS CERTIFICATION                             114
WITNESS ADDENDUM                                  115

            E X H I B I T S

Name              Offered By        Identified

Exhibit A         All parties            5
  (Declaration of Deponent)

Exhibit 1         Mr. Perrin            90
  (Mercy Health records)

Exhibit 2         Mr. Perrin            94
  (CPG records)

Exhibit 3         Mr. Perrin           101
  (SBI statement)

NOTE: Quoted material has been reproduced as read or
quoted by the speaker.

---

5

PROCEEDINGS
1       (10:09 o'clock a.m.)
2           THE COURT REPORTER:  The attorneys
3  participating in this proceeding acknowledge that I am
4  not physically present in the proceeding room and that
5  I will be reporting this proceeding remotely.
6           They further acknowledge that in lieu of
7  swearing in the witness, the witness has signed a
8  Declaration of Deponent which will be attached to this
9  transcript as Exhibit A.
10          (DEPOSITION EXHIBIT
11          LETTER A WAS MARKED
12          FOR IDENTIFICATION)
13          The parties and their counsel consent to
14 this arrangement and waive any objections to this
15 manner of reporting.  Please indicate your agreement
16 by stating your name and your agreement on the record.
17 Also, please indicate on the record all parties
18 present in the room with you.
19          MS. PFEIFFER:  This is Sonya Pfeiffer,
20 attorney for the plaintiff, and I agree.
21          MR. PERRIN:  This is Sean Perrin,
22 attorney for David Spencer, Josh Beam, Kyle Beam, and
23 Jimmy Williams, and I concur, too.
24          MR. MACLATCHIE:  Scott MacLatchie,

6

1 attorney for David Burroughs. So stipulated.
2        THE COURT REPORTER: Mr. Lattimore?
3        MR. LATTIMORE: Yes. Attorney Joseph
4 P. Lattimore on behalf of the plaintiff. I also
5 concur.
6        THE COURT REPORTER: And Mr. Beam?
7        MR. PERRIN: He -- he's a defendant.
8 Does he need to ---
9        THE COURT REPORTER: Just if there's
10 anyone in the room with him or ---
11        MR. PERRIN: Okay.
12        THE COURT REPORTER: --- if you guys
13 don't ---
14        MR. PERRIN: Josh, are you there?
15        MR. BEAM: Can you hear me?
16        MR. PERRIN: Is anyone in the room with
17 you?
18        MR. BEAM: Jimmy Williams.
19        THE COURT REPORTER: Thank you. We can
20 begin.
21        The witness, RAY KIFER, JR., under the
22 penalty of perjury, testifies as follows:
23               EXAMINATION
24 BY MR. PERRIN:
25    Q.  Sir, would you please state your name?

7

1    A.  My name is Raymond Kifer.
2    Q.  Hey, Mr. Kifer. I'm Sean Perrin. I
3 represent some of the defendants in this case. Mr.
4 MacLatchie, who you can see on the screen, represents
5 David Burroughs. Have you ever taken or given a --
6 excuse me, have you ever given a deposition before,
7 Mr. Kifer?
8    A.  No.
9    Q.  No?
10    A.  No.
11    Q.  If you could -- well, you understand that
12 this testimony is under oath?
13    A.  Yes.
14    Q.  And if for some reason you don't understand
15 my question, please ask me to repeat it. Sometimes
16 lawyers, me included, ask questions which make no
17 sense. Please just ask me to repeat it, and I'll try
18 to do that, okay?
19    A.  Okay.
20    Q.  You're doing a real good job now. If you
21 could answer audibly, like yes or no, versus a shake
22 of the head because the court reporter, Gretchen, is
23 taking down what I say and what you say. And she
24 can't down a shake of the head. Is that okay?
25    A.  Okay.

8

1    Q.  If for whatever reason, Mr. Kifer, you need
2 a break, I don't care what the reason is, just tell
3 me. I'll be happy to a break. I don't think this
4 will last very long. But if you just want to say,
5 "Hey, Sean, I need a break," be happy to a break.
6 Okay?
7    A.  Yes, sir.
8    Q.  And, Mr. Kifer, can you just tell me, sir, a
9 little bit -- what I'm going do, I'm going to ask you
10 about your background, about your family, education,
11 employment, things like that, and then get into what
12 happened on March 7th, 2018. So let me just start by
13 asking you -- tell me a little bit about yourself, Mr.
14 Kifer.
15    A.  I am a -- I'm a father of two. I have --
16 with my fiancé, which is Yajyuam Lela Vang. I do
17 currently work. I am renting my own house, trying to
18 save up to buy my own.
19    Q.  And how old and what are the names of your
20 children, Mr. Kifer?
21    A.  My son, he is -- just turned three. His
22 name is Mason.
23    Q.  Okay.
24    A.  And my daughter, she is one, her name is
25 Nova.

9

1    Q.  N-o-v-a?
2    A.  Yes, sir.
3    Q.  Okay. And you and Ms. Vang are not married
4 but you're engaged, I think you said. Is that right?
5    A.  Correct. Not in -- not legally in the
6 United States, but in her culture we are considered
7 married.
8    Q.  Okay. And what culture is that?
9    A.  Hmong.
10    Q.  That's H-m-o-n-g?
11    A.  Yes, sir.
12    Q.  And you mentioned, Mr. Kifer, that you're
13 working. Where are you working now, sir?
14    A.  Medical Specialties in Wadesboro.
15    Q.  And what are you doing for Medical
16 Specialties in Wadesboro?
17    A.  I do assembly for -- for wrist braces.
18    Q.  Like the -- like, if you fall and break your
19 wrist or hurt your wrist for some reason, you -- they
20 -- Medical Specialties makes that brace? Is that
21 right?
22    A.  Yes, sir.
23    Q.  Okay. And how long, sir, have you been
24 working there?
25    A.  I've been there since November of last year.

10

1    Q.   Of '21?
2    A.   Yes, sir.
3    Q.   On the day in question, the -- well, the
4  incident occurred on March 7th, 2018.  Is that
5  correct?
6    A.   Yes, sir.
7    Q.   Were you employed at that time?
8    A.   Not at that time, no, sir.
9    Q.   Okay.  And I recall looking at the video.  I
10 know you gave an interview, about an hour interview,
11 to Mr. Williams and Mr. Beam and a -- and a Homeland
12 Security agent.  Do you recall doing that?
13   A.   Yes, sir.
14   Q.   And you mentioned, I think at one point,
15 they had -- you had an interview at 10 a.m. the next
16 morning at Premiere Fibers.  Do you remember
17 mentioning that?
18   A.   Yes, sir.
19   Q.   Did you go to that interview, Mr. Kifer?
20   A.   I did.
21   Q.   Okay.  Did you get that job?
22   A.   I did.
23   Q.   Okay.  All right.  Let me -- and I'm not --
24 I'm really not trying to be intrusive, but I just --
25 you know, in case we pick a jury, I'm going to need to

11

1  know sort of your family in North Carolina,
2  particularly in, you know, Wadesboro east -- or west,
3  rather, to Charlotte.  Tell me what you family you
4  have, Mr. Kifer, from Wadesboro to Charlotte, let's
5  say.
6    A.   I have my father.  His name is Raymond Kifer
7  as well.  I'm a junior.
8    Q.   Okay.
9    A.   And then I have my sister.  Her name is
10 Renee Kifer.
11   Q.   All right.
12   A.   I have my stepmother.  Her name is Lorraine
13 Hannah.
14   Q.   Okay.
15   A.   And I also have my stepbrother, which is
16 Jordan Hannah, and my stepsister, and her name is
17 Jessica.  I -- I think she just married, but it used
18 to be -- it used to be Steele.
19   Q.   Is Jessica Lorraine's daughter?
20   A.   Yes.
21   Q.   Okay.  And any -- any other step siblings or
22 biological siblings?
23   A.   I -- I have a stepfather, but he's disabled.
24 His name is Lee Rushing.
25   Q.   And what's your mom's name?

12

1    A.   Melanie Green.
2    Q.   Is Mr. Rushing -- Mr. Rushing and your mom
3  are married?
4    A.   They've -- they've separated.  They're no
5  longer together.
6    Q.   Okay.  And tell me -- and I don't really
7  need a whole lot of detail.  What does your dad --
8  does your dad work in Wadesboro or in North Carolina?
9    A.   Actually, he works in Cheraw, South
10 Carolina.
11   Q.   Okay.  And how about Lorraine Hannah?
12   A.   Yes.  She works at the same facility I do,
13 Medical Specialties.
14   Q.   Okay.  And how about Jordan Hannah?
15   A.   He does work.  I'm not sure exactly where it
16 is.
17   Q.   Okay.  Does he work in North Carolina, or is
18 he also in Cheraw?
19   A.   I -- I -- I believe it's in North Carolina.
20   Q.   Okay.  And how about Jessica?
21   A.   She does work.  She works in Polkton, North
22 Carolina.
23   Q.   Do you know what she does?
24   A.   She owns a restaurant.
25   Q.   What's the name of the restaurant?

13

1    A.   It's called Crazy J's Diner.
2    Q.   And how about Renee, your sister?
3    A.   Yes, sir.  She also works at the same
4  facility as me, Medical Specialties.
5    Q.   Is Renee married?
6    A.   She's engaged.
7    Q.   What's her fiance's name?
8    A.   His name is Benjamin Oxendine (ph).
9    Q.   And does Mr. Oxendine also work at that same
10 Medical Specialties facility or somewhere else?
11   A.   No, sir.  He works in -- I believe it's
12 Cheraw, South Carolina --
13   Q.   And I think you see Lee Rushing is disabled.
14 Is that correct?
15   A.   Yes, sir.
16   Q.   And how about your mom, Melanie, is she
17 working anywhere?
18   A.   Not here in North Carolina, but she is
19 working.
20   Q.   In Cheraw or somewhere in South Carolina?
21   A.   No, sir.  She's in Ohio.
22   Q.   Oh, okay.  Mr. Kifer, thank you.  Do you --
23 were you born in Anson County?
24   A.   No, sir.
25   Q.   Where were you born?

14

1    A.   Warren, Ohio.
2    Q.   All right.  And, at some point, did you move
3 to Anson County?
4    A.   Yes, sir.
5    Q.   When did you move to Anson County?
6    A.   When I was six years old.  I believe it was
7 1998.
8    Q.   All right.  And who did you move here with?
9    A.   My mother and my father, and my sister was
10 in my mother's belly at the time.
11    Q.   Okay.  Got you.  When did your parents split
12 up?
13    A.   When I was seven, so the following year.
14    Q.   Okay.  And did you go to high school in
15 Wadesboro?
16    A.   I went to early college in Polkton, North
17 Carolina.
18    Q.   All right.  And did you graduate from early
19 college in Polkton?
20    A.   Yes, sir.
21    Q.   What year and what school, sir?
22    A.   2011, and the school was named Anson County
23 Early College.
24    Q.   Any -- any education, Mr. Kifer, after that?
25 Any community college or anything else after that?

15

1    A.   No, sir.
2    Q.   All right.  When did you first -- and I'm
3 going to call your fiancé Lela.  Is that okay?
4    A.   That's fine.  That's what she prefers.
5    Q.   Okay.  And I would try to pronounce her
6 first name, but to be honest with you, I would -- it
7 would not go well.  So Lela, when did you first meet
8 Lela?
9    A.   I first met her in my ten -- my -- I believe
10 it was 2010.  It was at early college.
11    Q.   Okay.  She went to the same school?
12    A.   Yes, sir.
13    Q.   Was she in your year or grade or?
14    A.   She was two grades underneath me.
15    Q.   Okay.  And did you all ever date in high
16 school, or was it just more of a -- like, a social
17 sort of friend thing?
18    A.   We -- we did date for just a little while.
19    Q.   Okay.  And I assume that -- how long did
20 that last?
21    A.   I think maybe just a few months.
22    Q.   And did you maintain contact with her?  I
23 know you all reconnected back in 2018.  But from,
24 let's say, 2010, you all broke up after a couple
25 months, did you all remain in contact until 2018?

16

1    A.   Just here and there, just, "Hey, how are you
2 doing, what are you up to?"
3    Q.   Okay.  But nothing romantic from, I guess,
4 2010 until '18?
5    A.   No.
6    Q.   Okay.  And same question, did you know,
7 either in high school or before, the events in
8 question which occurred on March 7th, 2018, David
9 Spencer?
10    A.   No, sir.
11    Q.   Okay.  And how about Kyle Beam?
12    A.   Yes, sir.
13    Q.   And how did you know Kyle Beam?
14    A.   My -- through my mother and my stepfather.
15    Q.   And was -- were they friends with Kyle, or
16 Kyle's mom and dad, or what -- how does that work?
17    A.   They were friends with -- oh, oh, I'm sorry.
18 I'm sorry.  I was thinking of Josh Beam.  I apologize.
19    Q.   Okay.  No, that's fine.  So Kyle you
20 didn't ---
21    A.   No, sir.
22    Q.   Okay.  And now about Josh, what about Josh?
23    A.   Yes, sir.
24    Q.   Your mom and stepdad knew his family or?
25    A.   They -- they were friends with him and, I'm

17

1 guessing now his ex-wife, Jamie.
2    Q.   Okay.  Prior -- I mean -- well, did you ever
3 socialize with Josh Beam as a result of that
4 relationship that your mom and stepdad had with his
5 family?
6    A.   Yes.  We've been over at their houses.
7    Q.   And how many times would you say you've been
8 over at Josh or -- well, let me ask this.  Was it
9 Josh's house or his family's house?
10    A.   I'm -- I'm guessing it was Josh's house.
11    Q.   Okay.
12    A.   It was where him and his ex-wife, or wife,
13 lived with their -- with their children.
14    Q.   And how often, Mr. Kifer, would you go over
15 there?
16    A.   I can't really recall how often.  I -- they
17 were friends for years.
18    Q.   Okay.  I mean, would it be a -- like a -- go
19 over for, like, a -- sort of a barbecue gathering, or
20 something more than that?  Or was it...
21    A.   Right.  Barbecue gathering, Halloween party,
22 Superbowl party, things of that nature.
23    Q.   Have you ever been married before, Mr.
24 Kifer?
25    A.   No, sir.

