Exhibit

H

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF NORTH CAROLINA

3                CHARLOTTE DIVISION

4            CASE NO. 3:21-CV-039-DCK

5    _____

6    RAY KIFER, JR.,

7            Plaintiff,

8    vs.

9    DAVID SCOTT BURROUGHS, DAVID
     SPENCER, KYLE BEAM, JOSH BEAM,
10   JIMMY WILLIAMS, AND UNKNOWN
     FEDERAL AGENT,
11
             Defendants.
12   _____

13

14            VIDEO-RECORDED DEPOSITION

15          TAKEN VIA VIDEOCONFERENCE OF

16              JOSHUA AUSTIN BEAM

17             (Taken by Plaintiff)

18          Wadesboro, North Carolina

19           Thursday, May 19, 2022

20                 9:39 a.m.

21

22

23

24
               Reported stenographically by
25      V. Dario Stanziola, CCR (GA)(NJ), RPR, CRR

Page 2

```
 1                   APPEARANCES
 2  ON BEHALF OF THE PLAINTIFF:
    (Appearing Via Videoconference)
 3
          SONYA PFEIFFER, Esquire
 4        DAVID RUDOLF, Esquire
          J.P. LATTIMORE, Esquire
 5        SUZETTE WOOLSEY
          JESSICA KOOL
 6        Rudolf Widenhouse
          225 East Worthington Avenue, Suite 100
 7        Charlotte, North Carolina 28203
          (704) 333-9945
 8        spfeiffer@rudolfwidenhouse.com
          dsrudolf@rudolfwidenhouse.com
 9        jlattimore@rudolfwidenhouse.com
          swoolsey@rudolfwidenhouse.com
10
    ON BEHALF OF THE DEFENDANTS DAVID SPENCER,
11  KYLE BEAM, JOSH BEAM, JIMMY WILLIAMS:
    (Appearing Via Videoconference)
12
          SEAN F. PERRIN, Esquire
13        Womble Bond Dickinson (US) LLP
          One Wells Fargo Center, Suite 3500
14        301 South College Street
          Charlotte, North Carolina 28202
15        (704) 331-4992
          sean.perrin@wbd-us.com
16
    ON BEHALF OF THE DEFENDANT DAVID SCOTT BURROUGHS:
17  (Appearing Via Videoconference)
18        SCOTT MacLATCHIE, Esquire
          Hall Booth Smith, P.C.
19        11215 North Community House Road
          Suite 750
20        Charlotte, North Carolina 28277
          (980) 949-7820
21        smaclatchie@hallboothsmith.com
22
23
24
25
```

Page 3

```
 1  Also Present:

    (Appeared Via Videoconference)
 2

          JAMES THOMAS WILLIAMS, JUNIOR
 3

          AMANDA SMITH, Videographer
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18        VIDEO-RECORDED DEPOSITION TAKEN VIA
19  VIDEOCONFERENCE OF JOSHUA AUSTIN BEAM, a witness
20  called on behalf of the Plaintiff, before V.
21  Dario Stanziola, CCR (GA)(NJ), RPR, CRR, Notary
22  Public, in and for the State of North Carolina,
23  with the deponent located in Wadesboro, North
24  Carolina, on Thursday, May 19, 2022, commencing
25  at 9:39 a.m.
```

Page 4

```
 1                  INDEX OF EXAMINATIONS
 2
 3  By Mr. Pfeiffer                    PAGE    7
 4
 5
 6
 7
 8
 9
10
11                  INDEX OF EXHIBITS
12  NUMBER         EXHIBIT               MARKED
13  (None marked.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        THE VIDEOGRAPHER:  This is the
 2  beginning of media number 1 in the
 3  deposition of Lieutenant Josh Beam in the
 4  matter of Ray Kifer, Junior versus David
 5  Scott Burroughs, et al.  Case number
 6  3:21-cv-039-DCK.
 7        Today's date is Thursday, May 19th,
 8  2022.  And the time on the monitor is
 9  9:39 a.m.
10        My name is Amanda Smith, and I am the
11  videographer.  The court reporter is Dario
12  Stanziola.  We are here with Huseby Global
13  Litigation.
14        Counsel, please introduce yourselves
15  after which the court reporter will make a
16  statement.
17        MS. PFEIFFER:  This is Sonya Pfeiffer,
18  and I'm joined by my paralegal Suzette
19  Woolsey, co-counsel J.P. Lattimore and the
20  summer student Jessica Kool, and we
21  represent the plaintiff, Ray Kifer, Junior.
22        MR. PERRIN:  This is Sean Perrin for
23  Joshua Beam.
24        MS. PFEIFFER:  Scott MacLatchie for
25  David Burroughs.
```

Page 6

1    THE STENOGRAPHER:  This is the court
2  reporter, Dario Stanziola.
3    Will all parties acknowledge that in
4  lieu of an oath administered remotely, the
5  witness will verbally declare his testimony
6  in this matter is true under penalty of
7  perjury and all parties and their counsel
8  consent to this arrangement, waive any
9  objections to this manner of reporting, and
10 the witness has verified that he is, in
11 fact, Joshua Austin Beam.
12   Please indicate your agreement to this
13 stipulation by stating your name and your
14 agreement on the record.
15   MS. PFEIFFER:  This is Sonya Pfeiffer
16 on behalf of the plaintiff and all of those
17 associated with me, we agree.
18   MR. PERRIN:  This is Sean Perrin, I
19 agree.
20   MR. MacLATCHIE:  Scott MacLatchie, so
21 stipulated.
22   THE VIDEOGRAPHER:  We may now proceed.
23
24
25

Page 7

1              JOSHUA AUSTIN BEAM,
2  under penalty of perjury, was examined and
3  testified as follows:
4              EXAMINATION
5  BY MS. PFEIFFER:
6    Q.   Good morning, Lieutenant Beam.
7         How are you?
8    A.   Good.  You?
9    Q.   I'm good, thanks.
10        As you know, I'm Sonya Pfeiffer.
11        You were here yesterday for Lieutenant
12 Williams' deposition, right?
13   A.   I was.
14   Q.   And did you attend that entire
15 deposition?
16   A.   I was in and out doing some duties at
17 the sheriff's office.
18   Q.   Okay.  What portion of the deposition
19 did you attend, if you can give a percentage?
20   A.   Probably about 85 percent.
21   Q.   Okay.  And Lieutenant Williams is in
22 the same room as you right now?
23   A.   He is.
24   Q.   And where is he sitting, please?
25   A.   He's parallel to me, to my left on the

Page 8

1  other side of Mr. Perrin.
2    Q.   All right.  Are you able to see him and
3  make eye contact with him if you were to turn to
4  your left?
5    A.   If I turn my head completely to the
6  left, I am.
7    Q.   Okay.  Other than Lieutenant Williams
8  and your attorney, Mr. Perrin, anyone else in the
9  room with you?
10   A.   No.
11   Q.   So yesterday when you were in the room
12 with Lieutenant Williams for about 85 percent of
13 the deposition, of course, you could hear all of
14 my questions, right?
15   A.   Yes.
16   Q.   And you heard all of the answers from
17 Lieutenant Williams, yes?
18   A.   Yes.
19   Q.   And part of the reason you were in the
20 room, of course, was to prepare for your
21 deposition, right?
22   A.   Yes.
23   Q.   So that you could hear those questions
24 and answers and figure out how you might respond
25 to those, right?

Page 9

1    A.   I was interested in the process.  I've
2  never done a deposition.  But I did -- I did hear
3  the questions.  I apologize.
4    Q.   That's okay.
5         And, of course, in hearing those
6  questions and hearing those answers, naturally
7  you'd be be able to help yourself prepare if you
8  were to have similar questions, right?
9    A.   In those circumstances, yes, I will
10 answer your questions, yes.  I could prepare for.
11   Q.   Did you and Lieutenant Williams talk
12 after the deposition last night?
13   A.   Not about the deposition.
14   Q.   Okay.  But you did talk with each
15 other?
16   A.   We actually rode out looking for a CI
17 of his after the deposition and then he brought
18 me back and I went back to my office.
19   Q.   What CI were you looking for?
20   A.   It's one of -- I'm not in narcotics
21 anymore, so it's one of his that he was just
22 looking for to do some work with.
23   Q.   Is it one of the CIs that he discussed
24 yesterday during his deposition?
25   A.   I'm not sure.

Case 3:21-cv-00039-DCK    Document 57-9    Filed 02/10/23    Page 3 of 54

Page 10

1      Q.   Did you talk at all about this case
2  when you were together yesterday?
3      A.   I don't think so.  I think we talked
4  about just my deposition being today and
5  basically that I was just -- had hoped to go
6  yesterday to get it over with.
7      Q.   Anything about the content of your
8  deposition today?
9      A.   No.
10     Q.   Anything about what you expected might
11 be asked of you today?
12     A.   Speaking with him about that?
13     Q.   Yes.
14     A.   No, I spoke with my attorney about
15 that.
16     Q.   I don't want to hear about any of that
17 conversation.  I'm just talking about with
18 Lieutenant Williams.
19     A.   Not about what questions you could ask
20 me today.
21     Q.   Okay.  Anything about his testimony,
22 did you talk with Lieutenant Williams about his
23 testimony yesterday?
24     A.   No.  I want to say that we talked just
25 about the process with our attorney afterwards.

Page 11

1      Q.   With -- outside --
2      A.   Not outside the attorney, no.
3      Q.   Okay.  Now, if you're not in narcotics
4  anymore, why is it that you were driving out on a
5  CI visit with Lieutenant Williams yesterday?
6      A.   He asked me to because I had worked --
7  I'd just recently like last week came out of
8  narcotics.
9      Q.   And did he ask you to so the two of you
10 could talk with each other, is that understanding
11 of why?
12     A.   I think in narcotics you try not to go
13 out and talk to your CIs by yourself --
14     Q.   Is there any --
15     A.   -- go with him.
16          THE STENOGRAPHER:  I'm sorry, I didn't
17     hear the end of your answer.  Could you
18     repeat your answer, sir.
19     A.   Basically, in narcotics you try not to
20 go out and meet CIs or anybody by yourself.  And
21 I think that's why he asked me to go because he
22 was up here at the office.
23     Q.   Is there anyone else in the narcotics
24 unit right now other than Lieutenant Williams?
25     A.   There is.

Page 12

1      Q.   And who is that?
2      A.   Detective Josh Martin.
3      Q.   And where was Josh Martin yesterday?
4      A.   He was at their office at the airport.
5      Q.   Any reason he couldn't have asked Josh
6  Martin to go with him?
7      A.   He called him and he did say he would
8  come up here.  No, no, he did go with us.  He
9  came up here and went with us.  We actually left
10 the sheriff's office and went and got a drink and
11 a snack.  And then he called him while we were
12 there and he asked if I wanted to ride with him
13 out to see the CI.  And so I did ride with him
14 out there to do that, just kind of as a -- we
15 used to do that and I've been assigned to a new
16 position.  So it was kind of a let's do what we
17 used to do, just go out and ride, get me out of
18 the office.  Because now I work in the office
19 here at the sheriff's office.
20     Q.   So it's not that this was a
21 particularly dangerous situation, he needed three
22 people instead of two, right?
23     A.   Not dangerous.  But just this is how we
24 work.  Because when I was in narcotics full time,
25 Detective Martin was a part-time narcotics

Page 13

1  detective.  And he would -- he would accompany us
2  from time to time.  But now if we do go out and
3  meet somebody, you do not -- you try not to do it
4  by yourself.  And he did ask me to go with him,
5  if I would go with him out to speak with this CI
6  -- or if he could find this CI.
7      Q.   But you really only needed a couple of
8  people to do that, right?
9      A.   It could have been just him and Martin.
10     Q.   So this did provide an opportunity for
11 the two of you to talk with each other after
12 yesterday, right?
13     A.   It did provide it.  But we did not.  I
14 think when Detective Martin got with him, he and
15 Detective Martin talked about a few of their
16 cases that they were trying to get together.
17     Q.   Did you speak with Lieutenant Williams
18 at all this morning about the deposition?
19     A.   He was here when me and our lawyer
20 talked.
21     Q.   Okay.
22     A.   But I didn't talk to him outside the
23 presence our lawyer, I did not talk to him about
24 the case.
25     Q.   Okay.  So now you've attended most of

Page 14

1  Lieutenant Williams'. You've also attended the
2  deposition of Ray Kifer, Junior, correct?
3      A.  Yes.
4      Q.  And you have attended the deposition of
5  David Spencer, right?
6      A.  I did.
7      Q.  Any other depositions that I'm missing
8  that you attended?
9      A.  I did not. I was wanting to attend I
10 think it was Mario that y'all did. And I was
11 busy that day. I couldn't attend that one.
12     Q.  Why did you want to attend Mario's?
13     A.  Again, this is all a new process to me.
14 And I just want to be familiar with the process
15 that y'all do and stuff like that.
16     Q.  Well, and also help you prepare to know
17 the kind of questions that might be asked of you
18 too, right? Fair?
19     A.  That is fair.
20     Q.  Well, now that you have sat through
21 that many depositions, including the one
22 yesterday, do you feel familiar enough or do you
23 want me to run you through some of the rules for
24 the rest of today?
25     A.  For clarification, if you could run

Page 15

1  through the rules, that would be awesome.
2      Q.  Sure.
3          For starters, we're doing a decent job,
4  maybe Dario would disagree, but we'll try not to
5  talk over each other. So I will try to let you
6  finish your answers before I ask my question.
7  And I just ask you do the same with me, okay?
8      A.  Yes.
9      Q.  Excuse me. I'm sorry.
10         And the reason for that is that Dario
11 is taking down everything that we say. So it's
12 -- he's transcribing that. Therefore, please
13 also make sure that your answers are audible and
14 there -- it's a full yes or no as opposed to
15 shaking your head or something like um-hum, okay?
16     A.  Yes.
17     Q.  If you don't understand something that
18 I ask you, if it's a poorly worded question or it
19 just doesn't make sense to you, please ask me to
20 rephrase or repeat the question, okay?
21     A.  Okay.
22     Q.  If you don't, I'm going assume that you
23 understand my question and that your answer is
24 responsive to that question, fair?
25     A.  Fair.

Page 16

1      Q.  Anything going on with you today, any
2  medication, any circumstances that would keep you
3  from being able to hear and understand me?
4      A.  Nothing to keep me from hearing and
5  understanding.
6      Q.  Okay. Great.
7          If you need to take a break at any
8  time, just let Mr. Perrin know or let me know and
9  we'll take a break. I just want to make sure
10 that if I'm in the middle of asking you a
11 question or you're in the middle of answering, we
12 go ahead and finish out that question and answer
13 or it might be a small series of questions that
14 relate to each other. I just ask that we finish
15 that up before we take a break, okay?
16     A.  Yes, ma'am.
17     Q.  All right. Lieutenant Beam, how long
18 have you been in law enforcement?
19     A.  18 years. This June the 1st will be
20 18 years full time.
21     Q.  And were you in law enforcement part
22 time before that?
23     A.  I was a reserve deputy for the
24 sheriff's office here. I -- I got sworn in on
25 May the 14th of 2004.

Page 17

1      Q.  And have you been at Anson County since
2  May of 2004?
3      A.  I have.
4      Q.  And just tell me about the various
5  roles you've had within Anson County since May of
6  2004.
7      A.  So, of course, I started out -- May I
8  was a reserve deputy, so I would come in and help
9  in the courts as a bailiff and like Superior
10 Court week, things like that. June the 1st I
11 became a full-time deputy and was put onto a
12 patrol shift. So my duties then were just
13 regular patrol around the county. Shortly after
14 that Sheriff Allen wanted me to go into the GHSP
15 program, which is the Governors Highway Safety
16 Program. So basically I would do traffic
17 enforcement and community events, things like
18 that, just public -- public education on traffic
19 safety.
20         Became an assistant -- or a corporal.
21 Did that up until I went into the GHSP full time.
22 Did that for a little while. In 2010 Sheriff
23 Allen promoted me to a shift supervisor, a
24 sergeant. I did that -- I don't think I did that
25 very long before our civil officer, she actually

Page 18

1  got pregnant and had to go out on maternity
2  leave, so Sheriff Allen asked me to fill the role
3  of the civil officer.  I did that for a little
4  while.

5         When that was completed or that
6  assignment was completed, Sheriff Allen did not
7  put me back on patrol, but maybe the
8  administrative sergeant.  So I did duties around
9  the office and things like that.

10         I did that up until 2014 when Sheriff
11 Reid took office.  And he had promoted me to the
12 administrative lieutenant position, which is just
13 the day-to-day operations of the sheriff's
14 office, the equipment, things like that.

15         It was 2015, myself and Lieutenant Tice
16 -- Lieutenant Tice was the narcotics detective at
17 the time.  We swapped jobs, just kind of lateral
18 lieutenant to lieutenant.  And I went into
19 narcotics.  Lieutenant Tice took the
20 administrative lieutenant's position.  I did that
21 for about seven years up until about last week
22 when the sheriff transferred me back into the
23 administrator lieutenant's position.

24     Q.  All right.  So --
25     A.  Oh, I apologize.

Page 19

1      Q.  Go ahead.
2      A.  And he did that because he needed the
3  position filled because I had done it prior.  That's
4  why he wanted me to come back to that position.

5      Q.  So now your position is administrative
6  lieutenant?
7      A.  Yes.
8      Q.  Do you like that position?
9      A.  I do.  It can come with its headaches.
10     Q.  Such as?
11     A.  Just the day-to-day of spending money
12 on car maintenance, uniforms, make sure everybody
13 has what they need.  It seems that when you get
14 that new position, everybody wants something new.
15 So they're coming to me daily requesting items,
16 which is okay.  But it's still a -- can be a
17 headache.

18     Q.  So was last week also when Josh Martin
19 moved into your role?
20     A.  Yeah, when I moved into the
21 administrative lieutenant's position, Josh Martin
22 moved into the full-time narcotics position.

23     Q.  You mentioned the civil officer role
24 that you went into.  What does the civil officer
25 do?

Page 20

1      A.  So a civil officer for us serves civil
2  processes, lawsuits, things like that, retrieving
3  property that is, of course, been awarded back to
4  an owner or a rental property, things like
5  evictions, things like that.  So that was my
6  duty.

7      Q.  Got it.
8         When you went to the narcotics unit in
9  2015, what specific training did you have in
10 narcotics or investigations before moving into
11 that role?
12     A.  So during my time as a patrol officer,
13 I took it upon myself to take some on --
14 different online trainings for like street level
15 drug investigations, narcotics investigations,
16 just some -- I'm trying to remember what the --
17 it was -- it was a college out of Florida that
18 offered it.  And I cannot remember the name of it
19 because that was back in, I think, 2005 when I
20 did all that.  And I actually also volunteered
21 some of my time helping Lieutenant Tice in his
22 role as narcotics, just coming out and helping
23 him here and there with a couple of things that
24 he might have had going on.

25     Q.  And why did you choose to take those

Page 21

1  online courses?
2      A.  I just wanted to further my education
3  and all.  But, I mean, it was -- it was not only
4  to narcotics, but different things like gangs and
5  -- I can't remember.  There was a lot of them and
6  I can't remember.  But it reached the whole broad
7  spectrum of what a law enforcement officer could
8  do.  And I just wanted to do that because I
9  didn't exactly know where my career was going at
10 the time or where it could go.  I wanted to be
11 prepared in case anything happened.

12     Q.  Did you have a specific desire to work
13 in the narcotics unit?
14     A.  It always was interesting to me.  But I
15 also enjoyed traffic enforcement.  But that
16 position went away.  And so basically in 2015
17 when I was the administrative lieutenant, it was
18 a new administration.  I had worked for the
19 previous one for so long.  And it just -- being
20 up there in the office with the -- all the
21 day-to-day, just -- I was still pretty young, it
22 had kind of got to me.  And so it was a good fit
23 because Detective Tice, of course, had been in
24 his position for like 13, 14 years and he needed
25 a change also.  So just felt a change would be

Page 22

1  good.  And that, to me, we could change
2  laterally, a rank for rank, and we wouldn't have
3  to promote anybody or demote anybody in that
4  case.
5      Q.   Got it.
6           Some of these online trainings that you
7  took from that college out of Florida, did those
8  count towards any of the required training hours
9  that you need to take in a year?
10     A.   So it didn't -- like the in-service
11 training, it didn't count toward that.  It did go
12 toward my -- like my general certificate,
13 intermediate certificate, advanced certificate,
14 those points that go along with that, it did
15 count for that.
16     Q.   And you mentioned the number of
17 certificates.  At what level are you?
18     A.   I'm advanced law enforcement.
19     Q.   And when did you get that certificate?
20     A.   I want to say it was either last year
21 or the year before I had attained that.
22     Q.   And what did you do to have to attain
23 that; is it just a number of hours or is it
24 specific courses?
25     A.   Well, it's just the number of hours.

Page 23

1  Like in training, beyond the in-service training.
2  And like your years experience, things like that
3  go into it.  I can't remember the exact number
4  you're supposed to have to obtain those.  Because
5  it goes from your general certification to your
6  intermediate certification to your advanced
7  certification.
8      Q.   And all of the courses that you take
9  that apply towards those certification come
10 through the North Carolina justice academy?
11     A.   So no, some of my training, like I am a
12 certified EMT in North Carolina, that -- some of
13 that counts toward it.  And, again, some of the
14 training that I took online was not like justice
15 academy training.  But then I did take classes
16 like the training officer, training officer
17 supervisor.  I went to those classes to get the
18 training, intoxilyzer, radar, stuff like that,
19 what came through the justice academy.
20     Q.   Okay.  But any of those courses would
21 apply towards your certificate, it doesn't have
22 to be an academy course?
23     A.   No.  I apologize.  Yes, so any training
24 that would, like, further your education and your
25 career field or public service would go towards

Page 24

1  your certificate.
2      Q.   Got it.
3           And who issues that certificate?
4      A.   The -- it's the sheriff standards.  I'm
5  pretty sure it's sheriff standards.  Because the
6  -- all the sheriff's sign it.
7      Q.   And when you say all the sheriffs, is
8  that in North Carolina --
9      A.   No -- I apologize.
10          THE STENOGRAPHER:  I didn't hear the
11     end of your question.
12     Q.   Is that only in North Carolina or is it
13 nationwide?
14     A.   So the sheriffs have a training
15 standard commission, and it's the sheriffs that
16 are actually on that commission.  So it's North
17 Carolina sheriffs that make up that commission.
18     Q.   Do you know that all sheriffs serve on
19 the commission?
20     A.   I'm -- they're all a part of the -- I
21 don't know what -- they're separate groups inside
22 the commission.  You have the training and then
23 you have like the -- I guess it would be like the
24 ethics, you have like a ethics board that has
25 certain number of sheriffs on it, stuff like

Page 25

1  that.
2      Q.   Is it your understanding, though, that
3  if you're a sheriff in North Carolina, one of the
4  100 counties, you are automatically a part of the
5  -- the training standard commission?
6      A.   No, the sheriff standards I think -- I
7  think -- I think they're all involved in that,
8  yes.
9      Q.   Okay.  Going back to 2015 and the
10 lateral move with Tice, what was required of you
11 to show that you were qualified to be a narcotics
12 detective?
13     A.   I don't think there was any specific
14 requirement.  It was just that I was able to go
15 in and I got with Detective Tice for a little bit
16 and just went over like what he does and stuff
17 like that.  So it's kind of a do it and a kind of
18 a learn and go as I go along.  Because it's --
19 you know, I didn't jump right into like major
20 investigations, but did, like, street level,
21 worked my way up to the bigger investigations.
22 And then, of course, went through extra training
23 after I got in that position for, like, again,
24 narcotics investigation, surveillance techniques,
25 interview interrogation, things like that.