18

1    Q.  Any children other than the two you have
2  with Ms. Vang?
3    **A.  No, sir.**
4    Q.  Okay.  And how about Jimmy Williams?  Same
5  question about Jimmy.  Did you know Jimmy Williams
6  before or ever run into him before March 7th, 2018?
7    **A.  Yes, sir.**
8    Q.  And how is that, sir?
9    **A.  I was friends with his stepson.  I -- I**
10  **called him Joey.  I think his official name was**
11  **Robert.**
12    Q.  And what's Robert's last name?
13    **A.  I believe it's Sears.**
14    Q.  S-e-a-r-s?
15    **A.  Yes, sir.**
16    Q.  Okay.  And did Mr. Sears go to Anson County
17  Early College with you, or did you know him through
18  somewhere else?
19    **A.  Through elementary school, Lilesville**
20  **Elementary School.**
21    Q.  Okay.  And did you maintain friendship with
22  Mr. Sears throughout your adulthood, or, I mean, how
23  does that -- how did that work?
24    **A.  No, sir.  He ended up moving to Burnsville,**
25  **North Carolina, and that's where we lost touch.**

19

1    Q.  Okay.  And did you ever go or -- I know you
2  said you went over to Josh's house.  Did you ever go
3  over to Jimmy's house to see Mr. Sears or anything
4  like that?
5    **A.  Yes, sir.**
6    Q.  And how often would you do that?
7    **A.  Not very often, just a handful of times.**
8    Q.  Okay.  And when's the last time you went
9  over -- let me start with Jimmy's house.  When was the
10  last time you went over to Jimmy's house that you can
11  recall?
12    **A.  I can't recall the year.  It -- it was**
13  **elementary school.**
14    Q.  Okay.  And how about -- and same question
15  with Josh.  I guess Josh is a little bit more recent
16  than Jimmy's?
17    **A.  Not necessarily.  It was -- it was when I**
18  **was a -- a kid, so it was around the same time.**
19    Q.  Okay.  And I should have asked you this.
20  How old are you now, Mr. Kifer?
21    **A.  I am 29 years old.**
22    Q.  Okay.  And I think you mentioned -- well, I
23  think earlier you said you live at Lakeview Drive in
24  Wadesboro.  Is that correct?
25    **A.  Yes, sir.**

20

1    Q.  And who are you living there with, Mr.
2  Kifer?
3    **A.  With my fiancé, Lela Vang, and also our two**
4  **children, Mason and Nova.**
5    Q.  Okay.  And how long have you lived there at
6  that particular address?
7    **A.  Since January of 2022.**
8    Q.  Okay.  You -- you -- I know you recall
9  submitting some, what they're called, Responses to
10  Interrogatories to us.  Do you remember doing that?
11    **A.  Yes.**
12    Q.  It was questions we essentially asked you,
13  and you responded to them.  And it looks like you
14  moved back -- you lived in Ohio, it says, right, from
15  August of '19 to March of 2021.  Is that correct?
16    **A.  Yes, sir.**
17    Q.  And what was the reason that you moved back
18  from Ohio in, I guess, March of 2021?
19    **A.  Our landlord that we were renting from at**
20  **the time did not want to rent his house anymore.  He**
21  **wanted to sell it.  And we didn't have enough savings**
22  **to be able to find another home, let alone the time to**
23  **find another home.**
24    Q.  Okay.  And so when you moved back, I think
25  you moved back with Lela's family.  Is that correct?

21

1    **A.  Yes, sir.**
2    Q.  And I'm just going to name some names here,
3  and just tell me who they are so I know.
4    **A.  Okay.**
5    Q.  It looks like, at least according to your
6  responses, from March 2021 until, I guess, June of
7  2021, you lived at 1603 Highway 218, Polkton, North
8  Carolina.  Is that correct?
9    **A.  Yes, sir.**
10    Q.  And did you live at that address until
11  January of 22 -- January of 2022 when you moved to the
12  Lakeview Drive address?
13    **A.  No, sir.**
14    Q.  All right.  Tell me, when you moved back to
15  North Carolina, you went to the Polkton, North
16  Carolina address.  Where did you move after that?
17    **A.  I moved in with my father and my stepmother**
18  **in Wadesboro, North Carolina.**
19    Q.  Okay.  And how long did you live with your
20  dad and your stepmom?
21    **A.  Maybe two months.**
22    Q.  And is that when you moved into -- to the
23  Lakeview Drive address?
24    **A.  Yes, sir.**
25    Q.  Okay.  I'm just going to read some names,

---

22

1 Mr. Kifer, just tell me who they are, if you could.
2 Let's see, Pheng, P-h-e-n-g, Vang?
3    **A. Oh, okay. That's Pheng Vang. That is**
4 **Lela's father.**
5    Q. Okay. And Mayo, M-a-y-o (sic) Vang?
6    **A. Oh, Mayko Vang, that is Lela's mother.**
7    Q. Okay. Chuck, and it's Her, H-e-r?
8    **A. That is Lela's oldest sister's husband.**
9    Q. And I'm going to just spell this, P-a-j-h-a
10 Vang?
11    **A. Pajha Vang, that is Lela's oldest sister.**
12    Q. Okay. Hazelynn, H-a-z-e-l-y-n-n Her?
13    **A. That is Pajha and Chuck's daughter.**
14    Q. And Wisdom, I guess, is a daughter, too, or
15 son?
16    **A. A son.**
17    Q. Okay. And Clever is?
18    **A. A son as well.**
19    Q. And how about Alex Vang?
20    **A. Alex Vang is Lela's brother.**
21    Q. Okay. Thank you, sir. When did you -- Mr.
22 Kifer, when did you and Lela start dating? And I
23 should say the second time, not in -- not in high
24 school.
25    **A. We started dating February of 2018.**

---

23

1    Q. And I don't really want a whole love story,
2 but just tell me how you all reconnected, if you will.
3    **A. Okay. I ended a relationship of mine.**
4    Q. Okay.
5    **A. Found myself. And just one night, I just**
6 **happened to message her and just ask her how she was**
7 **doing. And she told me that she was in a toxic**
8 **relationship, and I told her about how mine was. And**
9 **we just stayed friends for -- up until February, and**
10 **we decided to date.**
11    Q. Okay. And when was that? Do you remember
12 when that message -- the initial messaging occurred?
13 I know you all started -- you reconnected, I guess,
14 officially in February of '18. But do you remember
15 when that messaging was?
16    **A. To just say hello was -- I -- I don't**
17 **necessarily know when in January, but it was in**
18 **January of 20 ---**
19    Q. Okay. And what did you know about, if
20 anything, who Ms. Vang was dating at the time? When
21 you -- when she said, "Hey, I'm in a toxic
22 relationship," did you know who she was dating or
23 anything like that?
24    **A. No, sir.**
25    Q. Did you ultimately find out she was dating,

---

24

1 or at least had dated, David Burroughs?
2    **A. After it was over.**
3    Q. Okay. And tell me how you found out about
4 that.
5    **A. Basically just asking.**
6    Q. Okay. Asking Lela?
7    **A. Yes, sir.**
8    Q. And so let me -- let me kind of -- if you
9 all started -- if this incident occurred March 7th of
10 '18, you all were together about a month before this
11 incident occurring? Is that approximately right?
12    **A. Yes, sir. Close to it.**
13    Q. Okay. And were you all living together
14 during that month period, or were you living in
15 separate residences?
16    **A. I was -- I was staying with her at the time.**
17    Q. Okay. And let me ask you, prior to March
18 7th, 2018, did David Burroughs ever threaten you with,
19 you know, "I'm going to kick your ass," or anything,
20 you know, about your relationship with Lela?
21    **A. Not directly to me.**
22    Q. All right. Which leads me to my next
23 question which is, did he do it indirectly?
24    **A. Yes, sir.**
25    Q. And tell me, Mr. Kifer, how he did that

---

25

1 indirectly.
2    **A. He -- basically, he told Lela that that's**
3 **what he was going to do to me.**
4    Q. All right. And do you remember -- and I
5 know you paraphrased, and I appreciate that. Do you
6 have any idea what his exact words to Lela were about,
7 like, "Going to kill you," "Going to" -- I mean -- I'm
8 not -- I'm really not trying to make a joking matter
9 of this, but if you could be more descriptive of what
10 exactly Lela conveyed to you that David told her.
11    **A. From what Lela told me, his exact words**
12 **were, "Wow, he really has the balls to show up here.**
13 **He's lucky I don't get out of this car and kick his**
14 **ass."**
15    Q. All right. And that -- I -- I remember
16 reading, at one point, Mr. Burroughs came to Lela's
17 house when you were perhaps in your car, maybe? Is
18 that the incident that -- that sort of precipitated
19 him saying this?
20    **A. He showed up at her mother's house -- well,**
21 **her parents' house. Yes, sir.**
22    Q. Was she living -- were you all living at her
23 parents' house at the time?
24    **A. No, sir.**
25    Q. And were you present at the parents' house

---

26

1 when Mr. Burroughs came?
2    A.  I showed up a little after he did.
3    Q.  Okay.  So he was -- was he in his patrol car
4 or personal car?
5    A.  He was in his patrol car.
6    Q.  All right.  And do you remember, in relation
7 to, you know, March 7th, was that -- I'm assuming it
8 was earlier than that, but how -- what time frame?  Do
9 you recall when that occurred?
10    A.  I don't remember the date, but I would say
11 that it was just a few weeks prior to March 7th.
12    Q.  And did you all, being you and Mr.
13 Burroughs, have any words?  Or did you -- or was it
14 just words conveyed to Lela directed towards you?
15    A.  Just words conveyed to Lela directed towards
16 me.
17    Q.  Did Mr. Burroughs say anything to you,
18 either give you the finger, hello, how are you, or
19 just said nothing?
20    A.  He said nothing.  He would just stare at me.
21    Q.  And were you in the -- were you in the -- I
22 think you told me this, and I apologize, but were you
23 in the car, Mr. Kifer, at the time, or were you out in
24 the yard or in the house?
25    A.  I got out of my car, but I stood right next

27

1 to it because I didn't want to escalate the situation.
2    Q.  All right.  And how long were you there
3 before Mr. Burroughs left, do you recall?
4    A.  Maybe 15 to 25 minutes.
5    Q.  Okay.  And you just stood at your car while
6 he and Lela were talking?
7    A.  Yes.  I stood at my car for maybe five to
8 ten.  And then Lela told me to just get back into his
9 car -- to get back into my car because that's when he
10 -- that's when he told her that he was going to kick
11 my ass.
12    Q.  And at that time, I assume you knew he was
13 an Anson County Sheriff's Deputy?
14    A.  Yes, sir.
15    Q.  Did you ever tell anybody associated with
16 Anson County Sheriff's Office that a deputy had
17 threatened to -- I mean, you know, a deputy had
18 threatened to kick your ass, I guess?  Did you ever
19 tell anybody that?
20    A.  No, sir.
21    Q.  Okay.  And did you have any other
22 interactions with Mr. Burroughs after that?  And,
23 again, I'm excluding -- let's -- let's go from that
24 time period to March 7th.  But after this incident
25 until March 7th, did you have any interactions with

28

1 Mr. Burroughs?
2    A.  He showed up at the -- at Lela's house that
3 she was staying in to pick up some of ths things.  No
4 words were exchanged, just stared at me for a while.
5 And then we started seeing him back and forth driving
6 in the town of Polkton.
7    Q.  And, I'm sorry, I think you fade -- or one
8 of us faded.  In the town of Polkton?
9    A.  Yes, sir.
10    Q.  Were -- by your house, or by where you ---
11    A.  On that road -- I'm sorry, on 218 ---
12    Q.  No, I'm sorry.  I'm sorry, where?
13    A.  On -- on Highway 218.  That's where the
14 house is located.
15    Q.  And how many times would you see Mr.
16 Burroughs drive by that -- that road?
17    A.  It was about four or five times.
18    Q.  And that -- that's -- that road is in Anson
19 County?
20    A.  Yes, sir.
21    Q.  Did you ever -- let me ask this.  The time
22 he showed up at Lela's house and stared at you, did he
23 say anything to you?
24    A.  No, sir.
25    Q.  Did he say anything to Lela about, "I'm

29

1 going to get Ray," or anything like that?
2    A.  Not that I know of.
3    Q.  Okay.  And she never told you about
4 anything?
5    A.  No, sir.
6    Q.  And about driving by the road, did he, you
7 know, give you the finger when he drove by?  Did he
8 just drive by?  I mean, tell me about that.
9    A.  I -- I never really actually noticed him
10 until, basically, he was already gone.  I just
11 happened to see his face, but I -- I did not see any
12 gesture.
13    Q.  Okay.  And those -- those -- well, let me
14 ask you this.  Did him driving by the four to five
15 times make you cautious in any way?  I mean, did it
16 sort of give you pause to think, "Hmm, why is Mr.
17 Burroughs -- why is David driving by the house?"
18    A.  Yes, sir.
19    Q.  All right.  And why is that?
20    A.  It just didn't quite make sense on seeing
21 him so many times, especially after the -- the
22 hostility.
23    Q.  Okay.  And do you know whether or not that
24 area is an area he routinely patrols?
25    A.  No, sir.  I have no idea where he was

30

1 supposed to patrol.
2    Q.  Any other -- Mr. Kifer, any other incidents
3 you recall prior to March 7th where, you know, David
4 Burroughs either drove by your house or showed up at
5 Lela's house, other than what you've just told us?
6    A.  No, sir.
7    Q.  All right.  Let me ask this question.  Did
8 you -- I know we talked about David Burroughs, but did
9 -- did David Spencer, Kyle Beam, Josh Beam, or Jimmy
10 Williams ever drive by your house, or ever show up at
11 Lela's house, or do anything which you would consider
12 perhaps intimidating to you?
13   A.  No, sir.
14   Q.  Did Lela ever tell you, prior to March 7th,
15 "Hey, Ray, watch out for," you know, "David Spencer,
16 Jimmy Williams, Josh Beam, or Kyle Beam," or anything
17 just for her to put you on notice that perhaps they
18 were coming after you?
19   A.  Not their names specifically, no.  No, sir.
20   Q.  And what -- any other names that she gave
21 you?
22   A.  She didn't give me any names, she just
23 basically said that we needed to watch our back.
24   Q.  And did she elaborate on that?
25   A.  When I asked her, it was more of the whole

31

1 brother-in-blue code that you hear about; officers
2 stick up for other officers.
3    Q.  You were aware that -- that the elected
4 sheriff of Anson County, Landric Reid, actually is the
5 one who referred Mr. Burroughs to the State Bureau of
6 Investigations, right?
7    A.  I -- I -- I wasn't sure how that got over to
8 the state.
9    Q.  All right.  And you're aware that Josh Beam
10 and Jimmy Williams were actually part of that group
11 who referred Mr. Burroughs to the State Bureau of
12 Investigations?  Are you aware of that?
13   A.  I am not.
14   Q.  Okay.  If that's true, that would not
15 necessarily be a brother-in-blue situation, would it?
16       MS. PFEIFFER:  Objection.  You can
17 answer.
18       THE WITNESS:  I can answer?
19       MS. PFEIFFER:  You can answer.
20       THE WITNESS:  Oh, okay.  I'm sorry.  I
21 -- I don't know because I'm not a police officer or
22 affiliated with them.
23   Q.  (Mr. Perrin)  Okay.  Did Lela ever tell you
24 anything else, Mr. Kifer, other than, you know, watch
25 our backs, sort of the brother-in-blue thing?