Page 26

1    Q.    So mostly it was on-the-job training at
2  the beginning?
3        A.    At the beginning.  Taking what I
4  already knew and putting a little more on it like
5  search warrant writing, things like that.
6        Q.    You talked about some extra training.
7  Was that required of you, the surveillance
8  techniques, that kind of thing?
9        A.    Those were classes that -- I would say
10  yes, like the interview interrogation, homicide
11  investigation, when I -- because I was doing
12  narcotics investigation and criminal
13  investigation when I went into that position,
14  because that's what the position did.  So that
15  stuff for the investigation side of it yeah, they
16  -- they wanted us to go to that training and
17  encouraged us to go to that training.
18        Q.    And where was that training, interview
19  and interrogation?
20        A.    Stanly Community College.
21        Q.    And was that through the academy?
22        A.    I think it was a justice academy
23  course.
24        Q.    What other courses do you recall
25  specific to being a drug detective that you are

Page 27

1  required or asked to take?
2        A.    I can't think of anything that I was
3  required to take.  There were -- like, I think we
4  took one class and it was just one that came up.
5  I can't remember what group -- I don't think it
6  was the justice academy class, but it was just a
7  class on, like, undercover work, things like
8  that.  It was just -- it was a private group that
9  does that.  I don't -- it wasn't one we were
10  required to take.  But I can't recall of any that
11  they told me you need to take this training to do
12  this job.
13        Q.    So you didn't have any specific
14  training in -- that you were required to do in
15  the development or use of confidential
16  informants?
17        A.    Not that I was required to do.  I do
18  believe that, like, the undercover class, I think
19  it touched on you, know, confidential informants
20  and basically, you know, if we use them, how we
21  would use them, keep them safe while we're using
22  them, things like that.
23        Q.    But before you transferred into the
24  drug unit, before you became a drug detective,
25  there was no requirement that you take a class on

Page 28

1  how to develop and use and confidential informants?
2        A.    No.
3        Q.    Okay.  Did you have to take any sort of
4  required class on how to deal with situations
5  where you suspect a fellow law enforcement
6  officer is involved in misconduct?
7        A.    Nothing that I can recall, like, was a
8  mandatory class.  I think in in-service training
9  they touched on, like, ethics and things like
10  that, you know, what you should do if you suspect
11  an officer committing an illegal act or
12  something.
13        Q.    And what did you learn you should do?
14        A.    So at the patrol level would be to take
15  it to your sergeant and let the sergeant take it
16  from there.  If it was something that could be
17  dealt with at a level of a sergeant, then the
18  sergeant would stop there.  If it needed to go
19  beyond that, then he would go to his lieutenant
20  and the lieutenant would get -- it just depends
21  on what level it stopped and needed to be
22  handled.
23        Q.    At what level might a sergeant be able
24  to handle a situation?
25        A.    So I -- to me, this is me, would be

Page 29

1  like if you get a complaint that an officer's
2  speeding going to calls or something like that.
3  Something that the officer could speak with the
4  officer and the sergeant could speak with the
5  officer and maybe, you know, just handle it that
6  level.
7        Q.    And what would be beyond a sergeant and
8  need to go to a lieutenant?
9        A.    I think more of a -- more of a higher
10  crime where it may -- it may require arrest of
11  the officer or it may result in the termination
12  of the officer.  So a sergeant shouldn't be at
13  the level of where a situation occurs that a
14  person might need to be fired.  It could -- it
15  could go to a lieutenant or higher.
16        Q.    And what might make it go higher than a
17  lieutenant?
18        A.    So, of course, either way it goes.  If
19  a person needs to be terminated, it's going to go
20  to the chief and the sheriff.  Because in the
21  ultimate end of it, the sheriff's the one that
22  makes the decision on termination and all that
23  stuff, criminal activity.  Again, that stuff
24  eventually would be passed up to the sheriff.  It
25  just depends on, like, for me as a lieutenant, we

Page 30

1 would gather as much information as possible
2 about what's occurred before we take it to our
3 superior, like the chief or the sheriff. Because
4 if you're talking about firing somebody or
5 arresting somebody, you want all of your -- you
6 want everything there because, I mean, it's --
7 you want to make sure that this is the course you
8 have to take. So we would probably look into it
9 a little further than just saying hey, look, this
10 is what we're feeling or this is what we're
11 seeing. We would want to get as much evidence as
12 possible.
13    Q.   And if it's a situation like what
14 you're describing where somebody might be
15 terminated or might involve a crime, what I hear
16 you saying is you've got to investigate that
17 fully before taking it upstairs, right?
18    A.   I mean, I would want to do that. And
19 it's part of our job as an investigator, as a
20 lieutenant, you know, we have our responsibility
21 to, of course, reporting misconduct. But, again,
22 we would want to know the total circumstances
23 behind that so we could get the full facts to the
24 sheriff.
25    Q.   And so if you were going to do that, it

Page 31

1 would be important to act quickly on information
2 that you have, particularly if it might involve a
3 crime, right?
4    A.   I would say yes, if you have -- like if
5 somebody came to me and said, hey, your deputy's
6 taking money from people, then yes, that's
7 something that's quick to act. If it -- if
8 somebody actually gives me an actual complaint of
9 the misconduct.
10    Q.   And if you have suspicions about
11 misconduct, you should act on those?
12        MR. PERRIN: Objection to form.
13        You can answer.
14    A.   I would say that if I had a strong
15 suspicion of misconduct, it would be one to act
16 fairly quickly.
17    Q.   And if you were going to act, you would
18 want to gather as much information as possible,
19 right?
20    A.   Yes.
21    Q.   And that would involve things like
22 doing interviews, right?
23    A.   Yes.
24    Q.   And as a law enforcement officer, you
25 had the ability to do things that a general

Page 32

1 citizen couldn't do, right?
2    A.   Such as?
3    Q.   Such as approach someone and ask them
4 questions.
5    A.   I would say to that the general citizen
6 could ask anybody questions. You could approach
7 them. I mean, I don't think we would the -- in
8 questioning somebody, I don't think that steps
9 outside the realm of what a general citizen could
10 do. But I understand -- I kind of understand
11 what you're saying.
12    Q.   Yeah. Well, I'll be a little more
13 clear. You could pat somebody down?
14    A.   Yes, you could do a Terry frisk.
15    Q.   If you had any suspicion after that,
16 you might be able to search a person?
17    A.   If I have probable cause to search
18 them, yes, I could.
19    Q.   Right.
20        And in the context of law enforcement,
21 you, as a higher ranking officer, have the
22 ability to give orders to lower ranking officers,
23 right?
24    A.   Yes.
25    Q.   And so if you were investigating

Page 33

1 another officer, you could order officers below
2 you to do certain things, right?
3    A.   Again, this is just for clarification
4 before I answer. What certain things would you
5 mean by that?
6    Q.   Well, it would depend on the
7 circumstances. If we're talking about this
8 circumstance, for instance, you could order an
9 officer underneath you to make a phone call to
10 someone, right?
11    A.   Again, I'm confused by the --
12    Q.   Sure.
13    A.   -- like a phone call, I mean, I'm not
14 understanding where we're going.
15    Q.   Well, why don't we pause on these
16 questions and once I provide more context, we'll
17 come back to them.
18        But point being, as an officer with a
19 higher rank, you have the ability to order lower
20 officers, depending on the circumstances, so long
21 as your order is appropriate, right?
22    A.   Yes.
23    Q.   And that would be an order to do
24 something or not do something, right?
25    A.   Depending on the circumstances, yes.

Page 34

1    Q.   Now, a few minutes ago we were talking
2  about what you would do if you suspected an
3  officer of misconduct and how you would need to
4  report that up, what a sergeant could handle,
5  what a lieutenant could handle.  And just to be
6  clear, these are just -- this is just your
7  opinion about what should be done, right?
8    A.   Yes, this is my opinion.
9    Q.   You didn't have any specific training
10  on this, did you?
11    A.   Again, just the ethics training and
12  in-service.  Just this and that.  It was --
13    Q.   And when you --
14    A.   I apologize.
15    Q.   Go ahead.
16    A.   So like no specific, like, training
17  training that you -- I'm assuming is like you're
18  asking -- asking.
19    Q.   Well, it's not as -- I mean, you talked
20  about ethics and you said this and that.  This
21  and that doesn't sound like it's the kind of
22  course where you sit down as a student and you
23  have an outline and on your out line you see this
24  is what we're going to talk about today,
25  misconduct by a colleague, here's how you should

Page 35

1  act, right?  Like it's not that formal.  No one
2  ever trained you what to do, right?
3    A.   Oh, now -- I apologize for going in
4  quickly.  So the ethics training would be like in
5  our in-service, it would have an outline, like
6  this is what you're going to touch on and then
7  the instructor would go over it.  But it's --
8  it's like, like I said, it says like, if you see
9  an officer doing something wrong, report it to
10  your supervisor -- you should report it to your
11  supervisor or things like that.  It's just touch
12  like that.  It's not -- it doesn't go in depth,
13  depth like hey, the sergeant has this
14  responsibility, lieutenant has this
15  responsibility, captain has this responsibility.
16  It's just if you see it, you should report it or
17  it -- it should be something that should be
18  investigated.
19    Q.   And there's an expectation of law
20  enforcement officers that they understand that
21  they're held to a higher standard than a regular
22  citizen, right?
23    A.   I believe so, yes.
24    Q.   And a law enforcement officer is
25  expected to follow the law, right?

Page 36

1    A.   Yes.
2    Q.   And if there's just a mention in an
3  in-service training that if you see something
4  that raises your suspicions about a fellow law
5  enforcement officer, you should tell a superior,
6  it sounds like there's almost an assumption that
7  a law enforcement given her or his responsibility
8  to the public should know you've got to act on
9  this, right?  It seems like there's a sort of
10  level of trust there.  Would that be fair to say?
11    A.   Yes.
12    Q.   Yesterday in Lieutenant Williams'
13  deposition do you remember where -- were you
14  present when he was talking about working under
15  Tommy Allen?
16    A.   Yes.
17    Q.   And you also worked under Tommy Allen,
18  correct?
19    A.   I did.
20    Q.   And like Lieutenant Williams, were you
21  required to read through the Anson County
22  Sheriff's Office Policy and Procedure Manual?
23    A.   We were.
24    Q.   And were you also required to sign a
25  paper certifying that you had done so?

Page 37

1    A.   I recall signing a paper for that.
2    Q.   And did you, in fact, read through the
3  policy and procedure manual?
4    A.   I did.
5    Q.   Were you also required to read the
6  updates whenever the updates came in to the
7  policy manual?
8    A.   Yes.
9    Q.   And were you also required to sign that
10  you had read those updates?
11    A.   Yes.
12    Q.   And did you, in fact, read those
13  updates?
14    A.   Yes.
15    Q.   What was your understanding about why
16  that was important to do?
17    A.   It was just important that all officers
18  have the understanding of the policy and policy
19  changes.
20    Q.   Why would that be?
21    A.   So that officers could do their duty
22  according to the policy so that they wouldn't
23  step outside the policy.
24    Q.   And if within the pol- --
25         MR. PERRIN:  Hey, Sonya, you faded a

Page 38

1    little bit there.  I'm not sure if it's on
2    your end or our end.   Do you mind
3    repeating that?
4         THE STENOGRAPHER:  You froze there.  If
5    you can repeat your question.
6         MS. PFEIFFER:  Okay.  Gotcha.
7         Q.   So if within the policy manual there is
8    a responsibility for officers to report up the
9    chain if they have suspicions about another
10   officer, that would be important for everyone to
11   know, right?
12        A.   Yes.
13        Q.   And that would be an important policy
14   to follow, right?
15        A.   Yes.
16        Q.   You would expect every employee of the
17   Anson County Sheriff's Office department in law
18   enforcement to follow that policy of reporting
19   their suspicions up the chain, right?
20        A.   Yes.
21        Q.   Because it's fair to say if one officer
22   does bad, it reflects poorly on all officers,
23   right?
24        A.   It does.
25        Q.   And if there is a policy that deals

Page 39

1    with confidential informants, whether someone is
2    involved in the narcotics unit or not, it would
3    be important to understand that policy, wouldn't
4    it?
5         A.   Yes.
6         Q.   Because any law enforcement officer
7    might get a tip from somebody, right?
8         A.   It's not uncommon.
9         Q.   Right.
10             Especially in Anson County?
11        A.   Um-hum.  Yes, ma'am.
12        Q.   Because this is a place where lots of
13   people know each other, right?
14        A.   Yes.
15        Q.   Lots of people know who's in law
16   enforcement, right?
17        A.   Yes.
18        Q.   So if it's required that you get a tip
19   about drugs and there's a policy that should
20   go to someone in the drug unit, that would be
21   important for those underneath the drug unit to
22   understand, right?
23        A.   If that's the policy, yes.
24        Q.   When did the -- the policy that sheriff
25   Tommy Allen had of reading and signing

Page 40

1    documentation that you'd read the manual and read
2    the updates, when did that policy stop?
3         A.   So that -- I won't say that it stopped.
4    It's just when Sheriff Reid came in, he's
5    updating the policy manual as to -- you know,
6    he's -- he had to review the policy manual and
7    he's been updating the policy manual.  So I know
8    that once it's complete, all that will, I'm sure,
9    go back to the way it was.  Now that's just me.
10   I can't speak -- I would say that that's probably
11   how it's going to go back to.
12        Q.   When did Sheriff Reid come into office?
13        A.   2014.
14        Q.   And is it your understanding that he's
15   been reading and updating the manual since 2014?
16        A.   I know that the policies are still in
17   place that were here and he's just been going
18   through piece by piece and reviewing them.  I
19   don't -- like I said, again, he has a lot of work
20   to do.  It's not something that he can just sit
21   down and say -- because the policies are in
22   place -- still in place, it's just not something
23   that he can sit down and -- because the sheriff
24   has a lot of responsibility.  This is coming from
25   me, again, not from the sheriff or anybody else.

Page 41

1         Q.   Well, the sheriff has a responsibility
2    to all the citizens of Anson County, right?
3         A.   He does.
4         Q.   And those who work for the sheriff,
5    meaning you and the other sworn law enforcement
6    officers, also have a duty to the citizens of
7    Anson County, right?
8         A.   Absolutely.
9         Q.   And y'all will have a duty to the citizens
10   of Anson County to enforce the law, right?
11        A.   Yes.
12        Q.   And also to ensure that citizens of
13   Anson County aren't victims, right?
14        A.   Aren't victims of a crime?
15        Q.   Of those who break the law.
16        MR. PERRIN:  Well, objection to form.
17   If you understand it, you can answer.
18        A.   I guess we wouldn't want there to be
19   any victims of any crime and we would do our best
20   to keep that from happening.
21        Q.   Well, you certainly have a duty of --
22   to protect the citizens of Anson County from
23   crimes perpetrated by law enforcement officers,
24   right?
25        A.   If that crime occurs, yes.  Any crime.

Page 42

1    Q.   Well, and if you know about the
2 potential occurrence of a crime, you certainly
3 have a responsibility to the citizens of Anson
4 County to try to prevent that crime from
5 occurring, right?
6         MR. PERRIN:  Objection to form.
7         You can answer.
8    A.   If you have complete knowledge of
9 misconduct that would cause harm to anybody, yes,
10 you need to act on it.
11    Q.   And what do you define as complete
12 knowledge?
13    A.   So I assume we're talking about this
14 situation that we're here for.
15    Q.   I'm just asking you to describe for me
16 what complete knowledge is.  I'm asking generally
17 speaking.
18    A.   So just because a situation would seem
19 that hey, kind of looked strange that this is
20 happening, you still need to get the total
21 circumstances behind it.  Is there actually
22 misconduct occurring or whatnot?
23         I don't think just because your gut
24 feeling says hey, this is kind of strange, you
25 could just act on it immediately.  You still need

Page 43

1 to get the full circumstance behind it.
2    Q.   Right.
3         But you would want to act as quickly as
4 possible if a crime might be in the process of
5 happening, right?
6    A.   If you have the -- if you believe that
7 a crime is actually being committed, yes, you
8 should act on it quickly.
9    Q.   So going back to the policy manual that
10 Sheriff Reid has been reading and updating since
11 2014, how is it that you know the policies are
12 still in place?
13    A.   Because -- and, again, this is me,
14 because we've just been going off the old policy
15 manual.  I mean, that's just me.  Again, I don't
16 know completely.  But I know that the old policy,
17 you know, is still -- it never said that those
18 policies were outdated or, you know, null and
19 void when he came in.  It's just that, like I
20 said, and I don't even know even if he is
21 updating it.  And, again, this is just me, if he
22 he is updating it, I don't know how many he kept
23 or changed or took out or whatnot.  That's the
24 sheriff.  So as of now, all officers are acting
25 on the policy that was in place.

Page 44

1    Q.   And when you say this is me, you're
2 saying that because after Sheriff Allen left, no
3 one has instructed you on what the policies and
4 procedures are in Anson County, right?
5    A.   Again, that's -- I would not like
6 instructed as in like hey, we're following the
7 old policy or hey, these are the new policies.
8 Is that what you're saying?
9    Q.   Right.
10    A.   No, nobody said hey, these are new
11 policies that we're following.  So the old
12 policies is the way we're going.
13    Q.   But nobody told you the old policies
14 are still in place either, right?
15    A.   No, I can't say specifically if they
16 said that.  Because, again, that's a long time
17 ago.  But to that point, again, nobody said they
18 weren't.  And those are the policies that are in
19 place at the sheriff's office.
20    Q.   And under Sheriff Allen there were
21 routine updates to that policy that you had to
22 read and then sign and say that you'd read them,
23 right?
24    A.   There were updates.  I can only recall
25 a few.  I mean, it wasn't like a every month

Page 45

1 there was a new update or a change to a certain
2 policy.  I know that in my time here Sheriff
3 Allen, he added like a policy for TASER usage and
4 stuff like that and which fell under the use of
5 force policy and stuff like that.
6         I want to say that at one time he
7 changed, like, the chase policy, you know, what
8 officers could chase people for, like to pursue
9 them.  I don't remember any big changes.  It was
10 just here and there he would -- and it -- it
11 wasn't -- I would say it was kind of rare.  I
12 mean, when they would change it, they would type
13 it up, put it in everybody's box so that
14 everybody got a physical copy of it and then you
15 would indicate that you got it and you read it
16 and you understand it, it goes in the policy
17 manual.  But, again, it wasn't anything -- a
18 major change.
19    Q.   Well, whether it's a major change or
20 minor change, it's important to understand what
21 the policies and procedures are, right?
22    A.   Yes.
23    Q.   And when you say you would get an
24 update in your mailbox and it was put into the
25 manual, did you have a copy of the manual?

Page 46

1    A.   I still have the hard copy manual that
2 I was given in 2004.  And, again, I'm not -- I
3 don't know what everybody else has been given
4 between now and then because, of course, I was
5 not in that position.  But I can tell you what I
6 got when I was in 2004.
7    Q.   And then would you put your updates in
8 your manual when you got them?
9    A.   I would.
10    Q.   Because you knew it was important to be
11 up to date with what the policies and procedures
12 were, right?
13    A.   Yes.
14    Q.   Now, you said that this is me, we're
15 all operating under the old manual.  When was the
16 last time you reviewed the policy and procedure
17 manual at Anson County?
18    A.   I can't remember the last time I looked
19 at it.
20    Q.   Could you ballpark it?
21    A.   I could ballpark it.  I probably looked
22 at it in 2000 and I want to say -- hum.  2012 I
23 think I looked at it.  Because I -- there was a
24 question about an officer had been in a car
25 accident.  And there was a question about that

Page 47

1 while I was the administrative sergeant.  And I
2 remember looking through it on I think it was
3 vehicle operation policy.  If -- again, if I
4 remember correctly.
5    Q.   Sure.
6         So when there might be a situation that
7 was new to you or you hadn't handled before, that
8 might be a time that you would say hey, I'm going
9 to consult the policy and procedure manual, I'm
10 not sure how to operate here?
11    A.   Yeah, just using it as the --
12 definitely for the -- like the -- in that
13 situation was had this person violated policy and
14 had they caused the accident or something like
15 that to where it would be involved discipline for
16 that action.
17    Q.   I mean, it's fair to say that -- that
18 you or any officer couldn't know everything word
19 for word that's in that policy and procedure
20 manual on any given day right?
21    A.   Yeah, not word for word.
22    Q.   And it's like a resource that you go to
23 if you're not sure what to do, right?
24         So that's why --
25         THE STENOGRAPHER:  I'm sorry, I didn't

Page 48

1 hear a response.
2         THE DEPONENT: Yes, sir.  I said yes.
3    Q.   And that's why it's important to be
4 familiar with that manual, right?  So that you
5 know hey, that I haven't handled this before or
6 hey, I have a question, it might be in the
7 manual, I'm going to go consult the manual,
8 right?
9    A.   Yes.
10    Q.   Were you present yesterday when
11 Lieutenant Williams was testifying about required
12 courses, firearms and law enforcement updates,
13 were you present for that?
14    A.   Yes.
15    Q.   So you're aware that -- that you and
16 other law enforcement officers have requirements
17 that -- in-service requirements you've got to
18 meet every year, right?
19    A.   Yes, the certain classes that are
20 every-year classes.
21    Q.   In addition to firearms and legal
22 update, are you aware of any other required
23 courses?
24    A.   The only two that I'm aware of are
25 HAZMAT and blood-borne pathogens.  That's one we

Page 49

1 do every year.  Though it never changes, that's
2 one we do every year.
3    Q.   Well, it would change if there was an
4 update, though, right?
5    A.   If there was an update, yes.
6    Q.   And legal updates is one where
7 sometimes there are frequent updates in the law,
8 right?
9    A.   Yeah, laws change.
10    Q.   Well, And naturally law enforcement
11 officers need to know the law, right?
12    A.   Yes.
13    Q.   And that's because you're supposed to
14 enforce the law, correct?
15    A.   Yes.
16    Q.   So that is certainly a course that it
17 makes sense that you're required to take every
18 year, you'd agree?
19    A.   Yes.
20    Q.   And law enforcement officers should
21 know, therefore, that the law requires them to
22 tell a person why they're under arrest, correct?
23    A.   Yes.
24    Q.   When we were talking about some of the
25 -- the policies within the office and we were

Page 50

1  talking about what to do with an officer if you
2  suspect an officer of law enforcement -- a law
3  enforcement officer is involved in misconduct,
4  you gave me your thoughts on what someone should
5  do.  What about a policy relating to confidential
6  informants, what -- what was -- and in 2018 now,
7  what was the policy in dealing with confidential
8  informants?
9            What should you do if you -- if you get
10  a drug tip?
11       A.   I couldn't quote for you.  I know
12  there's a policy on confidential informants.  But
13  I couldn't quote you word for word what the
14  policy says.  I know that like with us, when I
15  worked in narcotics, if we develop a confidential
16  informant, you know, we put them on the book or
17  we have them sign paperwork, you know, that they
18  understand this is, you know, basically a
19  guideline as to this -- this, this and this, if
20  you're a confidential informant, this is the
21  rules we follow.  We assign them a number and we
22  keep them in the books so that way if we -- like
23  if we go do a dry drug buy, we put their number
24  on the paperwork, like our write-ups and our
25  receipts for the monies that we spend and stuff

Page 51

1  like that.  I don't know if there's -- in that
2  policy if there's a section about, like, just
3  getting a tip or a person giving you information.
4  I don't know about that.  I know that the policy
5  pertains to, like, paperwork and stuff like that
6  about confidential informants.
7       Q.   What about any policy about what to do
8  with information about a potential drug bust?
9            Like take, for instance, this situation
10  we're talking about today.  I'm not talking about
11  where you pull a car over for speeding and you
12  ask for consent to search and you find marijuana,
13  I'm not talking about that.  I'm talking about
14  purely getting a -- a -- information, a tip about
15  drugs, and a significant amount, what is the
16  policy for what a patrol officer should do in
17  that circumstance?
18       A.   I'm not sure that there's a set follow
19  policy that says, you know, hey, you get this
20  information, you need to pass it to the drug
21  detectives.  Of course, if it's a major -- if
22  somebody calls in and says hey, look, Joe Blow's
23  going to carry 200 pounds of meth through your
24  county, that's something that you would pass onto
25  a drug detective because that would be a larger

Page 52

1  scale investigation.
2            I know that with our small department,
3  officers get information about drugs and they can
4  act on it.  I don't know of anything that
5  requires them to tell us for -- or if there's
6  like a set hey, if it's over 200 pounds of dope,
7  you need to call the narcotics guys or if it's a
8  graham of dope, you can -- you know what I'm
9  saying?  I don't know that there's anything that
10  says that in our policy.
11       Q.   So from your belief is it's basically
12  like a judgment call?
13       A.   I believe that -- because I know when I
14  worked on patrol, I could get information on hey,
15  Tommy's slinging dope down here, so I would go to
16  that area and might work that information to try
17  and get some street level dope or this or that.
18  Whereas if somebody told me hey, Billy's been
19  slinging dope out of his house for the past two
20  years, then I would write that information up and
21  put it in the detective's -- pass that -- we had
22  a actual drug intelligence sheet that was in our
23  boxes that you could write the information and
24  put it in the detective's box.
25            But there was nothing that said I had

Page 53

1  to.  But, again, patrol officers don't handle,
2  like, distribution out of houses and stuff like
3  that.  They don't write search warrants and they
4  don't do drug buys and stuff like that.  But they
5  can do simple possession and just stuff like
6  that.
7       Q.   Part of that is because as a patrol
8  officer you just don't have time to do that,
9  right?
10       A.   I mean, you don't have time to go into
11  the big investigations, something that would drag
12  out.  Because drug investigation could be one
13  hour or a drug investigation could be -- I think
14  the longest we've done is maybe two years,
15  three years.  But it's stretched out before we
16  actually made arrests, things like that.
17       Q.   That -- that drug intelligence form you
18  mentioned, how often did patrol officers use that
19  form?
20       A.   Honestly, rarely.  I think since --
21  when I -- when I got in narcotics, I think maybe
22  I had two of those sheets put in my box.
23       Q.   I want to talk to you a little bit
24  about your -- your relationship with Anson
25  County.  Are you from Anson County?