32

1    A.  No, sir.
2    Q.  Okay.  Did Lela ever tell you -- there's a
3 couple names that I'll just mention to you that have
4 been in the discovery.  First is Darius, D-a-r-i-u-s,
5 Ellison, E-l-l-i-s-o-n, he was formally with the
6 sheriff's office.  Did Lela ever mention, "Watch out
7 for Mr. Ellison?"
8    A.  Not necessarily to watch out for him, but I
9 heard that he was David's best friend or partner in --
10 in the department.
11   Q.  And who did you hear that from?
12   A.  Lela.
13   Q.  And did she say that to you after Mr.
14 Burroughs had sort of driven by the house and made
15 those, you know, threats both veiled and stated to
16 you?
17   A.  Yes, that's when I started finding out about
18 Burroughs.
19 (Phone rings)
20       MR. PERRIN:  Sorry about that.  That's
21 one thing I could never figure out on Zoom, how to
22 prevent phone calls, so sorry about that.
23   Q.  (Mr. Perrin)  Let me ask you now, Mr. Kifer,
24 about March 7th, 2018.  That's -- we agree that's the
25 day that you were stopped by David Spencer.  I mean,

33

1 is that -- is that right?
2    A.  Yes, sir.
3    Q.  Okay.  Tell me, sort of, if you could -- and
4 I realize it's been almost four years -- actually more
5 than four years.  But can you tell me sort of about
6 that day, what you did that day, culminating with -- I
7 know you drove Lela to work.  But just describe to me
8 what happened that day.
9    A.  Sorry.  Do you mean before the incident
10 or ---
11   Q.  Yes, sir.  And thanks for asking me to
12 clarify.  That was a poor question.  Yeah.  Just --
13 you got up, and tell me what you did the entire day
14 until you got stopped.
15   A.  Okay.  Lela worked a second shift job, so
16 us getting up was usually around 10 -- 10 a.m.  And we
17 really just lounged around the house.  I -- I kind of
18 just started to research a little bit of the job
19 interview that I had for the next day; what kind of
20 company it was, the position I was going for.  Just to
21 try and get myself ready for that interview.
22   Q.  Yes, sir.  What -- second shift is what time
23 to what time?
24   A.  Her shift started at four.  And she (coughs)
25 -- excuse me.  And she clocked out at 12 a.m.

34

1    Q.   Okay.  And she also worked at Premiere
2 Fibers?
3    A.   Yes, sir.
4    Q.   Which is the -- I think the interview that
5 you had the next morning at ten?
6    A.   Yes, sir.
7    Q.   Okay.  And at some point, did you drive her
8 to work that day?
9    A.   She actually drove my car that day.
10    Q.   Okay.  Were you in the car, too?
11    A.   Yes, sir.  I was in the passenger seat.
12    Q.   Okay.  And what kind of car was that?
13    A.   It's a gray Toyota Corolla Sport, 2012.
14    Q.   All right.  And do you recall what time -- I
15 know she drove, but what time you all left your
16 residence, your house?
17    A.   Usually we would leave in between three or
18 3:30 p.m.
19    Q.   All right.  And how -- give me the amount
20 time -- how long does it take to get to Premiere?
21    A.   I'd say possibly 15 to 20 minutes.
22    Q.   And where is Premiere located?
23    A.   Ansonville, North Carolina.
24    Q.   And do you go on main roads to get there
25 from where you lived at the time, Mr. Kifer, or do you

35

1 go back roads?  How do you get there?
2    A.   It's more of a back road.  It's a -- it's a
3 road that stretches from 218 to Ansonville, called
4 Ansonville-Polkton Road.
5    Q.   And then Premiere is off of Ansonville-
6 Polkton?
7    A.   It's off of 52, Highway 52.
8    Q.   Okay.  So you go Ansonville-Polkton to 52,
9 is that how you get there?
10    A.   Yes, sir
11    Q.   Okay.  And on the way to -- and I realize
12 Lela was driving.  On the way to Premiere, did you
13 notice any sheriff's cars following you or anything
14 unusual that you -- you recall?
15    A.   Yes, sir.
16    Q.   And tell me about that, sir.
17    A.   We were -- we were on our way to -- to her
18 employment.  And -- and I looked in the side mirror
19 and saw a sheriff's vehicle behind us.  And I told
20 her, I said, "Make sure you're going the speed limit.
21 Don't do anything to get us pulled over.  Can't afford
22 a ticket right now."
23         And she looked and she said, "Oh, that's
24 David Spencer."
25    Q.   Okay.  Did you recognize David Spencer?

36

1    A.   No, because I didn't -- I did not know him
2 before that day.
3    Q.   Okay.  Had you heard his name before that
4 day?
5    A.   No.
6    Q.   And I know -- to be fair, I know you heard
7 Darius Ellison's name before that day, right?
8    A.   Yes, sir.
9    Q.   As someone who perhaps was friends with
10 Burroughs and was his partner.  Did you hear any other
11 sheriff's deputies being named as sort of being
12 friends with Mr. Burroughs or partners with him?
13    A.   Not at that time.
14    Q.   Okay.  At a later time?
15    A.   At a later time, I found out that David
16 Spencer, I guess in their rankings, worked underneath
17 David Burroughs.
18    Q.   Okay.  And did Lela tell you that, or did
19 you find that out from somewhere else?
20    A.   Le -- Lela told me that.
21    Q.   Okay.  All right.  And what was your
22 response when Lela said, "Hey, that's David Spencer?"
23    A.   When she said that, I said, "Well -- well,
24 who is that?"
25    Q.   Okay.

37

1    A.   And that's -- that's when she -- that's when
2 she said that he's on David Burroughs' shift.
3    Q.   Okay.  Did she anything, "He's a crook," or
4 "He's" -- you know, I know at one point she -- well,
5 no.  Strike that.
6         I know, at one point, she earlier tells you
7 that Burroughs said he's going to beat your ass.  But
8 did she ever mention, "Hey, watch out for Spencer,
9 he's sort of a bad guy with Burroughs," or anything
10 like that?
11    A.   When we were in the car, she did tell me
12 that we need -- we didn't -- need to make sure that,
13 you know, we follow the rules of the road because he
14 does like to pull people over.
15    Q.   And certainly nothing wrong with that,
16 right?  I mean, that's what law enforcement does?
17         MS. PFEIFFER:  Objection.  You can
18 answer.
19    Q.   (Mr. Perrin)  I mean, I've gotten a lot of
20 tickets myself.  I understand that.  But that's -- I
21 mean, she didn't say anything to you outside of what
22 his job duties are, right?
23    A.   Well, she asked -- well, kind of more of
24 like an outward question, "Why is he tailing us?"
25    Q.   Okay.  And did you have any response for

38

1 that?

2  A.  I -- I said, "Maybe he's just running our
3 plate."

4  Q.  Okay.  And how long was he behind you, do
5 you recall, Mr. Kifer?

6  A.  Not time-wise.  I -- I know distance-wise.

7  Q.  Okay.

8  A.  Sorry.

9  Q.  No, I'm sorry about that.  Distance-wise,
10 how long was that?

11  A.  So when -- when you turn onto Ansonville-
12 Polkton Road, he -- he followed us all the way until
13 you get to Highway 742.  I would say maybe it's around
14 -- in between five to ten miles.

15  Q.  Okay.  And he -- did he ever stop you or
16 anything, stop the car that is?

17  A.  Not at that time.

18  Q.  Okay.  And did he -- how -- was he right
19 behind you or sort of several car lengths back?  I
20 mean, how -- how far was he?

21  A.  He was to the point to where I couldn't see
22 his headlights any more and then he backed -- backed
23 away.

24  Q.  All right.  And you got to -- or Lela drove
25 to Premiere and then she got out of the car and went

39

1 in.  Is that right?

2  A.  She -- she went through the security gate
3 and -- and had a cigarette.

4  Q.  Okay.  And -- and -- in other words, you
5 didn't go in with her, right?  You stayed in the car
6 and drove back.  Is that right?

7  A.  Yes, sir.  But I forgot my keys to her
8 house, so I actually had turned right back around to
9 go and retrieve those.  And then I headed back to --
10 well, I was heading back to the house.

11  Q.  Okay.  So you were going to go back to the
12 house and realized, "Oops, I forgot the keys," and
13 drove back and got the keys from Lela?

14  A.  Yes, sir.

15  Q.  And did she anything at that point, "Hey,
16 Ray, watch out for" -- you know, "Watch out for
17 the sheriff's deputies on the road," or anything like
18 that?

19  A.  She did.  She told me to make sure that I --
20 I drove safe and didn't, you know, speed or anything
21 like that, no reason to get pulled over.

22  Q.  Okay.  And tell me what happened next, Mr.
23 Kifer.

24  A.  After I retrieved the keys, I started to
25 head back to her house.  As I was go ---

40

1  Q.  I'm sorry.  Did you take the same route home
2 -- route back, rather?

3  A.  Yes, sir.

4  Q.  Okay.

5  A.  And as I was on my way back, I -- I --
6 before I even got to 742 -- Highway 742, I saw a
7 sheriff's vehicle running blue lights, coming over the
8 hill pretty quickly.  So I pulled off just to get out
9 of this way and then he pulled in behind me.

10  Q.  Okay.  And give me an idea -- I know you
11 said it was before 742, Mr. Kifer, but give me an idea
12 of either miles or time-wise from the time you left
13 Premiere to the time you were stopped.  Do you know
14 either the time or distance that -- that you traveled?

15  A.  That happened, more than likely, in between
16 five to ten minutes after I had left Premiere.

17  Q.  Okay.  And when you saw the -- well, I
18 assume you pulled over and the sheriff's deputy pulled
19 right behind you?

20  A.  Yes, sir.

21  Q.  And tell me what happened next, Mr. Kifer.

22  A.  He stepped out of his vehicle and asked for
23 my license.  Asked me if I knew why he pulled me over.
24 I said, "No, sir."  And he said that I was speeding.

25  Q.  And prior to him coming into your car, did

41

1 you make a phone call to anybody?

2  A.  I did.  I -- I called Lela right away, and I
3 said -- and I told her that I -- that I had just been
4 pulled over by David Spencer.

5  Q.  All right.  How did you know it was David
6 Spencer who pulled you over?

7  A.  I read his name tag.

8  Q.  So was that phone call made prior to Spencer
9 coming to your car, or after he took your license and
10 went back to his car?

11  A.  After he took my license and went back to
12 his car.

13  Q.  All right.  And what did Lela say to you?

14  A.  She told me to watch everything that he
15 does.

16  Q.  And, I mean, did you watch everything he did
17 after she had told you that?

18  A.  As much as I could.

19  Q.  Okay.  And it's fair to say, then, if you're
20 watching everything that he does, it would have been
21 very difficult for Mr. Spencer to plant anything in
22 your car, right?

23      MS. PFEIFFER:  Objection.  You can
24 answer.

25      THE WITNESS:  Not necessarily.

---

**42**

1   Q.   (Mr. Perrin)  Okay.  And tell me why you say
2   that.
3   **A.   Because when I was placed in the back of his**
4   **vehicle, I couldn't see past his front seat and**
5   **computer.  So I actually could not see what he was**
6   **doing inside of my car clearly.**
7   Q.   Okay.  Are you contending that -- that -- in
8   your Complaint, it sort of implies that Josh Beam is
9   the one who planted the drugs, from the airport.  Are
10  you now contending that you think it may have been
11  David Spencer who planted those, or you don't know?
12  **A.   I'm saying that I don't know.  I don't know**
13  **where they came from.**
14  Q.   Okay.  Were you -- were you speeding, Mr.
15  Kifer?
16  **A.   I didn't feel that I was.  I -- I know when**
17  **the speed limit changes, and, I mean, I try to -- I**
18  **mean, if anything, I go five over the speed limit and**
19  **-- usually because that's -- usually a -- you're not**
20  **going to get pulled over for five over usually, but...**
21  Q.   Yeah, I hear you.  I do the same thing.  So
22  it would be fair to say you were maybe going five
23  miles over the speed limit when Mr. Spencer stopped
24  you?
25  **A.   Yes, sir.**

---

**43**

1   Q.   Okay.  And were you -- one of the citations
2   says that you went left of center.  Do you recall
3   doing that?
4   **A.   No, sir.  I -- I was told why it was, but to**
5   **that...**
6   Q.   Okay.  We may -- I don't know if I heard --
7   so were you going left of center?
8   **A.   No, sir, I wasn't.**
9   Q.   Okay.  And tell me -- so Spencer comes to
10  your car and you see his name tag.  He says, "Do you
11  know why I'm stopping you?"  You say, "No, I don't."
12  And he says, "You were speeding."  And what -- does he
13  ask you for your license or anything?
14  **A.   He asked for my license.**
15  Q.   And you gave it to him?
16  **A.   Yes, sir.**
17  Q.   And then what does he do with that?  Does he
18  go back to his car, or do you have more of a
19  conversation with -- with Mr. Spencer?
20  **A.   No, sir.  He said, "I'll be right back," and**
21  **then he went back to his vehicle.**
22  Q.   And that's, I think, when you said you
23  called Lela?
24  **A.   Yes, sir.**
25  Q.   All right.  And then Lela says, you know,

---

**44**

1   "Watch everything that he does," or that is going on
2   or something to that effect, correct?
3   **A.   Yes, sir.**
4   Q.   Did she say anything else to you, other than
5   that, on the phone call?
6   **A.   No, sir.**
7   Q.   Okay.  Did you say anything to her?
8   **A.   No, sir.  Other than that I would watch what**
9   **he's doing and let her know.**
10  Q.   Did you call anybody else, either maybe your
11  dad or maybe your sister or anything, Mr. Kifer, when
12  David Spencer went back to -- to run your license?
13  **A.   No, sir**
14  Q.   Okay.  Tell me how long Mr. Spencer was back
15  in his patrol car before he came back to your car.
16  **A.   Not very long.  Not -- I would say not even**
17  **five minutes.**
18  Q.   Okay.  And tell me what happens when he
19  comes back.
20  **A.   When he comes back, he says that he can**
21  **smell marijuana in my car.  I said, "No, you can't."**
22  **And he said that he can and asked if I would -- if I**
23  **would step out of the vehicle and asked if he could**
24  **search my vehicle.  And I said, "Yes, sir, you can**
25  **because I don't have anything in there."**

---

**45**

1   Q.   At this point, was any other sheriff's
2   deputies there?  I know Kyle Beam came later, at some
3   point, but was Kyle Beam present, that you can recall,
4   when -- when David asked you consent to search the
5   car?
6   **A.   No, sir.**
7   Q.   And you gave -- to be clear, you gave
8   consent to search the car, correct?
9   **A.   Yes, sir.**
10  Q.   All right.  And were you -- were you
11  searched in any way, Mr. Kifer, after that consent was
12  given, or were you placed somewhere?  Tell me about
13  that.
14  **A.   He asked me if I would stand at the -- at**
15  **the hood of his car.  And then he changed his mind and**
16  **said, "Actually, can you sit in the back seat?"**
17  Q.   Okay.
18  **A.   But no, I was not searched.**
19  Q.   And so did he -- they didn't do a pat down
20  of you or anything?
21  **A.   No, sir.**
22  Q.   Were you cuffed at all during -- you know,
23  when you were put in the back seat of his car?
24  **A.   No, sir.**
25  Q.   All right.  And did he leave the windows