Page 54

1    A.   I was born, yeah, and raised here.
2         Q.   Okay.  And what I'm gathering from a
3    lot of these depositions and some that you've
4    also attended is, you know, Anson County is one
5    of those smaller towns, smaller counties where
6    people tend to know each other, right?
7         A.   I would say yes.
8         Q.   And does that make your job as a law
9    enforcement officer easier or harder or does it
10   -- how does it impact your job as a law
11   enforcement officer?
12        A.   It just depends.  It can make it easier
13   because you can know a lot of people that could
14   give you information about things.  Like me --
15   and, again, and I was here for Jimmy's.  I don't
16   know a lot of people like Jimmy does.  Jimmy
17   knows -- or Lieutenant Williams knows a lot of
18   people.  So that's valuable to him because he can
19   get information from people.  And whether it be
20   we've signed him up as a CI or it's just somebody
21   that gives some basic information, I mean, he has
22   that because he's lived here longer and he knows
23   a lot of people.  Me, I'm -- I know some people,
24   but I don't know people like that.  I mean, I'm
25   -- I worked for the rescue squad, volunteer with

Page 55

1    them and pretty much stay at home.  I'm not a
2    very -- I don't go out and do a lot of stuff.
3         Q.   Well, now, did you run for sheriff a
4    few years ago?
5         A.   I did -- I did run for sheriff,
6    unsuccessfully.
7         Q.   Well, that's not just staying home, is
8    it?
9         A.   Well, I probably would have done a
10   little better if I'd actually got out and talked
11   to me.  That was my problem.  I did that because
12   Sheriff Allen was retiring, and at that time
13   nobody had put in from the sheriff's office and I
14   just thought somebody should put in from the
15   sheriff's office.  And I actually ran against
16   Sheriff Reid.  But we were -- it was very -- you
17   know, we were very -- there was no mudslinging or
18   anything like that.  Everybody knew that the
19   sheriff had retired and we weren't really
20   fighting for it.  You know, I even told people at
21   the polls, hey, if you don't vote for me, vote
22   for sheriff -- vote for Landric Reid because I
23   thought he would be a good sheriff.
24        But I didn't really -- I could have
25   done better at politicking, but I'm not -- I'm

Page 56

1    not a very big public speaker.  I'm nervous just
2    sitting here talking to y'all on the computer.
3         Q.   Why did you want to be sheriff?
4         A.   Because I've always wanted to be a law
5    enforcement officer since I was -- you can ask
6    anybody, three years old.  I mean, it's always
7    been what I wanted to do.  And I just thought,
8    you know, if the sheriff -- to me, if Sheriff
9    Allen was retiring, why not try and have somebody
10   that's worked with him for -- I can't remember
11   how long I'd worked with him, maybe ten or
12   ten or so years in this department, then somebody
13   should at least try from the department to do it.
14   And not that I had a problem with somebody coming
15   in from the outside.  But, you know, I thought --
16   to me I just thought that somebody from our
17   department should try and run.
18        Q.   Why did you think that might be
19   important or helpful to the next sheriff to have
20   somebody from the department?
21        A.   Just that was just -- to me was just --
22   I don't really know how to answer that.  It's
23   just to me at the time was somebody from our
24   department should run.  It shouldn't just go over
25   and somebody new come in.  I don't -- I really

Page 57

1    can't give a -- it was just a feeling at the
2    time.  And like I said, it was unsuccessful and I
3    spent the money to do it.  It was my money, it
4    wasn't like donations or anything, so... But I
5    don't regret doing it.  You know, it's something
6    life of experience, so...
7         Q.   Was Reid from the outside?  Did he work
8    in the department before?
9         A.   He was with the North Carolina Highway
10   Patrol and he was assigned in Anson County.
11        Q.   I got it.
12             Had you worked with him before he
13   became sheriff?
14        A.   Just like maybe going to a wreck or
15   something, just assisting with traffic control,
16   things like that.  Nothing major.
17        Q.   I want to talk about Ray Kifer, Junior
18   and your relationship with him before March 7th,
19   2018.  You knew who Ray was before that date,
20   right?
21        A.   I had met him several times, yes.
22        Q.   His -- his mother and stepfather are
23   friends with you and your ex-wife Jamie; is that
24   right?
25        A.   They were more friends with her than

Page 58

1  me, yes.
2      Q.   Tell me about that relationship with --
3  with you and your ex-wife at the time and Ray's
4  parents at the time.
5      A.   So my ex-wife was friends -- she was a
6  paramedic.  And I don't really know -- I think
7  her and Mr. Kifer's mother became friends through
8  another person, I think.  So they had this little
9  group.  My -- if I recall correctly, my only
10 involvement with, like, Mr. Kifer or even his
11 mother was I think I went to a Halloween party at
12 their house with my ex-wife.  I think his mother
13 came to a little get-together that my wife had
14 done.  I don't recall him ever, like, coming to
15 my house.  I remember seeing him at their house
16 and then at another person's house here in
17 Wadesboro, another friend of theirs with their
18 little group.  And I think that was like once.
19 So I didn't have like -- me, I didn't have like a
20 hey, I talked to him every day.  This was if my
21 ex-wife wanted me to do with them with her to
22 like a party or get-together, I'd do it.  And
23 that was it.  I didn't much care to go to parties
24 because I don't like going to parties.
25     Q.   I understand.

Page 59

1          So you knew who he was, but it's not
2  like you had a close relationship with Ray Kifer,
3  fair?
4      A.   We did not have a close relationship.
5      Q.   Okay.  Did you ever know him to be in
6  any trouble?
7      A.   Not that I recall.
8      Q.   Now, Jamie you said is your ex-wife,
9  right?
10     A.   Yes.
11     Q.   When did you get divorced?
12     A.   So -- and I apologize for laughing, but
13 we separated in -- good gracious.  Hang on.  I'll
14 come up with the year.  I can't give you the
15 year.  It was -- my son was five years old.  So
16 he was -- so around 2011 I think we separated.
17 And we stayed separated for five years and then
18 we finally got divorced.  It was just -- it was
19 nothing -- there was no hard feelings, there was
20 no anger toward it, we just separated.  We even
21 forgot about basically getting divorced because,
22 I mean -- and it just came up that -- something
23 came up where -- I can't remember why we even
24 filed the divorce papers, but we did five years
25 later and there was nothing -- like I told

Page 60

1  somebody, I said we're better friends today than
2  we were when we were married, so...
3      Q.   Well, you're not alone in that.
4          All right.  So 2016 is when you finally
5  got divorced?
6      A.   I'd say probably around in there.
7      Q.   Okay.  Are you married now?
8      A.   I am not.
9      Q.   Any marriages after Jamie?
10     A.   No.
11     Q.   Okay.  Let's talk about March 7th,
12 2018.
13     A.   Okay.
14     Q.   At that time were you a lieutenant?
15     A.   Yes.
16     Q.   And it was you and Jimmy Williams in
17 the -- in the drug unit, you guys were the two
18 narcotics detectives, right?
19     A.   I want to say that at that time I don't
20 know if Jimmy had been moved full time into
21 narcotics, because -- because he had -- they had
22 asked him to come down and help me part time.
23 Because one, I was doing it by myself.  And,
24 again, you don't want to do that stuff by
25 yourself just for one, you're handling money and

Page 61

1  two, you're handling, you know, stuff like that.
2  So he was there with me.  I don't remember if he
3  was full time or part time at the time.
4      Q.   Anyone else who worked in the -- on the
5  drug team in the drug unit with you?
6      A.   Not -- not then, no.
7      Q.   And was Scott Howell also your
8  immediate supervisor?
9      A.   He was.
10     Q.   When you and Jimmy would work, together
11 just sort of on a day-to-day relationship with
12 each other, would you share information about the
13 cases that you were working on or tips that you
14 got?
15     A.   We would talk about cases and things
16 like that.
17     Q.   Would you describe it as a close
18 working relationship?
19     A.   Yes.
20     Q.   With a lot of trust in each other?
21     A.   Yes.
22     Q.   Did you work a specific shift or like
23 what was your schedule as -- as the two guys in
24 the drug unit?
25     A.   So when I first came in, we were pretty

Page 62

1  much 8:00 to 5:00 every day.  And when we started
2  working together, it kind of got where they said
3  hey, look, sometimes you need to flip your
4  schedule, y'all need to work at night, you need
5  to work in the evening.  So they give us
6  permission to kind of change our schedule as
7  needed as long as we made our hours and worked
8  our cases.  But usually we would come in --
9  unless we had something specific going where we
10 would come in on night shift, we would work the
11 day shift 8:00 to 5:00, things like that.
12     Q.   So generally speaking, that would be
13 your schedule was 8:00 to 5:00, but you would
14 change that if you knew you needed to work a
15 night shift or you knew you needed to work a
16 weekend or something like that?
17     A.   Yeah, if we were going to do
18 surveillance or drug buys that we needed to do in
19 off hours, we would adjust our schedule.
20     Q.   What if something came up that you
21 hadn't planned?
22          I mean, surveillance is something that
23 you usually plan.  If what if some big call came
24 in, you had worked your day shift.  Would you
25 still be expected to respond to that call if it

Page 63

1  was drug-related?
2      A.   So if it was major, I know that several
3  times like at the end of shift we get called
4  because somebody would find like evidence of a
5  meth lab.  So I was a meth-certified responder.
6  So I would have to go out to that and, you know,
7  work on that case.  Things like that would
8  happen.
9          Now, again, street level dope stuff,
10 they usually wouldn't call us after hours, things
11 like that.  But if it was something like a major
12 case that we would have to do or say a search
13 warranted needed to be written or something like
14 that, we would do it, we would have to adjust our
15 schedule.
16     Q.   And would you say that the patrol
17 officers knew that you guys were available
18 whenever they needed them -- needed you if they
19 needed you?
20     A.   They felt they needed us, they could
21 call -- they knew they could call us.
22     Q.   It wasn't like you would say we work
23 8:00 to 5:00 and that's it, don't bother us,
24 right?
25     A.   No, I can -- I can honestly say that

Page 64

1  Jimmy Williams and myself, we've never told
2  people that.  I mean, if they needed us, we would
3  -- we would do what we could do to help them.
4      Q.   I get the sense that you guys are
5  pretty approachable, certainly that's the way the
6  patrol deputies would feel about you, right?
7      A.   Yes.  More Lieutenant Williams than me,
8  I think.  Just because of my admin positions in
9  the past, I think.
10     Q.   Why do you say that?
11     A.   I think they sort of looked at me more
12 as -- at one time they looked at me more as like
13 a -- I don't know what you would call it, one of
14 the brass, one of the top guys, you know.  Jimmy
15 was more like a patrol guy.  Even though he's a
16 lieutenant, he was more down to earth with the
17 patrol guys.  So I think they looked to him a
18 little more as approachable than me.  I looked
19 more like one of the bosses when I was working up
20 here, stuff like that.  So I think I was kind of
21 like, he's in close with them, which is not a bad
22 thing.  But you know how it is, you know, with
23 bosses and things like that.
24     Q.   I got it.
25          Might have operated to your benefit to

Page 65

1  some extent, right, having two guys that look at
2  you a little differently?
3      A.   I mean, it could have.
4      Q.   Now, I also understand that your --
5  your territory was the whole of Anson County, you
6  guys didn't have zones, it was anything in Anson
7  County that dealt with drugs, that was you and
8  Williams, right?
9      A.   Drugs and gang, anything that built
10 out, we were in the anywhere in the county, any
11 cities that were inside the county, anything like
12 that.
13     Q.   Generally speaking, how would you
14 interact with the patrol officers on a day-to-day
15 basis?
16          When you guys were doing your 8:00 to
17 5:00, what would your interactions be with the
18 other units?
19     A.   So on a day-to-day, unless we really
20 needed them, like to help us like we needed a
21 marked car in the area or something like that, we
22 wouldn't really interact with them unless it was
23 just like saying hey or maybe go eat lunch or
24 something like that.  I mean, we -- if we were
25 doing an investigation or we were doing

Page 66

1  surveillance or something, we tried not to
2  involve them unless we really needed them.  Or
3  like if we did a search warrant we would get them
4  because, you know, uniform cars and stuff like
5  that.  It's good to have on cases like that.
6  So...
7      Q.   But it sounds like mostly your work was
8  independent of the patrol officers?
9      A.   For the bigger cases, yes.  Now, if
10  like we were doing like a street level operation,
11  say we wanted to get -- or we got complaints
12  about drugs on the corner again, we might say
13  hey, look, guys, let's go to this area, we'll
14  just sort of saturate this area and, you know, do
15  the street level type stuff.  But other than
16  that, if it was like a long case, we're working
17  on things like that, we pretty much stayed
18  independent, just me and Lieutenant Williams.
19      Q.   Got it.
20          I want to understand a little more
21  about Agent Dugger.  So Agent Dugger was with you
22  guys on March 7th, right?
23      A.   Yes.
24      Q.   Okay.  Now, you smiled when I say said
25  Agent Dugger's name.  Why is that?

Page 67

1      A.   Just because listening yesterday, just
2  asking about Agent Dugger.  Just, you know, his
3  involvement with us was -- and if I can go into
4  it or you want to ask the question, either way.
5      Q.   No, go ahead.  I wanted to understand
6  your smile.  So fill me in.
7      A.   No, just Agent Dugger is assigned to
8  this district, which I think incorporated Stanly,
9  Richmond -- no, not Richmond, Stanly, Anson,
10  Union.  Agent Dugger would just come to the
11  county, he'd call us and say, hey, look, I'm
12  going to ride down Friday or I'm going to ride
13  down Tuesday and  basically would just get with
14  us.  And his whole purpose was if we got a case
15  that kind of met the federal level, he would be
16  our adviser on that or take the case, things like
17  that.  He helped us with the -- like the street
18  level stuff.  But that was just him helping us.
19  It was not -- we didn't call him in for stuff
20  like that.  He was just a person that this was
21  his, like, response area for the Charlotte
22  district.  So he was responsible for these
23  counties.  And if we needed assistance at the
24  federal level, like with cases and taking stuff
25  to the U.S. Attorney and things like that, he was

Page 68

1  here for that.  So he just came and sort of got a
2  feel for what Anson County was and what we were
3  working on, what we were doing, things like that.
4      Q.   How long was he in that role?  Like for
5  how long was he sort of a part of your rides and
6  stuff?
7      A.   So I want to say maybe Agent Dugger
8  came around 2000 -- first of 2017 I think is when
9  he came down and introduced himself.  And then it
10  was like just here and there, maybe once a week,
11  sometimes no weeks he would come.  It just
12  depended on what he was doing.  If he was free
13  and wanted to come -- or could come to this area,
14  you know, he would call and say, hey, look, you
15  know, do y'all care if I ride down on Tuesday.
16  And it was no, of course not, you know.  You can
17  come down, whatever.  So when he would come,
18  because, of course, he wasn't familiar with the
19  area or what we were doing, we would ride
20  together.
21      Q.   Was there any federal agent before
22  Agent Dugger who filled that same role?
23      A.   So Agent Dugger would be our first -- I
24  think our first Homeland Security agent that was
25  like would come to this area.  I have worked with

Page 69

1  ATF agent, he works this area.  He helps on cases
2  with the city and us.  And if you asked me his
3  name, I know -- I know his first name.  I don't
4  know his last name.  But like any weapons cases,
5  things like that, he would help us with.  We've
6  worked with the FBI on gang cases, things like
7  that.  So it's not unusual for a federal agent to
8  come here and help us with cases.  And we also
9  have state agents that come in and help us like
10  ALE and SBI that come in and help us with cases.
11      Q.   You talked about cases that would go
12  federal.  How frequently did cases go federal?
13  How frequently did Agent Dugger take over cases
14  from Anson County?
15      A.   So I can't think of a specific case
16  where we actually met the -- like the federal
17  criteria to take it to that level.  Again, he was
18  just here assisting us.  And if it were to get to
19  that level, he would help us.  But I can't
20  remember a specific one that actually met that --
21  that standard.
22      Q.   You think you probably would remember
23  if there was one that went up like that, right?
24      A.   I apologize.  Yes, I would remember if
25  he took a case for us.  And I don't remember one

Page 70

1 that he took for us.

2  Q.  Was there ever a time when you called
3 him for assistance?

4  A.  I don't -- not a time where I called
5 him like specifically for a case.  Just I may
6 have called him and been like hey, you know,
7 we're going to work on this today, do you want to
8 come down and ride with us or something like
9 that.  I've never called him like for a specific
10 case.

11  Q.  What might be a circumstance where you
12 would call him and say hey, you want to ride with
13 us?  What kind of task would you have that day?

14  A.  So sometimes I would call him like if
15 Lieutenant Williams was going to be off, just to
16 have that extra person with me.  I'd say hey,
17 look, you know, Jimmy's taking tomorrow off, you
18 want, do you want to ride down so we can just do
19 this and that or surveillance or something like
20 that.  You know, it was nothing -- if we were
21 going to do gang stuff, we would have him come
22 down just to be with us to help us with that
23 stuff.

24  Q.  Now, you talked earlier about how you
25 think some of the guys viewed you as sort of

Page 71

1 close to the brass and lioke Williams more
2 approachable.  Would you put Dugger in sort of a
3 different category when he came in that he was
4 viewed either by you or anyone else as a little
5 different, whether it's close to the brass or
6 close to somebody else?

7  A.  I think Agent Dugger, when he was here,
8 if I'm answering this appropriately, was a very
9 outgoing person.  I think people viewed him as a
10 -- you know, a friendly -- I don't think they
11 viewed him as like oh, it's fed or don't talk to
12 him or anything like that.  I think it's more of
13 like, hey, he's just like Joe Blow, he's just
14 down here helping or whatever.  You know, I don't
15 -- I can't say what they thought.  But I never
16 got the impression that they thought he was like
17 -- like up here compared to everybody else.

18  Q.  And how about you, how did you view
19 him?

20  A.  I just viewed him as Agent Dugger.  I
21 mean, I didn't -- I didn't view him as, like,
22 anything better or worse than what we were.  I
23 mean, he was just here to help us.  Again, it was
24 nice to have somebody to come in and help as
25 small a department as we are and just the two of

Page 72

1 us running the whole county.  We work in the
2 whole county.

3  Q.  Yeah, and speaking of the whole county,
4 and Lieutenant Williams and I talked about this
5 yesterday, but, you know, it was a small
6 department but also a county where you did tend
7 to get to know everybody, get to know the
8 territory, right?

9  A.  Yes.

10  Q.  And you being from Anson County, you
11 knew the territory pretty well, like Lieutenant
12 Williams, right?

13  A.  Yes.

14  Q.  Would you say you also had a sense of
15 where the high crime areas were?

16  A.  So, yeah, I mean, for us, we would
17 develop places, you know, like high crime and I
18 think -- I think I was there for that yesterday,
19 so I -- when certain people talk about high
20 crime, you think of breaking and enterings,
21 things like that.  So this place is more
22 susceptible -- or this is where all of the
23 breaking and enterings are happening.  And we
24 also developed places like, hey, there's a lot of
25 street drug activity down here or there's a lot

Page 73

1 of meth cooking up here or things like that.

2  So we do develop places like that that
3 are -- if we had to go to that area, I mean, so
4 the north end of the county was really bad with
5 meth for a long time.  That's where all your meth
6 cooks and all that stuff was.  The south end was
7 different types of street level drugs and things
8 like that.  And the west end was street level
9 drugs and things like that, like Polkton,
10 Peachland area.  And that also encompassed the
11 meth and all that stuff.

12  Q.  And what about people and developing a
13 sense of where, you know, your gangs were or
14 where your meth operators were, where your -- you
15 know, who was selling pot, like what about
16 developing an awareness of your sort of usual
17 suspects?

18  A.  So that just comes with over time just
19 doing your investigations and stuff.  You start
20 to develop your people, your persons of interest,
21 things like that.  And, you know, that changes.
22 I mean, you also -- you have the people that
23 you've been dealing with for the past 15 years
24 and then you get new people and things like that.
25 It just depends.  I mean, you know, might get

Page 74

1 information today that gets me a new person that
2 five years down the road this is my one of my
3 usual suspects. So, I mean, it just depends on
4 what you're doing. But yeah, you do develop the
5 over time who you deal with the most and arrest
6 the most and stuff like that.
7     Q. How about confidential informants, did
8 you have your own confidential informants back in
9 2018?
10     A. I had -- I want to say in 2018 I had
11 two that I had signed up. One is dead now and
12 the other one is no longer a confidential
13 informant, I don't think. I haven't looked at
14 their books. I don't know if he's still signed
15 up or not. I hadn't seen him in a long time.
16     Q. And when you say looked at their books,
17 were you there yesterday when we talked a little
18 bit about the book for confidential informants
19 and where it is?
20     A. Yes.
21     Q. And what's your understand
22 understanding about how to make sure that there's
23 a record of your confidential informants?
24     A. So if we sign up a confidential -- when
25 I was in it, if we signed up a confidential

Page 75

1 informant, of course we have the waiver form that
2 says, you know, of course, you know what you're
3 doing, this is not a -- it could be a dangerous
4 thing, things like that. We have them sign that,
5 we do a, like, information sheet with their name,
6 address, stuff like that. We assign the number
7 to it and all this goes into a notebook that we
8 kept at our office that was accessible to us.
9 And you can't make that accessible to everybody
10 because then everybody would know who your
11 confidential -- and that's something you've got
12 to keep confidential.
13     Q. Understood.
14         What -- what would it take for someone
15 to become a confidential informant? What would
16 you need to do until they had reached that level
17 of signing a waiver and having their name entered
18 into a book?
19     A. So one of the ways that we would do it
20 is we would interview them and get information
21 from them. Preferably information that we could
22 follow up on and verify that they're being
23 truthful and things of that nature. Once we got
24 to the level of signing the paperwork, we would
25 -- if they had -- if they were able to, we would

Page 76

1 do like a control buy with them. And, of course,
2 in that you wire them up with the surveillance
3 equipment, stuff like that or with a phone or
4 whatever we use and just do their whole thing.
5 And that in itself would help, you know, because
6 we search them, we make sure they're not hiding
7 drugs, things like that. It helps just to build
8 that reliability on that confidential informant.
9     Q. Would that be over a period of time
10 that you develop that level of trust and
11 confidence?
12     A. Just long enough to -- I mean, they may
13 give us information today that we could go out
14 and verify. You know, they could say, hey, look,
15 this guy's got a stolen car behind his house, you
16 know, you might want to go do a knock-and-talk
17 and see if you can get in there. Then we verify,
18 well, hey, and he's giving us reliable
19 information because we got a stolen car back. So
20 it could be a day, it could be a week just, it
21 could be -- it just depends on the situation.
22 It's all situational.
23     Q. But when we were talking about your
24 book of confidential informants, we're talking
25 about a book with names of people who would

Page 77

1 go back to over time, not the person who just
2 calls you up with a tip and says something, you
3 know, like what you just referenced here, that
4 person doesn't automatically become a
5 confidential informant, right?
6     A. No. That person would just be like a
7 tipster informant. I mean, I wouldn't say
8 confidential. So to us, confidential informant
9 is somebody that we're going to use to do control
10 buys or things like that. We're actually --
11 we're actually on our behalf gonna to send them
12 into a situation to help us gather information
13 for like a search warrant, things like that.
14 It's not -- it's not like just hey, Kelly called
15 me and said, you know, Bob's gonna to steal
16 something. So hey, okay, well, Kelly called and
17 said, well, why not ride to that area and see if
18 Bob's actually going to steal that stuff. So
19 that's just somebody giving information.
20         I think people use confidential
21 informant just because that's the word it is. I
22 mean, I think deputies say it. I think people in
23 the public say it. I mean, you know, it's just
24 that's what everybody hears, CI, CI, CI. But for
25 us, a confidential informant, as we use it, is

Page 78

1  somebody that we pay or we give money to to go do
2  something.
3          Again, the patrol people might say
4  confidential informant, but they don't have,
5  like, actual paid people that they give money to
6  do stuff.  They just have people that give them
7  information.
8      Q.   And part of that is because a true
9  confidential informant, that person, they have
10 some protection even in the law, right?
11     A.   They have -- I mean, they're covered
12 under what, like, we do.  Like if we have a
13 confidential informant we use to buy drugs and
14 that person's protected, that that -- them going
15 to buy drugs is not something they're going to be
16 charged with.  Because it's actually us doing it,
17 they're just the person that we're having do it
18 through our operation or whatnot.
19     Q.   It's almost like they become an agent
20 of yours?
21     A.   So I guess you could -- you could call
22 it that.  Because they are working on our behalf.
23     Q.   And part of what I'm talking about when
24 I refer to being protected by the law, so if you
25 use a confidential informant in a case, that

Page 79

1  information doesn't automatically get turned over
2  in discovery to a criminal defense lawyer because
3  they have some protection, right?
4      A.   That's right.
5      Q.   And that's not the same for a tipster
6  or somebody who calls you with just a casual bit
7  of information that may or may not be verified,
8  right?
9      A.   That's right.
10     Q.   And is that something that patrol
11 officers just didn't know and understand?
12          MR. PERRIN:  Objection to form.
13          You can answer.
14     A.   So I can't say what they don't
15 understand.  Again, I think if a patrol officer
16 uses that term, it's just something they hear.
17 And I don't think they're actually referencing as
18 a actual CI.  I think somebody says that I -- I'm
19 -- this guy gave me information but I want to --
20 you know, he doesn't want to be known or he wants
21 to be -- what's it called?  Anonymous and stuff
22 like that.  So then if you get something like
23 that, then yeah, you do follow up on that
24 information just to see it.  Okay, so he told me
25 this and this, I'm going to go here and -- well,

Page 80

1  did this person show up?  Did this happen?
2  Things like that.  It remains anon- -- and wants
3  to remain anonymous.  But still, I mean, I
4  understand what you're saying.  If it got into
5  the court system, it wouldn't be protected as --
6  as a confidential informant.  It would be like,
7  you know, who is this person who gave you this
8  information?  I understand what you're saying.
9      Q.   But that would be important to
10 understand even as patrol officer because if
11 somebody were to give you information and say, as
12 you put it, they want to remain anonymous, if a
13 patrol officer says yeah, no problem, I got you
14 and then it turns into a drug bust and then it
15 goes to court and then there's discovery, the
16 patrol officer has no choice, but they've got to
17 turn over that information, right?  Unless they
18 want to hide it, right?
19     A.   Yeah, they should turn over that
20 information.
21     Q.   So they couldn't fulfill the promise to
22 the person who said I want to remain anonymous,
23 right?
24     A.   That's right.
25     Q.   And that could be potentially

Page 81

1  problematic, especially in an area where you've
2  got gangs, right?
3      A.   Yeah, I mean, I could see where it
4  would be concerning.
5      Q.   Let's talk about the morning of
6  March 7th, 2018.
7      A.   Okay.
8      Q.   You were present yesterday when we
9  talked about the morning of March 7th with
10 Lieutenant Williams.  Did you hear that part of
11 the deposition?
12     A.   I think I was in here.  I remember
13 that, yes.
14     Q.   Okay.  And you also responded in your
15 interrogatories when we asked about the details
16 about getting information the morning of
17 March 7th, 2018 from Darius Ellison.
18          Do you remember that?
19     A.   I do.
20     Q.   Okay.  And --
21          THE STENOGRAPHER:  Ma'am.
22          MS. PFEIFFER:  Yes.
23          THE STENOGRAPHER:  This is the court
24      reporter.  I figured before you
25      transitioned, do you mind if we can take a