---

46

1  open, or did he close the door, or?
2  **A.  Closed the door.  I was sitting inside.**
3  **Windows were closed as well.**
4  Q.  Okay.  What was the weather?  Was it a cool
5  day?  I know it's March, which, I suppose North
6  Carolina is kind of odd in the weather aspect.  Do you
7  recall if it was cold or hot that day?
8  **A.  I mean, it was warm.**
9  Q.  And tell me -- you were put in the back seat
10  of the patrol car.  Tell me what you observed after
11  you were put in the back seat.
12  **A.  I watched David Spencer search my vehicle.**
13  **Started at the front seat, moved to the back.  And**
14  **then he opened up my trunk and started searching**
15  **there.**
16  Q.  Okay.  And at some point, did another deputy
17  come on the scene?
18  **A.  Yes, sir.**
19  Q.  All right.  And who was that?
20  **A.  That was Kyle Beam.**
21  Q.  And I think you said you -- you had a
22  previous relationship with Josh Beam, but not Kyle.
23  Is that right?
24  **A.  Yes, sir.**
25  Q.  Okay.  And tell me what Kyle Beam did when

47

1  he got to the scene.
2  **A.  He walked over to David Spencer and stood at**
3  **the trunk of my car.**
4  Q.  Okay.  And how long -- how long -- well,
5  strike that.
6      At some point, did -- did either David
7  Spencer or Kyle Beam come back and talk with you when
8  you were in the patrol car?
9  **A.  When they arrested me.**
10  Q.  Okay.  And tell me about that.
11  **A.  So after they were standing at the -- at the**
12  **trunk of my car, they went to the back of Kyle Beam's**
13  **SUV.  I lost sight of them at that point.  And then**
14  **they went back to my car.**
15  **And then that's when they pulled me out of**
16  **the (coughs) -- excuse me.  That's when they pulled me**
17  **out of the car, and that's when they told me that I**
18  **was being arrested.**
19  Q.  Where was Kyle Beam's car?  Was it be -- I
20  know you're in front, Spencer is behind you, I guess.
21  Did Kyle park behind Spencer?
22  **A.  No, sir.  He actually parked in front but**
23  **to the left of my vehicle.**
24  Q.  And how long, Mr. Kifer, was it from the
25  time you sat in the back seat of Spencer's patrol car

48

1  to the time either one of them came back and said,
2  "Hey, you're under arrest?"
3  **A.  I -- I would say -- to be honest, I -- I**
4  **don't know.  I would be guessing at this point.**
5  Q.  All right.  And we do know though that it's
6  around four o'clock because I think you said Lela's
7  shift started at four.  Is that right?
8  **A.  Yes, sir.  It -- it was -- it was four.**
9  Q.  Okay.  So at some time after four is when
10  you were stopped?
11  **A.  Yes, sir.**
12  Q.  Do you recall, sir, you know, approximately
13  what time after four?  Was it 4:30, was it more
14  towards four?
15  **A.  I -- I would say 4:15, 4:20.  I don't**
16  **actually recall.**
17  Q.  Okay.  And tell me what -- what was said to
18  you when they come back to the car and say, "You're
19  under arrest?"  I mean, was it -- did they say
20  anything else other than that?
21  **A.  I asked why I was being arrest -- arrested,**
22  **and Spencer said that he would tell me later.**
23  Q.  Did Kyle Beam ever say anything to you at
24  the scene?
25  **A.  Not that I can recall.**

49

1  Q.  So it was actually Spencer who came.  And
2  did Spencer open the door and say, "You're under
3  arrest," you say, "Why," he says, "I'll tell you
4  later?"
5  **A.  Well, Kyle was right next to him, but he**
6  **just didn't happen to say anything to me.**
7  Q.  Okay.  And what was your response when
8  Spencer said, "Hey, I'll tell you later?"
9  **A.  I was kind of more of in shock.  I didn't**
10  **understand why I was being arrested.**
11  Q.  Did they ever say anything else to you,
12  "Hey, Mr. Kifer, are you a dope dealer," or anything?
13  I mean, anything leading you to understand why you
14  were being arrested?
15  **A.  No.  No, sir.**
16  Q.  Okay.  And at some point, did Jimmy Williams
17  and Josh Beam come to the scene?
18  **A.  Yes, sir.**
19  Q.  And when did they come to the scene?
20  **A.  Not too long after I was arrested.  I don't**
21  **know the specific time.**
22  Q.  Okay.  And tell me what, if anything, Mr.
23  Josh Beam and Jimmy Williams either said or did when
24  they got there.
25  **A.  I actually don't know.  I -- I was inside**

50

1 the car. I -- I couldn't hear them outside of it.
2    Q. Okay. You were inside David -- David
3 Spencer's car or Josh and Jimmy's car?
4    **A. I was still in the back of David Spencer's**
5 **car.**
6    Q. Okay. And who -- at some point, I ex -- I
7 suspect you were taken out of that car. Is that
8 right?
9    **A. Yes, sir.**
10   Q. And who took you out of the car?
11   **A. The -- I don't -- I don't know his name, but**
12 **it was the Homeland Security or federal agent and Josh**
13 **Beam.**
14   Q. And did you ev -- when Josh took you out,
15 did he look at you like, "Hey, I know you," or
16 anything like that?
17   **A. No, sir.**
18   Q. Did you ever say anything to him, "Hey,
19 Josh, what's going here?"
20   **A. When I was -- when I was in their patrol**
21 **vehicle, supposed to be heading back to the sheriff's**
22 **department.**
23   Q. That's when you asked him, "What's going
24 on?"
25   **A. I didn't ask him what was going on. I asked**

51

1 him basically how he was doing and how his kids were
2 doing.
3    Q. Did he re -- did he respond like he knew
4 what you were talking about?
5    **A. He just said, "They're fine."**
6    Q. So the Homeland Security guy and Josh take
7 you out of Spencer's car. And what do they put you
8 in?
9    **A. They put me in the -- the sheriff's SUV that**
10 **they arrived in with Jimmy Williams.**
11   Q. And they put you in the back?
12   **A. No, sir. I was in the front passenger seat.**
13   Q. And do you recall who was driving?
14   **A. Jimmy Williams.**
15   Q. And Josh and the Homeland Security guy were
16 in the back?
17   **A. Yes, sir.**
18   Q. All right. And did you stay in that car for
19 a period of time, or did you all just go right to the
20 airport from there?
21   **A. I -- we -- that's when we left and went to**
22 **the airport.**
23   Q. All right. And prior to leaving, did David
24 Spencer or Kyle Beam ever show you what they found in
25 your trunk?

52

1    A. No, sir.
2    Q. Did you ever tell David Spencer or Kyle
3 Beam, "Hey, I've never seen that before," at the scene
4 when you were stopped?
5    **A. Not that I can recall.**
6    Q. Tell me, Mr. Kifer, about the -- you get in
7 the sheriff's SUV with Jimmy driving, you're in the
8 front passenger seat. Tell me about what happened
9 from there until the time you got to the sheriff's
10 office.
11   **A. We -- so we -- we left the scene of the**
12 **stop. And we headed back down Ansonville-Polkton**
13 **Road, turned onto 52 towards Wadesboro. Ended up**
14 **taking a detour, a -- a road that I don't know of, I**
15 **don't know the name of. I'm sorry.**
16   Q. That's fine.
17   **A. And ended up going to a building that has an**
18 **airstrip attached to it. I asked, "Is this the**
19 **sheriff's department?" And they -- and Jimmy Williams**
20 **said, "No, Josh Beam has to pick something up."**
21   Q. Okay.
22   **A. We -- we pulled in, let Josh -- Josh Beam**
23 **out. Pulled onto the airstrip. Sat there for a**
24 **little while, I don't know how long. And then turned**
25 **back around to where we had dropped Josh Beam off and**

53

1 **picked him back up. And then we headed to the**
2 **sheriff's department.**
3    Q. When you picked Josh up, was Josh on the --
4 was Josh seated in the driver -- back driver side or
5 back passenger side?
6    **A. The back driver side.**
7    Q. Did you see Josh carry anything out when he
8 came back to the SUV driven by Mr. Williams?
9    **A. I saw something was in his hand, but I could**
10 **not make out what it was.**
11   Q. Was -- did it appear -- was it big, was it
12 small, was it a notebook? Do you remember what it
13 was?
14   **A. I -- I don't. I was, to be honest, mainly**
15 **just trying to just look forward, trying to figure out**
16 **what is going on.**
17   Q. I know, Mr. Kifer, you told me that you
18 mentioned or asked Josh, "Hey, how are you doing, how
19 are the kids doing," sort of pleasantries with him.
20 Did you make any other comments to either Josh, Jimmy,
21 or the Homeland Security guy during your trip from
22 where Spencer stopped you, to the airport, to the
23 sheriff's office?
24   **A. The only thing I can recall is saying, "So I**
25 **guess," -- you know, I said, "So I guess I -- I can't**

54

1 become a police officer now."
2   Q.  I mean, you were kidding around, I guess,
3 right?  Trying to make light of what happened.  Is
4 that right?
5   **A.  Right.  It's kind of a -- kind of a thing**
6 **that I do to just try and calm my own nerves.**
7   Q.  Okay.  Have you ever thought of becoming --
8 has that ever been a career goal of yours to become a
9 police officer?
10   **A.  It was at one point.  It is no longer, now.**
11   Q.  Was that -- and tell me why it's no longer
12 your -- a possible career goal.
13   **A.  Going through what I went through, I don't**
14 **think I could trust anybody to have my back if**
15 **something were to happen.  And I prefer to stay alive.**
16   Q.  And just so I'm clear, at no point did
17 anybody, Spencer, Josh Beam, Kyle Beam, or Jimmy
18 Williams ever threaten to kill you, right?
19   **A.  No, sir.  They never threatened to kill me.**
20   Q.  Okay.  And did -- I know you made that --
21 sort of the calming your nerves comment about not
22 being able to be a police officer anymore.  Did you
23 make any other comments, Mr. Kifer, other than that
24 and when you mentioned to Josh Beam?
25   **A.  Not that I can remember.**

55

1   Q.  Okay.  Did -- did they ever say anything --
2 they being Jimmy Williams, Josh Beam, the Homeland
3 Security guy, ever say anything to you about why you
4 were being stopped or arrested or anything?
5   **A.  No, sir.**
6   Q.  All right.  And how long would you estimate
7 you all waited at the airport for Josh Beam to go in
8 and to come out?
9   **A.  I would say in between maybe 15 to 30**
10 **minutes.**
11   Q.  All right.  And did anybody, Jimmy Williams
12 or Homeland Security guy, say anything to Josh about
13 why that -- they were stopping to let him out there?
14   **A.  Not that I can remember.**
15   Q.  Then, at some point, you get to the
16 sheriff's office.  Is that correct?
17   **A.  Yes, sir.**
18   Q.  And do you know what time that was, Mr.
19 Kifer?
20   **A.  I don't.**
21   Q.  I can tell you, and I don't know if this is
22 accurate -- give me one second here.  The video -- and
23 I don't know if this time is -- I'm asking you.  The
24 video appears to start at 4:34 p.m.  Does that sound
25 about right, when you got to the sheriff's office?

56

1   **A.  To be honest, I would say no.**
2   Q.  Okay.  Do you think it's earlier than that
3 or later than that?
4   **A.  I -- I feel that it's later than that.**
5   Q.  And why do you feel that?
6   **A.  Because of where I was stopped versus**
7 **stopping at the building with the airport attached to**
8 **it and then also getting all the way back down to**
9 **Wadesboro.  It takes longer than 30 minutes, being**
10 **that Lela started her shift at four.**
11   Q.  Do you recall what time, and I may have
12 asked you this, you dropped Lela off?
13   **A.  I dropped her off right before her shift**
14 **started.  She maybe had five to ten minutes for a**
15 **smoke break.**
16   Q.  Okay.  And tell me what happened, Mr. Kifer,
17 when you got to the sheriff's office.  Did you --
18 where -- do you recall where you were -- where they
19 parked, what happened when you got out, anything like
20 that?
21   **A.  We parked in front of -- in front of where**
22 **you go in for, I'm guessing, detectives for the**
23 **interrogation rooms.  We parked on the street in front**
24 **of where that area is.**
25   Q.  Okay.  And I should have asked you this

57

1 earlier, were you handcuffed by either David Spencer
2 or Kyle Beam at the scene?
3   **A.  Yes, sir.**
4   Q.  All right.  And you were still handcuffed?
5   **A.  Yes, sir.**
6   Q.  When you got to the sheriff's office.  Okay.
7 And did you walk by anybody from when you got -- when
8 you arrived at the sheriff's office to the
9 interrogation room?  In other words, anyone from the
10 public see you or anything like that?
11   **A.  I didn't walk directly past anybody.  I**
12 **don't know if anybody was around to see me walk in**
13 **there.**
14   Q.  Okay.  And tell me what happened when you
15 walked in there.
16   **A.  Well, we walked into the building, and they**
17 **led me to the room for interrogation.  The Homeland**
18 **Security gentleman took the handcuffs off of me.  And**
19 **I asked him, I said, "Do you guys need to pat me**
20 **down?"  And he said, "Oh, they didn't pat you down out**
21 **there?"  And I said, "No, sir."**
22   Q.  Mr. Kifer, have you seen the video of that
23 interrogation?
24   **A.  No, sir.**
25   Q.  Okay.  What did the Homeland Security guy

58

1 say after, "Oh, they didn't pat you down?" Did he
2 ultimately pat you down?
3    **A.  Yes, sir.**
4    Q.  And your handcuffs were off, correct?
5    **A.  Yes, sir.**
6    Q.  And do you have an idea, Mr. Kifer, and I
7 can tell you the video appears to be a little over an
8 hour, about the time that you spent -- let me get the
9 exact time.  Yeah, it looks like it's about an hour
10 and five minutes, according to video, again, that you
11 were in that room -- the interrogation room.  Does
12 that sound about accurate to you?
13    **A.  To be honest, I don't know because it felt**
14 **like I was in there forever.**
15    Q.  All right.  And tell me what you can recall
16 about the interrogation.  I realize -- I realize it
17 felt like it was an hour -- or -- or long and it
18 occurred a while ago, but tell me what you can recall
19 about that.
20    **A.  The main points that I can recall is trying**
21 **to get those three, Josh Beam, Jimmy Williams, and the**
22 **Homeland Security gentleman to believe that I had no**
23 **part in anything.  It did take a while, but finally**
24 **drugs were brought in and put in front of me because I**
25 **did ask again, you know, why was I arrested.**

59

1    **And they did finally show up.  They sat them**
2 **down on the table in front of me.  And that's where I**
3 **was trying to get them to understand that I have no**
4 **part in that.  That's -- that is not mine.  But it**
5 **felt like it was going nowhere.**
6    Q.  Would it be fair to say that the Homeland
7 Security guy was the one taking the lead in the
8 interrogation?
9    **A.  Yes, sir.**
10    Q.  And he was sort of the one flexing his Fed
11 muscles like, you know, "I want the bigger fish," kind
12 of thing?  "Cooperate with me and I can help you out,"
13 and that kind of thing?
14    MS. PFEIFFER:  Objection.  You can
15 answer.
16    **THE WITNESS:  Yes, sir.  He did say**
17 **that to me.**
18    Q.  (Mr. Perrin)  And, in fact, Jimmy Williams
19 and Josh Beam really -- well, let me start with Jimmy.
20 Jimmy Williams, I think, asked you one question,
21 didn't he, during that entire interview?
22    **A.  To be honest, I don't remember.**
23    Q.  To be fair though, he did not -- he did not
24 take an active role in that interrogation compared to
25 the Homeland Security gentleman.  Is that right?