1    break here for a little bit.
2        MS. PFEIFFER:  Oh, sure.  That's no
3    problem at all.
4        THE VIDEOGRAPHER:  This is the end of
5    media unit number 1 in the deposition of
6    Lieutenant Josh Beam.  The time is
7    11:05 a.m.  We are now off the record.
8        (A BRIEF RECESS WAS TAKEN.)
9        THE VIDEOGRAPHER:  This is the
10    beginning of media number 2 in the
11    deposition of Lieutenant Josh Beam.  The
12    time is 11:15 a.m.  We are back on the
13    record.
14    **Q.    Lieutenant Beam, when we took a break I**
15    **was beginning to ask you about the morning of**
16    **March 7th, 2018, right?**
17    A.    Yes, ma'am.
18    **Q.    And I want to talk to you about the**
19    **note you received from Darius Ellison that**
20    **morning.**
21    A.    Yes, ma'am.
22    **Q.    Earlier you mentioned this drug**
23    **intelligence sheet.  Did he put his note on the**
24    **drug intelligence sheet?**
25    A.    No, ma'am.  The note that was -- and

1    this is me remembering -- in my box was on a
2    little like a notepad, like the one of the little
3    flip pad sheets of paper.  I'm -- recall that.
4    It wasn't on a full page, like a drug
5    intelligence sheet.  It was just thrown in my
6    box.
7        **Q.    Where are those drug intelligence**
8    **sheets kept?**
9        A.    So if you go in our main office, the
10    officers have mailboxes by the door.  So just
11    beside that is like all of the forms and stuff
12    that officers would, like, need in their
13    day-to-day.  And some of the new officers
14    probably don't even know about the drug
15    intelligence sheets.  It's more the old -- the
16    older group that have put them in my box.  I
17    don't know that the new officers even know that
18    they're there.
19        **Q.    And so when you talk about the main**
20    **mailbox, does everyone go to their mailbox daily?**
21        A.    I would hope they do.  But, you know,
22    it just depends on the officer.  But usually the
23    road officers and the things like that, because
24    the detectives have offices not in the main
25    office.  Like criminal guys are like underneath

1    in the basement.  And then myself and Lieutenant
2    Williams have an office at the airport.
3        **Q.    And so the forms that are near the**
4    **mailboxes that you hope everyone checks on a**
5    **daily basis, they're in plain view, right?**
6        A.    Yes.  If you walk in there, you would
7    see them.  Everybody's name is on their mailbox
8    and things like that.
9        **Q.    And what about the -- the forms, are**
10    **those also in plain view next to the mailboxes?**
11        A.    So yeah, next to the mailboxes is a
12    little cubby thing that has forms and they're
13    labeled -- well, the labels are sort of fallen
14    off of it, but -- over time.  But yeah, they're
15    like there are property sheets and there are
16    arrest -- or the rights forms and things like
17    that, they're all in there.
18        **Q.    And was this the same case back in**
19    **2018, the same set up?**
20        A.    Yes.
21        **Q.    And when you talk about the labels,**
22    **what are those drug intelligence sheets, what are**
23    **those labeled?**
24        A.    I want to say that the label was on
25    them is -- just says drug intelligence.  I'm

1    pretty sure it says drug intelligence.  Don't
2    hold me to it.
3        **Q.    Okay.  But you mentioned that younger**
4    **officers might not even know they're there?**
5        A.    Again, I'm not sure what -- like if
6    they have a training officer, which they do have
7    training officers.  I don't know what they go
8    over with them.  You know, they may just -- this
9    line of forms we still, like, use on a
10    day-to-day.  So they may go through the rights
11    forms, property forms, stuff like that.  So the
12    forms on this side of the box may be like
13    reimbursement forms for expenditures and things
14    like that and it may not be something they really
15    touch on.  Because most officers don't spend
16    money that they get reimbursed for things
17    like that.  So I don't know, you know, where that
18    would fall, if they actually go through those
19    forms completely.
20        **Q.    But sounds like you weren't getting**
21    **many of those forms put in your box?**
22        A.    No.
23        **Q.    Is that part of why you suspect that at**
24    **least the younger officers weren't even aware of**
25    **those forms being there?**

1      A.   That and I think it's for them would
2  probably just be easier like in this situation,
3  just to write it down, throw it in my -- throw it
4  in my box or throw it Lieutenant Williams' box as
5  it were.
6      Q.   Do those forms still exist today?
7      A.   I would have to walk over there and
8  see.  I'm not sure.
9      Q.   All right.  I'll follow up with your
10 lawyer about that.
11          What -- what do the forms say?  Like is
12 there -- on the form itself.
13     A.   If I remember correctly, it just says
14 drug intelligence at the top and then it's just a
15 bunch of blank lines where you could just write
16 information on it.  It's like a -- like a sheet
17 of notebook paper with a title.
18     Q.   So you could put whatever you wanted on
19 there?
20     A.   Whatever information you want to put
21 on.  There's no specific box for this information
22 or that information.
23     Q.   Got it.
24          Okay.  So let's go back to the note
25 that you received on March 7th.  And you said it

1  was just like from a notebook?
2      A.   It was from all those little flip pads,
3  the small little flip pads that somebody might
4  carry to jot down information, things like that.
5      Q.   Got it.
6          And what do you remember that note
7  having written on it?  What did that note say?
8      A.   Ooh.  And this is going off memory.  I
9  want to say it had maybe a description of a car
10 and a name, Mr. Kifer's name on it.  I don't
11 remember if it, like, specifically said what was
12 going on with it except maybe just drug activity
13 or like if there was more detail to it.  When I
14 found the note, Deputy Ellison was actually in
15 the office, front office, and he was sort of
16 filling me in on, you know, that this was some
17 drug information that we might want to look into
18 and all of that.  So I can't -- I can't remember
19 if I went to the computer and, like, pulled Mr.
20 Kifer's information like to just get us started
21 to know a little bit about him or whatever.
22          But I do remember that after I received
23 the note and just sort of that brief talk with
24 Ellison that I met up with Lieutenant Williams
25 and I was like, hey, look, this is somebody we

1  need to look at.  And that's when Lieutenant
2  Williams was like, you know, I kind of already
3  know about this, let's talk about it.  You know,
4  there's something that we need to talk about, you
5  know.  That he said that he had talked to Mario,
6  Sergeant Kobersy, about it I think either the day
7  or earlier or something -- before this day.  And
8  so I was like, okay, well, we just need to look
9  into it more, a little deeper, when we get the
10 chance.  You know, to me, at the time, it wasn't
11 emergent that we would jump on it right off the
12 bat.  But while we were talking we made the
13 decision to talk to Deputy Ellison and just say,
14 you know, look, don't pursue it, let us look into
15 it, you know, this is our job, let us look into
16 it further because, you know, I think the
17 information that was getting between what
18 Lieutenant Williams had heard, the note and
19 everything was -- and experience was a little too
20 detailed.  You know, you don't usually get
21 specifics about this -- it's not that it couldn't
22 happen.  It's just in our experience at the time
23 we really hadn't gotten like detailed, detailed
24 information.  So we wanted to look into it
25 further.

1          And so we met -- we met Deputy Ellison
2  at the -- I think it was the Citgo at the time, I
3  think it's Exxon now in Polkton.  I remember
4  because we backed up at the vacuum cleaner where
5  people vacuum their cars out.  And Deputy Ellison
6  pulled up alongside.  And the most that I
7  remember from that conversation was basically
8  telling him, you know, don't -- don't stop this
9  car, don't go looking for him, you know, we're
10 going to look into.  Just let us do our thing and
11 we just feel like it's not something we just want
12 to go -- so we left it at that and pretty much
13 thought since Ellison was given the information,
14 that it was done.  You know, we didn't know that
15 anybody else at the time besides Mario had been
16 informed to look for the car.  This is from me.
17 And we were going to go do something in the sound
18 end of the county anyway that day.  So we went to
19 do that.  And we didn't -- at the time, again, we
20 had planned on investigating it, but it was not
21 something that we felt needed to be jumped on
22 immediately.  Because it was something that we
23 were probably just going to try and set up a
24 little surveillance, do a little background, if
25 we could, of like Mr. Kifer and see if he's

Page 90

1 actually traveling these roads. Because that's
2 just where we felt the investigation was at the
3 time. So we went to another part of the county.
4 And, again, after telling Ellison not to deal
5 with it, we felt that nobody was going to deal
6 with it until we -- you know, we looked into it.
7 So I know I went on and on beyond probably where
8 we were going, but...
9      Q.   That's okay.  Let me back you way back
10 up to when you first got the note.  I appreciate
11 that, though.
12          Was this when you first came into the
13 office on that Tuesday morning?
14      A.   I don't know if it's the first time I
15 went in.  But it was just the first time I
16 checked my box.
17      Q.   Do you remember around what time was
18 this about 8:00 a.m., 8:30 a.m.?
19      A.   I couldn't give you a specific.  It was
20 probably around 8:00, 9:00, somewhere around in
21 there.
22      Q.   As far as you remember, was it
23 basically like first thing in the morning, like
24 you got in --
25      A.   It was in the morning, yes.

Page 91

1      Q.   And what was your habit?
2          Was your habit to check your mailbox as
3 soon as you came in?
4      A.   I think I would go look in it just to
5 see if there was anything new.  I had a bad
6 tendency to leave stuff in it.  So my box would
7 get piled full of stuff.  And I think it was then
8 that I saw the little note and then Ellison was
9 in there and sort of just said, you know, this is
10 why I put this in here, this is something to look
11 at, something like that.
12      Q.   Where is that note that Ellison gave
13 you?
14      A.   Well, that is on me.  I could not tell
15 you.  I've been through every piece of paper and
16 file that I've -- could go through trying to find
17 it.  I don't know if it fell in the -- you know,
18 the floor board, got under the seat of the
19 Explorer, which I don't have that Explorer
20 anymore, or if it was just -- because it was a
21 small note and I don't know if I set it like on
22 the dash or up on the visor or something.  I -- I
23 don't know where it's at.
24      Q.   When was the last time you remember
25 looking at the note?

Page 92

1      A.   It would be that day.
2      Q.   After speaking with Ellison in the
3 morning, had you seen it later in the day?
4          Like did you you keep it with you as a
5 reference at all; do you remember?
6      A.   It would have been -- because I think I
7 generated some paperwork just on Mr. Kifer.  It
8 would have been just probably over my visor.
9 Because I had a bad tendency like to put
10 paperwork up there that I was going to look at
11 later or something like that.
12      Q.   What paperwork did you generate on Mr.
13 Kifer?
14      A.   Usually if we got a -- like a
15 information on somebody, I would pull a CJLEADS
16 report on them.  And that would just give me like
17 their -- it would indicate like if they had like
18 a criminal history and their driving history, if
19 their driver's license was good, things of that
20 nature.  Just give us a little photograph of a
21 suspect or a person of interest or things like
22 that.
23      Q.   And do you recall, is that what you
24 pulled on March 7th?
25      A.   I can't recall.  But it was my habit to

Page 93

1 try and do that if we had a person of interest.
2      Q.   And you would call Mr. Kifer at this
3 point a person of interest?
4      A.   Well, just based off the information
5 that I had received at the mailbox, yes, he was
6 -- to me was a person of interest to me.  And
7 Lieutenant Williams could look into whenever we
8 got the opportunity to look into it.
9      Q.   Now, you said that Deputy Ellison was
10 there at the time when you pulled the note out.
11 Do you remember, was his name on that note and
12 you knew he wrote the note?
13      A.   I can't remember if his name was on it
14 or if he was like, hey, I put that in your box
15 or, you know, if he had volunteered the
16 information to me.  I can't remember that.
17      Q.   So you'd also then don't recall if you
18 went to him or he came to you?
19      A.   I think when I was going through my
20 box, I think he was literally standing over my
21 left shoulder, like right behind me.
22      Q.   Did it seem like he was eager to talk
23 to you?
24      A.   I can't remember like an eagerness to
25 talk to me.  I couldn't remember if he was

Page 94

1  waiting to get to the boxes or if he was watching
2  me to see if I pulled that note out.  I -- I
3  couldn't tell you that.
4      Q.   What do you remember about your
5  conversation with Deputy Ellison there at the
6  mailboxes?
7      A.   All I remember is he was just saying
8  that this was some information he got, you know,
9  and was explaining that, you know, this car is
10  going to be hauling drugs -- excuse me -- and
11  that this was the suspect.  I don't remember us,
12  like, going in detail ways, you know, how he got
13  the information and all that stuff, not at the
14  box.  I don't remember that.  But I remember him
15  just sort of summarizing what the note was.
16      Q.   And to be clear, the reason Deputy
17  Ellison wrote you the note and the reason he
18  brought it to your attention is because you were
19  one of the drug detectives, right?
20      A.   Yes.
21      Q.   And he did what you would expect a
22  deputy would do in the same situation as Ellison
23  with this information, right?
24      A.   Again, it just depends on the
25  situation.  Some deputies will do it, some won't.

Page 95

1      Q.   I'm talking about this situation with
2  this information.
3      A.   Well, I would -- the information at the
4  time, I don't know that I would have expected
5  them to do it.  But after the whole situation is
6  done, I would think this whole situation was a --
7  a mess and it was good to pass it onto the
8  detectives.  But at the time it seemed like a
9  situation that a patrol officer could handle if
10  they wanted to.
11      Q.   Well, given the fact that Mario had
12  given that same information to Lieutenant
13  Williams the night before and then Deputy Ellison
14  gives you the same information the next morning,
15  that's two deputies who've gone directly to the
16  drug detectives.  Doesn't that seem like that's
17  probably what they should be doing in a situation
18  like this?
19      A.   So before I got that information, I
20  didn't know that Mario had called Lieutenant
21  Williams.  It wasn't until after I got downstairs
22  and told him that, you know, this was some
23  information that we got from patrol to look into
24  that I found out that Mario had called Lieutenant
25  Williams for advice on the situation.

Page 96

1      Q.   Well, it sounds as though in that note
2  and in your conversation with Ellison in the
3  morning, he didn't give you the full picture at
4  that point in time; is that fair?
5      A.   That's fair.
6      Q.   After that conversation with Ellison,
7  at what point did you then get together with
8  Jimmy, with Lieutenant Williams?
9      A.   So, again, had I generated the report
10  or the information on Mr. Kifer, it would have
11  been right after that I would have walked down,
12  maybe he would have picked me up in the parking
13  lot or I would have picked him up in the parking
14  lot or he would have met me in the parking lot
15  and we would have gotten together.  Because I'm
16  pretty sure we got together at the sheriff's
17  office, the main sheriff's office.  And after we
18  conversated about Mario and everything is when we
19  decided to call Ellison to meet us to talk to him
20  about that.
21      Q.   Okay.  So it would be your normal
22  practice, you guys check in individually, at some
23  point you come together and if there's a need to
24  update each other on anything, you do it at that
25  time?

Page 97

1      A.   If there -- yeah, if there was
2  something we were going to work on or we needed
3  to look into it or if it was just something that
4  maybe we're going to look into tomorrow or the
5  next day, we would talk about it.  Like if I got
6  some information, he got some information, we
7  would just conversate about it after we got
8  together.  And we may get together at the main
9  office, we may get to the together at the
10  airport.  It just depends on what we're doing
11  that day.
12      Q.   What do you remember about the
13  conversation you had with Lieutenant Williams
14  that morning when you shared with him what Darius
15  Ellison told you?
16      A.   So when I shared with him I was kind of
17  like hey, look, this is -- this is something we
18  -- information we got is a new individual for us
19  to look at and all that.  And then I do recall
20  him saying, you know, hey, look, I talked to
21  Mario about this the other night and we need to
22  look into it further because the information just
23  sounds too -- I won't say like too out of -- like
24  out of this world.  It's just for us in that
25  moment was this is pretty detailed information.

Page 98

1  You know, it's not beyond belief that we could
2  get detailed information.  But we just need to
3  look into the -- maybe the source of the
4  information and things like that further before
5  we pursue it any.  You know, we don't need to
6  just go into it blind.
7      Q.   Well, and when you say it's more
8  detailed than you've had before, fair to say
9  you've never had this much detailed information
10 that one could describe as basically a tip
11 wrapped up with a bow on top, right?
12     A.   Not that detailed, no.  But, again --
13 but, again, to me it was just not outside the --
14 it could possibly happen.  But for us it had not
15 happened to us at all.
16     Q.   Do you remember whose idea it was to
17 follow back up with Darius Ellison?
18     A.   I want to say it was maybe -- I
19 suggested we talked to him and tell him not to
20 mess with it.  I want to say that was me.  I'm
21 not sure.
22     Q.   Okay.  I'm going to share my screen and
23 I want to talk about the meeting with Darius
24 Ellison at the Citgo.
25          All right.  Can you see my screen here?

Page 99

1      A.   It's blank.  There we go.
2          MR. PERRIN:  Sonya, I'm handing Josh
3      Bates 21 through 24.  I think that's this
4      document.
5          MS. PFEIFFER:  Yep, you got it.  Thank
6      you.
7      Q.   So you can look at the screen or you
8  can look in front of you.  We have the same
9  document here.  And I can scroll just so that
10 you're sure that we're talking about the same
11 thing.
12     A.   Okay.
13     Q.   You with me here?
14     A.   Yeah, it is.
15     Q.   Got it.
16          So you're aware that Darius Ellison
17 talked to Internal Affairs later on March 7th,
18 2018, right?
19     A.   I am.
20     Q.   Okay.  And I'll represent to you that
21 these are the notes that Lieutenant Tice took
22 from that interview.
23          I want to go down to -- it's page -- I
24 guess this is page 2 or at the bottom it will say
25 Bates 22.

Page 100

1      A.   Okay.
2      Q.   Okay.  And -- and here in the -- right
3  after the number two he says -- this is Ellison
4  telling Tice that David had called him and then
5  the next paragraph says, stated that he told
6  David to call Tim at Polkton and he said he was
7  getting off at 10:00 so he told him to call
8  Mario.
9          Do you see that there?
10     A.   I do.
11     Q.   Do you recall Ellison telling you that
12 he told Burroughs to call Polkton PD?
13     A.   I do not recall that.
14     Q.   Do you recall whether Ellison told you
15 that Burroughs had been calling other people at
16 all?
17     A.   I do not recall him telling me that.
18     Q.   Let's go to the next page, which has
19 the ASCO23 in the bottom.
20     A.   Yes.
21     Q.   The top paragraph, and I'll just read
22 this along with you, Stated that he spoke with
23 Lieutenant Beam this morning to pass on the
24 information that Ray Kifer on Highway 218 Polkton
25 driving a blue Toyota PC and that he would have

Page 101

1  drugs in the spare tire of the trunk.  Lieutenant
2  Beam asked me how I knew this information.  I
3  told him a reliable source.  But the reliable
4  source was David Burroughs.
5          Did I read that right?
6      A.   You read that right, yes.
7      Q.   Okay.  The next paragraph, Stated that
8  Lieutenant Beam and Williams told him to meet at
9  the Citgo in Polkton and asked him why he didn't
10 share the information.  And he responded that he
11 was sorry and he didn't know what their reaction
12 would be if he had told them where the info came
13 from.
14          Did I read that right?
15     A.   Yes.
16     Q.   Okay.  And then that next line, Stated
17 that Lieutenant Beam told him to leave it alone,
18 they would take care of it, right?
19     A.   Yes.
20     Q.   Okay.  So reading through that, does
21 that refresh your recollection about whether
22 Ellison held back any information from you when
23 I first talked to you in the morning at the
24 sheriff's department?
25     A.   So when he first talked to me, he did

1 not inform me that Burroughs had given him the
2 information. I want to say that during mine and
3 Lieutenant Williams' conversation, I can't
4 remember how it came about that Burroughs --
5 whether Lieutenant Williams told me, maybe
6 through what him and Mario talked about, but that
7 was something that, according to his statement
8 and that we had addressed at the Citgo.
9      Q.   When you talked with Lieutenant Beam,
10 do you recall -- and I'm talking about the first
11 time in the morning, do you recall whether --
12 sorry with Lieutenant Williams, do you recall
13 whether Lieutenant Williams told you now that
14 Burroughs was involved when you guys first talked
15 that morning?
16      A.   Again, I can't recall -- if Lieutenant
17 Williams had that information, he would have
18 passed it on. And that's how I would have
19 obtained that information. And it would have --
20 and this is me, would have been from the
21 conversation between him and Mario. So I don't
22 know.
23      Q.   Sure.
24           That's the way you guys would work
25 right? That he had information from the night

1 before, you just got this information, the two of
2 you would be together, and as we talked about
3 before, you had a level of trust, you worked
4 together. So he would sure what he knew and you
5 would share what you knew, fair?
6      A.   Yes.
7      Q.   So is it also fair to say then that now
8 you are slowly beginning to become more
9 enlightened as to the details of this situation
10 after your first conversation with Lieutenant
11 Williams that morning?
12      A.   It's fair to say that I was getting
13 more information than what I got to begin with.
14      Q.   And then when you met with Ellison a
15 bit later, do you recall what time that was?
16           Was it -- was it right after you guys
17 met with each other and -- and you headed
18 directly to the Citgo?
19           What do you recall about that?
20      A.   If I recall, I think it might have been
21 maybe a little closer to lunchtime. It may have
22 been right as we developed that, you know, we
23 talked, we may have decided then. So it may have
24 been not long after we left the sheriff's. So
25 around 10 o'clock, maybe. And that's a guess.

1      Q.   That's okay. I understand. It's four
2 years ago.
3           When you were talking with Darius at
4 the Citgo, do you remember whether he showed you
5 his cell phone and showed you any phone calls
6 from David Burroughs on his cell phone?
7      A.   I don't remember looking at his cell
8 phone.
9      Q.   Do you remember asking him if you could
10 look at his cell phone?
11      A.   I don't remember asking him that.
12      Q.   Do you remember asking him if there
13 were any text messages between him and David
14 Burroughs?
15      A.   I don't remember asking that.
16      Q.   At this point when you were talking
17 with Ellison at the Citgo, was Agent Dugger with
18 you yet?
19      A.   I don't think he was.
20      Q.   Do you remember when Agent Dugger got
21 up with you that day?
22      A.   He usually got -- this is going off of
23 his times coming, usually got here around 11:00,
24 11:30, 12 o'clock. Around lunchtime he would
25 show up if we were doing -- unless we were doing

1 something that we needed him or wanted him to
2 come to, like a search warrant or something early
3 in the morning.
4      Q.   Now, back to the written report of
5 Darius -- Darius's note, which, by the way, I
6 believe is Exhibit 21, entered as Exhibit 21. In
7 that second paragraph where Ellison said he was
8 sorry, he didn't know what their reaction would
9 have been if he told them where the info came
10 from. Ellison was concerned how this information
11 would be received if he told you that the source
12 was Burroughs.
13           What did you take that mean?
14      A.   I can't answer that. Because I -- I
15 see it in his statement. But I can't remember,
16 you know, him saying that. I -- I don't remember
17 that part of our conversation. The bulk of
18 meeting at the Citgo I remember is telling him
19 not to do anything, that we would deal with it.
20 I can't remember the detailed conversation that
21 we had.
22      Q.   And why did you tell him not to do
23 anything?
24      A.   Because, again, the information -- like
25 I said before, it was very detailed and myself

Page 106

1  and Lieutenant Williams just felt that we needed
2  to investigate it further.  And, again, maybe do
3  surveillance on Mr. Kifer later on, even maybe do
4  a knock and call where we would go talk to him
5  about any drug activity.  We were still working
6  on what we wanted to do with the case and we
7  didn't want the patrol guys or Ellison or anybody
8  to sort of rush to the information to where we
9  couldn't investigate it.
10      Q.  Well, and at this point you also
11  learned that Burroughs was the source of the
12  information, right?
13      A.  Yes.
14      Q.  And you also knew that this information
15  involved the boyfriend of Burroughs'
16  ex-girlfriend, right?
17      A.  I want to say that I learned that Mr.
18  Kifer was Burroughs' ex-girlfriend, boyfriend
19  that day when I think talking to Jimmy.  I didn't
20  keep up with Mr. Burroughs' relationship because
21  it just didn't interest me.  And I didn't pay
22  attention to what was going on in that.  So I
23  didn't know.  I don't think -- until that day I
24  didn't know that he'd even broke up with that
25  girl.