60

1    MS. PFEIFFER:  Objection.  You can
2 answer.
3    **THE WITNESS:  Yes, sir.  He didn't say**
4 **much while we were in there.**
5    Q.  (Mr. Perrin)  And -- and same would be true
6 with Josh Beam?  In other words, the Homeland Security
7 gentleman, whatever his name is, was sort of the lead,
8 and Josh was a passive observer during that interview?
9    MS. PFEIFFER:  Objection.  You can
10 answer.
11    Q.  (Mr. Perrin)  Josh Beam?  Yeah.
12    MS. PFEIFFER:  Objection.
13    **THE WITNESS:  Yes, sir.  He didn't say**
14 **much as well.**
15    Q.  (Mr. Perrin)  Okay.  And you told me that
16 you wanted them to believe you that you had no --
17 nothing to do with the drugs.  At some point, did they
18 believe you?  In other words, I know you were
19 released, but was anything said to you, Mr. Kifer,
20 about, "Hey, you know what?  You're right.  These are
21 not yours?"
22    **A.  No, sir.  I was still under the impression**
23 **that I was looking at a minimum of 20 years in prison.**
24    Q.  Okay.  And when was that impression?  When
25 were you disabused of that impression?

61

1    **A.  When the Homeland Security gentleman told me**
2 **that, with what was in my car, that's what I'm looking**
3 **at.**
4    Q.  I understand.  But when did you realize that
5 was not on the table?  In other words, you were being
6 let go.
7    **A.  Well, until Burroughs was arrested way later**
8 **on, is when I finally had the clarification of I'm --**
9 **I'm not looking at a minimum of 20 years in prison.**
10 **But, I mean, I was told that they weren't going to**
11 **charge me in case they found evidence against me.  And**
12 **then they would come and get me later.**
13    Q.  Okay.  And who -- who told you that?
14    **A.  The magistrate.  I don't know his name.**
15    Q.  Do you recall anything else other than what
16 the mag -- what you just said, did the magistrate tell
17 you?  Anything more descriptive than that?
18    **A.  When we were walking to the magistrate's**
19 **office, the -- the Homeland Security gentleman told me**
20 **that he had spoken to the state to -- I'm trying to**
21 **remember what exactly he said.  Basically, he said**
22 **that he made a deal with the state to where they**
23 **wouldn't charge me immediately.  But it came down to**
24 **the magistrate.**
25    Q.  Did you see the magistrate after the

62

1 interview with the Homeland Security guy or before?
2     A.  I -- it was after when I actually spoke to
3 him.
4     Q.  Okay.  And did you -- at some point, I know
5 your mom -- excuse me, your dad and your stepmom came
6 to the sheriff's office?
7     A.  Yes, sir.  They were there.
8     Q.  And did you leave with them -- leave the
9 sheriff's office with them?
10     A.  When -- you mean, at the end of -- I left --
11 I left with my sister.  My sister drove me to my
12 father's house.
13     Q.  Okay.  And how -- do you recall when your
14 sister drove you back to your dad's house?
15     A.  I don't recall the time, but it was getting
16 dark at that point.
17     Q.  Okay.  Do you know how long, Mr. Kifer, you
18 were at the sheriff's office?
19     A.  I -- I do not know.
20     Q.  Okay.  If -- if the video reflects that you
21 were there about an hour and maybe ten minutes, would
22 that be accurate, or would that be too short, too
23 long, in your opinion?
24     A.  I -- I would say that that was too short of
25 a time because, like I said, when I actually left, it

63

1 was already turning dark.
2     Q.  And this is March 7th, correct?
3     A.  Yes, sir.
4     Q.  And tell me -- so I know, at least in the
5 video, it appears like the Homeland Security guy says,
6 "Hey, let's go," to you or something to that effect.
7 I think that's verbatim what he said.  Do you recall
8 him saying that?
9     A.  No, I don't ---
10     Q.  Towards the end of the interview?  I'm
11 sorry?
12     A.  I don't recall.
13     Q.  Okay.  Do you recall him saying something
14 like, "Let's get out of here?"  I mean, you left that
15 room, right?
16     A.  Oh, oh.  Yes, sir.  To go to the magistrate.
17     Q.  Right.  And then you saw the magistrate and
18 that's when the Homeland Security guy says, "Hey, I
19 made a deal with the state," something along those
20 lines.  And the magistrate says, "We're not going to
21 -- you're -- you're good to go pending," I forget --
22 whatever words he used, "Pending more information," or
23 something?
24     A.  It was on -- it was -- it was when -- it was
25 when they were walking me back to the magistrate's

64

1 office.
2     Q.  Okay.
3     A.  Was when he told me that he was trying to
4 make a deal with the state.
5     Q.  All right.  And then that was before you saw
6 the magistrate, right?
7     A.  Yes, sir.
8     Q.  And then the magistrate said something to
9 you like, "We're not going to charge with you this,"
10 or, "You're not being charged with this.  If anything
11 future comes out, you might be."  Or something to that
12 effect?
13     A.  Yes, sir.
14     Q.  And then from there, Mr. Kifer, do you go
15 home?  What happens after that, after you see the
16 magistrate?
17     A.  My -- my father and my stepmother, they --
18 they told me that I was coming home with them.  And my
19 -- my sister retrieved my car from the impound lot and
20 drove me to my father's in Wadesboro.
21     Q.  All right.  And you were never charged with
22 anything related to drugs, is that -- in this case,
23 right?
24     A.  Yes, sir.
25     Q.  And you were -- in fact, the speeding ticket

65

1 or traffic ticket was dismissed, too, right?
2     A.  I was told that it was being brought down to
3 left -- the left of center.
4     Q.  Okay.
5     A.  But that I wasn't -- I didn't have to pay
6 for anything.
7     Q.  Okay.  And you were never -- I mean, you --
8 my assumption, then, is that it was dismissed.  Is
9 that your assumption as well?
10     A.  I'm guessing so.  I don't know how the legal
11 system works.
12     Q.  Okay.  Do you recall having to pay anything
13 for the impound lot, any sort of storage or tow fees?
14     A.  No, sir.  I was being told that the
15 sheriff's department had paid for my car to be
16 released.
17     Q.  Did you ever have to pay, Mr. Kifer, for a
18 criminal defense lawyer to represent you in any way in
19 these -- as a result of what happened on March 7th,
20 2018?
21     A.  No, sir.
22     Q.  Okay.  So tell me what happened, Mr. Kifer.
23 You get home.  Do you recall what time you got home to
24 your dad's house that day?
25     A.  I don't recall the time.  I know that it was

66

1 already dark at that point.
2     Q.  All right.  And what -- tell me what
3 happened.  I mean, at some point, you find out that
4 David Burroughs was involved, right?
5     A.  I -- not that day.  I actually did not know.
6     Q.  Okay.  Well, tell me, at some point, did you
7 find out that David Burroughs may have been involved
8 in this?
9     A.  Only when I -- only when I spoke to the
10 State Bureau of Investigations officer.
11     Q.  Okay.  And do you recall when that was, Mr.
12 Kifer?
13     A.  I -- I don't recall.  I know that it was -- I
14 know that it was after the ---
15     Q.  Right.  And did that SBI agent say, "Hey, we
16 know that Burroughs did this," or was it just sort of
17 the tone of the questions that led you to believe that
18 perhaps Burroughs was involved?
19     A.  No.  He told me that when the sheriff's
20 department started their investigation, that Burroughs
21 had admit that he had done it, but that he couldn't
22 necessarily use the -- the -- what the sheriff's
23 department found.  He had to find his own evidence.
24     Q.  Okay.  And, Mr. Kifer, prior to talking to
25 the SBI but after you got released from the

67

1 magistrate, did you talk to any investigators from the
2 sheriff's office, not the SBI but the sheriff's
3 office, about what happened?
4     A.  The very next day, I did.
5     Q.  And tell me, that would be the 8th?
6     A.  Yes, sir.  Sorry.
7     Q.  Tell me, Mr. Kifer, what happened -- who you
8 talked to and what you told them on the 8th.
9     A.  When I got done with my job interview, I
10 showed back up at Lela's house, and Brian Tice and
11 Ricky Little were there.
12     Q.  And Mr. Tice and Mr. Little are both
13 employees of the sheriff's office?
14     A.  Yes, sir.
15     Q.  And tell me what -- did -- well, they were
16 there talking with Lela?
17     A.  Yes, sir.
18     Q.  And did they interview you, too, or just
19 Lela?
20     A.  They did, right after they were done with
21 her.
22     Q.  All right.  And tell me what they -- what
23 they -- what they asked you or what they told you, Mr.
24 Kifer.
25     A.  They -- they -- they asked me what -- what

68

1 exactly -- what exactly I knew.  And I said that I
2 didn't know anything.  And they said that they were
3 investigating Burroughs, that they had interrogated
4 him when he had gotten off of his shift that night.
5 And basically the -- they said that Lela and I were
6 the victims.
7     Q.  Okay.  And so that's the first time you
8 found out, I guess on the 8th, that you and Lela were
9 not -- I guess really not Lela.  But you were not a
10 suspect but rather a victim of perhaps something Mr.
11 Burroughs did?
12     A.  I mean, that's what they said to me, but I
13 didn't believe them.
14     Q.  Okay.  Why did you not believe them?
15     A.  Because of the events on March 7th.  I mean,
16 from there, I can't trust Anson County Sheriff's
17 Department.  So I didn't believe anything that they
18 were saying to me.  To be honest, I felt that they
19 were just telling me what I wanted to hear.
20     Q.  Did you tell them that or anything similar
21 to that, "Hey, I don't -- you guys are full of
22 whatever?"
23     A.  No, sir.
24     Q.  And did Brian Tice or Ricky Little tell you
25 anything else other than the fact that you and Lela

69

1 were victims?
2     A.  Not that I can remember.  I -- Ricky Little
3 went to say something.  He said -- he started a
4 sentence off of, you know, "Well, this hasn't
5 happened," and then he stopped.
6     Q.  This what?  This ---
7     A.  He said -- he said, "Well, this hasn't
8 happened," and then he stopped what he was saying.
9 And he would not continue whatever that sentence was.
10     Q.  In other words, was he trying to deny, like,
11 talking with you?  Or what did you take that to mean?
12     A.  To be honest, with how everything happened
13 and -- I just figured he was hiding something else.
14     Q.  And how about Mr. Tice, did he ever say
15 anything to you similar to what Mr. Little said?
16     A.  No, sir.  They explained that my father and
17 my stepmother were at the sheriff's department and
18 that they had spoken with him.  But other than that,
19 that was all the information I got that day.
20     Q.  Okay.  So this -- so your -- your -- your
21 dad and stepmom were at the sheriff's office on March
22 8th?
23     A.  On March 7th ---
24     Q.  Okay.
25     A.  --- when I was -- sorry.

70

1    Q.  No, that's fine.  And did your mom -- excuse
2  me, did your dad and stepmom talk to Mr. Little or Mr.
3  Tice on March 7th?
4    **A.  I'm not sure who exactly they talked to.  It**
5  **was during -- I was being transported there in -- in**
6  **interrogation.**
7    Q.  Did -- regardless of who they talked with,
8  do you know what either your dad or stepmom told the
9  sheriff's office, or vice versa, on March 7th, '18?
10   **A.  No, sir.**
11   Q.  Okay.  Did you ever ask your dad, did you --
12 about, "Hey, what did they tell you when you went
13 there," or anything like that?
14   **A.  I heard that he was very irate when he was**
15 **there.  And I asked them, and he told me that he was**
16 **irate, that he told them, the officers, whoever that**
17 **he spoke to, that they needed to let me go, that I was**
18 **innocent.**
19   Q.  How about -- did you ask your stepmom what
20 she may have said on March 7th to the sheriff's
21 office?
22   **A.  No, sir.**
23   Q.  Okay.  Other than Mr. Little and Mr. Tice
24 talking with you on March 8th of '18, did you ever
25 talk to anyone else about what happened on March 7th?

71

1    **A.  You mean with the -- I'm sorry, do you mean**
2  **with the sheriff's department?**
3    Q.  Yeah.  And -- and, of course, I'm excluding
4  anything that you may have talked to Mr. Lattimore,
5  Ms. Pfeiffer, or Mr. Rudolf about, but any -- yeah,
6  did you ever talk to any other sheriff's office
7  employees other than Brian Tice and Ricky Little about
8  what happened to you on March 7th, '18?
9    **A.  No, sir.**
10   Q.  Okay.  Have you ever -- have you been
11 called, Mr. Kifer, to testify in -- in Mr. Burroughs'
12 trial or anything related to that criminal case?
13   **A.  I -- I did receive a call from, I'm**
14 **guessing, a secretary at the sheriff's department**
15 **saying that when he does go to trial, that I will be**
16 **-- I will be called upon.  That hasn't not happened**
17 **yet.**
18   Q.  Did Lela tell you, at some point after March
19 7th, that she suspected David Burroughs was involved
20 or anything about David Burroughs' involvement in
21 this?
22   **A.  No, sir.**
23   Q.  Did she -- did you all ever speculate about
24 how the drugs wound up in your car?
25   **A.  I did.  I mean, she was trying to figure it**

72

1  out as well, but she -- I mean, we -- we didn't
2  understand how that even happened.
3    Q.  Is it ---
4    **A.  I mean -- sorry.**
5    Q.  No, that's fine.  So ---
6    **A.  But we -- we did try to figure it out.**
7    Q.  All right.  And did it ever -- I mean, prior
8  to the SBI coming to you and interviewing you, did you
9  have any thought that it could have been David
10 Burroughs who did this?
11   **A.  I did.  Yes, sir.**
12   Q.  All right.  And why is that?
13   **A.  It -- it just made sense at the time, with**
14 **the events that happened prior.  And then, now, out of**
15 **nowhere, I'm being pulled over and, "Hey," you know,**
16 **"you have drugs in your car."**
17   Q.  And how about Lela, did she ever speculate
18 similarly to you, or?
19   **A.  I mean, she -- yes, sir.  We tried to figure**
20 **out how it happened, amongst ourselves.**
21   Q.  And did you ever speculate that perhaps
22 David Burroughs got help from anyone, any of the
23 defendants in this case, either David Spencer, Kyle
24 Beam, Josh Beam, or Jimmy Williams?
25   **A.  I did speculate that they had something to**

73

1  do with it.  Yes, sir.
2    Q.  All right.  And tell me, what was the basis
3  for your -- for that particular speculation?  Let me
4  start -- well, let me start with David Spencer.  Let
5  me ask you this right -- let me -- I'll go one at a
6  time.  That will be easier.
7         But do you have any personal knowledge, as
8  we're sitting here today, that David Spencer planted
9  drugs in your car?
10   **A.  I don't have any proof of it.  No, sir.**
11   Q.  Okay.  And tell me -- I know you speculated,
12 and I'm going to ask you that, too.  But what
13 speculation do you have that Mr. Spencer was involved?
14   **A.  Considering that he was the initial officer**
15 **to pull me over, to arrest me without telling me on**
16 **why I'm being arrested.  And then, as we were leaving**
17 **the magistrate's office, he leaned in to shake my**
18 **stepmother's hand and he apologized.  I didn't**
19 **understand why he was apologizing because if you're**
20 **doing your job, then why would you apologize for doing**
21 **your job?**
22   Q.  Unless he was hoodwinked by David Burroughs,
23 perhaps he might apologize for that, right?
24       MS. PFEIFFER:  Objection.  You can
25 answer.