Page 107

1      Q.  But at this point in time you knew the
2  situation because that's what Ellison shared with
3  you and that's what Williams also shared with you
4  at this point in time, right?
5      A.  At this point in time I knew that
6  Burroughs was part of that information trail.
7      Q.  But you also knew that part of the
8  information he was providing related to the
9  person dating his ex-girlfriend, you knew that by
10  this point in time at the Citgo, right?
11      A.  I did.
12      Q.  And whether it interested you or not, I
13  mean, Burroughs breakup with his girlfriend,
14  whether you knew her name or you knew details,
15  this was common knowledge at the sheriff's
16  department, right?
17      A.  I can't speak on what -- I'm sure it
18  was, but it was not -- again, it was not
19  something that I -- I don't even recall if I knew
20  they broke up.  I knew they dated and that was
21  just because I saw them once in public.
22      Q.  In the responses to our second set of
23  interrogatories you wrote that you told Ellison
24  that you would handle any investigation.
25          Do you remember that?  That's what you

Page 108

1  told him?
2      A.  Yeah, that's what I just stated that at
3  the Citgo I told him that we would handle the
4  investigation.
5      Q.  We talked a little bit about some of
6  what that meant.  But let me ask you this, did
7  you take any notes of that meeting with Darius
8  Ellison at the Citgo?
9      A.  I did not.
10      Q.  Did you make any kind of report about
11  that meeting with Darius Ellison?
12      A.  I didn't -- I don't -- pretty sure I
13  didn't.  It was just a conversation.
14      Q.  And at this time you and Williams were
15  in your car, you were in the same car together?
16      A.  Yes.
17      Q.  Where did you go after the meeting with
18  Darius Ellison at the Citgo?
19      A.  I'm pretty sure we left there and went
20  and met Agent Dugger.  And then from there we got
21  in and went to the southern end of the county
22  and worked on what we were working on that day.
23      Q.  When you and Williams left Darius
24  Ellison.  What did the two of you discuss on the
25  way to go get Agent Dugger?

Page 109

1      A.  I don't know what we discussed.  I
2  don't know if we discussed -- I couldn't tell you
3  if we discussed anything on that case or if we
4  discussed what we were going to do with Agent
5  Dugger.  I'm not sure of our conversation there.
6      Q.  Did you -- do you remember talking
7  anymore about these two tips from Mario and
8  Darius Ellison?
9      A.  I don't remember if we talked about it
10  at that time because, again, it was not something
11  that we were going start investigating right
12  then.  We were going to do something else in the
13  southern end of the county, something we had
14  planned.  And I think at that time we figured --
15  we told Ellison not to mess with it.  We weren't
16  expecting anybody to mess with it because we were
17  going to start investigating it, you know, after
18  we got done with our -- whatever we were working
19  on.
20      Q.  When would that have been?
21      A.  It may have been later on that evening
22  or the next day.  It was not -- to us it wasn't
23  something that we could follow up on, like we
24  could actually set up some surveillance maybe to
25  catch Mr. Kifer driving down the road or just to

Page 110

1  see if he's actually traveling from the area that
2  they're claiming he's traveling.  But it was not
3  something that at the time we felt was I guess in
4  need of immediate investigation just because it
5  was a -- information about possible drug activity
6  and we didn't -- it was something we felt we
7  could work up to.
8      Q.    Well, what you learned from Lieutenant
9  Williams is that David Burroughs was trying to
10 get Mario to stop Ray Kifer on Tuesday,
11 March 7th, right?
12     A.    Yes, ma'am.
13     Q.    And what you learned from Darius
14 Ellison was the exact same thing, that Ray Kifer
15 was coming through on Tuesday, March 7th at a
16 very certain time and Burroughs was trying to get
17 someone to stop him, right?
18     A.    Yes, ma'am.  That's why we told Ellison
19 not to stop him.
20     Q.    What was not immediate about
21 investigating this if Burroughs had already
22 reached out to two people and -- and maybe --
23 maybe you don't remember, but maybe you were also
24 told that had reached out to Polkton because at
25 that point he had.  What was not immediate about

Page 111

1  investigating this?
2      A.    Again, we wanted to lengthen our
3  invest- -- excuse me, investigation.  But in
4  this small county it's not uncommon for family
5  members or exes or anything to pass on
6  information.  You know, so we didn't feel that --
7  we felt that we needed to investigate it, but it
8  didn't to us seem to be one that we needed to
9  jump right on because we just need to follow up
10 on the information.
11     Q.    Well, one way to follow up would have
12 been to call David Burroughs, right?
13     A.    Yes, ma'am.
14     Q.    You both had cell phones with you that
15 day, correct?
16     A.    Yes, ma'am.
17     Q.    You could have brought David Burroughs
18 into the sheriff's department and questioned him,
19 right?
20     A.    Yes, ma'am.
21     Q.    You could have asked him the name of
22 his alleged CI, right?
23     A.    Yes, ma'am.
24     Q.    And if he gave you a name, you could
25 have interviewed that alleged CI, right?

Page 112

1      A.    Yes.
2      Q.    I mean, you, yourself, just said you
3  could have gone to Ray Kifer's and done a knock
4  and talk, right?
5      A.    Yes.
6      Q.    You certainly could have gone and asked
7  him if you could search his car, right?
8      A.    Yes.
9      Q.    And given how willing he was to let
10 Spencer search his car, he probably would have
11 said yes, don't you think?
12     A.    Yes, ma'am.
13     Q.    And if you searched his car and you
14 found drugs in his car, you could then talk to
15 him about the drugs in his car, right?
16     A.    Yes, ma'am.
17     Q.    And you could have talked to him right
18 at his home, right?
19     A.    We could have.
20     Q.    And at this point in time, at a
21 minimum, you had reasonable articulable suspicion
22 that Ray Kifer was the potential victim of a
23 crime, right?
24          MR. PERRIN:  Objection to form.
25          You can answer.

Page 113

1      A.    I would say at that time, I mean --
2  again, at that time we thought the information
3  was just too good.  We did not have -- we did not
4  have strong suspicion that anybody had been
5  involved in like a setup or anything.  We just
6  knew that Burroughs had passed on this
7  information and that he had done it through a
8  third party and, again, to -- to that we received
9  this information, we were working on something
10 else, we were going to come back to it.  And, of
11 course, once we started the investigation, that
12 would have been the -- one of the avenues we
13 probably would have taken was to make contact
14 with him.
15          But it had -- at the time that was an
16 investigation we were going to start later on
17 after we finished the duties that we were doing
18 that day.  And we had given orders to Ellison
19 that this investigation was now on us.  Now, what
20 Ellison relayed to his other officers, we don't
21 know.  Because obviously a stop did occur.  So we
22 gave Ellison an order not to pursue it, that we
23 would pursue it.  And it was not something at
24 that time that we jumped on because we had other
25 cases that we were working and it fell into our

Page 114

1  just kind of where we figured we need to go.  We
2  did have information that Burroughs was the one
3  that facilitated the information, but not enough
4  as to think that this person had actually done
5  anything criminal.
6         So that's why we didn't jump right on
7  it.  It was something we were going to work on,
8  but we already had another case we were working
9  on with some gang stuff in the south end of the
10 county.  And I -- at that time we didn't feel it
11 was emergent enough, especially after telling
12 Ellison not to pursue this matter, that we
13 thought anybody would take action on it.  No
14 patrol officer would take action on it.
15     Q.    You were present during Lieutenant
16 Williams' deposition yesterday where he testified
17 that he thought this sounded like a setup as soon
18 as he heard that from Mario, right?
19     A.    I was.
20     Q.    That was on Monday night, correct?
21     A.    Yes.
22     Q.    On Tuesday after talking with Williams
23 you had the same information that Williams had,
24 right?
25     A.    Yes.

Page 115

1      Q.    And after meeting with Darius Ellison
2  you knew several things.  You knew that Mario had
3  been contacted by David Burroughs with
4  information that made no sense to two experienced
5  drug detectives and that it was fishy and, as
6  Lieutenant Williams described, sounded like a
7  setup.  You knew that, correct?
8         MR. PERRIN:  Objection to form.
9         You can answer.
10     A.    I knew the information that I had
11 gained that day in that moment.  Now, in that
12 moment I believed that the information was too
13 good to be true.  Now, I didn't jump right to a
14 setup thinking that at that time.  That's why,
15 again, we wanted to investigate further as to
16 whether this was just information to just try and
17 cause some aggravation, get this guy stopped.
18 Nothing about like a setup as in planting drugs
19 or anything because at that time we had no
20 evidence of that.
21     Q.    Well, just setting up a stop to
22 aggravate a citizen who didn't do anything, is
23 that in and of itself is criminal, isn't it?
24     A.    That is, definitely.  But like I said,
25 we got the information.  I gathered the

Page 116

1  information from one -- my talk with Lieutenant
2  Williams.  But I'm saying in that moment it was
3  not on my mind setup.  But we did need to visit
4  it further whether this guy was involved in drug
5  activity, whether the information was credible or
6  where it could go.
7      Q.    Lieutenant Beam, you and Williams
8  worked together all the time, you trusted each
9  other, you shared information, you talked
10 frankly, he believed this was a setup, he told
11 you that on Tuesday, you knew this information
12 from Lieutenant Williams, he didn't hide that
13 from you, did he?
14         MR. PERRIN:  Objection to compound
15     question.
16         Go ahead.
17     A.    I don't recall him saying the words
18 this is a setup.  I recall us talking about how
19 the information was just too good.  It seemed too
20 good to be true, that it was very detailed.
21 That's what I recall of it.  And I don't recall
22 anybody ever saying a setup until we got further
23 in the investigation after the traffic stop
24 occurred.
25     Q.    Well, by the time you had talked to

Page 117

1  Ellison at the Citgo, though, you had much more
2  information now.  You had Mario's report, you had
3  everything Lieutenant Williams shared with you on
4  Tuesday, you had everything Ellison shared with
5  you that matched up to what Mario said.  You had
6  information that David Burroughs was reaching out
7  trying to get people to stop a car that very day
8  and you had options at that point in time.  You
9  knew all of this after that meeting with Darius
10 Ellison, right?  That's what you knew?
11     A.    So --
12         MR. PERRIN:  Objection to form.
13         You can answer.
14     A.    So on that day I don't recall having
15 the information that Polkton was reached out to.
16 I knew that Mario was called and that Ellison had
17 passed the information on.  That's what I knew
18 that day.  And, again, I don't recall anybody
19 talking about a setup until after the stop was
20 made and we were investigating then.  We took
21 that information and we were going to work on it
22 later on in the day.  And we had given Ellison
23 the order not to mess with it.
24         Again, I didn't know that Polkton had
25 been reached out to at that point in time.  I

1  learned that later on during this whole process.
2         So, again, we went to do what we were
3  going to do in the southern end of the county
4  before we actually come back and started on that
5  investigation.  It was after we heard the traffic
6  stop made that we said well, we're going to go up
7  there because one, we had told Ellison not to
8  mess with it.  And we wanted to look into it
9  further from that point.
10     Q.    Backing up to before the traffic stop,
11 though.
12     A.    Okay.
13     Q.    At this point in time you'd been in --
14 in law enforcement for more than a decade, right?
15     A.    Yes.
16     Q.    You'd had your law update every year,
17 right?
18     A.    Yes.
19     Q.    Every officer knows there's something
20 called reasonable articulable suspicion, right?
21     A.    Yes.
22     Q.    Every officer knows there's probable
23 cause, right?
24     A.    Yes.
25     Q.    Probable cause is a higher standard

1  than reasonable articulable suspicion, correct?
2     A.    It is.
3     Q.    And reasonable articulable suspicion is
4  pretty low, right?
5     A.    Yes.
6     Q.    You had reasonable articulable
7  suspicion after your conversation with Darius
8  Ellison given all that you and Lieutenant
9  Williams knew at the time, you had enough
10 suspicion that Ray Kifer was the potential victim
11 of a crime, even if it was just to aggravate a
12 citizen and pull him over, you had enough, didn't
13 you?
14        MR. PERRIN:  Objection, asked and
15    answered.
16        You can answer.
17     A.    So, again, at that point in time I had
18 enough information that the information -- that
19 the information we got was too good and that
20 Burroughs was the supplier of the information.
21 Again, at that point in time I didn't have the
22 suspicion that, you know, this was a setup on Mr.
23 Kifer to get him locked up.  That came later on
24 after the investigation, after the traffic stop.
25     Q.    I'm not even going that far.  You

1  talked about just harassing a citizen, right?
2  That would also break the law, correct?
3     A.    I did say that.  And I may have
4  misspoke on that.  But yes, that would be a
5  breaking of the law if that was the goal of the
6  person that made the complaint.
7     Q.    Well, at a minimum that's what this
8  sounded like; isn't that fair?
9     A.    Again, at the time, we're talking about
10 at the time, not after the incident these years
11 later, it was -- the information was too good, we
12 needed to look into it further.  That was at
13 time.  I'm not -- I can't go -- I can tell you
14 what at the time was in my mind and my thought
15 process during the invest- -- or during what we
16 wanted to do.
17     Q.    And that's exactly what I'm talking to
18 you about, what was in your mind when you had the
19 information from Mario and the information from
20 Ellison, in your mind you at least had a
21 reasonable articulable suspicion that Burroughs
22 was trying to have somebody stopped and harassed
23 at a minimum.  Forget about what you learned
24 later.  Mario was suspicious, Ellison was
25 suspicious, Lieutenant Williams was suspicious.

1  At a minimum that was a concern, right?  Fair?
2         MR. PERRIN:  Objection, asked and
3    answered and compound question.
4         You can answer.
5     A.    Again, at the time, and I'm not doing
6  this to aggravate, but it was the -- the
7  information was too good to be true and that it
8  came from Burroughs and that we needed to look
9  into it.  That's why we told Ellison not to do
10 anything.  But, again, it was not something that
11 we felt we needed to jump right on.  It was
12 something that we felt we could investigate after
13 we got all our stuff done.
14     Q.    That's not my question.  I'm going to
15 repeat it again, okay?  And try to answer my
16 question.
17        Is it fair to say that at that time
18 after talking to Ellison with all that you knew
19 that reasonable articulable suspicion that Ray
20 Kifer was a potential victim of a crime, even if
21 the crime is pulling him over to harass him?
22 That's my question.
23        MR. PERRIN:  I'm going to object, asked
24    and answered.  You can answer.
25        MS. PFEIFFER:  Well, I mean, he hasn't

Page 122

```
1       answered it, so...
2           MR. PERRIN:  I mean, I would disagree.
3       But that's my objection, asked and
4       answered.
5       Q.   That's the question.
6           Did you have reasonable articulable
7  suspicion, that's it, yes or no?
8       A.   That he was the victim of a crime?
9       Q.   He was the potential vic- -- he was the
10 potential victim of a crime.  Did you --
11      A.   I --
12      Q.   Yes, sir.  Sorry.
13      A.   I can say at that time, with the little
14 information that I had, I don't know that I felt
15 that he was the victim of a crime because I
16 didn't know of a crime that had occurred.  I just
17 knew the information we had that we needed to
18 look into.
19      Q.   Okay.  I'm going to ask one more time.
20          MS. PFEIFFER:  Sean, you can feel to
21      object because I'm not asking whether he
22      was the victim of a crime, okay?
23      Q.   Listen to my question.
24          At the time after meeting Darius
25 Ellison at the Citgo, with all of the information
```

Page 123

```
1  that you had, did you have reasonable articulable
2  suspicion that Ray Kifer was the potential victim
3  of a crime even, if the crime is just pulling him
4  over to harass him on the side of the road, yes
5  or no?
6           MR. PERRIN:  Objection, asked and
7       answered.
8           You can answer.
9       A.   This is me.  I'm going to say no.
10      Q.   We went through a number of things that
11 you could have done after learning that
12 information.  We talked about going to Mr.
13 Kifer's house, a knock and talk, searching his
14 trunk.  Do you remember that, right?
15      A.   Yes.
16      Q.   You also could have further followed up
17 with Ellison, right?  You could have asked to
18 look at his phone?
19      A.   Yes.
20      Q.   You could have made a report about your
21 meeting with Ellison?
22      A.   I could have, yes.
23      Q.   You could have called a superior and
24 shared the information that you and Lieutenant
25 Williams had at this time, right?
```

Page 124

```
1       A.   I could have.  But I didn't feel it
2  needed to be passed on at that time.
3       Q.   Oh, I understand.
4           Let's talk about the stop on March 7th,
5  2018, okay?
6       A.   Yes.
7       Q.   You said that you think Agent Dugger
8  got up with you guys around lunchtime?
9       A.   I believe that probably be around the
10 time.
11      Q.   Okay.  In the responses to our second
12 set of interrogatories we asked for details about
13 how you -- how you got to the stop and you said
14 you received a call and a text from Josh Beam.
15          Do you remember that?
16          MR. PERRIN:  Hey, Sonya, I think you
17      said Josh.
18      Q.   I'm sorry, Kyle Beam.  Yes, you
19 received a call and a text from Kyle Beam?
20      A.   Yeah, I did receive that after we heard
21 the radio traffic.
22      Q.   Kyle Beam is your brother, right?
23      A.   He is.
24      Q.   What do you remember hearing in the
25 radio traffic?
```

Page 125

```
1       A.   They had -- Deputy Spencer had
2  performed a traffic stop.  I can't remember if we
3  recognized the tag number or if it was when they
4  called out I think maybe Mr. Kifer's name over
5  the radio and we were like, hey, look, this is
6  what we told him not to do, we need to head to
7  Ansonville.  Or wherever the stop was, which was
8  in Ansonville.  We need to go up there and -- and
9  see what's going on.
10      Q.   You remember Lieutenant Williams saying
11 oh, shit?
12      A.   I don't remember that word from word
13 but that is something he would say.
14      Q.   And when you heard that information,
15 then you -- you just put your hands up like this.
16 What was your response to hearing that over the
17 radio and then saying we've got to go over there,
18 what -- what was going through your mind?
19      A.   That we needed to get up there and find
20 out what was going on with the situation and as
21 to why -- and find out why they stopped the car.
22      Q.   Would you say that now this was an
23 emergent situation?
24      A.   I wouldn't say like an emergency
25 situation.  But it was a situation we felt we
```

Page 126

1  needed to go up there and see what was going on.
2  Because now the patrol guys have stopped this car
3  that we're trying -- we were going to investigate
4  later on.  So we need to figure out what's going
5  on and see what happened with the stop and what's
6  going on.  And, again, that's when I received a
7  phone call from Kyle stating, you know, hey, we
8  got this car stopped, I believe it was something
9  like, you know, we found some drugs or something
10 like that.  And I think I asked him to send me a
11 picture of what they found.  And that was the
12 text picture that I gave to Mr. Perrin to give to
13 you all which showed the little envelope they had
14 found in the trunk -- or the folder thing they'd
15 found in the trunk of the car.
16      Q.   You said now they had stopped a car
17 that we had heard something about.  But now they
18 stopped a car that you had told two deputies not
19 to stop, Lieutenant, you told Mario don't stop
20 it, you told Ellison don't stop it, right?  Let's
21 be clear about what happened.  You had told
22 people don't stop this car, right?
23      A.   Yes.
24      Q.   And now the car is stopped?
25      A.   Yes.

Page 127

1       Q.   And you didn't view this situation as
2  escalating to emergent at all?  That was the term
3  you used before, it wasn't emergent.
4            Was it emergent now?
5       A.   It was to the situation -- to the point
6  where we need to go up there and find out what
7  was going on.  I mean, so emergent to me or, you
8  know, like that would be if I got information
9  somebody was about to be killed, that's something
10 I would jump right on.  But this was something
11 that we could follow up days later.
12           Now, now that he's been stopped, we've
13 decided that we need to get on up there because,
14 again, this was an investigation that we were
15 going to do, but now the car is stopped so we
16 need to find out what's going on.  And, again,
17 why they stopped the car or did Ellison not --
18 how did -- what's the deal -- what's the reason
19 behind the stop?
20      Q.   Going back to your brother's call, so
21 did you have just that one call and one text
22 message with him or did you guys communicate
23 more?
24      A.   I don't know that we communicated more.
25 I think it may have just been the one phone call

Page 128

1  and the text.
2       Q.   Do you remember what he said to you in
3  that phone call?
4       A.   I don't remember word for word what he
5  said, no.  I think just to the base of it would
6  have been that they had that car stopped and
7  found some drugs on them would be -- again, I
8  can't remember word for word.
9       Q.   Do you remember talking to him later in
10 the day about the situation?
11      A.   After that, I don't remember talking to
12 him or seeing him after that.  I don't -- I don't
13 recall seeing him after that.
14      Q.   When you guys headed to the scene, how
15 far away were you?
16      A.   So we were on the southern end of the
17 county, probably close to Morven.  So we were
18 probably a good maybe -- gosh.  15 miles or so,
19 15 to 20 miles a way.  I couldn't give you a time
20 just because of the traffic and everything.
21      Q.   When Kyle called you, did he confirm
22 that this was -- that Ray Kifer was in the car?
23 I mean, did you know from that phone call now
24 that this all matched up to the information you
25 had before?

Page 129

1       A.   I want to say that he did -- or I may
2  have asked him -- well, obviously we confirmed it
3  because we heard it on the radio.  We heard the
4  dispatch give I think Mr. Kifer's information and
5  then the tag and all that stuff.  But I want to
6  say that I may have told him just to stand by,
7  that we were on the way up there to figure out
8  what's going on.
9       Q.   All right.  So by the time you headed
10 there, whether Kyle had told you or whether you
11 heard it on the radio, you now knew that Ray
12 Kifer had been pulled over on the side of the
13 road, right?
14      A.   Yes.
15      Q.   And he was pulled over right on the
16 road where Burroughs told Mario and Ellison he
17 was going to be pulled over, right?
18      A.   Yeah, he was pulled over on
19 Ansonville-Polkton Road, yes.
20      Q.   Which is exactly where Burroughs said
21 it was going to be, correct?
22      A.   Yeah, I think Burroughs -- I think the
23 information he gave was that the car would be
24 traveling that road going to Premiere Fibers, one
25 of the plants up there in Ansonville, and would

Page 130

1  probably be coming back that way.  So yes, it was
2  -- it was consistent with the information that
3  was given.
4       Q.   And then you learned, whether it was
5  over the radio or from Kyle, that drugs were, in
6  fact, found in the trunk, right?
7       A.   Yes.  And I think that was from Kyle,
8  not over the radio.
9       Q.   And that was just like Burroughs told
10  Mario where the drugs would be, right?
11      A.   Again, the information was matching up
12  to what was given.
13      Q.   The same information that Burroughs
14  told Ellison, right?
15      A.   Yes, that's information he gave him.
16      Q.   And then your brother texted you a
17  photograph of what was in the trunk; is that
18  right?
19      A.   He sent me a picture, yes.
20      Q.   Now, I think I've seen that in
21  discovery.  So I want to make sure that we're
22  talking about the same photograph where you can
23  actually see the drugs, like the little packets
24  and stuff like that, you get an idea from that
25  photograph what the packaging looked like; is

Page 131

1  that -- is that the picture that you saw?
2       A.   I'd have to look at the picture.  I
3  can't -- I remember it was the -- the folder
4  thing and you could see the car, like the back of
5  the car, the side of the car behind it.  And I
6  think he just held it up and just took a picture
7  of it.  I don't remember if you could see in
8  detail exactly what was in it, like the packaging
9  and all that stuff.
10      Q.   So you can't recall if on the way there
11  you already saw what the drugs looked like, like
12  they how they were packaged, and like you
13  couldn't -- at that point in time you didn't have
14  a sense of that?
15      A.   I don't recall that.  I just remember
16  seeing the folder.
17      Q.   Okay.  Describe the scene for me when
18  you and Lieutenant Williams arrived from Morven.
19      A.   So we came in from Ansonville.  So we
20  came up behind the officers on the traffic stop.
21  I think we parked behind Spencer's car.  And I
22  can't remember exactly where Beam's car was.  But
23  I know that when we pulled up, they were in the
24  trunk area -- or the trunk area of the car was
25  open, there was some, I think, clothing items,

Page 132

1  maybe a guitar or something that was set out on
2  the ground.  I want to say that Mr. Kifer was in
3  the -- Spencer's patrol car.  And I remember -- I
4  want to say then we got out, we -- I think
5  Spencer gave us kind of a rundown as to, you
6  know, why he stopped him, which I think was a
7  left of center violation.  Or yeah, I think
8  that's what it was.
9           And basically what they had found,
10  where they had found it.  They showed us where
11  they had found it like in the tire well, in the
12  trunk of the car.  And just looking at the scene,
13  it's just stuff we kept in our mind.  We made the
14  decision then to further the investigation.
15  Because now at this time yes, the car was
16  stopped.  The information given that we believed
17  was really good information is starting to match
18  up.  And yes, drugs were found.
19           So that's when we decided that we would
20  take Mr. Kifer to do an interview with him on
21  camera.  Because yes, at this time drugs were
22  found.  So we were proceeding as a drug
23  investigation at this time.  So we made the
24  decision to take him down to the interview room
25  so that we could interview him on camera.