---

74

1    THE WITNESS: Either that or you're
2  apologizing that you got caught.
3    Q. (Mr. Perrin) And how about -- let me go
4  with Kyle Beam. Do you have -- as we're sitting here
5  today, do you have any personal knowledge that Kyle
6  Beam planted the drugs in your -- in your car on March
7  -- that was found on March 7th, '18?
8    A. I don't have any proof of it.
9    Q. All right. Any -- same question, Mr. Kifer,
10  what sort of -- any speculation that Kyle Beam was
11  involved, and if so, what leads you to speculate?
12    A. Considering that he showed up after Spencer
13  was in my vehicle searching, and then they walked to
14  the back of his SUV and I lose sight of them, and then
15  now, all of a sudden, I'm being arrested, it just
16  makes me believe, you know, okay, so then what -- what
17  exactly -- you know, what did you guys do back there
18  because now I'm being arrested?
19    Q. Okay. And how about Josh Beam, do you have
20  any proof that Josh Beam planted those drugs in your
21  car on March 7th of '18?
22    A. I have no proof of it.
23    Q. Do -- and, again, same -- same question.
24  Have you speculated that Josh Beam was involved?
25    A. Yes, sir.

75

1    Q. And tell me why, your basis for that
2  speculation.
3    A. Well, with us taking a detour to the
4  building that has the airport attached to it, to pick
5  something up, I don't understand why we wouldn't go
6  straight to the sheriff's department. Which, I did,
7  later on, find out that that building is apparently
8  the evidence locker for narcotics.
9    Q. And you -- I mean, Josh Beam had no -- I
10  know Burroughs had some animus towards you and perhaps
11  Lela. But Josh Beam, to your knowledge, had no animus
12  towards you or Lela, right, at least that you knew of?
13    A. Correct, to my knowledge.
14    Q. I mean, you're not -- are you suggesting
15  that David Spencer, Kyle Beam, and Josh Beam would
16  risk their careers to plant drugs on you, in your car?
17    MS. PFEIFFER: Objection. You can
18  answer.
19    THE WITNESS: To be honest, yes, sir.
20  I feel that if, you know, somebody wrongs something --
21  wrongs somebody that is close to you in any way, shape
22  or form, that you'll go out of your way to either hurt
23  somebody else or basically -- you'll do things that --
24  legal or illegal, to try and make the person that is,
25  you know, of interest feel better or to help them out

76

1  in any way, shape or form.
2    Q. (Mr. Perrin) And just -- just so -- tell me
3  if I'm wrong, but I'm kind of paraphrasing. So your
4  thought would be that David Spencer, Kyle Beam, and
5  Josh Beam are close with David Burroughs. David
6  Burroughs was upset that you are now dating his ex-
7  girlfriend, Lela. And to sort of help David Burroughs
8  out, they would commit felonies by setting you up. Is
9  that what you're saying?
10    A. With the way that that day went, yes, sir.
11  I feel that that's how it went.
12    Q. Okay. And I didn't ask you about Jimmy
13  Williams and I apologize. What proof do you have that
14  Jimmy Williams put drugs in your car on March 7th,
15  2018?
16    A. I don't have any proof that he did.
17    Q. And I know -- well, let me ask this; any
18  speculation that he did? And if so, what is that
19  speculation based on?
20    A. My speculation of that is that he knew that
21  we needed to go the building with the airport attached
22  to it for Josh to pick up whatever it is. So, I mean,
23  if anything, you at least know you're not -- you're
24  not stopping for this going any further, going down
25  the wrong road.

77

1    Q. And I know you mentioned to me, Mr. Kifer,
2  that Brian Tice and Ricky Little said that you and
3  Lela were victims of Burroughs, I guess, on March 8th,
4  2018. Is that right?
5    A. Yes, sir.
6    Q. Isn't it entirely possible, then, that David
7  Spencer, Kyle Beam, Josh Beam, and Jimmy Williams were
8  also victims of what David Spencer (sic) did on March
9  7th, 2018? Isn't that entirely ---
10    MR. MACLATCHIE: You mean David
11  Burroughs.
12    MR. PERRIN: Excuse me, David
13  Burroughs. Isn't that -- let me rephrase it. Thank
14  you.
15    Q. (Mr. Perrin) Isn't it entirely possible
16  that, in fact, David Spencer, Josh Beam, Kyle Beam,
17  and Jimmy Williams were also victims of what David
18  Burroughs did to you on March 7th, '18, as opposed to
19  them be conspirators with him? Isn't that entirely
20  plausible?
21    MS. PFEIFFER: Objection. You can
22  answer.
23    THE WITNESS: I mean, I believe that it
24  could be a chance, but not with how everything had
25  gone. I mean, it -- to be honest, use common sense is

78

1  where I'm coming down to it.
2        MR. PERRIN: And that ---
3        THE WITNESS: Why would you even get
4  involved?
5     Q. (Mr. Perrin) Yeah. And I am using common
6  sense, and what my common sense tells me is that they
7  didn't plant the drugs in your car. And I realize we
8  disagree. But it seems -- I mean, it just seems odd
9  to me that you're suggesting that law enforcement
10 officers would spend their entire career enforcing the
11 law and throw it away over a deputy's failed
12 relationship with a woman. Don't you find that
13 strange?
14       MS. PFEIFFER: Objection. You can
15 answer.
16       THE WITNESS: I do. But I also find it
17 strange that somebody would throw their own life away
18 because of a break-up.
19       THE PERRIN: Well, yeah. And that ---
20       THE WITNESS: So if one person can do
21 it, then I feel that -- why not anybody else?
22    Q. (Mr. Perrin) And to be fair, the break-up
23 is not -- I mean, David Burroughs was the one who was
24 -- who Lela broke up, or they -- they had the
25 relationship, right? Not -- David Spencer, Kyle Beam,

79

1  Josh Beam, and Jimmy Williams had no relationship,
2  romantic, with Lela, right?
3     A. That I know of, yes, sir.
4     Q. Okay. And I know that you mentioned that
5  David Spencer was underneath David Burroughs in the
6  chain of command. I think Lela told you that later.
7  Do you have any information that Kyle Beam, Josh Beam,
8  or Jimmy Williams were even friends with David
9  Burroughs?
10    A. I -- I don't know who are friends or
11 acquaintances, I just know that they all work in the
12 same department.
13    Q. And how many people do you work with in your
14 -- in your office or your job right now, at Medical
15 Specialties?
16    A. I don't know how many employees are there.
17    Q. Is it more than 100?
18    A. I would say somewhere around 100, maybe
19 more.
20    Q. And my assumption is you're not friends with
21 every single one of those people that you work with.
22 Is that right?
23    A. Correct.
24    Q. Although you do work with them, right?
25    A. Correct.

80

1     Q. Mr. Kifer, you mentioned that David Spencer
2  apologized to your stepmom, right?
3     A. Yes, sir.
4     Q. Did he apologize to you, too, or did he just
5  go up to your stepmom and say, you know, "I apologize,
6  ma'am," or something like that?
7     A. Just to my stepmother. I actually -- I
8  actually wasn't even sure that he had even apologized
9  until she told me. I was already walking out the door
10 at that point.
11    Q. And did your stepmom say anything to you,
12 "Hey, Ray, I know him from X, Y, and Z?"
13    A. No, sir.
14    Q. Did you ever ask her what she said -- excuse
15 me, what he said to her, or why he said it to her?
16    A. She said that as we were leaving the
17 magistrate's office, that he leaned in and said, "I
18 apologize, ma'am." And then she walked out.
19    Q. Do you recall being asked in your video
20 about possible individuals who could have planted
21 drugs in your car?
22    A. I do remember them asking me that. Yes,
23 sir.
24    Q. Okay. And I think the first person you
25 mentioned was your ex-fiance's brother, Christopher

81

1  Bennett. Is that right?
2     A. Yes, sir.
3     Q. All right. And tell me why you first gave
4  Mr. Bennett's name as someone who may have planted the
5  drugs in your car.
6     A. Because that's the only person that I know
7  of that actually does drugs.
8     Q. Okay. At any point, did you suggest, to
9  your recollection, I realize it's been a while, that
10 David Burroughs was the one who perhaps put drugs in
11 your car?
12    A. I -- I do think I remember giving up his
13 name as well.
14    Q. Okay. Mr. Kifer, after you -- after this
15 incident -- and I know we've talked a little bit about
16 your discussions with the sheriff's office people.
17 Did you have any other discussions with anyone from
18 the sheriff's office about Mr. -- about you being
19 stopped on March 7th, 2018 other than what you've
20 already told us?
21    A. No, sir. I haven't spoken to anybody else.
22    Q. Okay. And I know -- I think, at one point,
23 you said maybe a secretary called you to tell you that
24 your -- you may be called as a witness in Burroughs'
25 criminal trial?

82

1    A.   Correct, after he was arrested.
2    Q.   Okay.  And tell me, Mr. Kifer, how long did
3 you stay in Anson County from March 7th, '18 until --
4 I know you moved to Ohio.  How long were you here in
5 Anson County before you moved to Ohio?
6    A.   Until -- until August of 2018.
7    Q.   Was that 2018 or 2019?
8    A.   I'm -- let's see.  It was 20 -- 2019, I'm
9 sorry, because my son was already born.
10   Q.   And that's completely fine.  I realize it's
11 been a while.  So you stayed in Anson County for a
12 little less than a year and a half after this incident
13 and then moved to Ohio?
14   A.   Yes, sir.
15   Q.   And what was the reason you moved to Ohio?
16   A.   I didn't feel safe.
17   Q.   Had anything happened to you from March 8th,
18 2018 until, I guess, mid-summer of 2019 that caused
19 you not to feel safe in Anson County?
20   A.   Not in between those dates.  March 7th
21 basically did it for me.
22   Q.   Okay.  Did you have any contact, like being
23 stopped by -- you know, for speeding or whatever, with
24 anyone from Anson County Sheriff's Office from March
25 7th, 2019 (sic) until you moved to Ohio in 2019?

83

1    A.   I was pulled over one time.  My -- my tag
2 was -- my tag was out, so I was pulled over for -- for
3 that.
4    Q.   Did anybody involved in this case pull you
5 over?
6    A.   No, sir.
7    Q.   Okay.  Were you given a ticket?
8    A.   I was, which -- you know, to go ahead and
9 fix it and then it gets -- it gets tossed.
10   Q.   Okay.  And tell me -- you said you did not
11 feel safe, Mr. Kifer, tell me what you mean by that.
12   A.   I -- I don't feel safe meaning that I'm
13 constantly and consistently paranoid.  Am I going to
14 get pulled over again for XYZ reason?  Is somebody
15 outside of my house?  You know, if something does
16 happen to where I do need police, are they even going
17 to show up?
18        I -- just completely afraid.  You know, now
19 that, you know, all this has happened and, you know,
20 these people are in trouble, are they going to go, you
21 know, looking for trouble and do I have to worry about
22 my safety?  Do I have to worry about my fiance's
23 safety?  You know, she's -- she's going to work.  Do I
24 have to worry about if something is going to happen to
25 her?  I have a son now.  You know, how do I protect

84

1 him when I'm also trying to protect myself?  Just
2 complete and utter fear.
3    Q.   And when did that fear start?
4    A.   On March 7th.
5    Q.   And has that -- has that decreased at all or
6 increased?
7    A.   It has increased.
8    Q.   All right.  And I think you said you moved
9 back to Anson County.  You stayed in Ohio for about a
10 year and a half-ish.  Is that right?
11   A.   Yes, sir.
12   Q.   Okay.  And from March 7th of 2019 (sic) you
13 until you moved to Ohio in August of 2019, did you see
14 any counselors or therapists for, sort of, the feeling
15 of not being safe or anything like that?
16   A.   No, sir.
17   Q.   In fact, the only time -- my understanding
18 is the only time you saw a counselor or therapist was
19 because your lawyers told you to do so.  Is that
20 right?
21        MS. PFEIFFER:  Objection.  You can
22 answer.  Not ---
23        THE WITNESS:  My lawyers ---
24        MS. PFEIFFER:  --- content of our
25 conversation, but you can answer the question.

85

1        THE WITNESS:  I'm sorry, Sonya, your
2 thing broke out.  I didn't hear it all the way.
3        MS. PFEIFFER:  I said objection.  You
4 can answer the question without discussing the
5 contents of our conversation.
6        MR. PERRIN:  Yeah.
7        THE WITNESS:  Okay.  My lawyers did not
8 tell me that I needed to go.  They didn't advise me to
9 -- to do that.  My family members, my -- my friends,
10 they were the ones that were telling me that I needed
11 to -- that I needed to seek help for my personal self.
12   Q.   (Mr. Perrin)  All right.  And I think you
13 went to Mercy Health and then Comprehensive Psychiatry
14 -- Comprehensive Psychiatry Group in Ohio.  Is that
15 correct?
16   A.   I believe so.  Yes, sir.
17   Q.   Did you see any other entities other than
18 those two in Ohio?
19   A.   No, sir.  Those were my main care givers.
20   Q.   And then how about when you came back to
21 Anson County in 2021, have you maintained treatment
22 with any other new providers or anything like that?
23   A.   I'm -- I'm -- I have a doctor with -- his
24 name is Dr. Tagge.  He is with the Anson Hospital,
25 he's a doctor there, to continue my medication.