Page 133

1       Q.   Proceeding just like a normal drug
2  investigation, yeah?
3       A.   Because drugs had been located, yes.
4       Q.   And is it --
5       A.   I -- I apologize.  I didn't mean to
6  interrupt you.  But, again, proceeding as a
7  normal drug vacation.  But, again, keeping in
8  mind all of the information that had occurred
9  earlier.  Everything was all together.  But
10  because drugs had been located at this time, we
11  pursued or we followed up as a drug
12  investigation.  Because, again, all I can say is
13  drugs were located then.
14      Q.   Explain what you mean to me, why -- why
15  you followed up like a regular drug investigation
16  because drugs were found?
17           Given -- you said given all of the
18  information you had.  What do you mean?
19      A.   So even though the information was --
20  seemed too good to be true, it was still a
21  possibility that it could have been credible
22  information.  Even with everything that's going
23  on.  So once the drugs were located, we were not
24  just gonna just sort of dismiss this.  So we did
25  it as a drug investigation.  Because if our

Page 134

1  investigation had proven the information was
2  correct and he actually was a drug dealer, we
3  needed to do it properly.  So that's why we
4  decided to take the evidence, take Mr. Kifer and
5  interview him at the Anson County sheriff's
6  office in the interview room.
7      Q.  And at that point what did you think
8  the odds were that it would turn out these were
9  his drugs at that point in time?
10     A.  I couldn't give you any odds.  I mean,
11  again, at that time we're just going off the fact
12  that a stop was made, he gave content to search
13  his vehicle, drugs were located.  So at this
14  point we are doing a drug investigation on Mr.
15  Kifer.  And we took him downtown -- or to the
16  sheriff's office.  I won't say downtown, to the
17  sheriff's office interview room to do an
18  interview with him.
19     Q.  Well, if you can't give me odds, give
20  me a percentage.  What, 50/50?  What percentage
21  do you think is realistic?  What percentage that
22  this was an actual drug dealer based on
23  everything that you knew?
24     A.  Well, the actual location of narcotics
25  at this time and just even off that, I mean, I

Page 135

1  would put -- in my belief would be probably about
2  -- just because the drugs were located and that
3  stuff, I -- and this is me, 75 percent that they
4  were his.  And this is going off my -- just me.
5      Q.  So in your mind at that time with all
6  of the information that you had, there was a
7  75 percent chance that Ray Kifer was, in fact, a
8  drug dealer and these were his drugs, that's your
9  testimony?
10     A.  My testimony is that even though the
11  information seemed too good to be true, it's
12  still the possibility that it could have been
13  true and that drugs were located at this time.
14  So, I mean, I could even drop it down to
15  70 percent that I believe that there was the
16  possibility that these could have been his drugs.
17  But that's why we were doing the investigation to
18  either prove that they were or they were not his
19  drugs.
20     Q.  So 70 percent chance, given all that
21  you knew, that these drugs you found belonged to
22  Mr. Kifer and he was a drug dealer, about a
23  70 percent chance at this point in time is your
24  testimony?
25     A.  My testimony is that it's 70 percent

Page 136

1  chance that they possibly could have been his
2  drugs.  Whether they were for dealing or
3  possession, just to use, that, again, is part of
4  the investigation to figure out.
5      Q.  And what weighted in favor of that for
6  you?  What lifts that up to 70 percent?
7      A.  Hum.  To me it's just me, it's just the
8  information, the possession -- I mean the
9  location of the drugs.  Again, this is why we
10  wanted to investigate it.  We still had to
11  investigate it as a possession of drug until we
12  either cleared him or proved that he was in --
13  that they were his drugs.  The 70 percent is just
14  me just saying -- I mean, I -- I couldn't give
15  you an exact reason as to why it's the
16  70 percent.  I mean, it could be 60 percent, it
17  could be 50, it could be whatever.  I mean, I'm
18  just -- this is just me again.  In the moment
19  that day just feeling that now okay, a stop was
20  made, a search was conducted, drugs were found.
21  Yes, the information was too good to be true.
22  Yes, the information is matching up.  But we need
23  to follow it and do an investigation because one,
24  if Mr. Kifer is -- these are his drugs, then we
25  need to have that case proper.  You understand?

Page 137

1  And that if they aren't his drugs, then, of
2  course, we're going to prove that too.
3      But, again, by this time drugs were
4  located by the officer.  So we needed to
5  investigate it as a drug investigation.  Because
6  once we got to the office and we talked to him
7  for just a little bit, that everything sort of
8  just -- I mean, we -- I made the decision that --
9  and with talking with Lieutenant Williams that
10  hey, something's up with this.  Like really up
11  with this, we need to broaden our investigation
12  out a little bit further.
13     Q.  If you're going to do a proper drug
14  investigation, you need to make sure that you
15  document everything that's part of your
16  investigation, right?
17     A.  Yes.
18     Q.  So it would be important to document
19  the call with Mario that Lieutenant Williams had,
20  right?
21     A.  Well, again, I don't know the -- I know
22  that Mario called Lieutenant Williams.  But, you
23  know, I don't know if that was a concern of
24  Mario's or if it was for advice on what to do in
25  the situation.  And we give advice -- our

Page 138

1  officers call us for advice and we just give it
2  to them.  It's not something we document all the
3  time.  Again, had Lieutenant Williams known that
4  it was going to get to this point, I'm sure he
5  would have documented the conversation.  Had he
6  we known it was going to get to this point, I'm
7  sure I would have probably documented the
8  situation with Ellison.
9      Q.   Well, it didn't have to get to this
10  point, did it?
11      A.   You're referring that had we followed
12  up on it immediately it would have never gotten
13  to this point?  I'm confused by the question.
14      Q.   Right.
15      A.   Yes.
16      Q.   Right.
17          It didn't have to get to the point
18  where Ray Kifer was stopped, did it?
19      A.   It didn't have to.  Had we -- had we
20  seen that this was an investigation that needed
21  to be done right away.  Again, this -- at the
22  moment in time it seemed an investigation that we
23  could follow up on, like we do all drug
24  investigations, you know.  Unless, like I said
25  again, in an investigation, if it's something

Page 139

1  that's going to cause bodily harm or death or
2  something -- or like to me in that moment, twice
3  he'd been given information that he's going to be
4  on this road with drugs.  So it's not like it was
5  a one-time thing.  So I felt that our
6  investigation could stretch out just a little bit
7  so that we could actually do the surveillance on
8  Mr. Kifer and attempt to build evidence as to
9  whether he was involved in the drug trade or
10  wasn't.  But yes, had it been something that we
11  jumped right on, it maybe could have been
12  avoided.
13      Q.   Maybe could have been?
14      A.   Well, I mean, during our investigation
15  he still could have been stopped.  We don't know
16  how -- at that moment in time we didn't know that
17  that information had passed onto Spencer or
18  Sergeant Beam or whoever else was involved.  We
19  knew that Ellison was attempting to pass on that
20  information.  So we told him not to mess with it
21  anymore.  And we didn't know that it -- and,
22  again, at that moment in time I didn't know that
23  Burroughs had reached out to Polkton Police
24  Department.  But I did know that he had talked to
25  Mario.

Page 140

1      Q.   If you had gone to talk to Ray Kifer
2  right after your meeting with Ellison and if you
3  had gotten consent to search Ray's car and talked
4  to Ray, you could have avoided Ray Kifer being
5  stopped on the side of the road by David Spencer,
6  correct?
7          MR. PERRIN:  Objection.
8          You can answer.
9      A.   Had we conducted the investigation
10  right then and Mr. Kifer was at home and that
11  everything worked out where he was there and
12  all that, yes, then he would not have been
13  stopped -- he probably would not have been
14  stopped.  Because, of course, we would have found
15  whatever he had.  But again --
16      Q.   You would --
17      A.   Go ahead.
18      Q.   You would have protected him from that
19  stop, right?
20          You would have prevented that stop from
21  happening, correct?
22      A.   Obviously, again, had we -- the
23  investigation been to the point that we need to
24  do it or I felt -- we felt that we needed to do
25  it right then, and we had found that stuff during

Page 141

1  that, then yes, he would have been -- he would
2  not have been stopped.
3      Q.   You talked about needing to investigate
4  the possibility that these weren't his drugs.
5  How would you go about investigating that?
6      A.   So I guess in that, in my statement
7  there would be when we take him back or we escort
8  him back to -- or take him back to the sheriff's
9  office to interview him, you know, and then just
10  sort of putting -- so I guess would be -- hang
11  on.
12          THE DEPONENT:  Thank you.
13      A.   Just doing the investigation, period.
14  I mean, just everything, just the interview with
15  him, just the information we got and all that
16  stuff.  Again, after he was stopped, we -- it
17  went from -- to a drug investigation on Mr.
18  Kifer.  And then when we interviewed him and he
19  gave his statements and just sitting down there
20  talking with him and then going through
21  everything again, it just -- his story or his
22  statements in the interview were consistent --
23  consistent.
24          And it was just me developing, talking
25  to him.  And Lieutenant Williams, just that

Page 142

1  feeling that there was just more that we really
2  needed to go outside the scope of and that that
3  -- it was in that moment we said Mr. Kifer needs
4  to be released to go home.  He's no longer a
5  suspect in any of this.  We need -- and that is
6  when even in the interview you see me leave
7  several times and then I leave for good.  I'm
8  upstairs talking to the sheriff saying, hey,
9  sheriff, look, there's something going on with
10 this, we really -- we've got to let Mr. Kifer go
11 and we need to turn our investigation.  We need
12 to branch it out and go further as to where this
13 information came from and all that stuff.
14       So it was just doing the drug
15 investigation that just helped turn our
16 investigation from Mr. Kifer to somebody else.
17       Q.   And all of that could have been done
18 before noon on that day if you and Lieutenant
19 Williams decided to go talk to Mr. Kifer right
20 after meeting with Ellison, right?
21       A.   If we had in that moment decided that
22 the investigation should be the immediate
23 investigation to do, then this whole -- that
24 whole thing probably could have been avoided.
25 And, again, I say probably because had we even

Page 143

1  decided to go out to Mr. Kifer's house, he might
2  not have been home and it still could have
3  happened.  But I -- to what you're saying, had we
4  -- because there was no standard saying that we
5  had -- it had to be the investigation at the top
6  of our list but one that we could do later, like
7  we do on most complaints.  It could have been --
8  it possibly could have been avoided.  I'll say
9  possibly could have been avoided because we don't
10 know if it could have been at home or somebody
11 else could have stopped him.  Because don't know
12 who -- at that time we didn't know who all he'd
13 given the information to except Mario and Ellison
14 to me.
15       Q.   So is it your common practice then when
16 you have tips about a possible drug runner that
17 you decide to investigate that later?
18       A.   Well, again, I mean, I wouldn't say
19 drug runner.  I would say that we got information
20 this person was traveling with drugs in his car.
21 And that -- we could get that any day.  And,
22 again, it may not be something that we -- to me
23 and Lieutenant Williams, we need to do it
24 further.  Again, like I said, set up a
25 surveillance on Mr. Kifer, see if that

Page 144

1  information panned out.  It wasn't something that
2  we felt this would be a one-time deal that this
3  would be the only day that he would be passing
4  through.  We felt that we could set up a
5  surveillance on Mr. Kifer or we could do
6  something else with him.  We could pull some
7  information on him.  We could talk to some people
8  about him, things like that.  It was not
9  something that we felt would be like missed -- a
10 missed opportunity if we didn't jump on it right
11 away.
12       Q.   And is that because in the more than a
13 decade experience you had that people who are
14 selling drugs always keep their drugs in the same
15 place that you'd be likely to catch them the next
16 day in the same place; is that your testimony?
17       MR. PERRIN:  Objection.
18       You can answer.
19       A.   My testimony would just be that if a
20 person is either involved in the drug trade or a
21 user, that if we investigate it and they do carry
22 drugs, it will just be in their vehicle.  I'm not
23 saying they would be in the same place.  But just
24 off the information we got, it was not enough
25 information that we could look into it and we

Page 145

1  felt we need to look into it -- where we could
2  look into it more besides just doing a traffic
3  stop on Mr. Kifer.  That's what we thought at the
4  time.
5        Q.   So I want to talk about some of the
6  other decisions that you made that day.  When you
7  arrived Mr. Kifer was in the back of Spener's car
8  in handcuffs, correct?
9        A.   I believe so.
10       Q.   And you brought him into your SUV,
11 correct?
12       A.   I did.  I walked him back to my car.
13       Q.   Was that your decision?
14       A.   To take Mr. Kifer and take him to the
15 sheriff's office?
16       Q.   Yes, to take him from the scene into
17 your car to the sheriff's office, yes.
18       A.   It was probably my decision because I
19 felt we needed to interview him.
20       Q.   Well, you could have interviewed him on
21 the side of the road, right?
22       A.   I wanted it on video and audio.
23       Q.   Why is that?
24       A.   Just in our practice, if we're working
25 a drug case and like we have somebody actually

Page 146

1  arrested or in custody with drugs, I like to have
2  it on video and audio so that if we played it for
3  the jury, they could hear from the person's own
4  mouth, you know, whether it is theirs or isn't
5  theirs or -- or whatever.
6       Q.   So the video that was made, as you
7  know, while it could be played for a jury, right?
8       A.   Yes.
9       Q.   And a jury would see everything that
10  happened to Mr. Kifer in that hour that he was
11  interrogated, right?
12       A.   Yes.
13       Q.   And a jury would also hear everything
14  that you and Lieutenant Williams knew before he
15  was stopped, right?
16       A.   Well, what do you mean?  I'm confused
17  by that.
18       Q.   If this goes to trial and a jury hears
19  all of the evidence, they will watch the video of
20  that interrogation, right?
21       A.   Yeah, the -- yeah, yes.
22       Q.   And before the video shows they will be
23  provided with all sorts of testimony from
24  everyone involved and they will know what you and
25  Lieutenant Williams knew before Mr. Kifer was

Page 147

1  interrogated, right?
2            MR. PERRIN:  Objection to -- I'm not
3       sure if that's a question or a threat or
4       what, but if you know what it is, you can
5       answer.
6       A.   I mean, I think I -- I think understand
7  what you're saying now.  They would receive --
8  like they would know what we -- the information
9  we got from Ellison, the information we got from
10  -- that's what you're saying.
11       Q.   Right.
12       A.   So yes, they would know everything
13  leading up to the interview with Mr. Kifer.
14       Q.   And the jury would see him patted down,
15  correct?
16       A.   Yes. On the video?
17       Q.   Yes.
18       A.   Yes.
19       Q.   And the jury would say Agent Dugger
20  take off the handcuffs, correct?
21       A.   Yes.
22       Q.   The jury would hear Agent Dugger
23  threatening him with jail time, correct?
24       A.   If it's on the video. I don't know
25  about a threat.  But advising him he could get

Page 148

1  jail time.  I don't -- I don't know -- I don't --
2  I wouldn't -- I don't know if it was a threat.
3  Like I said, I know -- I'm pretty sure he told
4  him that he could get jail time for possession of
5  drugs.
6       Q.   The jury would see him sign a Miranda
7  form, correct?
8       A.   Yes.
9       Q.   The jury would see him sign a form
10  handing over his phone, correct?
11       A.   Yes.
12       Q.   You had him sign that form, remember?
13       A.   Yes, with the -- for the cell phone to
14  do a search of the cell phone.
15       Q.   And there's all sorts of interviews you
16  can do that are far less formal than a recorded
17  interrogation, right?
18       A.   I mean, yeah.
19       Q.   And your testimony is the reason you
20  decided to have this recorded in the
21  interrogation room is because this was a regular
22  drug investigation?
23       A.   Is because at that time, because the
24  drugs were located, we were doing it as a drug
25  investigation.  And that's what we wanted to do

Page 149

1  was to have it -- an interview done on camera and
2  audio.
3       Q.   You're aware that a person is supposed
4  to be informed why they're being put under
5  arrest, correct?
6       A.   I am.
7       Q.   Any reason why you didn't tell Ray
8  Kifer why he was being put under arrest?
9       A.   I don't remember what the extent of our
10  conversation was in the truck except that we were
11  going to go down and talk about what was going on
12  and investigate what was going on.  I do know
13  that we transported the evidence that was found
14  in the car with Mr. Kifer and that he -- I
15  remember him saying that he'd never seen that
16  thing before, the folder with the stuff in it.
17            But now, as to why, I don't know what
18  was told to him before we got on scene.  I don't
19  know if he was told he was under arrest, and I
20  don't know if he was told that drugs were found in the
21  car.  I just told him that we were -- wanted to
22  take him down to Wadesboro and do an interview
23  with him.  And, again, we collect -- we took the
24  evidence from the car and we put it in the car
25  with Mr. Kifer, who was seated in the front seat

Case 3:21-cv-00039-DCK   Document 57-9   Filed 02/10/23   Page 38 of 54

Page 150

1 beside me, and transported him to the sheriff's
2 office. And we talked a little bit about just
3 this and that going down the road.
4      Q.   Well, you're also aware that once a
5 person is under arrest, the policy is to head
6 directly to the magistrate, right?
7      A.   What policy are you referring -- are
8 you referring?
9      Q.   Basic Law Enforcement Training. If you
10 arrest somebody, unless there's a reason to delay
11 their transport to the magistrate, that's where
12 you take them.
13      A.   But we were taking him to do an
14 interview.
15      Q.   Well, that might be a reason. But if
16 you're going to take him to do an interview, then
17 you take him directly to the interview room,
18 correct?
19      A.   Oh, yeah.
20      Q.   And instead you stopped at your office
21 by the airport, right?
22      A.   The office, it's in the airport
23 terminal.
24      Q.   And you heard Lieutenant Williams
25 describing that office yesterday?

Page 151

1      A.   Yes.
2      Q.   Did he describe that pretty accurately?
3      A.   From what I remember, he did.
4      Q.   Fair to say it's a nondescript
5 building?
6      A.   It's Anson -- it says Anson County and
7 it's the airport terminal.
8      Q.   Doesn't say sheriff's department on it?
9      A.   It does not.
10      Q.   Anyone other than you and Lieutenant
11 Williams have access to that office?
12      A.   I think maybe the sheriff and the chief
13 had a key, but they never went out there, to my
14 knowledge.
15      Q.   So you and Lieutenant Williams were
16 really the only ones to use that office?
17      A.   Yes.
18      Q.   He talked yesterday about the safe
19 where money is kept. Are there any drugs kept in
20 that office?
21           Like when you do a drug bust, is there,
22 like, an evidence locker or anything there?
23      A.   No, no evidence locker.
24      Q.   Where -- where is that?
25      A.   The evidence locker for the sheriff's

Page 152

1 office is at the main office downstairs in the
2 investigation division.
3      Q.   Do you know the physical address of
4 that airport office?
5      A.   I want to say it's like 2980 Airport
6 Road, I think. Don't hold me to -- I think
7 that's the address.
8      Q.   Now, tell me why you stopped there.
9      A.   To get my notebook that I write notes
10 in.
11      Q.   What notes do you write in there?
12      A.   If I do an interview, I may write up
13 the interview after we -- usually my thing is
14 I'll take him, we'll talk and then we'll go back
15 through it and I'll write up the interview, you
16 know, what we talked about or whatever. But I'd
17 left my notebook on my desk. And I wanted to
18 swing by there because our office was literally
19 between us and the sheriff's office. We just
20 pulled right off 52 like not even a quarter of a
21 mile off 52, went to the airport, I jumped out,
22 grabbed my notebook and got back in and we left
23 and came back to the office.
24      Q.   So that would be a notebook where you
25 could write up a report or write up notes from

Page 153

1 your conversation with Darius Ellison earlier in
2 the day, right?
3      A.   Yeah, if I'd taken notes on that.
4      Q.   It would be a place where you could put
5 notes that you learned from Jimmy Williams after
6 he filled you in on Tuesday morning, right? You
7 -- that's where you could put it, in that
8 notebook, right?
9      A.   Yeah, if I -- if I had made notes on
10 that.
11      Q.   Okay. And did you take any notes on
12 March 7th, 2018?
13      A.   For which incident? I don't think that
14 I -- I don't even think I got to the point in the
15 interr- -- interview that I'd even wrote any
16 notes on it because at that time I had just said
17 hey, look, we need to -- we need to change this
18 and we need to let Mr. Kifer go and all that.
19 And I'd walked upstairs to tell the sheriff what
20 our plan was to let him go and to turn -- or that
21 we needed the investigation to go further in
22 another direction. And I don't -- I do not think
23 that I actually handwrote anything at that time.
24 I'm pretty sure I didn't.
25      Q.   At that time from your experience, you

Page 154

1 knew that it was important to take notes when
2 significant events occurred because it helps
3 refresh your recollection later, right?
4        A.   Yes.
5        Q.   And by the time Ray Kifer was released
6 from that interrogation room, you had a sense
7 that this was a significant situation that needed
8 further investigation, right?
9        A.   Yes.
10       Q.   And you'd agree with me that you had a
11 fair amount of information about what occurred
12 before he was interrogated, right?
13       A.   I had -- yeah, the information that I
14 was given that day.
15       Q.   And you didn't write any of that down
16 in the notebook?
17       A.   No.  At the time I just didn't feel
18 like those conversations, because it was
19 something, again, we were just gonna to work on,
20 I guess I just didn't think I needed to write
21 those up.
22       Q.   Why not?
23       A.   I guess because at that time it was
24 just -- again, it was me and Jimmy talking about
25 what he had known or he had done and then

Page 155

1 basically that's just giving Ellison that order
2 not to mess with the case and I just didn't write
3 that up.
4        Q.   I'm going to share my screen and try to
5 show you video.  Give me just a minute because
6 I've got to click on a couple of things here to
7 make sure that -- make sure you're able to hear
8 it.
9             Okay.  Can you see the video on my
10 screen?
11       A.   I can.
12       Q.   Okay. I'm going to push play and then
13 let me know if you can hear it.
14            Can you hear that Lieutenant Beam?
15       A.   Yes, I can hear it.
16       Q.   Great.
17            I'm just going to have you watch for a
18 little bit when you arrived here at the interview
19 at about -- that's Jimmy Williams, right?
20       A.   Yes.
21       Q.   So he was already there before you came
22 in?
23       A.   I can't tell if that's my notebook on
24 the table.  I may have walked in the room and
25 then gone back and turned the camera on.

Page 156

1        Q.   Where do you think your notebook might
2 be?
3        A.   I can't tell if that's it right there
4 in the chair right in front of Lieutenant
5 Williams where the handcuffs are.
6        Q.   Okay.
7        A.   That's -- you can see I walk in, I
8 don't have it in my hand when I walk in.  I had
9 put it down.
10       A.   So you can see --
11            THE STENOGRAPHER:  I'm sorry, I can't
12       hear with the video running.
13            THE DEPONENT:  Oh.  All right.  You
14       ready?
15       A.   So you can see I walked in and I, of
16 course, pushed my notebook over to where I was
17 going to sit.  So I had come in the room and set
18 my notebook and the piece of paper down and then
19 I left out of the room to go turn the camera
20 system on so that it would record what we were
21 doing.
22       Q.   And so this -- is this a legal size
23 notebook?
24       A.   Yeah, it's -- it's one that you put a
25 legal pad in, yes.

Page 157

1        Q.   Okay.  And is there actually paper in
2 that notebook?
3        A.   Yes, like a -- there's a notepad, a
4 legal pad.
5        Q.   Okay.  And you can see here where I
6 pause the video that I'm pushing a piece of
7 paper over to Mr. Kifer.
8            Do you recall giving him a Miranda
9 form?
10       A.   It was a copy for him to read along.
11       Q.   Okay.  I'm just going to push play
12 again and let's just let it play and then I'll
13 ask you some questions, okay?
14       A.   Okay.
15       Q.   Okay.  So Mr. Kifer has signed the
16 Miranda form, right?
17       A.   Yes.
18       Q.   And you have read his rights to him,
19 correct?
20       A.   Yes.
21       Q.   And Miranda rights, of course, are for
22 custodial interrogations, right?  You just don't
23 have your rights read to you on the side of the
24 street, right?
25       A.   Yes, ma'am.

Page 158

1    Q.   They're read to you when you are under
2  arrest, right?
3    A.   I mean, again, yes.  And, I mean, they
4  could just be advised just to -- so the people
5  know their rights.  I mean, it could be viewed as
6  -- it could be standing on them.  I've read
7  people their rights on the side of the road.  I
8  mean, it's just situation.  But now, if we bring
9  them -- if we come to the interview room, then
10  we're going to read you your rights.
11    Q.   Because you're in custody?
12    A.   I would say if he was in handcuffs, he
13  may have been in custody at that time.  I don't
14  know.  Again, I don't know what Deputy Spencer
15  told him before we got there.  I knew he was in
16  handcuffs.  I knew we transported him back and we
17  read him his rights when we went to interview
18  him.
19    Q.   But what we're watching on that video
20  is what's called a custodial interrogation,
21  correct?
22    A.   I would -- that's what -- yes.  At that
23  point in time I do not believe Mr. Kifer was free
24  to leave the room if he wanted to.
25    Q.   Which is otherwise known as --

Page 159

1    A.   If he had a --
2         THE STENOGRAPHER:  I'm sorry, you're
3    both going at the same time again.
4    Q.   Which is otherwise known as a custodial
5  interrogation?
6    A.   Yes.
7    Q.   Before the camera was turned on, you
8  said you went to go turn on the camera; is that
9  right?
10    A.   Yes, I believe so.
11    Q.   What, if anything, was said to Mr.
12  Kifer before that camera went on?
13    A.   I'm not sure of anything that was said.
14  I'm not sure of anything that was said at that
15  point in time.  I believe he was escorted into
16  the room and then a camera was turned on.
17    Q.   So you don't recall any conversation
18  with him at that point?
19    A.   Not that I can recall.
20    Q.   Later on it's at 17:01 at 5 o'clock is
21  when you take his phone.  And I'm going to share
22  my screen again and just show you that.
23         Have you had a chance to watch this
24  whole video, by the way?
25    A.   I don't think I watched the whole

Page 160

1  thing --
2    Q.   Okay.
3    A.   -- in its entirety.
4    Q.   Okay.  I want to move forward here.
5    Q.   Were you able to see and hear all of
6  that Lieutenant Beam?
7    A.   I was.
8    Q.   You see you're showing your phone to
9  Lieutenant Williams there?
10    A.   I do.
11    Q.   Do you remember what you were showing
12  him on your phone?
13    A.   I'm not sure what I could have been
14  showing him.  I was wondering that myself.
15    Q.   Do you remember communicating with
16  Lieutenant Williams by text at all during the
17  interrogation?
18    A.   I don't.  I don't know if I did.  I
19  tried to go back through my records to see if
20  there were any texts between us.  But they
21  wouldn't go back that far on my work phone
22  because I've actually had to change work phones
23  several times.  Yeah, I don't know what it could
24  have been that I would have showed him.  I don't
25  -- I'm not sure.