86

1    Q.   Cagey, C-a-g-e-y?
2    A.   Oh, I'm sorry.  Tagge.  T, as in Tom, A, I
3  believe it's g-g-e.
4    Q.   Okay.  And what medications were you
5  prescribed in Ohio?
6    A.   The anti-anxiety and depression.
7    Q.   And is there -- is it Celexa?
8    A.   Citalopram, sorry.
9    Q.   That's all right.  Can you -- can you spell
10  that, please, Mr. Kifer?
11    A.   Roughly.  I believe it's C-i-t-a-l-o-p-r-a-
12  m.
13    Q.   Okay.  And are you still -- are you taking
14  that same medication now with Dr. Tagge at Anson
15  Hospital?
16    A.   He switched me to another medication.  I --
17  I actually am not sure on what it -- what it's called.
18    Q.   Are you still on the -- whatever you -- the
19  C-i-t -- the Celexa sort of variety you took in Ohio?
20  Are you still on that, or just taking something else
21  in substitute of that?
22    A.   I -- I'm -- I'm still taking antidepressant
23  -- anti-anxiety and depression medicine.  It's not
24  Citalopram because it ended up getting to the point of
25  not working for me anymore.  So I'm on the one that

87

1  I'm on now.  I don't recall the name of it.
2    Q.   Okay.  And I know you mentioned that you
3  had, you know, these feelings of unsafety, if you
4  will.  Any other, sort of, effects, either physical or
5  mental, that you've had as a result of the March 7th,
6  2018 incident?
7    A.   Yes, sir.
8    Q.   And what is that, sir?
9    A.   It is -- it's hard for me to stay asleep at
10  night.  I -- I -- I constantly wake up throughout the
11  night.  Due to that, it's hard for me to stay awake
12  during the day.  I actually lost a -- lost a job in
13  Ohio because I was falling asleep at work.
14    Q.   What job was that?
15    A.   I was -- I was working for a company called
16  Roth Brothers.  And I have panic attacks consistently
17  through the day, every day.  My voice becomes very
18  shaky.  My hands, they tend to shake.  I actually
19  cannot do my artwork because of how bad they -- they
20  shake.
21       Anytime a police officer even gets behind
22  me, my anxiety goes through the roof.  I know I'm not
23  doing anything wrong, but still.  I would -- I -- and
24  I still do, disassociate, which is basically just
25  staring off into the distance and it's like I'm not

88

1  even here in mid conversation.  Fall asleep during mid
2  conversation.  Fall asleep during driving.
3       I'll have outbursts of just irritation and
4  anger.  The smallest little thing can happen, and it
5  sets me off, and it takes a while for me to calm back
6  down.  There -- there's -- excuse me, there are days
7  to where I -- I can't even -- I can't even get out of
8  bed because I -- automatically, I wake up, I'm having
9  a bad day, as in the rush of all those feeling coming
10  in at once, break down crying.
11       And I -- and I still have not found a way to
12  be able to cope with them or -- I've tried to even
13  suppress it, and that does -- that does more harm than
14  good.
15    Q.   You told -- you told us a lot.  Any other,
16  you know, after effects, if you will, from March 7th,
17  Mr. Kifer, that you haven't told us already?
18    A.   No.  Those are the main big ones that I
19  have.
20    Q.   You mentioned artwork.  Are you -- have you
21  -- is that something you do as a hobby, or do you do
22  it for a job?  Tell me about that.
23    A.   It's just a hobby.
24    Q.   Okay.  You ever -- have you ever, like, sold
25  artwork for instance or, I don't know, showed it in a

89

1  gallery or something?
2    A.   I -- I've always dreamed about having
3  artwork in a gallery.  I have -- I have sold my
4  paintings to my family members.
5    Q.   Okay.
6    A.   But other than that, nothing -- nothing
7  else.
8    Q.   And the -- sort of the shaky hands that you
9  described earlier has prevented you from doing that,
10  impacted that?
11    A.   Yes, sir.
12    Q.   I know we talked about Dr. Tagge.  Have you
13  seen any counselors or therapists since you've been
14  back in Anson County for, you know, your anxiety, your
15  disassociation, or anything else?
16    A.   I haven't found one here just yet.  I am
17  still currently looking.  But until I do find one,
18  Paul, the -- the gentleman I was speaking to in Ohio,
19  he did say that I still can -- like on my bad days, I
20  still can talk with him, even though, you know, he --
21  he's not able to charge me for it or anything.  He
22  just -- he wants for me to make sure that I get the help I
23  need.
24    Q.   And he's from CPG, I think, Paul?
25    A.   I believe so.  I'm -- I'm not 100 percent

90

1 sure.
2    Q.  Okay.  Have you, Mr. Kifer, had any similar
3 feelings of anxiety, depression, unsafeness, what you
4 just described to us, prior to March 7th of 2018?
5    A.  No, sir.
6    Q.  All right.
7        MR. PERRIN:  Madam Court Reporter,
8 would you pull up the Mercy Health Exhibit?
9        MS. PFEIFFER:  Sean, I don't mean to
10 ruin your groove, but could we take a short break at
11 some point?  I don't know if now is a good ---
12        MR. PERRIN:  Sonya, I'm not in a groove
13 at all.  Let's take a break.
14        MS. PFEIFFER:  Okay.
15        THE COURT REPORTER:  Off the record at
16 11:51.
17 (Brief recess:  11:51 a.m. to 12:01 p.m.)
18        THE COURT REPORTER:  We are back on the
19 record at 12:01, and I will pull up that exhibit.
20        MR. PERRIN:  Thank you very much.
21 Yeah, we can look at the exhibit and then -- Mr.
22 Kifer, I don't think I have too much longer.
23        (DEPOSITION EXHIBIT
24         NUMBER 1 WAS MARKED
25         FOR IDENTIFICATION)

91

1    Q.  (Mr. Perrin)  Mr. Kifer, are you able to see
2 this exhibit?
3    A.  Yes, sir.
4    Q.  And I want to ---
5        MR. PERRIN:  Madam Court Reporter, can
6 I move the pages?  How does that work?
7        THE COURT REPORTER:  I gave you
8 control.
9        MR. PERRIN:  Oh, awesome.  This is a
10 whole lot better than me doing it myself.
11    Q.  (Mr. Perrin)  Mr. Kifer, just give me a
12 minute please, sir.
13    A.  Yes, sir.
14    Q.  I'm going to -- you mentioned earlier --
15 this is Page 4 of the Mercy Health records.  You
16 mentioned before that you had no preexisting
17 conditions about anxiety or depression.  Is that
18 correct?
19    A.  Yes, sir.
20    Q.  And if you look here under Anxiety and/or
21 Depression, I'm just going to read this.  It says,
22 "Patient is here with complaints of anxiety and/or
23 depression.  This is a/an chronic problem.  This has
24 been going on for six years."  And this would have
25 been -- the encounter date was 2021.  That's what it

92

1 says, correct?
2    A.  Yes, sir.
3    Q.  So at least according the medical records
4 from Mercy Hospital, you've had anxiety/depression
5 since 2015, predating the March 7th, '18 incident,
6 correct?
7    A.  I see that's how she wrote it, yes.
8    Q.  Okay.  And do you not recall her -- telling
9 her this?
10    A.  I told her that -- I told her that my mother
11 said that, you know, I needed to basically get on
12 anxiety medicine, that it dated back that far.  But
13 that was her opinion, not mine.
14    Q.  And tell me -- I'm sorry, Mr. -- so your mom
15 -- did you mom think you had depression predating this
16 incident then?
17    A.  Not depression, just anxiety.
18    Q.  Okay.  So your mom, at least, felt you had
19 anxiety prior to March 7th of '18?
20    A.  She said that -- she said that.  Yes, sir.
21    Q.  And then I'm going to go back, Mr. Kifer.  I
22 think you mentioned earlier that your relatives were
23 the ones who told you to seek help.  Is that right?
24    A.  Yes.  They -- they were -- some of them.
25    Q.  Let me read to you, on Page 59, "Patient

93

1 states that he had something in March of 2018 prior to
2 establishing care in our office.  He states that he
3 was told by his lawyers that he needed to notify his
4 family doctor."  Do you see that?
5    A.  I do see that.  Yes, sir.
6    Q.  All right.  Did you, in fact, tell -- on
7 October of 2020, tell the folks at Mercy that the
8 reason you were there is because your lawyers told you
9 to come?
10    A.  No, sir.  I did not tell them that my
11 lawyers were the ones that told me to come.
12    Q.  Do you know how that got put in your records
13 though?
14    A.  I told her -- I told her that I was seeking
15 help, that family, friends, and -- family, friends had
16 told me to -- told me that I needed to seek help for
17 my own benefit.  And that my lawyers agreed.  I didn't
18 say that my lawyers told me I need to come and seek
19 help.
20    Q.  And you would agree with me though, that, at
21 least, the medical records written down by the people
22 at Mercy say that your lawyers told you that you
23 needed to notify your family doctor, right?
24    A.  I -- I see that on there.  Yes, sir.
25        MR. PERRIN:  Madam Court Reporter, if

94

1 you could pull up the CPG exhibit. Thank you, again.
2      THE COURT REPORTER: You have control.
3      (DEPOSITION EXHIBIT
4      NUMBER 2 WAS MARKED
5      FOR IDENTIFICATION)
6 Q. (Mr. Perrin) Thank you. And I think you
7 told us that also, with regard to CPG, that this
8 suggestion did not come as a result of this
9 litigation. In other words, your lawyers didn't
10 advise you to go see CPG, correct?
11 **A. I -- I'm sorry. What is CPG? Is that what**
12 **this document is?**
13 Q. Yes, sir. It's Comprehensive Psychiatry
14 Group. I can -- I can move up if you'd like. Do you
15 see that, "Comprehensive Psychiatry Group. Raymond
16 Kifer, Jr."?
17 **A. Yes, sir.**
18 Q. All right. So your lawyer at least -- you
19 told us earlier that your lawyers didn't tell you to
20 go here either. Is that right?
21 **A. They -- they didn't -- they didn't tell me**
22 **to specifically go here. My lawyers told me that I**
23 **need ---**
24      MS. PFEIFFER: Well, objection to the
25 content of our conversations.

95

1 Q. (Mr. Perrin) Yeah. And let me just -- it
2 might be easier, Mr. Kifer, to just read this. Do you
3 see on "2. Previous Attempt & Responses to Treatment,"
4 it says, "PCP and attorney suggested talking to
5 someone about PTSD," do you see that?
6 **A. Yes, sir.**
7 Q. All right. And did you, in fact, tell CPG
8 that your attorney said that's why you should --
9 that's why you're there, to talk to somebody?
10 **A. I didn't tell them that my attorney was the**
11 **-- the whole reason on why I needed to go and seek**
12 **help.**
13 Q. Okay. Did you say anything that would
14 suggest or would indicate why CPG wrote this statement
15 here about your attorney suggesting you talk to
16 someone about PTSD?
17 **A. The only thing that I said to them was that**
18 **I -- that I needed help. That I believe that I have**
19 **PTSD. And that family, friends, even my lawyer said**
20 **that I need to seek the help that is going to help me.**
21 Q. Had you -- prior to March 7th of '18, had
22 you had any sleep issues, Mr. Kifer?
23 **A. No, sir.**
24 Q. Did you ever text Lela regarding any of the
25 -- anything which arose out of this incident on March

96

1 7th of '18, like when you were in the car or anything
2 like that?
3 **A. I don't believe that I text her. I -- I**
4 **called her. I was on the phone with her.**
5 Q. Did you ever text anyone else that you were
6 going to call, for instance, maybe your dad or stepmom
7 or sister or someone like that?
8 **A. No. I -- I call -- I called Lela and then I**
9 **also was able to get my sister on the phone.**
10 Q. When did you get your sister on the phone?
11 **A. While I was inside the -- the back of the**
12 **police vehicle.**
13 Q. Is that with -- when you were with Mr.
14 Spencer's car, or with Mr. Williams and the Homeland
15 Security guy and Mr. Beam?
16 **A. Mr. Spencer's car.**
17 Q. So you called -- what did you tell your
18 sister?
19 **A. I'm sorry. I didn't hear that.**
20 Q. Sorry. What did you tell your sister?
21 **A. I told her that she needed to get a hold of**
22 **our father, and I let her know what was happening at**
23 **that point.**
24 Q. And what did your sister say?
25 **A. I don't remember 100 percent. I know that**

97

1 **she told me that she was going to get a hold of our --**
2 **our father.**
3 Q. And I know you told me earlier that -- that
4 David Burroughs had told Lela to her face, to her
5 person, that he wanted to kick your ass. Did he ever,
6 to your knowledge, call Lela or text her and say
7 something similar?
8 **A. I -- I have no knowledge.**
9 Q. Okay. There is an allegation, Mr. Kifer,
10 and, you know, I have to ask the question, and it's
11 sort of personal but I need to ask it. There's an
12 allegation in the Complaint that David Burroughs
13 either audiotaped or videotaped a sexual liaison
14 between you and Lela. Do you remember anything about
15 that?
16 **A. The State Bureau of -- of Investigation**
17 **Officer, he told me that there.**
18 Q. And prior to him telling you that, did you
19 have any knowledge about that, or is that something
20 you found out after all this stuff happened?
21 **A. That -- that was -- that was after. That**
22 **was when he told me.**
23 Q. Okay. Mr. Kifer -- I'm just looking through
24 my notes, Mr. Kifer, so maybe a minute or so. So I
25 apologize.

98

1    A.   Yes, sir.

2    Q.   You -- one of the allegations is that you

3  incurred moving expenses in this case, or at least

4  that's what you are claiming, moving expenses.  Do you

5  know how much it cost you to move from -- and let me

6  ask this, is that -- well, number one, are you

7  claiming that you suffered moving expenses as a result

8  of the incident on March 7th, 2018?

9    A.   Yes, sir.

10    Q.   And tell me why you're saying that.

11    A.   Because if it didn't happen, then I wouldn't

12  have been afraid to live there.

13    Q.   Okay.  And -- and it's true now, though,

14  that you actually live right near Josh Beam, don't

15  you?

16    A.   I didn't know that.

17    Q.   Are you near Trexler Road or Trexler Avenue?

18    A.   I don't really know the roads that are

19  around me because I'm -- I'm new to that area.

20    Q.   All right.  You've -- you went to Josh

21  Beam's house as a child, I think you said, right?

22    A.   Yes, sir.

23    Q.   His parents' house?  His parents live right

24  near you, don't they?

25    A.   I don't know.  To be honest, I don't even

99

1  know his parents' name.

2    Q.   Okay.  And so tell me, how much were moving

3  expenses that you're claiming?

4    A.   To move to Ohio?

5    Q.   Yes, sir.

6    A.   It cost me -- it was either six -- 600 or

7  $800.  I -- I don't have -- I have the receipt in my

8  emails, but I don't -- I don't remember which one it

9  is immediately.

10    Q.   And it's fair to say, though, that those

11  moving expenses almost a year and a half after March

12  7th of '18, right?

13    A.   Yes, sir.

14    Q.   And one of the things you also claimed is

15  lost wages.  Is that right?  Are you claiming lost

16  wages as a result of what happened to you on March 7th

17  of '18?

18    A.   Yes, sir.

19    Q.   And it's fair to say you were not employed

20  on March 7th of 2018, correct?

21    A.   No, sir.  Not on that day.

22    Q.   And you were actually -- you actually went

23  to a job interview the next day, at 10 a.m., at

24  Premiere Fibers, right?

25    A.   Yes, sir.

100

1    Q.   Okay.  And you got that job?

2    A.   I did.

3    Q.   And did you start working there?

4    A.   I did.

5    Q.   All right.  What -- that day or the next

6  day?