Page 161

1    Q.   So you were able to hear that
2  discussion you explaining to Ray about the phone
3  and what he was signing to hand his phone over,
4  correct?
5    A.   Yes.
6    Q.   And you heard Agent Dugger telling him
7  he was going to be booked for everything, right?
8    A.   I did hear that.
9    Q.   And so this was at 5:03, he's already
10  been there for about a half an hour, right?
11    A.   I think -- I'm not sure the exact time
12  we got there, but yes.
13    Q.   Well, if you came in at 5:35 and it's
14  now 5:01, that's about a half an hour, right?
15    A.   Yes.
16    Q.   And Ray has continued to deny
17  everything, right?
18    A.   Yes.
19    Q.   And by this time in time Dugger has
20  mentioned jail several times to Ray Kifer, right?
21    A.   From the times I heard, yes.
22    Q.   And you heard him use the expression
23  you're going to be booked for everything,
24  correct?
25    A.   I did hear him saying that, yes.

Page 162

1    Q.   And booked means you're going to be
2  charged with a crime, right?
3    A.   Yes.
4    Q.   You're going to go in front of a
5  magistrate, right?
6    A.   Yes.
7    Q.   Magistrate's going to decide whether to
8  set bond, correct?
9    A.   Yes.
10    Q.   Booked means you're going to have a
11  first appearance, right?
12    A.   Yes.
13    Q.   And right after that you then take his
14  cell phone and he signs that form, right?
15    A.   Yes, I believe so.
16    Q.   Why?
17    A.   Why did we take his phone or why did we
18  want to go through his phone?
19    Q.   At that point in time, why?
20    A.   It's just part of our process in drug
21  investigation.  We'll ask because if he was
22  involved in drug activity, I mean, people keep
23  their contacts, keep their communication between
24  other people.  Maybe if he was a user, it would
25  be to his drug dealer or if he was a drug dealer

Page 163

1  it would be to his users.  Again, this was just
2  part of a process of the drug investigation.
3    Q.   So at this point in your mind this was
4  still a common drug investigation; is that right?
5    A.   At this point in my mind we were still
6  conducting a drug investigation, yes.  When I get
7  up to leave is when -- and I can't remember how
8  long I was in there or whatnot.  But is when I'm
9  saying, hey, look, this is where we need to -- so
10  collecting that little information and all that
11  stuff like the phone and stuff is just part of a
12  drug investigation.  But I couldn't give you the
13  exact moment that was like, hey, we need to --
14  we need to drop this and we need to go.  You'll
15  see me leave in the video several times.  And I
16  think I come back once and then I leave maybe for
17  the rest of the video I'm gone.  And again, it's
18  in those moments that I'm saying that we need to
19  let Mr. Kifer go.
20    Q.   I'm going to share my screen again here
21  and we'll go to 503.  Hang on.
22         All right.  Can you see that?
23    A.   Yes.
24    Q.   And I'm just going to play this for a
25  short bit here.  You see down at the time it says

Page 164

1  17:03, that's 5:03?
2    A.   Yes.
3    Q.   Okay.  So you see you got up and you
4  walked out there at 5:03 and 40 seconds or
5  something like that?
6    A.   Yes.
7    Q.   Okay.  Now, I'll represent to you that
8  you actually do not come back after leaving at
9  5:03.
10    A.   Did I not?  I couldn't remember if I
11  did or not.
12    Q.   That's okay.  I probably spent more
13  time with the video than you have.
14         But, you know, at that point in time
15  you had reason to believe that Mr. Kifer had not
16  committed a crime, right?
17    A.   I -- I had -- I had reason to believe
18  that we needed to let Mr. Kifer go and pursue
19  this at a larger scale investigation going --
20  going -- see where we needed to go from there as
21  to whom we needed to investigate or talk to.  I
22  believed at that moment when I think me and
23  Lieutenant Williams walked outside and I was -- I
24  think I might have told him I was going to run
25  upstairs to inform the sheriff what was going on.

Page 165

1    Q.   And what exactly did Ray say that lead
2  you to believe you needed to go upstairs?
3    A.   So in the interview it's just his
4  demeanor.  Nothing changed.  Like when we do
5  interviews with other people, you can talk to
6  them and you can get their first initial
7  statement and then you can keep talking to them
8  and their demeanor would change.  It could
9  change.  Like I did a homicide interview for nine
10  hours and it changed almost every 30 minutes
11  every time we would go back and review.  And it
12  was just a constant -- to me it was just the fact
13  that he's just -- nothing -- his body language
14  never changed, his statement never changed and it
15  just, to me, was taking all that in after we were
16  able to get him there to interview him and sit
17  him down and talk to him.  And then you put all
18  the other stuff, just take some of the other
19  stuff and put it in and just felt at that point
20  Mr. Kifer needed to be released and we needed to
21  go investigate in a different direction.
22    Q.   And when you say all that other stuff,
23  you're talking about what Mario reported, what
24  Ellison reported, what you and Williams found out
25  from the second conversation with Ellison, right,

1 that's what you mean by all the other stuff,
2 right?
3      A.   All that other stuff that -- the
4 information we gathered that day, just things
5 that -- like the traffic stop and stuff like
6 that.  So, I mean, there were still -- there were
7 things that stood out that stuck with you.  But,
8 again, once the drugs were found the
9 investigation was a drug investigation.  And we
10 did take him down and interview him, which was
11 what we would do in a drug investigation.  But
12 then you play everything else back, you put it
13 all together, you take his -- the way he acted in
14 the interview.  I mean, we did the interview like
15 we would do other interviews and his demeanor and
16 body language never changed.  And so just all
17 that together just said hey, look, we need to
18 investigate this a little differently and we need
19 to let Mr. Kifer go.
20      Q.   At what point did you decide you needed
21 to investigate this a little differently?
22      A.   So, again, talking to him, we were
23 still -- once the drugs were found, we did the
24 drug investigation on Mr. Kifer.  Even with the
25 information we got, we still did it as a drug

1 investigation.  We brought him down to interview
2 him.  And, again, just my experience in
3 interviews and stuff with people is his demeanor
4 never changed, his body language never changed,
5 you know, whereas in other investigations when
6 we're interviewing people, they may -- their
7 stories change, a little bit of this and that.
8 They show that nervousness, just the body
9 language.  And to me it just -- to me it was just
10 -- didn't give the indications that Mr. Kifer was
11 attempting to hide any truth at that moment in
12 time.  That was through our interview that we did
13 during the drug investigation.  So that's when I
14 made the decision that I need to go inform the
15 sheriff that we need to let Mr. Kifer go or that
16 we were going to let Mr. Kifer go and that we
17 needed to just broaden this investigation out,
18 figure out what's going on.
19      Q.   Well, you'd agree that a custodial
20 interrogation being the most formal
21 investigation -- interrogation is a place where
22 people often feel nervous, right?
23      A.   I mean, yeah.  I mean, I could see
24 where anybody would be nervous in an interview
25 room.

1      Q.   And if Mr. Kifer hadn't been nervous or
2 displaying any of these signs that you're
3 describing suspects display in the custodial
4 interrogation, he likely wouldn't have been
5 nervous if you interviewed him somewhere else
6 either, right?
7           MR. PERRIN:  Objection, speculation.
8           You can answer.
9      A.   Again, I don't know how he would react
10 if we were talking to him on the road side, if we
11 were talking to him at our office or wherever
12 like that.  I don't know how he would react.
13 But, I mean, again, I don't know -- I couldn't
14 answer that because sometimes just situations, no
15 matter where you are, would make you nervous just
16 answering questions if you're not used to
17 answering questions.
18      Q.   You think you'd be more nervous if you
19 talked to him on the side of the road?
20      A.   I couldn't answer as to what he would
21 be.  You're talking now -- are you asking me if I
22 would be nervous?
23      Q.   I'm asking you if anybody would be more
24 nervous talking to a law enforcement officer on
25 the side of the road versus custodial

1 interrogation after being handcuffed, patted down
2 and questioned by a federal agent, anybody, where
3 would you be more nervous?
4      A.   Again, that's -- I've done traffic
5 stops on people and they were nervous as all get
6 out and it was just a traffic stop on the side of
7 the road sitting in their own car.  I've brought
8 people up here to interview them in the interview
9 room and they've been fine, not nervous at all.
10 It's just a situation thing.
11      Q.   A number of times you've mentioned
12 other investigations.  And clearly you were
13 treating this as a common drug investigation.
14 What about this was like other investigations?
15      A.   Well, again, besides the information
16 being too good to be true and Burroughs being a
17 source of some of the -- or the information, I
18 mean, it was just like getting the -- we get
19 information, we investigate it.  I mean, it's
20 just, you know, such and such could call today
21 and say hey, my ex-girlfriend's cooking meth.
22 Okay.  Well, we'll investigate it.  We'll look
23 into it.  We'll ride out and talk.  We'll set up
24 surveillance, things like that.  I mean, it's
25 just you're going off information.  And, again,

Page 170

1 just because it was too good to be true, just
2 because it came from Burroughs does not mean that
3 the possibility that it couldn't be a good tip.
4 So that's why we wanted to investigate it.
5          But when the drugs were found, we just
6 investigate it as a drug arrest until -- again,
7 until we got down there and I made -- well, we
8 made the decision because we talked about it, I'm
9 sure. That's why we walked out of the room, that
10 Mr. Kifer needed to be let go and that we would
11 broaden this investigation.
12     Q. Well, it wasn't just that handful of
13 things that you mentioned. I mean, you said just
14 a tip from Burroughs. I mean, let's talk about
15 what it was, right? It was the information Mario
16 provided and Mario was skeptical. Lieutenant
17 Williams called it a setup when he talked to
18 Mario on Tuesday night. He filled you in on
19 Wednesday after Ellison gave you the same
20 information from Burroughs. You already believed
21 it was too good to be true. Everybody knew that
22 Burroughs and Lela had broken up. The tip was
23 clearly about Lela's current boyfriend. He
24 wasn't known to you as somebody who did drugs.
25 The tip itself was ridiculously perfect in where

Page 171

1 the drugs would be, in where the car would be and
2 what time of day it would be there.
3          My question is what about that is like
4 your other investigations? Because you keep
5 talking about other investigations. You have
6 said you were treating this like a drug
7 investigation. What about this was like other
8 drug investigations?
9      MR. PERRIN: Objection to form.
10      You can answer.
11     A. Again, this itself, yes, the perfect
12 information -- like I said before, yes, the
13 perfect information; yes, the source, all that
14 stuff. But there's still we want to investigate
15 it because if it could have been true, we needed
16 to investigate it. If it couldn't have, we
17 needed -- we just needed to investigate. And
18 then the stop was made, the stop was made so we
19 had to go from there. And when drugs were found,
20 we treated it as a drug investigation. We did an
21 interview and when it was decided that Mr. Kifer
22 needed to be released, we released him. And then
23 we turned the investigation in the other
24 direction.
25     Q. So based on everything that you knew,

Page 172

1 your investigation consisted of arresting and
2 questioning Ray Kifer, right?
3      MR. PERRIN: Objection.
4      You can answer.
5     A. Again, I don't know when Mr. Kifer was
6 told he was arrested. He was in handcuffs and we
7 transported him to the interview room to do an
8 interview with him. Our investigation, once the
9 drugs were located by the deputy, turned the
10 drug investigation with him. We did not have
11 time to start our other investigation because, of
12 course, we were doing something else and we
13 thought that telling Deputy Ellison not to pursue
14 it, we were not expecting to hear a traffic stop
15 made that afternoon while we were doing that
16 other investigation. But when we did hear it, we
17 reacted and responded to the scene. And then
18 when the drugs were located, we conducted our
19 drug investigation. And then when -- again, when
20 we realized that there was -- Mr. Kifer needed to
21 be released, he was released and the
22 investigation went in another direction.
23     Q. But as we've already established, all
24 of that could have been avoided in a number of
25 ways, right?

Page 173

1     A. I mean, to your question, yes, it could
2 have been if it were not something that we were
3 just -- we were going to investigate. Had we
4 gone out there the moment we got that
5 information, knocked on the door and he had been
6 there, there's a possibility it could have been
7 avoided.
8     Q. Let's go back to when you left the
9 interview room at 5:03 and you spoke to Jimmy
10 Williams. Do you remember what you told
11 Lieutenant Williams when you stepped outside?
12     A. Not word for word. But I think I
13 informed him that I was going to upstairs and
14 talk to the sheriff.
15     Q. And is that what you did next?
16     A. Yes.
17     Q. And what did you say to the sheriff?
18     A. Best I can remember, I just informed
19 him that there was more to this investigation
20 that we needed to let Mr. Kifer -- or we were
21 going to let Mr. Kifer go and that we need to
22 investigate further into this and that it may
23 involve -- I think I told him it may involve
24 Deputy Burroughs. And I think that's when he
25 called Lieutenant Tice in to start an Internal

Page 174

1  Affairs investigation on -- on Burroughs.
2      Q.   And did Sheriff Reid already know what
3  was going on or were you the first person to fill
4  him in on anything; do you know?
5      A.   I don't know that he knew.  I can't say
6  -- I -- I want to say that I was the first person
7  to fill him in.  But I -- I'm not going to stamp
8  that in stone because it may have been filled in
9  by somebody else before I got there.
10     Q.   Do you remember his response to you
11 when you told him what you knew at that point in
12 time?
13     A.   I can't remember his response.  Again,
14 the only parts I remember was that I want to say
15 that after I told him we were going to release
16 Kifer and we needed to investigate further is
17 when he contacted Lieutenant Tice for the
18 internal.  That's about the best I can remember
19 about that.
20     Q.   Were you there when he got in touch
21 with Tice or did you just learn later that's what
22 he did?
23     A.   I don't know that I was there for their
24 initial -- like the first conversation they had.
25 I can't remember if I'd walked downstairs to the

Page 175

1  magistrate's office to talk to Deputy Spencer.  I
2  may have walked down to talk to him to inform him
3  that, you know, we needed to go before the
4  magistrate, but this case needed to be
5  investigated further, that, you know, at this
6  time no drug charges should be taken out against
7  Mr. Kifer.
8      Q.   When you explained to Sheriff Reid that
9  Mr. Kifer needed to be released, you mentioned
10 earlier that you realized that based on his body
11 language he wasn't nervous.  So was it all just
12 his body language within that 30 minutes that
13 convinced you you needed to let him go?
14     A.   No.  I mean, like I said before, it was
15 just everything.  You know, the -- like I said,
16 the perfect information, the Burroughs, the --
17 you know, where the drugs were located in the
18 car, you know, that was -- that was something
19 that I know me and Lieutenant Williams had spoke
20 about, you know, that it was just, you know,
21 after we just spoke about it was like, you know,
22 everything -- it was just everything.  Just the
23 -- and then, like I said, because the drugs were
24 found and we did the drug investigation, just his
25 -- during the interview was his demeanor and all

Page 176

1  that stuff just sort of -- you know, it was
2  obvious that his story wasn't going to change
3  because, you know, it didn't appear he was trying
4  to hide anything.  And this is just in the
5  interview and stuff.  And it's just a total of
6  everything, putting it all back together and just
7  saying that we need to investigate it further,
8  not, you know, just stopped completely, but we
9  need to broaden this investigation, Mr. Kifer
10 needs to go home.
11     Q.   And after talking to Sheriff Reid, then
12 did you go directly to find Spencer?
13     A.   I want to say that I walked downstairs
14 to the -- like right outside the magistrate's
15 office in the parking lot area of the sheriff's
16 office, I think we spoke.  And I was -- I think I
17 informed him that, you know, that this
18 investigation is going to go further than what it
19 is and that Mr. Kifer's -- we needed to get him
20 released.  So -- go ahead.
21     Q.   No, you can finish.
22     A.   So it was then, I think, somewhere in
23 all this time I think I may have also told
24 Lieutenant Williams to go ahead and bring Mr.
25 Kifer up to the magistrate's office.  And I know

Page 177

1  that Spencer went in before -- I want to say it
2  was Magistrate Leviner, and informed him, you
3  know, of the traffic stop and all that stuff.
4  And then informed him that I think this
5  investigation -- there's more to this
6  investigation at this time.  I think the
7  magistrate found there was no probable cause to
8  issue any warrants because of the information we
9  provided him so that Mr. Kifer could be released.
10     Q.   Let's talk about Spencer, your
11 conversation with him.  What did you tell
12 Spencer, as much as you remember?
13     A.   Again, from what I remember, I think I
14 just told him that there was a more to what was
15 going on and that we had to investigate it more
16 and that Mr. Kifer needed to be released.  I
17 can't remember exact details about.  But I don't
18 know that we went into specifics about what we
19 were investigating.  But as the investigator,
20 interviewer, I told him that we need to release
21 Mr. Kifer and we need to just look into this
22 whole case even more than what we were.
23     Q.   And after that, did you go into the
24 magistrate at all?
25     A.   I think I was in there.  I don't know

1  if I went, like, into stand before the magistrate
2  with Spencer or if I stood in the lobby.  I may
3  have gone in with Spencer and just maybe told the
4  magistrate, you know, there is more that we're
5  going to investigate in this and all that stuff
6  while he was given his information.
7      Q.   What, if anything, do you remember the
8  magistrate saying?
9      A.   All I remember is him saying okay, at
10 -- I think -- I think he said okay, at this time
11 I find no probable cause for a warrant for I
12 think it was drug possession or possession of
13 meth or marijuana, whatever was -- I can't
14 remember what the drugs were that were in it.  So
15 it was then that Mr. Kifer was -- his parents --
16 I think his mom and dad were there or his dad and
17 step-mom were there.  And he was told that he was
18 free to leave at that time.
19     Q.   And do you remember interacting with
20 Mr. Kifer again after you left the interview
21 room?
22     A.   The interview room or the magistrate's
23 office?
24     Q.   The interview room.  So, like, for
25 instance, like, did you talk with him when you

1  were with the magistrate; if you remember?
2      A.   I don't know if I spoke to him in the
3  lobby unless it was just to tell him that he was
4  free to leave.  And Spencer may have told him he
5  was free to leave or the magistrate.  I'm not
6  sure if we spoke in any conversation or any type
7  after that.
8      Q.   Do you remember any interaction with
9  Mr. Kifer's parents?
10     A.   I don't remember -- I don't think I
11 spoke to his parents.  I'm pretty sure I didn't.
12 Unless his dad might have said something.  But
13 I'm not sure.
14     Q.   Okay.  At some point you became aware
15 that an internal investigation was under way,
16 correct?
17     A.   Yes.
18     Q.   Was that right after talking to Sheriff
19 Reid that you knew he was launching an internal
20 investigation?
21     A.   I want to say that maybe I -- I don't
22 remember -- I don't remember -- I don't remember
23 if I was in there when he called Lieutenant Tice,
24 but I think everything after everything -- like
25 after Mr. Kifer was released, I think we went

1  back upstairs and I think they were in the
2  process of meeting about what to do next.  And
3  then myself and Lieutenant Williams assisted
4  Lieutenant Tice and Lieutenant Little just pretty
5  much with some interviews that they were going to
6  do on several individuals.
7      Q.   Who asked you to assist them with those
8  interviews?
9      A.   It may have been Lieutenant Tice, it
10 may have been the sheriff.  I'm not sure which
11 one of those two asked.
12     Q.   Were you asked to be interviewed by
13 Lieutenant Tice or Lieutenant Little?
14     A.   No.
15     Q.   Did you offer to be interviewed?
16     A.   If they had wanted to interview me, I
17 would have sat down for an interview.
18     Q.   But did you volunteer yourself?
19         I mean, did you say to them, hey,
20 listen, you know, Williams and I have this
21 information from -- from Mario and from Ellison
22 and -- and we're happy to write up a report for
23 you, did you volunteer to do that?
24     A.   I'm pretty sure we talked about the
25 situation and we were there with them the whole

1  time.
2      Q.   But did you offer to write up a report
3  about what information you had?
4      A.   I did -- no.
5      Q.   Do you think that might have been
6  important to their Internal Affairs
7  investigation?
8      A.   Yeah, I mean, it could have been.  But,
9  again, I didn't know that Lieutenant Tice went
10 with his Internal Affairs investigation.  I mean,
11 obviously if he'd asked for a report or a
12 statement from me on anything about that, that he
13 would have got it.
14     Q.   Well, if you're going to investigate
15 something like this or anything for that matter,
16 it's important for it to be as full and thorough
17 an investigation as possible, right?
18     A.   It is.
19     Q.   And you certainly had important
20 information about what happened before Ray Kifer
21 was pulled over, right?
22     A.   Yeah, I had the information that I got
23 that day, yes.
24     Q.   Wouldn't you consider that important
25 information?

Page 182

1     A.   The circumstances as to the information
2 we got, I mean, it was definitely useful in the
3 internal investigation.
4     Q.   So it probably would have been useful
5 if Tice and Little had a report from you, right?
6     A.   Again, I can't say as to why we didn't
7 sit down with an interview.  I just know that
8 they knew the information we had and we assisted
9 them with interviews.  I don't know as to why
10 they didn't -- I had thought about that as to
11 why.  But I couldn't tell you why.
12     Q.   Did you say you have thought about
13 that; is that what you said?
14     A.   Well, shortly after I was just -- and
15 it may have been because we were involved in the
16 internal investigation or helped with the
17 interviews and stuff.  But they didn't interview
18 myself or Lieutenant Williams.
19     Q.   But did you --
20     A.   Again, I don't know why it wasn't done.
21 That's not something I can answer.  But, again,
22 had they wanted an interview from me, I certainly
23 would have been there to offer that information.
24     Q.   But you didn't volunteer it?
25     A.   They -- again, they knew the

Page 183

1 information now.  As to whether they wrote it up,
2 I don't know.  But they knew exactly what
3 happened that day with the information we got,
4 the information that Lieutenant Williams got from
5 Mario.  Now, as to whether they felt necessary to
6 write it up, that's on them.  But they did know
7 everything at the time that Mr. Kifer was let
8 go.
9     Q.   I just want to run through some of the
10 interviews to understand which ones you were
11 present for; if you remember.
12     So David Burroughs was interviewed on
13 March 7th, 2018, that day.  Were you present for
14 that first interview?
15     A.   I don't --I don't think I was present
16 for that first interview.
17     Q.   He was interviewed again the next day.
18 Were you present for that?
19     A.   I was present for that one.
20     Q.   David Spencer was also interviewed on
21 March 7th were you present for that?
22     A.   I was not present for that interview.
23     Q.   Darius Ellison was also interviewed on
24 March 7th.  Were you present for that?
25     A.   I was not present for that interview.

Page 184

1     Q.   Mario was interviewed on March 9th.
2 What about that one, were you present for that?
3     A.   I was not present for that interview.
4     Q.   Lela Vang was interviewed.  Were you
5 present for that?
6     A.   I was not present for that one.
7     Q.   Ray Kifer was interviewed.  Were you
8 present for that?
9     A.   I was not.
10     Q.   Which interviews do you remember being
11 present for?
12     A.   I want to say I -- maybe it was -- I
13 think it was me and Lieutenant Little -- we
14 interviewed -- I think it was Burroughs' cousin,
15 I think it's a Dillon maybe Williams I think was
16 the last name.  We interviewed him.
17     Q.   When did you interview him?
18     A.   It was the 8th, I think.  Or the next
19 day.  I'm pretty sure it was the next day.
20 Because we had been given information that that's
21 who gave Burroughs the information and that's why
22 we interviewed him.
23     Q.   Was he somebody that you already knew?
24     A.   I don't think I knew him.  I can't
25 remember if I knew him.  I don't think I did.

Page 185

1     Q.   And anyone you knew associated with
2 drugs or anything like that?
3     A.   Not that I know of.
4     Q.   Okay.  Do you remember was it easy to
5 find him?
6     A.   I don't think we had any problem
7 finding him.  It was just getting up with him,
8 setting up a time to meet him.
9     Q.   And did he give you any trouble or did
10 he talk with you right away?
11     A.   He talked with us.  He didn't have any
12 problem talking to us.
13     Q.   So if you had talked to Burroughs on
14 Tuesday morning and got the information about
15 Dillon, you'd had been able to find Dillon and
16 talk to him on Wednesday morning, right?
17     A.   Possibly.
18     MR. PERRIN:  Objection.
19     Go ahead.  No, you can answer.
20     A.   Possibly.
21     Q.   Have you been interviewed by the SBI?
22     A.   I was not interviewed by the SBI.
23     Q.   You weren't asked to be interviewed?
24     A.   I was not asked by an agent to be
25 interviewed, no.

Page 186

1    Q.   Were you aware that an SBI
2 investigation was going on?
3    A.   I was aware that the SBI was contacted
4 after the interview with Burroughs, the second
5 interview with Burroughs.
6    Q.   And did you offer the SBI to volunteer
7 to provide a report or any information?
8    A.   I can't remember if I told him I'd give
9 him a statement or not. But, again, I was
10 available if they wanted to interview me or -- I
11 don't know if they knew my information or not.
12 But I think Lieutenant Tice had most of the
13 contact with the SBI. So I don't know what he
14 informed them that, you know, myself and
15 Lieutenant Williams had passed on. But, again, I
16 was not reached out to by an SBI agent for
17 interview, but I was available if they needed to
18 interview me or wanted to interview me.
19    Q.   We talked about a number of things that
20 could have been done, right, by you and
21 Lieutenant Williams, whether it was calling
22 Burroughs, whether it was talking to Ray Kifer, a
23 number of things that could have been done. I
24 wonder if looking back now on the situation, do
25 you think this could have been handled better by

Page 187

1 you and Lieutenant Williams?
2    A.   If you're asking if we knew now what we
3 didn't know then? I mean, if we knew then what
4 we know now, it could have gone differently. But
5 we did not know that at the time. You know,
6 anything, if you look back on it, could have gone
7 differently if you knew the information that you
8 know now or the stuff that came to light during
9 the investigation, it could have been done
10 differently. I feel that we -- you know, at the
11 moment I think we did what we were doing with any
12 interview or any -- not interview, but any
13 information that we may get, we were going to
14 investigate it. It was not something that we
15 jumped right on. Again, knowing now what
16 happened, then you would say yeah, you should
17 have -- if we knew then now -- if we knew then
18 what we know now, we would have jumped right on
19 it. But we didn't. And we went for what was
20 going on in the moment and we did what we
21 normally would do. And then, of course, during
22 that whole thing, during the investigation, when
23 the drug investigation came about, everything
24 came about, everything just sort of started
25 rolling and we just broadened everything out.