7    A.   I think it was the Monday after.  I'm not

8  100 percent sure.  It -- it -- I had a couple of days

9  and then I started my work.

10    Q.   Let me ask you this, Mr. Kifer, what --

11  given the fact that you weren't employed when this

12  occurred, you had the job interview the next day and

13  you got that job, what is your basis for claiming loss

14  of wages as a result of what happened to you on March

15  7th of '18?

16    A.   Because of the events that happened, the

17  constant insomnia that I have, it's very hard for me

18  to stay awake during the day.  And I ended up losing

19  employment because of that.  Because I was falling

20  asleep during -- during work.

21    Q.   That was the job in Ohio, I think you

22  mentioned?

23    A.   Yes, sir.

24    Q.   And when did you get let go from that job?

25    A.   It was in June of -- I think -- I think of

101

1  2020.  I'm trying to remember exactly.

2    Q.   And is that -- is that the only basis for

3  your allegation that you are entitled to lost wages?

4    A.   No, sir.  I ended up quitting -- I ended up

5  quitting Premiere Fibers, to be honest, because it was

6  just so much of a mental strain, of having to travel

7  the -- the same route as of where I -- where I was

8  pulled over, where all this happened.  So from

9  constantly -- I mean, I can -- I can describe to you

10  the house that I was sitting in front of.

11    Just constantly having to see that and be

12  reminded of it every single day, to be honest, it

13  became way too much for me.  And I ended up quitting.

14    Q.   Okay.  And when did you quit?  Would it be

15  December of '18 -- excuse me, September of '18 that

16  you quit Premiere Fibers?

17    A.   I believe so.  It wasn't too long after I

18  had -- I had became employed with them.

19    Q.   Okay.

20    MR. PERRIN:  Madam Court Reporter, can

21  we pull up the SBI statement?

22    (DEPOSITION EXHIBIT

23    NUMBER 3 WAS MARKED

24    FOR IDENTIFICATION)

25    Q.   (Mr. Perrin)  Mr. Kifer, what I'm going to

---

102

1  do now, just show you -- it's not a transcript, but
2  it's a summary of the statement you gave the SBI
3  agent. And what I'm going to ask you to do is just
4  look at it and tell me anything there you think is not
5  accurate, okay?
6      **A. Yes, sir.**
7          THE COURT REPORTER: Is this for -- Mr.
8  Perrin, I have a WBB Stan LV, I have two of those.
9          MR. PERRIN: It should be SCAN RK
10  maybe?
11          THE COURT REPORTER: Okay. Okay.
12          MR. PERRIN: Sorry about that.
13          THE COURT REPORTER: That's okay.
14      Q. (Mr. Perrin) Mr. Kifer, what I'll do is
15  just -- tell me when you finish this page.
16      **A. Okay.**
17  (Witness examines document)
18      **A. Okay.**
19      Q. All right. Is there anything in, at least,
20  Page 1 that's not accurate?
21      **A. I knew that -- I knew that she was dating --**
22  **that she was dating somebody, but I didn't -- I didn't**
23  **know who he was.**
24      Q. Okay. So the last paragraph?
25      **A. Right. So saying, "He knew that Vang and**

---

103

1  David Burroughs were together for three years," I
2  found that out after they had broken up.
3      Q. Okay. I got you. But other than that,
4  everything accurate?
5      **A. Yes.**
6      Q. All right. Let me go to Page 2. Sorry.
7  (Witness examines document)
8      **A. Okay. The -- the part where it says that I**
9  **had only seen him once, I saw him more than once. I**
10  **saw him when he came to pick up his stuff, and then**
11  **also when he showed up at Lela's parents' when --**
12  **basically when he made the threat to her, and then, of**
13  **course, passing -- passing by.**
14      Q. Okay. Anything else? And I'll go down a
15  little bit, too, Mr. Kifer. I think that's --
16  anything else? And I'll let you finish that. But
17  anything else, other than that? If could just let me
18  know if anything is not accurate.
19      **A. Yes, sir.**
20  (Witness examines document)
21      **A. Okay.**
22      Q. Anything else in that -- the rest of Page 2
23  that's inaccurate?
24      **A. So far everything looks accurate.**
25      Q. Okay. Let me go to Page 3. And see if I

---

104

1  can make it one page here.
2  (Witness examines document)
3      **A. Okay. Everything on there looks correct.**
4      Q. Okay. And I think this might be the second-
5  to-last page. Let me see here. Yep.
6  (Witness examines document)
7      **A. Okay.**
8      Q. Is anything in there, Mr. Kifer, inaccurate?
9      **A. No, everything looks accurate.**
10      Q. And then this one's shorter, but this is
11  Page 5.
12  (Witness examines document)
13      **A. Okay.**
14      Q. Is everything on Page 5, Mr. Kifer,
15  accurate?
16      **A. Yes, sir.**
17      Q. Did your -- I know we talked about your dad
18  talking to someone at the sheriff's office. Do you
19  know if your dad actually called Sheriff Reid prior to
20  him going to the sheriff's office on March 7th of
21  2018?
22      **A. I'm not sure if he did or not.**
23      Q. Okay. Did you ever -- strike that.
24          Did Lela ever talk, to your knowledge, to
25  David Burroughs after March 7th of 2018?

---

105

1      **A. I know that he tried to get in contact with**
2  **her, but she had blocked him on her phone and social**
3  **media.**
4      Q. And I assume you never -- he never reached
5  out to you after March 7th of 2018?
6      **A. No, sir.**
7      Q. Did you ever tell anyone that you harbored
8  no hard feelings towards David Burroughs sometime
9  after this incident?
10      **A. No, sir. It was -- I -- I told Lela that,**
11  **you know, if -- if he didn't do it, then, you know, I**
12  **don't want somebody innocent going down for something**
13  **that they didn't do.**
14      Q. Okay.
15      **A. But, I mean, I -- I didn't know.**
16      Q. Okay. Who is Dot Huntley, H-u-n-t-l-e-y?
17      **A. I'm not sure.**
18      Q. How about Regina Caldwell?
19      **A. I have no idea.**
20      Q. Barbara Melton, M-e-l-t-o-n?
21      **A. I'm not sure.**
22      Q. Did you ever go retrieve your property, Mr.
23  Kifer, from the sheriff's office?
24      **A. No. My sister, she went and picked it up at**
25  **the impound lot.**

---

106

1    Q.   Okay.
2    A.   And then drove me home.
3    Q.   So you never did that, you never went back
4 to the sheriff's office after March 7th of '18?
5    A.   Not that I could recall -- well, I did show
6 -- I did go there, and I asked the secretary or front
7 clerk, I don't know her name, if I was able to get my
8 hands on the -- I don't know what it's officially
9 called.  But basically, whenever an officer writes
10 their report on -- I asked her if I could get that to
11 -- when I -- when -- for that day, March 7th.
12    Q.   When did you go to the sheriff's office and
13 ask about that?
14    A.   To be honest, I -- I don't necessarily
15 remember.  I know that it was before I moved to Ohio.
16    Q.   Okay.  And were you given that, or did you
17 not get it?
18    A.   I was given that.
19    Q.   One of the -- and, again, I need to ask you
20 this.  But one of -- there's a reference to Sheriff
21 Reid having an affair with your mother.  And my -- I
22 mean, it's not -- there's nothing other than that
23 saying that.  Do you know anything about that, if it's
24 true or not?
25    A.   You mean my stepmother?

107

1    Q.   I -- I don't know, honestly.  It just said
2 mother.  I mean, it's an allegation that's not made by
3 you or anyone from the sheriff's office, but it was
4 contained in a piece of the SBI report.  It could be
5 your mom, it could be your stepmom.  Do you know
6 either one?
7    A.   I don't -- I don't know.  I definitely know
8 that it's not my mother just because, you know, I know
9 her.  But I don't know if that's an actual fact or
10 not.
11    Q.   And I don't know if it is either, and,
12 again, I don't mean to imply that it is.  But I just
13 -- you know, I needed to ask you that question.
14        Mr. Kifer, is there anything else you think
15 I, as the attorney for David Spencer, Kyle Beam, Josh
16 Beam, and Jimmy Williams, should know about this
17 lawsuit or what happened to you on March 7th of 2018?
18    A.   Not that I can think of.
19        MR. PERRIN:  Okay.  I appreciate your
20 time, Mr. Kifer.  Sorry we had to meet under these
21 circumstances, but thank you for your time.
22        THE WITNESS:  Thank you.
23        MR. MACLATCHIE:  And I have no
24 questions.
25        MS. PFEIFFER:  I have just a couple of

108

1 quick questions for you, Ray.  I just want to follow
2 up on a few things that Mr. Perrin asked you.
3            EXAMINATION
4 BY MS. PFEIFFER:
5    Q.   When Mr. Perrin was asking you about getting
6 pulled over, he asked whether you believed you were
7 speeding, and I think that your answer was no.  And
8 then you said, if anything, you go five over the speed
9 limit from time to time.
10        Given the fact that you had just been tailed
11 by David Spencer for quite some time before dropping
12 off Lela, do you think that you were even going five
13 over the speed limit after you dropped her off?
14        MR. PERRIN:  Objection to leading.
15        MR. MACLATCHIE:  Objection.
16 Speculation.
17        MS. PFEIFFER:  You can answer.
18        THE WITNESS:  No, just because, I mean,
19 you see an officer, you immediately slow down anyways.
20 And knowing that he was right there, then -- I mean,
21 more than likely I was not.
22    Q.   (Ms. Pfeiffer)  I also want to follow up
23 some questions Mr. Perrin asked you about whether
24 Jimmy Williams or Josh Beam threatened to kill you.
25 He asked whether they threatened to kill you, and your

109

1 response was, "No, they didn't threaten to kill me."
2        It -- it sounded as though there was more to
3 that answer based on the tone of your voice.  Did they
4 verbally threaten you in any way in the car?
5    A.   No.
6    Q.   Did you feel threatened in the car?
7    A.   Yes.
8    Q.   Why?
9    A.   Well, I had done nothing wrong, but yet I'm
10 being arrested.  I don't know why I'm being arrested.
11 And we're not even going to the sheriff's department,
12 we're going to another building that, at the time, I
13 didn't even know was affiliated with the sheriff's
14 department.  So yes, ma'am, I felt like my life was in
15 danger.  I had no idea what was going on.
16        I mean, like I said, common sense, you get
17 arrested, you go to the sheriff's department.  You
18 don't take detours or anything like that.  So I felt
19 that something bad was about to happen.
20    Q.   How would you describe the atmosphere in
21 that SUV, with the Homeland Security agent and Jimmy
22 Williams and Josh Beam?
23    A.   It was -- it was very, very tense,
24 especially considering that I've -- that I've known on
25 a personal level Josh Beam and Jimmy Williams, but yet

110

1  I'm sitting there as if I'm nobody at all to them.  It
2  -- it -- it was very, very tense, very intense.  And
3  just very scary.
4      Q.  Mr. Perrin also asked you about the
5  interrogation with the Homeland Security agent where
6  Jimmy Williams and Josh Beam were also present.  Do
7  you remember that?
8      A.  Yes, ma'am.
9      Q.  Do you remember who was sitting directly
10  across from you?
11      A.  Jimmy Williams.
12      Q.  Do you remember that he had handcuffs in his
13  hands?
14      A.  Yes, ma'am.
15      Q.  Do you remember him constantly clicking the
16  handcuffs in front of you?
17          MR. MACLATCHIE:  Objection.  Leading.
18          MS. PFEIFFER:  You can answer.
19          THE WITNESS:  Yes, ma'am.
20      Q.  (Ms. Pfeiffer)  Did you find that
21  intimidating?
22      A.  Very.
23      Q.  Do you recall where Josh Beam was sitting?
24      A.  Yes, ma'am.
25      Q.  Do you recall that he also had handcuffs?

111

1      A.  I -- I don't necessarily remember Josh Beam,
2  what was in his hands.
3      Q.  Do you recall feeling intimidated by Josh
4  Beam and his presence in that room?
5      A.  I -- I do.  Yes, ma'am.
6      Q.  What about it was intimidating?
7      A.  Basically, just -- just going back to -- I
8  mean, just the way that he looked at me.
9      Q.  And what do you mean by that?
10      A.  Like he's looking right through me, like
11  I'm, you know, I'm just another scum of the earth
12  criminal, and, you know, it's -- knowing I did nothing
13  wrong, it's very intimidating.
14      Q.  And had you done anything that attracted law
15  enforcement at any point in your life before March
16  7th, 2018?
17      A.  No, ma'am.
18      Q.  And these were two people who had known you
19  from the time you were young, correct?
20      A.  Yes, ma'am.
21      Q.  In Anson County, correct?
22      A.  Yes, ma'am.
23          MS. PFEIFFER:  I don't have any further
24  questions for you, Ray.
25          MR. PERRIN:  No questions for Mr.

112

1  Kifer.  Thank you.
2          MR. MACLATCHIE:  No questions.
3          THE COURT REPORTER:  Thank you.  This
4  concludes the deposition.  The time is 12:35 p.m.
5
6          WHEREUPON, at 12:35 o'clock p.m., the
7  deposition was adjourned.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

113

CERTIFICATION
    I, Gretchen Wells, Notary Public in and for
the County of Iredell, State of North Carolina at Large,
do hereby certify:
    That there appeared before me, via video conference,
the foregoing witness at the time and place herein
aforementioned and the foregoing consecutively numbered
pages are a complete and accurate record of all the
testimony given by said witness;
    That the witness has executed a declaration, which
is attached as an exhibit hereto, and who made an
attestation through this declaration that their testimony
is truthful under the penalty of perjury;
    That the undersigned is not of kin, nor in anywise
associated with any of the parties to said cause of
action, nor their counsel, and not interested in the
event(s) thereof.
    Reading and signing of the testimony was requested.
    IN WITNESS WHEREOF, I have hereunto set my
hand this 8th day of April, 2022.

                    *Gretchen Lynn Wells*
                    CHAPLIN & ASSOCIATES
                    Notary No. 202110400230

114

## WITNESS CERTIFICATION

I, RAY KIFER, JR., do hereby certify,
That I have read and examined the contents of the
foregoing pages of record of testimony as given by me
at the times and place herein aforementioned;
And that to the best of my knowledge and belief,
the foregoing pages are a complete and accurate record
of all the testimony given by me at said time, except
as noted on the attached here (Addendum A).
I have _____ / have not _____ made changes/corrections
to be attached.

_____
(WITNESS SIGNATURE)

I, _____, Notary Public
for the County of _____, State of
_____, do hereby certify:
That the herein-above named personally appeared
before me this the _____ day of _____, 20_____;
And that I personally witnessed the execution
of this document for the intents and purposes herein
above described.

_____
NOTARY PUBLIC

My Commission Expires:                  (SEAL)

115

## ADDENDUM A

Upon the reading and examination of my
testimony as herein transcribed, I note the following
changes and/or corrections with accompanying reason(s)
for said change/correction:

Page    Line                    Is Amended to Read

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____