Page 188

1    Q.   What do you know now that makes it so
2 different from what you knew at 11:00 a.m. on
3 Tuesday, March 7th, 2018?
4    A.   So, again, now, now we know that Deputy
5 Burroughs planted the drugs in the car that came
6 through the investigation. Then we did not know
7 that. Then we knew that Burroughs had given the
8 information. Then we knew that information -- I
9 mean, the people were trying to get stopped and
10 the information was -- appeared to be too good.
11 But, again, it was not outside the realm of
12 possibility that that information could be true.
13 I mean, there's still that small possibility that
14 we needed to investigate. And that's what what
15 we were going to try to do. The stop came about
16 so then we had to go from the stop happening, the
17 drugs being found, we did the investigation as
18 drugs and then we turned it back into -- or we
19 turned it into an investigation after we just put
20 everything together.
21      So yes, knowing now that yeah,
22 Burroughs did that, that's different. But then
23 we didn't -- we didn't -- like I said, we had the
24 information from Burroughs, but it was something
25 that we were going to investigate. And yes, if

Page 189

1 we knew then that we needed to jump right on it,
2 we would have jumped right on it. And there's
3 the possibility that Mr. Kifer might not have
4 been stopped. There's a possibility that he
5 might not have been taken to the interview room
6 and interviewed. But the point is that when we
7 attempted to investigate the way we were doing
8 drug investigations at the time and the traffic
9 stop. We had to go from there once the traffic
10 stop was completed.
11    Q.   But you just called it a small
12 possibility that this could be true. I mean,
13 let's be clear about what you knew at that time,
14 right? Information from Mario, skeptical Mario,
15 skeptical Williams, skeptical Ellison. All of
16 that information and so many things you could
17 have done differently, calling Burroughs,
18 interviewing Burroughs, interviewing his CI,
19 showing up at Mr. Kifer's door, asking to talk to
20 him, asking to search his car. You don't think
21 looking back that you could have done it better?
22      MR. PERRIN: I'm going to object. Just
23      facts not in evidence with the skeptical
24      Ellison. But that's my objection.
25      You can answer that.

Page 190

1    A.   So, again, looking back, we could say
2  anything.  We could say that -- but me in that
3  moment, I don't recall -- I recall that me and
4  Jimmy, our conversation was this information is
5  just too good to be -- it just seems to good to
6  be true.  Again, I don't recall before the
7  traffic stop and before we got into the interview
8  stuff and all that stuff him saying anything
9  about a setup.  I do remember him saying that
10 Mario had questions about the stop and I do
11 remember saying -- telling Mario not to mess with
12 it, you know.  I don't remember if he said we'd
13 look into it.  But just not to mess with it.  Not
14 to -- not to go down that road right now.  So
15 yes, he thought we needed to look into it further
16 and we agreed on that.
17       But yeah, looking back you could say
18 anything could have done differently.  But we're
19 talking about what we knew at the moment.  Yes,
20 we knew that Burroughs gave the information.
21 Yes, we knew that it seemed too good to be true.
22 But, like I said, that's why we do the
23 investigation, for the small possibilities or the
24 big possibilities, is to figure out the truth.
25       And like I said, the traffic stop, once

Page 191

1  the drugs were found, we had to investigate it as
2  drugs.  And then, again, during our interview,
3  like I said, like you heard, like I said before,
4  we made the decision that we knew Mr. Kifer
5  needed to leave and we needed to make the
6  investigation more than just focusing on the drug
7  possession and Mr. Kifer.
8     **Q.   Where is the policy or the rule that**
9  **you had to investigate it like a regular drug**
10 **case once you found the drugs, especially given**
11 **everything you already knew at that point in**
12 **time.**
13    A.   Well, again there's -- I don't know
14 that there's a policy on it, but -- well, I don't
15 believe there's -- but this is us.  And, again,
16 now that the drugs have been found, now that the
17 car's been searched with consent and the traffic
18 stop was for a traffic violation and we pursued
19 it as drug investigation because, again, you're
20 looking at either the big possibility or the
21 small possibility that Mr. Kifer was in
22 possession of those drugs for his own use or
23 sale.  And we can't go off what we know now for
24 then.  We could look back and say we would have
25 changed things maybe.  But then, then, in that

Page 192

1  moment, Mr. Kifer had been stopped, Mr. Kifer --
2  they found drugs in his car.  So we investigated
3  it as a drug investigation, which is what we
4  would do with anybody.
5       And yes, I know you say getting the
6  information early in the day, that that's --
7  should have really stuck in our minds.  But
8  that's why we investigate things is to get to the
9  true, the true truth of the matter.  And I
10 understand the whole -- where we're saying now
11 about looking back and all this stuff, but in
12 that moment we did the drug investigation when
13 the drugs were found and then when we realized
14 that Mr. Kifer needed to be released, he was
15 released immediately.
16    **Q.   But you had enough information as of**
17 **11:00 a.m. or noon on March 7th, 2018 to get to**
18 **the truth of the matter; isn't that fair?**
19    A.   Again, I had the information that
20 Burroughs had provided and that it was -- again,
21 appeared just through our experience to be very
22 detailed information.  And that's why we were
23 going to investigate it further.
24       Now, it didn't happen right off the bat
25 because we felt that we had time to set up an

Page 193

1  investigation on it to delve in it further.  The
2  traffic stop sped all that up because then the
3  traffic stop happened.  And like -- like you were
4  asking earlier, you could look back and say that
5  had we jumped on it, it could have been
6  prevented.  But, again, it still might not have
7  because he might not have been home if we'd gone
8  out there and knocked on the door.
9       But Mr. -- I've lost -- what I was
10 saying.  But anyway, we went with, of course,
11 what we had.  That's why -- because we were
12 questioning Burroughs giving the information a
13 little bit -- giving the information and that it
14 was so good is why we told Ellison not to pursue
15 it any further.  And like I said, I don't know to
16 whom passed on the information to, Spencer and
17 all that, but once the drugs were located by
18 Spencer, we just investigated it as a drug
19 investigation.  And once Mr. Kifer -- we realized
20 he needed to be released, we released him and
21 turned the investigation in a different
22 direction.
23    **Q.   But you knew Burroughs was trying to**
24 **set this up for that day and right after talking**
25 **to Ellison with the information you had, you've**

Page 194

1  testified multiple times you and Lieutenant
2  Williams planned on doing an investigation,
3  right?
4       A.   Yes.
5       Q.   Okay.  Was that investigation to arrest
6  Ray Kifer and interrogate him with a federal
7  agent when you were talking about your
8  investigation with Lieutenant Williams at
9  11:00 a.m., was that the investigation you
10  intended to do, arrest him and interrogate him?
11       A.   Again, at that time our investigation
12  was going to be a drug investigation to set up
13  surveillance on Mr. Kifer and go through back
14  through a little bit of this or talk to some
15  people here or there.  It was not at that moment
16  to arrest him.  The traffic stop when the drugs
17  were actually located in his vehicle facilitated
18  that.  And then that's why we decided to do the
19  interview as a drug investigation and just go
20  down and talk to him.
21            And then, again, when he was -- it was
22  decided that he needed to be released, he was
23  released and Mr. Kifer went home and then we
24  turned the investigation in another direction.
25            But no, the initial investigation was

Page 195

1  going to be more at length and with surveillance
2  and talking to some people and things like that
3  is what our goal was.  But, again, we were
4  working on another thing and we thought that once
5  we told Ellison not to pursue it, that, of
6  course, we could step up our investigation later
7  on either in that day or the next day to come.
8       Q.   Were you going to set up that
9  surveillance before even talking to Burroughs?
10       I mean, I wouldn't that be the easiest
11  thing to do?
12       A.   Well, I mean, I say set up
13  surveillance, but obviously we were going to talk
14  to people.  But, again, telling Ellison not to go
15  through with it, we believed that we were going
16  to be able to pursue our investigation, whichever
17  way it went, talking to Burroughs, talking to --
18  re-interviewing Ellison -- or re-talking to
19  Ellison or doing things like that.  It was not --
20  we were going to do our investigation like we
21  would even though the information seemed good,
22  even though it came from Burroughs, we had told
23  Ellison not to mess with it.  We left that day
24  believing that nobody would stop that car and we
25  went and did our job, the other stuff we had to

Page 196

1  do, and then we were going to get -- follow up on
2  it.  That was our goal.  And, again, the traffic
3  stop, whoever told Spencer, I don't know.  I
4  don't remember who supposedly gave him that
5  information.  Got -- the traffic stop occurred
6  and the drugs were found and we went on from
7  there as a drug investigation.  And, again, Mr.
8  Kifer was released when we came to the conclusion
9  he needed to be released for the further
10  investigation of this incident.
11       Q.   So were you also viewing this as a
12  common drug investigation at 11:00 a.m. on
13  March 7th, 2018 before the car was stopped, was
14  it still a common drug investigation to you?
15       A.   Again, it was an investigation, like
16  when we received -- I understand what you're
17  saying that Burroughs giving the information --
18  the information didn't -- just didn't seem to be
19  common.  But it was information given that we
20  were going to investigate.  But it was not
21  something that we were going to investigate then.
22  We were going to start our investigation either
23  later on in the day or the next day because,
24  again, it's a small county, there's two of us.
25  We had this other investigation that we were

Page 197

1  doing or this other -- whatever we were doing
2  that day.  I know it had to do with gangs in the
3  south end of the county.  And we didn't feel that
4  after we told Ellison not to pursue it, that we
5  needed to be in a rush to begin that
6  investigation.
7       Q.   So you didn't think there was any hurry
8  to stop this possible setup, harassment of a
9  citizen, whatever you want to call it, you didn't
10  think there was any hurry to do it knowing that
11  Burroughs had been calling around, whether you --
12  even if you only knew it was Mario and Ellison,
13  forget about Polkton, you didn't think there was
14  any hurry to try to intercept it that day?
15       MR. PERRIN:  Objection, asked and
16  answered.
17       You can answer again.
18       A.   Well, again, harassment -- harassment
19  stop, that was my words, and I misspoke on that.
20  But, again, we had no evidence that Burroughs had
21  planted drugs.  And I know you say that it was
22  common knowledge to everybody that Burroughs was
23  upset about his breakup.  But, again, I will tell
24  you that now that I don't recall hearing that
25  conversation.  I didn't carry on a conversation

Page 198

1  with people about his anger over a breakup or
2  anything like that.  I don't recall that.  But at
3  that moment in time we felt that it was an
4  investigation we could start and build up later
5  on.  Because once we left Ellison and gave him
6  the words not to stop the car, we were not
7  expecting to hear a traffic stop on that vehicle.
8       Q.   And what was it you were doing in
9  Morven that was taking priority of over this?
10            What was the specific investigation you
11  had going on?
12       A.   We were dealing with one of the gangs
13  down there.  God, what was their names.  Wasn't
14  the Nine Trey --
15            THE STENOGRAPHER:  I'm sorry?
16       A.   It wasn't the Nine Trey, I apologize,
17  which is one of the gangs we busted.  It was --
18  gosh, what were their names?  Anyway, we were
19  going down and identifying houses and locations
20  of people of -- suspected in this gang.  We had
21  -- I want to say that was the ones where we'd
22  seen the music video that they had made there in
23  the city limits of Morven, and so we were going
24  around trying to identify these individuals.  It
25  was something that we had planned on doing that

Page 199

1  day.
2       Q.   Why couldn't that wait?
3       A.   Again, at that moment in time we felt
4  like that drug investigation could wait because
5  it didn't seem at that moment in time that it was
6  something that would -- we wouldn't be able to
7  investigate later on in the day or the next day.
8  I understand what you're saying.  But that was
9  the activity that we planned on doing and this
10  other thing we felt that we could wait at least
11  till later on that afternoon or the next day to
12  start that investigation --
13       Q.   So despite --
14       A.   -- to look for -- I apologize.
15       Q.   Despite the fact that Burroughs had
16  reached out to two deputies about stopping this
17  car that very day, you decided that this
18  non-time-sensitive investigation with the gangs
19  couldn't wait?
20       A.   Like I said just a minute ago, we felt
21  that once we told Ellison not to pursue it and
22  Mario had already been told not to pursue it,
23  that investigation we could start work on it
24  either later that evening or the next day.
25       Q.   So was this really just a matter of you

Page 200

1  not wanting to mess up what you had planned for
2  Tuesday?
3       A.   No.  It was just a matter of we felt
4  like we could start the investigation later on
5  that day or the next day because we were -- it
6  wasn't about not wanting to mess up anything, but
7  had we felt the situation warranted us doing it
8  right then and there, we would have done it right
9  then and there.  But that moment in time we felt
10  like we could start it later that evening or the
11  next day.
12       Q.   So it just wasn't a priority to you?
13       A.   In that moment in time, it didn't feel
14  like it was a priority because once we told
15  Ellison not to pursue it and Mario was told not
16  to pursue it, we didn't feel that anybody was the
17  patrol guys.  We -- again, we didn't know
18  somebody else -- or whoever passed on the
19  information to Spencer would do it.
20       Q.   Well, I'm just trying to understand why
21  the gang was a higher priority to this situation
22  that was clearly time sensitive?
23            Whatever investigation you're in, you
24  as it relates to Ray Kifer, you knew that based
25  on the information you had, it was going down

Page 201

1  that very day.  I don't understand why what you
2  were investigating with the gangs was more of a
3  priority than investigating what you learned from
4  Ellison and Mario.
5            MR. PERRIN:  Objection as to form.
6            You can answer.
7       A.   Again, once we told Ellison not to
8  pursue it, Mario was told not to pursue it, those
9  officers were told not to pursue it.  We felt
10  that we could start our investigation after we
11  completed whatever we were doing down there with
12  the gangs because they weren't supposed to stop
13  the vehicle and they knew we were investigating
14  because we told them that we were going to look
15  into it.
16            MS. PFEIFFER:  Why don't we take a
17            short break.  We've been going again for
18            another couple of hours.  Ten-minute break
19            okay?
20            MR. PERRIN:  Sure.  Sounds good.
21            THE VIDEOGRAPHER:  Okay.  This is the
22            end of media number 2 in the deposition of
23            Lieutenant Josh Beam.
24            The time is 1:43 p.m.  We are now off
25            the record.

Page 202

1           (A BRIEF RECESS WAS TAKEN.)
2           THE VIDEOGRAPHER:  This is the
3     beginning of media number 3 in the
4     deposition of Lieutenant Josh Beam.
5           The time is 1:54 p.m.  We are back on
6     the record.
7  BY MR. PFEIFFER:
8     Q.    Lieutenant Beam before we took our
9  break we were talking a little bit about what you
10 were doing on March 7th, 2018 in relationship to
11 this gang investigation in Morven.
12          Do you remember that?
13    A.    Yes.
14    Q.    And did you write reports about that
15 investigation?
16    A.    I'm not sure.  So I can't remember if I
17 put information into the gang books.  Just like
18 if we found out where somebody lived, we printed
19 their information off, put it in the gang book,
20 stuff like that.  I'm not sure if it's in there.
21    Q.    And where is the gang book?
22    A.    It would be in Lieutenant Williams' and
23 Detective Martin's office.
24    Q.    And is that gang book still in
25 existence?

Page 203

1     A.    I guess so.  Like I said, I've been out
2  of that office for a week now.  So I don't know
3  if they've changed it up or moved that gang back,
4  because I don't know where their gang
5  investigations are right now.
6     Q.    Was the gang book there when you left a
7  week ago?
8     A.    I believe it was.
9     Q.    And is that an ongoing record of what
10 you learn in your gang investigations?
11    A.    So, basically, the gang book is just
12 like the information of people that we either
13 have information that are in the gang or we
14 believe they're associates of the gangs or things
15 things like that.  It's just a -- it's like a
16 demographic sheet.  It's not nothing like
17 handwritten notes or anything like that.
18    Q.    And how far back does that book go?
19    A.    Shoot, I -- probably 2018, 2019.  Like
20 I said, with the pandemic and everything, gang
21 investigations sort of went back a little bit.
22 And then after the pandemic came open we started
23 back in the drug side and really haven't ramped
24 back up the gang stuff.  Gang -- gang stuff was
25 all new to us back then.  That's why we were

Page 204

1  trying to gather information that we could put
2  together on possible gangs.  And these videos
3  were coming out and I -- if I could remember the
4  name of the video, it may still be up.  I'm not
5  sure.  But, like I said, I know we were dealing
6  with the gangs that day and I think that's what
7  it had to do with.  But I can't be 100 percent.
8  But if I did make note or make a demographic
9  sheet for that -- one of those investigations,
10 then it should be in the -- in the gang book or
11 in one of the books.  There were like four or
12 five notebooks of different areas or different --
13 the different gangs that we supposedly -- or that
14 we kind of identified through our work with the
15 FBI and stuff like that.
16    Q.    Okay.  And if you were doing
17 demographics or trying to locate houses or gang
18 members, that would be the kind of thing that you
19 would put in that gang notebook if that's what
20 you were doing on March 7th, 2018?
21    A.    That's exactly what we were doing that
22 day, then yes, I would have printed out a -- a
23 demographic sheet, probably from CJLEADS is where
24 I think I got most of my information from and it
25 would have gone into the book.

Page 205

1     Q.    Fair to say if this was new in 2018,
2  you were probably trying to put as much
3  information as you could in there?
4     A.    So, basically, I think what I was
5  putting in the book was basically a demographic
6  sheet.  If they had like descriptors, tattoos,
7  things like that, maybe a criminal history like
8  that we could pull from CJLEADS or something like
9  that of some photographs of them, like mugshots,
10 things like that.
11    Q.    And anything you'd pull from CJLEADS
12 would have the date on it when you pulled it,
13 right?
14    A.    It should, yes.  I think it does a date
15 and time stamp at the bottom if I pull it.
16    Q.    And while you were in Morven doing this
17 gang work, your testimony is that you weren't
18 concerned about what was happening as it relates
19 to the information you got from Mario and Ellison
20 because you had told Mario and Ellison don't stop
21 that car, right?
22    A.    At the time we believed that telling
23 them not to do it that we could begun our
24 investigation.  Later on either -- later on after
25 we -- and, again, we -- I'm pretty sure that's

1  what we were doing.  But I know it was getting --
2  we were doing something with gangs down there.
3  But we believed that we could start our
4  investigation either later on that day or the
5  next morning.  That that would be my testimony.
6      Q.   And the reason you told Mario and --
7  and Darius Ellison don't stop that car is because
8  you had some concerns about what you had learned,
9  right?
10     A.   We believed we needed to investigate it
11 further than just a traffic stop.
12     Q.   Right.
13          Now, if Ray Kifer did not know about
14 the drugs in his car, that meant there might be a
15 rogue cop trying to set up an innocent person,
16 right?  That's a hypothetical, right?
17          If Ray Kifer did not know about the
18 drugs in his car, that might mean there's a rogue
19 cop trying to set somebody up who's innocent,
20 right?
21     A.   To your point, that could -- it could
22 mean that or it could mean anything -- anybody
23 was -- could have planted drugs on him.  But, I
24 mean, to your point, I mean, it's a possibility
25 that anything could have been, that rogue cop or

1  somebody else did it or -- yes, to your point, I
2  mean, that could fall under the possibility that
3  it could have occurred that way.
4      Q.   Well, and based on what you knew at the
5  time, that could be a possibility, right?
6           I mean, we're not talking about
7  anybody, I'm talking about this situation.  If it
8  turned out that Ray didn't know about drugs in
9  his car, if there were drugs and he didn't know
10 about it and it turned out that he was innocent,
11 it was possible that there was a rogue cop who
12 was involved in this based on what you knew at
13 the time, right?
14     A.   And based on what I knew at the time,
15 that was not, like, a thought that I had that a
16 rogue cop put drugs in the car.  But if you're
17 asking if it could have been a possibility, then
18 it could have been a possibility.  But at the
19 time of the incident or at the time of we were
20 getting this information, that was not a thought
21 that was in my mind that a rogue cop did it.  It
22 was that we needed to look further into the -- or
23 we needed to investigate it further.
24     Q.   Right.
25          And you need to investigate it further

1  because you had concerns about what you learned,
2  right?
3      A.   We needed to investigate it further
4  because, again, the information was too good to
5  be true or it seemed too good to be true, not
6  that it couldn't have been true, but it seemed
7  too good to be true.  And that we felt as the
8  drug investigators we would should look into it
9  further than just a traffic stop.  But we did not
10 feel it was something that we need to jump on
11 right then because, again, we had told Ellison
12 and Mario not to deal with it, that we would look
13 into it.  So we believed that we had time to look
14 into it.
15     Q.   If it was too good to be true, which
16 you have testified to a number of times, and it
17 turned out that Ray Kifer was innocent and there
18 were drugs in his car, if you were right, if it
19 was too good to be true, then it could mean that
20 Burroughs was involved in setting up an innocent
21 person, right?
22          That was a possibility, correct?
23     A.   At the time that was not a possibility
24 in my mind.  During our investigation we did
25 prove that that is what happened.  And looking

1  back on it, you could say that that was -- was
2  the possibility.  But at the moment that was not
3  possible.  It was -- the evidence -- I mean the
4  information appeared to be too good to be true
5  because nobody's really given us detailed
6  information like that.  And that it came from
7  Burroughs.  But I can say that at that moment
8  and, again, you say that Lieutenant Williams was
9  talking about setup, but I don't recall him
10 saying that in the -- for the traffic stop.
11 That's -- that's me.  Not saying that he may not
12 have said it.  I -- I don't remember that.  And I
13 don't remember having that feeling until honestly
14 like the real feeling that something really big
15 was going on with this case was when we were
16 interviewing him and I stood up and left and went
17 and talked to the sheriff.
18     Q.   Lieutenant Beam, these are your words,
19 too good to be true.  You've said it a number of
20 times.  Too good to be true meaning this kid
21 might not be a drug dealer, this is too perfect,
22 right?
23          Too good to be true, that's what you've
24 said, correct?
25     A.   Yes.

**Page 210**

1      Q.   And you wanted to investigate because

2 it might be too good to be true, right?

3      A.   Yes.

4      Q.   And the possibility that Ray Kifer was

5 innocent, that this was too good to be true, that

6 wasn't more important than getting the names of

7 potential gang members to you?

8          MR. PERRIN:   Objection.

9          You can answer.

10      A.   Again, we in the moment felt we had

11 time to start our investigation later on after we

12 did what it was we planned on doing that day.   It

13 wasn't that that was more important or this, it's

14 just the way we do it, our investigation stuff,

15 is we felt we had time to start that

16 investigation and to build that investigation.

17      Q.   So, in other words, getting the names

18 of potential gang members was more important than

19 investigating something that was too good to be

20 true?

21          MR. PERRIN:   Objection, asked and

22     answered.

23          You can answer.

24      A.   Again, we felt that after we told

25 Ellison and told Mario not to deal with it, we

**Page 211**

1 were going to investigate it, we had time to

2 investigate it.

3      Q.   It's really a yes or no question.

4          MR. PERRIN:   Objection. No, it's not.

5          You can answer.

6      A.   I mean, I'm just going to -- my answer

7 is that we felt we had time with the -- with the

8 circumstances behind it or during that day.

9      Q.   All right.   I don't have any further

10 questions.   Your attorney might and Mr.

11 MacLatchie might.

12          MR. PERRIN:   I have no questions,

13     Scott.   I don't know if Scott does.

14          MR. MacLATCHIE:   Yeah, you know me, I

15     have none.

16          MR. PERRIN:   Shocker.

17          And Dario, Mr. Beam will waive, please.

18          THE VIDEOGRAPHER:   One more time.

19          This is the end of media number 3 in

20     the deposition of Lieutenant Josh Beam.

21     The time is 2:06 p.m.   We are now off the

22     record.

23          THE STENOGRAPHER:   Mr. Perrin, do you

24     have a standing order too?

25          MR. PERRIN:   I don't know if it's

**Page 212**

1 standing, I just want an E-trans with

2 exhibits.   So I don't know if that's

3 standing or not, but that's just what I

4 want.

5          (TIME NOTED: 2:10 p.m.)

6          (SIGNATURE WAIVED.)

**Page 213**

1 STATE OF NORTH CAROLINA

   COUNTY OF MECKLENBURG

2

3              CERTIFICATE

4      I, V. Dario Stanziola, a Notary Public

5 in and for the State of North Carolina duly

6 commissioned and authorized to administer oaths

7 and to take and certify depositions, do hereby

8 certify that on Thursday, May 19, 2022, Joshua

9 Austin Beam, being by me personally duly sworn to

10 tell the truth, thereupon testified as above set

11 forth as found in the preceding pages, this

12 examination being recorded stenographically by me

13 verbatim and then reduced to typewritten form by

14 me, that the foregoing is a true and correct

15 transcript of said proceedings to the best of my

16 ability and understanding; that I am not related

17 to any of the parties to this action; that I am

18 not interested in the outcome of this case; that

19 I am not of counsel nor in the employ of any of

20 the parties to this action.

21      IN WITNESS WHEREOF, I have hereto set

22 my hand, this the 22nd day of May 2022.

23

24      _____

      V. DARIO STANZIOLA, CCR (GA)(NJ), RPR, CRR

25      Notary Public No. 20011200120