**Exhibit**

**O**

1        UNITED STATES DISTRICT COURT
         DISTRICT OF NORTH CAROLINA
2           CHARLOTTE DIVISION

3

4
   RAY KIFER, JR.,

5
          Plaintiff(s),

6                     ACTION NO.
    vs.                3:21-CV-039-DCK

7

   DAVID SCOTT BURROUGHS, DAVID
8   SPENCER, KYLE BEAM, JOSH BEAM,
   JIMMY WILLIAMS, AND UNKNOWN
9   FEDERAL AGENT,

10          Defendant(s).

11

   VIRTUAL VIDEO
12  DEPOSITION OF:  KYLE BEAM

13  DATE:          Wednesday, May 11, 2022

14  TIME:          12:32 p.m. through 2:33 p.m.

15  TAKEN BY:      Attorneys for the Plaintiff(s)

16  COURT REPORTER: MADONNA M. FARRELL
                Registered Professional Reporter
17              Certified Livenote Reporter
                CaseViewNet Realtime Reporter
18

19

20

21

22

23

24

25

**Page 2**

```
 1            VIRTUAL APPEARANCES OF COUNSEL
 2  REPRESENTING THE PLAINTIFF:
 3         REPRESENTING THE PLAINTIFF:
 4         RUDOLF WIDENHOUSE
           BY:  SONYA PFEIFFER, ESQUIRE
 5         AND:  J.P. LATTIMORE, ESQUIRE
           225 East Worthington Avenue, Suite 100
 6         Charlotte, NC 28203
           Office: 704.333.9945
 7         Email: Spfeiffer@rudolfwidenhouse.com
                  Jplattimore@rudolfwidenhouse.com
 8
    REPRESENTING THE DEFENDANTS & DEPONENT VANCE
 9  BENNETT:
10         WOMBLE BOND DICKINSON
           BY:  SEAN PERRIN, ESQUIRE
11         One Wells Fargo Center, Suite 3500
           301 South College Street
12         Charlotte, NC 28202-6037
           Office: 704.331.4900
13         Email:  Sean.perrin@wbd-us.com
14  REPRESENTING THE DEFENDANT DAVID SCOTT BURROUGHS:
15         HALL BOOTH SMITH P.C.
           BY:  CHRISTIAN FERLAN, ESQUIRE
16         11215 North Community House Road, Suite 750
           Charlotte, NC 28277
17         Office: 980.949.7822
           Email: Cferlan@hallboothsmith.com
18
19
    ALSO PRESENT:  SUZETTE WOOLSEY, PARALEGAL
20
21
22
23
24
25
```

**Page 3**

```
 1                    INDEX
 2  Examination By                    Page    Line
 3  By Ms. Pfeiffer                     6       4
 4  Certificate of Reporter           112       1
 5
 6
 7            PLAINTIFF(S) EXHIBITS
 8  Exhibit #   Description             Page    Line
 9  EXHIBIT 14  BLET Controlled          42      25
                Substances Page 46
10
    EXHIBIT 15  K. Beam Answers to       46      25
11              Interrogatories
12  EXHIBIT 16  Subset of calls          88      18
                between K. Beam and D.
13              Burroughs
    EXHIBIT 17  Subset of calls          88      25
14              between  D. Burroughs,
                K. Beam, D. Spencer
15  EXHIBIT 18  D. Burroughs IA          92      15
                interview,
16  EXHIBIT 19  K. Beam reprimand       100       3
17  EXHIBIT 20  Blue Line post          104       9
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              P R O C E E D I N G S
 2  * * * * * * * * * * * * * * * * * * * * * * * *
 3         VIDEOGRAPHER:  This is the beginning of
 4  Media Unit Number 1 in the deposition of
 5  Kyle Beam in the matter of Ray Kifer versus
 6  David Scott Burroughs, et al., Case Number
 7  3:21-CV-039-DCK.
 8         Today's date is Wednesday, May 11th,
 9  2022, and the time on the monitor is
10  12:32 p.m.
11         My name is Amanda Smith, and I am the
12  vid- -- videographer.  The court reporter is
13  Madonna Farrell.  We are here with Huseby
14  Global Litigation.
15         Counsel, please introduce yourselves,
16  after which the court reporter will make a
17  statement.
18         MS. PFEIFFER:  Good afternoon.
19         I'm Sonya Pfeiffer, and along with J.P.
20  Lattimore, I represent the plaintiff, Ray
21  Kifer, Jr., and we're also joined by our
22  paralegal, Suzette Woolsey.
23         MR. PERRIN:  This is Sean Perrin on
24  behalf of Kyle Beam.
25         MR. FERLAN:  Christian Ferlan on behalf
```

**Page 5**

```
 1  of David Scott Burroughs.
 2         COURT REPORTER:  And I will read in
 3  this statement.
 4         Will all parties acknowledge that in
 5  lieu of an oath administered remotely, the
 6  witness will verbally declare his or her
 7  testimony in this matter is true under
 8  penalty of perjury and all parties and their
 9  counter consent -- and all parties and their
10  counsel consent to this arrangement, waive
11  any objections to this manner of reporting,
12  and the witness has veri- -- verified that
13  he is, in fact, Kyle Beam.  Please indicate
14  your agreement to this stipulation by
15  stating your name and your agreement on the
16  record.
17         MS. PFEIFFER:  Sonya Pfeiffer, on
18  behalf of all plaintiff's attorneys, we
19  agree.
20         MR. PERRIN:  Sean Perrin, on behalf of
21  Kyle Beam, we agree.
22         MR. FERLAN:  Christian Ferlan, on
23  behalf of Defendant Burroughs, I agree.
24         VIDEOGRAPHER:  Okay.  We may proceed.
25         MS. PFEIFFER:  Okay.  Great.
```

Page 6

1          KYLE BEAM, being first duly sworn,
2      testified as follows:
3          EXAMINATION
4 BY MS. PFEIFFER:
5    Q. Good afternoon, Sergeant Beam. How are you?
6    A. I'm good. How are you?
7    Q. I'm good, thanks. I'm Sonya Pfeiffer, as
8 you heard. I represent Ray Kifer, Jr.
9        Have you ever had your deposition taken
10 before today, sir?
11   A. No.
12   Q. I just want to go over some ground rules
13 mostly for the sake of the court reporter. You and
14 I are being recorded, everything we say, by the
15 court reporter, she's writing it down. So the
16 first thing I'm going to try to do is not talk over
17 you when you're answering, and I'll ask that you
18 try to let me finish my question before you
19 respond, okay?
20   A. Okay.
21   Q. Next important rule is to verbalize your
22 answers. So instead of saying "uh-huh" or
23 "unh-unh" or shaking your head, make sure it's a
24 "yes" or a "no" so that she can take that down
25 because she can't really record what your -- what

Page 7

1 your response is if you're just nodding your head,
2 all right?
3    A. Okay.
4    Q. And are you taking any kind of medication or
5 have any condition that would impact your ability
6 to hear and understand what I'm asking?
7    A. No.
8    Q. Okay. If -- there might be a question I
9 ask, it's just a bad question, it doesn't make
10 sense, I stumble over my words, if that happens,
11 please just ask me to rephrase the question, okay?
12   A. Okay.
13   Q. If you don't ask me to rephrase the question
14 and you respond, I'm going to assume that you
15 understood the question and that your answer is
16 responsive to that, fair?
17   A. Fair enough.
18   Q. All right. And then if you want to take a
19 break, you're in control of the deposition. I just
20 ask if I'm in the middle of a question or you're in
21 the middle of an answer, we go ahead and finish
22 that before you take a break, okay?
23   A. Okay.
24   Q. All right. Is there anyone else in the room
25 with you other than Mr. Perrin today?

Page 8

1    A. No.
2    Q. Okay. And where are you right now? Where
3 are you located?
4    A. We are at the Anson County Sheriff's Office
5 courthouse.
6    Q. Okay. How did you prepare for today's
7 deposition?
8    A. Just met with my attorney this morning.
9    Q. Did you review any documents?
10   A. Just the -- the little questionnaire that we
11 sent in, whatever --
12       MR. PERRIN: And so --
13       THE DEPONENT: I can't remember what it
14       was called.
15       MR. PERRIN: -- just -- just -- I know
16       I'm not supposed to answer, but it was
17       interrogatory responses.
18       MS. PFEIFFER: Yeah.
19       THE DEPONENT: That's the word I was
20       looking for.
21       MS. PFEIFFER: Okay. I understand.
22       MR. PERRIN: I like questionnaire
23       better, actually. That -- that should be --
24       MS. PFEIFFER: Yeah.
25       MR. PERRIN: That's a little clearer.

Page 9

1        MS. PFEIFFER: Yeah, questionnaire.
2      Yeah, definitely. I understand.
3 BY MS. PFEIFFER:
4    Q. So, in other words, the responses that you
5 gave based on what we had asked your -- your --
6 through your attorney, right, the
7 interrogatories --
8    A. Yes.
9    Q. -- or requests for production?
10      Okay. Got you.
11   A. Yes.
12   Q. Have you talked to anybody other than
13 Mr. Perrin about today's deposition?
14   A. Not other -- other than just my family to
15 let them know I was doing it.
16   Q. Okay. Any details about the deposition with
17 your family?
18   A. No.
19   Q. And does your wife work for the sheriff's
20 department? Is she a dispatcher?
21   A. She was. She hasn't worked in several
22 years.
23   Q. Okay. Did you read any transcripts of
24 anyone's deposition already taken?
25   A. I didn't, but my attorney read some to me.

Page 10

1        MR. PERRIN:  Oh --
2  BY MS. PFEIFFER:
3     Q.  You don't need to -- you don't need to go
4  into the details about what you and your attorney
5  talked about.
6     A.  Oh, okay.
7     Q.  That -- yeah.
8        And so anything you guys talked about or --
9  or he, you know, specific worked with you about,
10  that would be privileged.  So...
11     A.  Okay.
12     Q.  Did you speak with any of the other
13  defendants about their testimony in this case?
14     A.  No.
15     Q.  Did you talk with them at all about the case
16  before your deposition today?
17     A.  Here and there over the last few months,
18  yeah.
19     Q.  Okay.  And what have you talked about here
20  and there over the past few months?
21     A.  Just -- we would just have little
22  conversations about how things went that day, just
23  to kind of -- I would say just refreshing our
24  memories and -- and stuff like that.  It wasn't any
25  detail, anything about questions that were asked or

Page 11

1  anything like that.
2     Q.  And who were the people that you spoke with
3  specifically?
4     A.  My brother, Josh Beam.  Who else did I talk
5  to?  Jimmy Williams.  That's basically the main
6  two.
7     Q.  And what about David Spencer?
8     A.  I haven't talked to him about this case, no.
9     Q.  Okay.  But when you talked with your brother
10  Josh and with Jimmy Williams, you said sort of
11  refreshing your memory?
12     A.  Yeah, just helping remember a few things.
13     Q.  Okay.  So, in other words, you would talk
14  with them and see what their memory was, and then
15  they would talk with you and see what your memory
16  was?
17     A.  Yeah, basically.  I would try to remember
18  things and then ask them if they -- if that
19  sounded -- sounded right, and they would, you
20  know...
21     Q.  So kind of like comparing memories?
22     A.  Yeah.
23     Q.  Okay.  And was there anything that you had
24  shared with them that they had a -- a different
25  memory than you?

Page 12

1     A.  No.
2     Q.  Okay.  Do you remember some of the specific
3  things that you talked about, some of the specific
4  events or -- you know, you used the word "memory."
5  Any memories, anything that stands out to you as
6  important in those discussions?
7     A.  Nothing that stands out.  Just I would -- I
8  couldn't -- I -- the one thing I couldn't remember
9  is at what point I called my brother on that day
10  and when I sent him the picture.  I couldn't
11  remember if he asked for it or if it was just
12  something I sent because I know there was a picture
13  that I sent him.
14     Q.  What picture did you send him?
15     A.  It was a picture of the stuff -- of the
16  narcotics that were located that day.
17     Q.  And when did you talk with him about not
18  being able to remember that?
19     A.  I can't remember the exact day.  It's
20  been -- it's been a few weeks back.
21     Q.  Was he able to help you remember the
22  sequence --
23     A.  He --
24     Q.  -- of events?
25     A.  He couldn't remember if he asked for it or

Page 13

1  if I just sent it, either, that I -- that I recall.
2     Q.  Okay.  Back in 2018, were you interviewed by
3  Agent Blackman with the SBI?
4     A.  No.
5     Q.  Okay.  Were you interviewed by anybody in
6  Internal Affairs?
7     A.  No.
8     Q.  Okay.  On the 7th of March, obviously that's
9  the date we'll be talking a lot about, do you
10  remember whether you had a call with Lieutenant
11  Tice?
12     A.  No, I don't recall.
13     Q.  Okay.  How about Lieutenant Little?
14     A.  No.
15     Q.  And as far as you remember, was there anyone
16  who spoke to you and created a report of that
17  conversation based on your actions that day?
18     A.  No.
19     Q.  So you don't recall any kind of follow-up
20  with you after the --
21        (Indiscernible crosstalk.)
22        THE DEPONENT:  Not with me, no.
23  BY MS. PFEIFFER:
24     Q.  Okay.
25     A.  I'm sorry.  I didn't mean to talk over you.

Page 14

1     Q.  That's okay.  But good catch.  See, very
2  good.  You listened at the front.
3          Let's just talk a little bit about some of
4  your education and training.  I want to understand
5  a little bit about your background.
6          Where did you go to high school?
7     A.  Anson High School.
8     Q.  Okay.  Any secondary education?
9     A.  I tried to go to college, but I don't think
10 I finished the whole semester.
11    Q.  And where did you go for a semester?
12    A.  I went to Wingate University, but failed
13 out.  And then I tried Richmond Community College
14 for a little bit and just quit.
15    Q.  Where is Richmond Community College?
16    A.  In Rockingham, North Carolina.
17    Q.  Oh, got you.  Okay.
18          And you just quit that, you said?
19    A.  Yeah.
20    Q.  Okay.  How long were you enrolled at
21 Richmond?
22    A.  Half a year.  I don't know the months.
23    Q.  Do you remember why it was, just decided to
24 drop out?
25    A.  At the time, I was just done with school.

Page 15

1  School wasn't my favorite thing.
2     Q.  I don't think you're alone, it's all right.
3          When did you start working at Anson County
4  Sheriff's Department?
5     A.  The sheriff's office, in 2016.
6     Q.  Okay.  Did you work in law enforcement
7  before then?
8     A.  Yes.
9     Q.  Okay.  Just sort of walk me through your law
10 enforcement employment history, then, if you would.
11    A.  I worked at Wadesboro Police Department from
12 2001 until 2015.
13    Q.  Oh, okay.  So you were there a long time?
14    A.  Yeah.
15    Q.  Was that your first job out of -- after --
16 so what year did you graduate high school?
17    A.  '98, 1998.
18    Q.  Okay.  So was Wadesboro P.D., was that your
19 first job?
20    A.  In law enforcement, yes.
21    Q.  Gotcha.  What did you do before that?
22    A.  I was a -- I don't even know what the job
23 title was.  I basically stacked boxes and stuff for
24 Walmart Distribution in Pageland --
25    Q.  Okay.

Page 16

1     A.  -- South Carolina before that.
2     Q.  Warehouse work?
3     A.  Yeah.
4     Q.  Gotcha.  Okay.  What made you want to get
5  into law enforcement?
6     A.  A whim.
7     Q.  Okay.  Well, looks like the whim lasted
8  awhile, right?
9     A.  Yeah, it worked out.
10    Q.  What -- when you say "a whim," I mean, was
11 there something about it that interested you, or...
12    A.  I'd always been interested in it, but I
13 never thought it's what I wanted to do.  And then I
14 just -- I was really between careers.  I was
15 working down there, but I knew that it wasn't going
16 to be long-term.  And I just got to talking about
17 the different options of what I could do and
18 being -- a couple weeks after I think me and my
19 brother and my momma had talked about what I was
20 going to do in my life, Wadesboro had an opening,
21 so I applied and they hired me.
22    Q.  Okay.
23    A.  Sent me to school.
24    Q.  So you stayed there 2001 to 2015.  And then
25 did you go to Anson directly from there or was

Page 17

1  there someplace in between?
2     A.  No, I went straight here.
3     Q.  Okay.  And when you started at Anson, in
4  what role did you begin?  Was it as a -- as a
5  deputy?
6     A.  Yeah, just a regular road deputy.
7     Q.  And now you're a sergeant.  Talk me through
8  the levels of promotion from deputy sergeant, or is
9  that the next jump?
10    A.  When I came over to the sheriff's office,
11 that was the next jump.  The previous
12 administration had had corporals, but Sheriff Reid
13 doesn't do corporals.  It's patrol, then sergeant,
14 then you can move into detective or lieutenant or
15 just whatever's next.
16    Q.  Okay.  So when you came in Landric Reid was
17 already the sheriff?
18    A.  Yes.
19    Q.  Okay.  And he already instituted let's do
20 away with this corporal, you go from deputy to
21 sergeant?
22    A.  Yes.
23    Q.  Okay.  How long did it take you to become a
24 sergeant?
25    A.  I think at the end of my first year, is when

Page 18

1   I got promoted, but I had had supervisor experience
2   at Wadesboro.  I was a sergeant there when I left.
3       Q.  Okay.  What did you have to do to get the
4   promotion to sergeant at Anson County?
5       A.  There's really not a structured promotion --
6   something happened with my screen.  Can y'all hear
7   me?
8       Q.  I can hear and see you, yeah.  Can you hear
9   and see us?
10      A.  Yeah.  Something on my computer.
11          MR. PERRIN:  It just shrunk.  I don't
12      know, but we can see you.
13          THE DEPONENT:  I don't know.
14          MS. PFEIFFER:  Sean will be technical
15      support for you there.
16          MR. PERRIN:  That -- that's -- I'm not
17      a good technical support.
18          MS. PFEIFFER:  Can you see and hear us
19      okay?
20          THE DEPONENT:  Yeah, I gotcha now.
21      There's a little bit of a delay, but --
22          MS. PFEIFFER:  Okay.
23          THE DEPONENT:  -- I just wanted to make
24      sure everybody was still on.
25          MS. PFEIFFER:  Yep.  No.  Thanks for

Page 19

1       that.
2   BY MS. PFEIFFER:
3       Q.  Okay.  So I was asking about your -- what
4   you had to do to -- to -- to go from deputy to
5   sergeant.
6       A.  Being a smaller agency, we really don't have
7   a structured promotion plan.  It's pretty much who
8   the sheriff and his administration assigns to the
9   position.
10      Q.  Do you remember why it was that Sheriff Reid
11  advanced you to sergeant, what his reasoning was at
12  that time?
13      A.  He -- because at the time he told me I had
14  the most experience, supervisory experience.  It
15  was a pretty young department career-wise,
16  experience-wise.
17      Q.  Got it.
18          And you said when you went over to
19  Wadesboro, they sent you to school.  Let's talk
20  about your training to be a law enforcement
21  officer.
22          Did you take the BLET?
23      A.  Yes.
24      Q.  Okay.  Any other training in addition to
25  BLET before you started at Wadesboro?

Page 20

1       A.  No.
2       Q.  Okay.
3       A.  Not before I started.
4       Q.  And just to -- to make sure everyone knows
5   what we're talking about and for the sake of the
6   court -- court reporter, when we say "BLET," we're
7   talking about Basic Law Enforcement Training,
8   right?
9       A.  Yes.
10      Q.  Okay.  And -- and those are those -- those
11  big black binders.  They've got like the State of
12  North Carolina in gold on the front, right?  We're
13  talking about the same thing, right?
14      A.  Yes.
15      Q.  Okay.
16      A.  Yeah.
17      Q.  Do you have your own set of those binders?
18      A.  They're somewhere.  I don't -- that was 21
19  years ago.  I don't know --
20      Q.  Do you --
21      A.  -- where they would be.
22      Q.  Do you still get the updates to them, or did
23  those kind of get shelved after you finished BLET?
24      A.  They just kind of got shelved after I got
25  finished.

Page 21

1       Q.  Okay.  But fair to say that -- that BLET,
2   the Basic Law Enforcement Training, those manuals,
3   what those contain is -- they're like -- they're
4   the basics.  They're sort of the minimum a person
5   needs to know and understand in order to be a law
6   enforcement officer, right?
7       A.  Correct.
8       Q.  And then if you wanted, you could take
9   further advanced training in-service, that type of
10  thing?
11      A.  Yes.
12      Q.  Okay.  So I -- I want to understand a little
13  bit about your role in 2018, in March of 2018,
14  and -- and your responsibilities.
15          So by that time, you were a sergeant, right?
16      A.  Yes.
17      Q.  And I understand you were a part of what
18  some people have referred to as A squad.
19          Did you call it A squad?
20      A.  I really don't know what the squad numbers
21  are.  I don't go by that.
22      Q.  How -- what -- what do you refer to the
23  units as?
24      A.  Just the shift.
25      Q.  Okay, the shift.  So, in March of 2018, what

Page 22

1   shift were you on?

2       A.  On that day, I was working with the shift

3   that consisted of myself, David Spencer, David

4   Burroughs, and Darius Ellison.

5       Q.  Okay.  Was that your normal shift?  Was that

6   group your normal shift?

7       A.  No.

8       Q.  Okay.  What was your normal shift in 2018?

9   Because I understand, just -- just to be clear,

10  Sergeant Willoughby would normally be in charge of

11  that shift, correct?

12      A.  Correct.

13      Q.  And he happened to be out on March 7th,

14  2018?

15      A.  We had switched; he worked night shift and I

16  worked day shift that week.

17      Q.  Okay.  So who was on your normal shift?

18      A.  I believe at the time I had Scott Gulledge,

19  Weston Kelly, and maybe Mike Helms was working at

20  the time.

21      Q.  And were those three guys all deputies?

22      A.  Yes.

23      Q.  And so they were below rank?

24      A.  Yes.

25      Q.  You were in charge of -- of those guys?

Page 23

1       A.  Yes.

2       Q.  And then when you switched with Willoughby

3   and you were in charge of the other unit which

4   consisted of Burroughs, Spencer, and I think it was

5   Darius Ellison; does that sound right?

6       A.  Yes.

7       Q.  Okay.  So you were, then, in charge of those

8   guys?

9       A.  Yes.

10      Q.  Okay.  We were talking earlier about the

11  ranks and I -- I -- I wanted to understand the

12  ranks and -- and you help me get where corporal

13  fell in because I wasn't sure about that.

14          What is the order of rank starting with

15  sheriff?  And just, I don't mean people; I just

16  mean the titles.  I want to understand, like, is it

17  captain?  Is it chief?  Is it captain?  Like, just

18  run me through those ranks, if you would.

19      A.  The way we are structured now we have the

20  sheriff, we have the chief deputy, we have two

21  majors, we have different lieutenants over

22  different divisions, and then after that it falls

23  to sergeant, and then deputy.  And there's

24  detectives, but they're a different division.

25      Q.  I was going to ask you, where do detectives

Page 24

1   fall in the rank?

2       A.  They -- just under investigations.  They

3   have a major and a lieutenant and a sergeant in

4   their -- their division over them.

5       Q.  So was it the same way in 2018, what you

6   just described?  Was that the same --

7       A.  I don't think the majors had been promoted

8   yet.  They were just captains.  But basically the

9   same.

10      Q.  Okay.  So if I understand the way detectives

11  operated, then, it's maybe -- is it similar to a

12  deputy?  You would have detectives in a unit, and

13  then over those detectives you'd have a major or a

14  lieutenant or a sergeant, is that --

15      A.  Yes.

16      Q.  -- is -- okay.  I got it.  Thank you for

17  that.

18          In terms of the units that involved deputies

19  and at the time in 2018, I guess, there would be

20  also a corporal, because David Burroughs was a

21  corporal, right?

22      A.  Yeah.  There were a few corporals leftover

23  from the previous sheriff, and the sheriff just

24  kept them until they phased out or whatever.

25      Q.  So if there was a leftover who was a

Page 25

1   corporal, would that person still have

2   rank above --

3       A.  Yes.

4       Q.  -- a deputy?

5          So you'd still have to abide by that?

6       A.  Yes.

7       Q.  Okay.  Does -- so a deputy would always

8   answer to a corporal, right?

9       A.  Yes.

10      Q.  And then a corporal would answer to a

11  sergeant?

12      A.  Yes.

13      Q.  Okay.  And then when you were, like, in the

14  context of a unit, right, for instance, when you

15  were working with that -- that shift, we'll call it

16  a shift, that's how it would work, deputy, corporal

17  sergeant.

18          Would -- would that be the same order of

19  command if you were working outside of your normal

20  shift?  I mean, like, when you come in and you're

21  the sergeant, those deputies, those corporals, they

22  still answer to you, right?

23      A.  Yes.

24      Q.  What about in the context of a -- a

25  different assignment or a different job?  So if --

Case 3:21-cv-00039-DCK   Document 57-16   Filed 02/10/23   Page 7 of 29

Page 26

1  if one of your deputies was working in another
2  division, maybe the child support office, and he's
3  a deputy and there's a sergeant there, would you
4  expect that your deputy would answer to that
5  sergeant even though he's out of his normal shift?
6      A.  To a certain extent, yes.  A sergeant is
7  still a higher rank.  But they usually wouldn't
8  directly order people around unless it was
9  necessary.
10     Q.  Right.  Would a deputy -- generally
11 speaking, if a deputy's in that circumstance and
12 there's a sergeant who isn't his or her shift
13 sergeant, would they still sort of check in with
14 that person, say if they were going to leave the
15 job they were doing, or would they--
16     A.  Yes.
17     Q.  I'm sorry.  Go ahead.
18     A.  I'm sorry, yes.
19     Q.  If -- if that deputy had some concern about
20 any type of situation that arose that was new or
21 raised a red flag, and that deputy were with a -- a
22 sergeant that wasn't the shift sergeant, would you
23 expect that that deputy would still go to the
24 sergeant who was nearby?
25     A.  If -- yes, if necessary, yeah.

Page 27

1      Q.  So, in other words, you're a deputy, there's
2  a sergeant there with you, you should consider that
3  person as a resource and as your senior, right?
4      A.  Yes.
5      Q.  And -- and the point of that, generally, I
6  mean, you mentioned that you became a sergeant
7  because you had more experience, right?
8      A.  Yes.
9      Q.  And you want the more experienced officers
10 guiding officers who don't have as much experience,
11 right?
12     A.  Yes.
13     Q.  The shift that you were working back on
14 March 7th with Burroughs and Spencer and -- and
15 Darius Ellison, did you have a relationship with
16 them, generally speaking?
17     A.  I mean, we all know each other, yeah.
18     Q.  Is it fair to say that the office is not a
19 huge office?
20     A.  No, it's a very small department.
21     Q.  Yeah.  How would you describe the general
22 relationship among the deputies and sergeants?  I
23 mean, we've been talking about rank.  But -- so
24 just setting that aside, how would you describe
25 everybody's relationship with each other?

Page 28

1      A.  Friendly.  Everybody gets along pretty good.
2      Q.  How about your relationship with David Scott
3  Burroughs, in particular, back in 2018?  How would
4  you describe your relationship with him?
5      A.  We were friendly.  We were acquaintances.
6  We didn't hang out or anything, but...
7      Q.  Was he -- was he somebody you would talk or
8  text with regularly?
9      A.  From time to time if we needed it; but, no,
10 we didn't make a habit of just chatting on the
11 phone all the time.
12     Q.  Uh-huh.  And how about socializing outside
13 of work?  Did you ever socialize with him outside
14 of work?
15     A.  I can't recall a time that I ever did, no.
16     Q.  What about anybody else within the
17 department?  Anyone else you socialized with?
18     A.  Who, me?
19     Q.  Yes.
20     A.  I've had different friends from time to
21 time, but I'm really not a big
22 get-out-and-do-stuff-type person.
23     Q.  Who --
24     A.  I stick close to my family most of the time.
25     Q.  Okay.  Now, I just want to ask about the

Page 29

1  other guys on A squad just because, obviously,
2  that -- we'll be focusing on -- on your role with
3  them in March of 2018.
4          What about David Spencer?  How would you
5  describe your relationship with him back in 2018?
6      A.  We -- we got along.  I was -- he was on the
7  same shift as me before I got promoted and we knew
8  each other.
9      Q.  Any social interaction with him?
10     A.  Not really.  There may have been a few
11 get-togethers or something that we went to at the
12 same time, but not really.
13     Q.  Okay.  How about Darius Ellison?  What --
14 what was your relationship with him?
15     A.  We were friendly.  Again, he was on the
16 shift I left to become a sergeant at the time; so,
17 you know, we got along.
18     Q.  Any socializing with him outside of the
19 office?
20     A.  Seems like we played golf maybe one time
21 before I left the shift, but after I went to
22 sergeant I really didn't hang out with him that
23 much.
24     Q.  Why is that?
25     A.  Just we didn't see each other a lot, working

Page 30

1  different shifts.  He'd be on days, I'd be on
2  nights, and we just didn't.  Like I said, there's
3  not a lot I do that doesn't involve my kids and my
4  wife anymore, so...
5      Q.  How would you describe the relationship
6  among the units themselves?  So, for instance, the
7  relationship between and among David Burroughs and
8  David Spencer and Darius Ellison since they were
9  working together, how would you describe that?
10     A.  I -- I do seem to recall that Darius and
11 David Burroughs were real close.  I don't know
12 where David Spencer fit in with them at the time.
13     Q.  What about the other shifts?  Were -- was
14 there also a sense of any closeness, whether it was
15 between a couple or -- or two or three of the
16 people on other shifts?  Did they just develop a
17 relationship because of the -- the working
18 together?
19     A.  As far as the other rotation, I really can't
20 speak on them because we don't see them at all.
21 They work the days we're off, so there's really not
22 a lot of interaction on the other squads.
23     Q.  What about your squad?  What about your
24 shift, the guys that you mentioned?  Let's see if
25 I've got their names here.  You mentioned Weston;

Page 31

1  is that right?  Here we go.  Scott Gulledge, Weston
2  Kelly, Mike Helms.  What about those guys?  That
3  was your unit, right?
4      A.  Yes.
5      Q.  What about their relationship?
6      A.  We got along okay.  We weren't together
7  long.  Some people moved around after that.  My
8  shift -- over the years, with turnover, my shift
9  changed so many times, I can't -- don't remember
10 who worked for me, when they worked for me.
11     Q.  Got it.  Okay.  What about your relationship
12 with Jimmy Williams?  How would you describe that?
13     A.  I've known Jimmy -- me and Jimmy went to
14 BLET together.
15     Q.  Okay.
16     A.  I've known him forever.  But we -- outside
17 of work, we really never hung out.
18     Q.  And then Josh Beam is your brother?
19     A.  Yeah.
20     Q.  Should I ask you how your relationship with
21 your brother is?
22     A.  That's a good one.
23     Q.  Okay, good.  What is his role now within
24 Anson?  Is he still a detective?
25     A.  Josh's role?

Page 32

1      Q.  Josh.
2      A.  Here in the last week, he has been moved to
3  the admin lieutenant over equipment and courthouse
4  and stuff like that.  So he's no longer detective.
5      Q.  And what brought about that change?
6      A.  I don't know.  You would have to ask the
7  sheriff.
8      Q.  As far as you know, is he happy about that?
9      A.  Yeah.
10     Q.  Okay.  Let's talk a little bit about David
11 Burroughs and Lela Vang.  Names I'm sure you're
12 familiar with by now, right?
13     A.  Yeah, I've heard it.
14     Q.  So it's my understanding that it was no
15 secret at Anson County that David Burroughs was
16 dating Lela Vang.  Is that a fair statement?
17     A.  Yes.
18     Q.  Did you have any interaction with Lela at
19 all?  I mean, did you ever see her at a lunch with
20 the guys, ever outside of the office?  Did you have
21 any interaction with her at all before March of
22 2018?
23     A.  If I did, it was to the point where I don't
24 recall it.
25     Q.  Did you have any interaction with Lela and

Page 33

1  David Burroughs when they were together?
2      A.  I -- I honestly don't -- don't remember if I
3  did.
4      Q.  What do you remember about David Burroughs
5  and Lela Vang's breakup?  What do you remember
6  about either when you learned it or what you heard
7  about it?
8      A.  I -- I don't think I even heard about it
9  before the date in question.  I didn't know that
10 they had split up at that time.
11     Q.  When you say "the date in question," we're
12 talking about March 7th, 2018, right?
13     A.  Yes.
14     Q.  What did you learn on March 7th, 2018 about
15 the relationship?
16     A.  Just that they had broken up and that the
17 gentleman that he had given the tip on was
18 supposedly her ex-boyfriend -- or her current
19 boyfriend.  I'm sorry.
20     Q.  And do you remember where you learned that
21 information?
22     A.  I remember that that morning David Burroughs
23 himself called me to meet with me, and he told me
24 that -- well, first when he -- when he called me,
25 we met up and he asked me if I had known anything

Page 34

```
1   about the guy that was supposedly bringing drugs
2   into the county, and I told him no.  Then he gave
3   me a rundown saying that he had received tips from
4   some people that this guy was bringing drugs
5   into -- into the county and he was trying to get it
6   stopped, that it was -- he told me that it was her
7   family that had given him the tip because they were
8   concerned about her new relationship.
9       Q.  And you said the morning of.  You're talking
10  about March 7th, 2018?
11      A.  Yes.
12      Q.  And you said Burroughs called you?
13      A.  Yes.
14      Q.  Did you remember what time in the morning?
15      A.  I do not recall.
16      Q.  Where were you when he called?
17      A.  I really don't remember.  I was riding
18  around in my patrol car.
19      Q.  So you were on shift?
20      A.  Yes.
21      Q.  And what do you remember about how you
22  responded to that call from David Burroughs?
23      A.  When he gave me the information, I told him
24  that, you know, if we get a chance, we might ride
25  up that way and see if we can see anything, but I
```

Page 35

```
1   really didn't, at the time, put a lot of stock into
2   it because it was so far up on the north end of the
3   county, and I knew I wasn't going to be able to get
4   up there.
5       Q.  Was he on shift that day?
6       A.  Yes.
7       Q.  And he was calling you while he was also on
8   shift?
9       A.  Yes.
10      Q.  Did it surprise you that he was calling with
11  a tip about drugs in a car?
12      A.  No.
13      Q.  Why not?
14      A.  That's not uncommon in a small community
15  like this.  We get a million tips a day sometimes
16  from just random people.
17      Q.  How frequently would David Burroughs have
18  tips about drugs in somebody's car?
19      A.  That would be the first one I knew because,
20  like I said, I didn't work with him very long
21  before I moved over and then just working with him
22  on that day.
23      Q.  So you didn't know him to have any
24  confidential informants?
25      A.  Not that I knew of.
```

Page 36

```
1       Q.  You didn't know him to do any big drug
2   busts, right?
3       A.  Not that I recall, no.
4       Q.  You knew he wasn't a member of the narcotics
5   unit, correct?
6       A.  Correct.
7       Q.  I mean, your brother was in the narcotics
8   department at the time, right?
9       A.  It's a two-man unit, but, yeah, he was in
10  it.
11      Q.  Right.  So there were only two people in
12  that unit:  your brother and Jimmy Williams?
13      A.  Yes.
14      Q.  So you didn't find it unusual that David
15  Burroughs had a tip about what actually was a lot
16  of drugs in the back of somebody's car?  You
17  thought that was a normal everyday tip that
18  everybody gets in Anson County?
19          MR. PERRIN:  Object.  Asked and
20      answered.
21          You can answer.  Go ahead and answer.
22  BY MS. PFEIFFER:
23      Q.  You can answer.
24      A.  Say it one more time, I'm sorry.
25      Q.  You didn't find it surprising that David
```

Page 37

```
1   Burroughs had this tip about what was a lot of
2   drugs in the back of somebody's car, despite him
3   never having a confidential informant, never
4   working with the investigative unit, and you never
5   knowing him to be involved with drug
6   investigations?  It didn't surprise you?
7       A.  No.
8       Q.  But you -- as you said, you don't know him
9   to have ever been involved in a drug bust or a drug
10  investigation, right?
11      A.  Not that I know of.
12      Q.  When he was a patrol officer, right?  He was
13  a patrol deputy?
14      A.  Yes.
15      Q.  And, you know, we talked about BLET earlier.
16  And one of the things that you learn in BLT -- BLET
17  is that patrol officers, they're limited, right, by
18  certain factors that are out of their control, I
19  mean, lack of manpower, other calls for service,
20  and generally, therefore, they're not running big
21  drug investigations, right?
22      A.  Not extensive drug investigations, no.
23      Q.  Anytime there is one, that would be with the
24  drug unit, right?
25      A.  Not always.  Patrol can work drugs.  We've
```

Page 38

1  worked them before. I've made several drug arrests
2  in my career.
3     Q. But those are usually tied to pulling
4  somebody over in a traffic stop, right?
5     A. Yeah, but tips can lead to traffic stops.
6  They do all the time.
7     Q. But if you're a patrol officer and you get a
8  tip about a big drug bust, one of the first things
9  that you learn in BLET is that that goes to the
10  drug unit, right?
11     A. Not necessarily. Small department. We --
12  we are jack-of-all-trades sometimes.
13     Q. But you took BLET, right?
14     A. Yep.
15     Q. BLET applies to all departments, right?
16     A. It's a basic standard set by the State.
17  Different departments do things a little bit
18  different.
19     Q. Well, if there's a department that's not
20  abiding by the Basic Law Enforcement Training
21  manual, they're not abiding by the rules that apply
22  to the entire state; isn't that right?
23     A. No. Basic law enforcement is just that.
24  It's basic. It's basic training. You're going to
25  learn other stuff as you get out on the road.

Page 39

1  There's other stuff that's done. We are sworn law
2  enforcement officers. We have the authority to
3  enforce all the laws of the State of North
4  Carolina. That's taught in BLET, too.
5     Q. Yeah, I understand that, but we talked
6  earlier about the basics of BLET, which is what you
7  have to know in order to be a police officer,
8  right?
9     A. Yes.
10     Q. Okay. And your testimony is that smaller
11  departments can do whatever they want even if it's
12  not what they're taught in BLET; is that your
13  testimony?
14        MR. PERRIN: Object.
15        You can answer the question.
16        THE DEPONENT: No, that's not my
17     testimony.
18  BY MS. PFEIFFER:
19     Q. Okay. Explain to me what you mean, then,
20  when you said that despite what BLET says you're
21  supposed to do, it's okay for you to do it
22  differently.
23     A. Basic law enforcement is teaching tactics
24  and guidelines. It's not law; it's not standard.
25  It's just a basic operation of law enforcement.

Page 40

1  Each department sets their owns policies and
2  procedures and standards that they go by.
3        Due to manpower issues and not always having
4  the narcotics unit and time that you need to do
5  things, you know, road officers can make drug
6  arrests based on tips if it leads that direction.
7     Q. All right. I'm going to go ahead and share
8  my screen here. Can you see what's up here on my
9  screen? Can you see this?
10     A. Yes.
11     Q. So the heading is "Controlled Substances,
12  Basic Law Enforcement Training, Student Manual,"
13  and I'll represent to you this is from the 2008
14  manual and has been updated as recently as 2021.
15  All right?
16     A. Uh-huh.
17     Q. And this is controlled substances. And
18  right here, Number 4, I'll read it along. You let
19  me know if I read it correctly. "Patrol response
20  versus a narcotics unit referral. Patrol officers
21  attempting prolonged controlled substance act
22  violations are limited by certain factors which are
23  out of their control."
24        This is what you were just talking about,
25  right?

Page 41

1     A. Yes.
2     Q. "Lack of manpower," "Other calls for
3  service," "Lack of equipment," "Limited time."
4        Those things are all true, right?
5     A. Yes.
6     Q. Okay. And then it says, "As a result of
7  these limitations, it becomes necessary to refer
8  cases to the units that are designed for the
9  specific purpose of narcotics investigation. Such
10  units include," and the first one says,
11  "departmental drug units/detectives."
12        Did I read that right?
13     A. Yes.
14     Q. On March 7th, 2018, Anson County had a
15  departmental drug unit, correct?
16     A. Say it again.
17     Q. On March 7th, 2018, Anson County had a
18  departmental drug unit, correct?
19     A. Yes.
20     Q. And it had two detectives in that unit,
21  Jimmy Williams and Josh Beam, your brother,
22  correct?
23     A. Yes.
24     Q. Okay. Is your testimony that this Basic Law
25  Enforcement Training document does not apply to

Page 42

1  Anson County in the context of drug investigations?
2      A.  I'm sorry.  I'm just reading this one more
3  time.
4          Like I said, this is just guidelines.  I
5  mean, patrol units can do drugs.  We always have.
6  I don't know where you're going with this because
7  I'm a little confused.  This doesn't say we are
8  required to contact drug units.  It says it may
9  become nec- -- or it is necessary to refer cases
10  based on those things.  But at the time, we weren't
11  overly pounded with calls; we didn't have a high
12  call volume on that day.
13      Q.  I'll repeat my question.  My question was:
14  Is it your testimony that this page from the Basic
15  Law Enforcement Training manual does not apply to
16  Anson County?  Is that your testimony?
17      A.  It applies to all law enforcement.
18      Q.  All right.  I'm going to go ahead and mark
19  that as Exhibit 14, I believe that's what we're on.
20          MS. PFEIFFER:  Suzette, can you correct
21      me if I'm wrong?
22          MS. WOOLSEY:  You're correct.  14.
23          MS. PFEIFFER:  All right.  Thank you.
24      Who else is surprised?
25          (EXHIBIT 14, BLET Controlled Substances

Page 43

1          Page 46, was marked for
2              identification.)
3  BY MS. PFEIFFER:
4      Q.  Did you ever do any detailed drug-related
5  investigations with the narcotics unit?
6      A.  No.
7      Q.  Did you have any confidential informants
8  back in 2018?
9      A.  I've never had a confidential informant.
10      Q.  And you're a sergeant, right?
11      A.  Yep.
12      Q.  Were you aware of any confidential
13  informants who had been developed by anyone on that
14  shift that they call A squad other than David
15  Burroughs alleging to have one?
16      A.  No.
17      Q.  Well, one of the other things you learn in
18  BLET, of course, is that informant development and
19  use is meant to be employed by experienced officers
20  who have advanced training, right?
21      A.  Yes.
22      Q.  And that, of course, is consistent with your
23  brother's work in the narcotics unit, right?  I
24  mean, you knew that that was part of his job,
25  right?

Page 44

1      A.  Yeah.
2      Q.  And that's because it takes time to develop
3  a confidential informant, right?
4      A.  Yes.
5      Q.  You need to trust them?
6      A.  Yeah.
7      Q.  And you need to build that relationship over
8  time, correct?
9      A.  Yeah.
10      Q.  Let's talk specifically about March 7th,
11  2018.  We talked about this earlier, that you
12  didn't give any interviews to anybody that day,
13  whether it was SBI later or Internal Affairs.  No
14  one talked to you about your role at all in the
15  stop, correct?
16      A.  Correct.
17      Q.  Okay.  And just to be clear on what it means
18  to be in charge of a unit, so Willoughby's out;
19  you're the sergeant in charge.  What does that
20  mean?  Like, what are your duties when you're the
21  sergeant in charge of a shift?
22      A.  Just to make sure that everybody's doing
23  their job, like serving papers and -- and answering
24  their calls and answer any questions they may have
25  as they do stuff, read reports, review reports.

Page 45

1  Just basically take the daily function of the shift
2  and just keep it moving.
3      Q.  And how do you do that?  How do you -- how
4  do you keep it moving to make sure people are doing
5  what they're supposed to do?
6      A.  Really around here, I just wait until
7  somebody has an issue.  Or if there's something
8  that needs to be done, I call the person that needs
9  to do it and make sure they're doing it the way I'm
10  supposed to do.
11      Q.  Do you recall sort of what your activities
12  were that day?  Like, were you out patrolling?
13  Were you in the office?  What did you do on March
14  7th?
15      A.  I remember being out on patrol most of the
16  day.
17      Q.  And is that normally what a sergeant would
18  do?  Like if you're on that shift, are you expected
19  to also be patrolling?
20      A.  Yes.
21      Q.  So it's not like it's an office job?
22      A.  No.
23      Q.  Who would be -- who would have sort of the
24  office job?  Would that be a lieutenant who would
25  be back at the sheriff's office if something

Page 46

1  happened and you needed to reach him?
2      A.  Yes.
3      Q.  So even though you're in charge, you're
4  still sort of considered one of that team out
5  patrolling, just actively aware of what's happening
6  in whatever section you're assigned to?
7      A.  Yes.
8      Q.  As the sergeant, are you expected to go from
9  zone to zone?
10     A.  If needed, yes.
11     Q.  Okay.  I am going to share my screen again,
12 and I'm going to mark as Exhibit 15 your responses
13 to our interrogatories.
14         MS. PFEIFFER:  Sean, do you have those
15     there?
16         MR. PERRIN:  I do.
17         MS. PFEIFFER:  Okay.  All right.  So
18     this will be 15.  Let me pull these up.
19 BY MS. PFEIFFER:
20     Q.  And you're welcome to look at what your
21 attorney has there rather than looking on the
22 screen.  I'm just going to call these up on the
23 screen so that we are all looking at the same
24 thing.  Hang on a quick sec.  Do this.
25         (EXHIBIT 15, K. Beam Answers to

Page 47

1         Interrogatories, was marked for
2         identification.)
3  BY MS. PFEIFFER:
4      Q.  Okay.  Can you see what's up on my screen?
5      A.  Yes.
6      Q.  All right.  Just want to make sure we're
7  looking at the same thing.  The title is "Defendant
8  Kyle Beam's Responses to Plaintiff's
9  Interrogatories."  You have that in front of you?
10     A.  Yes.
11     Q.  Okay, great.  Now, on the back page of that
12 is your signature, all the way back on Page 7.
13 I'll scroll down here, make sure we're all looking
14 at the same thing here.  Right there?
15     A.  Yes.
16     Q.  Okay.  And you answered these back in
17 November of last year.  And were you with your
18 attorney when you did that?
19     A.  Yes.
20     Q.  And you understood by signing this
21 Verification that you were effectively swearing
22 that everything in here was true?
23     A.  To the best of my knowledge, yes.
24     Q.  Okay.  I want to scroll down to your
25 response to Number 1.  It will be on Page 2.

Page 48

1      Q.  So you refer to this -- you see where I am
2  here?  "RESPONSE:  David Spencer contacted me and
3  told me that he stopped a car for a traffic
4  violation."
5         You see that there?
6      A.  Yes.
7      Q.  Okay.  Do you remember about what time you
8  got that phone from David Spencer?
9      A.  I do not recall.
10     Q.  Morning?  Afternoon?
11     A.  It may have been midday, sometime in there.
12 I'm not sure.
13     Q.  Okay.  What did he tell you about the
14 traffic violation?
15     A.  I don't recall exactly.  He believe he said
16 he may have got him for crossing the center line,
17 but I'm not -- I'm not 100 percent sure what he
18 said.
19     Q.  And then you write, "Spencer also informed
20 me that Corporal David Burroughs informed him that
21 the car contained narcotics," and "I told Spencer I
22 would come to the scene."
23         That's what it says, right?
24     A.  Yes.
25     Q.  Now, as I understand from your earlier

Page 49

1  testimony, you had had a conversation hours before
2  with Corporal Burroughs about a potential drug
3  courier going through Anson County, right?
4      A.  Yes.
5      Q.  So when David Spencer called you and said
6  Corporal David Burroughs informed him the car
7  contained narcotics, did you recognize this was the
8  same tip that Burroughs gave you earlier in the
9  day?
10     A.  Yes.
11     Q.  And what did Spencer say to you about who
12 was in the car?
13     A.  I don't believe he gave me the name of the
14 person at the time.  He just said that there was a
15 single driver.  I don't remember much about it at
16 that point.
17     Q.  But you knew from Burroughs that this was
18 going to be Lela's boyfriend, right?
19     A.  Yes.
20     Q.  And did anything about this call from David
21 Spencer give you pause?
22     A.  Not -- not really.  Not the call from David
23 Spencer.  Just -- I mean, like I said, it's not
24 uncommon for family members of family members to
25 call us and -- and report stuff that they want us

Page 50

1  to look into.
2      Q.  Well, you knew by this point in time that
3  David Burroughs was very unhappy about the breakup
4  with Lela Vang, right?
5      A.  I did not.
6      Q.  Well, earlier you testified that everybody
7  was aware of the relationship between David
8  Burroughs and Lela Vang in the office, right?
9      A.  Yeah.
10      Q.  And you get a call from David Burroughs
11  alleging that Lela Vang's family is concerned that
12  her new boyfriend has drugs in the trunk, right?
13      A.  Yes.
14      Q.  Okay.  So you knew, therefore, that the
15  person in the car was Lela Vang's boyfriend, right?
16      A.  Yes.
17      Q.  So did that give you pause when David
18  Burroughs called and gave you this information?
19          MR. PERRIN:  Object.  Asked and
20      answered.
21          You can answer.
22          THE DEPONENT:  Again, not really,
23      because it's not unusual for us to receive
24      tips from family members and -- and stuff
25      like that who are not comfortable calling

Page 51

1      the direct phone number to the sheriff's
2      office.  They'd rather deal with somebody
3      they know.
4  BY MS. PFEIFFER:
5      Q.  So it's common in Anson County for people
6  who have a personal relationship to call someone
7  who has another personal relationship and suggest
8  there's drugs in the car and they want Anson County
9  deputies to follow up?
10      A.  In this small community, it's not unheard
11  of.
12      Q.  So it probably wouldn't surprise you, then,
13  that there are a fair number of reports about
14  people getting pulled over for lack of probable
15  cause but for a personal vendetta in Anson County,
16  right?
17      A.  I don't know anything about that.
18      Q.  That's not the first time you've heard that?
19      A.  First time I've heard it, yes.
20      Q.  You've been in Anson County since 2016,
21  right?
22      A.  Yes.
23      Q.  And you're not aware of officers being
24  reprimanded for pulling people over, despite the
25  fact that there actually hasn't been a traffic

Page 52

1  violation but, instead, there's a personal
2  vendetta?
3      A.  I don't know of any.
4      Q.  When Spencer called you, had he already
5  written the citation, do you know?
6      A.  I don't -- I don't know.
7      Q.  Are you aware that he wrote a citation?
8      A.  I found out after everything was said and
9  done.
10      Q.  You're familiar with citation writing,
11  right?
12      A.  Yes.
13      Q.  I'm just going to stop my share for just a
14  minute here.
15          You know, again, that's something that you
16  learn about in BLET, isn't it, citation writing?
17      A.  Yes, ma'am.
18      Q.  I mean, they have a whole chapter on
19  techniques of traffic in law enforcement, right?
20      A.  Yep.
21      Q.  Now, earlier you said that you don't learn
22  anything about law or the Constitution at BLET, but
23  that's not quite true, is it?
24      A.  I don't believe that's what I said.
25      Q.  Well, if that's what I understood you to

Page 53

1  say, then I would have understood you incorrectly,
2  right?
3      A.  Yes.
4      Q.  Because one of the things you learn about
5  proper service of a citation is that you deliver
6  one copy to the person who received it, right?
7      A.  Yeah.
8      Q.  And then the original gets filed with the
9  clerk by the officer who wrote the citation, right?
10      A.  Yes.
11      Q.  You also learn that the only person who's
12  allowed to dismiss a citation is a prosecutor,
13  right?
14      A.  I believe so, yes.
15      Q.  Well, the prosecutor is the person to decide
16  that, because it's the prosecutor who figures out
17  whether there's sufficient evidence to prosecute,
18  right?
19      A.  Yes.
20      Q.  So only a prosecutor can dismiss a citation?
21      A.  Yeah.  We'll say that.
22      Q.  So if -- if the -- if the officer who issued
23  the citation decided it was within his discretion
24  to void it, that would be wrong, right?
25      A.  What do you mean by "void it"?

Page 54

1    Q.  If an officer writes a citation and then on
2  his own decides to void it, literally write "void"
3  across the citation, that would be wrong?
4    A.  We've voided check -- listen to me, checks.
5      We've voided citations before, but that's
6  usually one that never gets issued.  It would be
7  for -- like we wrote something wrong and couldn't
8  correct it and just moved on to the next citation.
9    Q.  Right.  But if you've issued a citation --
10   A.  Yeah, you usually don't write "void" on an
11  issued citation.
12   Q.  Well, it's not that you usually didn't; you
13  shouldn't.
14   A.  As far as I know, you're right; you
15  shouldn't.
16   Q.  Right.  Because only a prosecutor can do
17  that, right?
18   A.  I don't even think they would write "void"
19  on it.  They would just dismiss it in the system.
20   Q.  Right.  And so an officer who did that was
21  certainly out of bounds.  Fair to say?
22      MR. PERRIN:  Objection to "out of
23      bounds."
24      You can answer.
25      THE DEPONENT:  He definitely made a

Page 55

1      mistake or did something out of character
2      for a regular officer.
3  BY MS. PFEIFFER:
4    Q.  Well, we can agree it shouldn't be done?
5    A.  Yes.
6    Q.  And the officer who writes that citation is
7  supposed to keep the notes and a copy of that
8  citation until all appeals are dismissed or all
9  appeals have passed and are exhausted, right?
10   A.  Yes.
11   Q.  And that, of course, is because if -- if you
12  don't have the notes and if you don't have the
13  citation, you might not have evidence if there's an
14  appeal later, right?
15   A.  Yes.
16   Q.  Or if there's a civil case later, right?
17   A.  Yes.
18   Q.  I mean, it's to make sure that evidence is
19  retained, right?
20   A.  Yes.
21   Q.  So if an officer who issued a citation
22  decided that it's within his discretion to void a
23  citation, not only is it wrong because it's the
24  prosecutor's job to do so, but it's wrong because
25  he could also be destroying evidence that might be

Page 56

1  needed later, right?
2    A.  Yeah.
3    Q.  So going back to what David Spencer said to
4  you when he told you he pulled someone over for a
5  traffic violation, with as much specificity as you
6  can, tell me what it is Spencer told you in that
7  phone call.
8    A.  He told me that he had gotten behind the
9  vehicle and stopped it and that he was fixing to
10  ask for consent to search the vehicle, if I would
11  be on the way up that way, and I said I would come
12  up there.
13   Q.  And why was he fixing to ask for consent to
14  search?  Did he say?
15   A.  I don't remember.
16   Q.  And you agreed to come?
17   A.  Yes.
18   Q.  Because it would be normal if you thought
19  there were drugs in a car, that two people would be
20  there, right?
21   A.  Yes.
22   Q.  How long did it take you to get there after
23  Spencer called you, do you think?  What would you
24  estimate?
25   A.  I really don't recall.  Maybe 10, 15

Page 57

1  minutes.  I believe I was in Wadesboro when it --
2    Q.  I was going to ask, do you remember where
3  you were?
4    A.  Yeah.  I was in -- I was somewhere in
5  Wadesboro, in -- down near Wadesboro.
6    Q.  When you arrived on the scene, where was
7  Spencer?
8    A.  He was standing I believe beside his patrol
9  car.
10   Q.  And did he have his citation book in his
11  hand?
12   A.  I don't believe so.
13   Q.  Where was Ray Kifer when you arrived?
14   A.  I want to say he was in Deputy Spencer's
15  car.
16   Q.  And do you know, was he handcuffed at that
17  point, do you know?
18   A.  I don't recall.
19   Q.  Had Spencer started a search at all before
20  you came?
21   A.  No.
22   Q.  Just going back to your interrogatories, and
23  I -- I don't need to pull them back up on the
24  screen.  If you just want to track along with me
25  here, I'm still on your answer to Number 1.  You

Page 58

1  said, "I arrived and assisted Spencer in searching
2  the vehicle's trunk."
3          Did you guys start anywhere else? Like, did
4  you start in the body of the car, or -- or did you
5  go to the trunk? What do you remember about the
6  search itself?
7      A. What I remember about the search is I stood
8  by -- next to Deputy Spencer's car and he did the
9  majority of the search. And I believe he started
10  in the passenger area and then ended up at the
11  trunk at some point.
12      Q. Okay. And did you -- when you said -- you
13  wrote here that you assisted in searching the
14  vehicle's trunk. So, at some point, did you step
15  away from Spencer's car --
16      A. Yes.
17      Q. -- to physically assist in the search?
18      A. When he indicated that he had located
19  something in his trunk, I stepped over to look at
20  it.
21      Q. Okay. So he's the one who first opened the
22  trunk and looked in the trunk?
23      A. Yes.
24      Q. And when you say "he indicated something was
25  in the trunk," what did he say or do?

Page 59

1      A. I believe he just pointed in the trunk and
2  said, "There it is" or something like that.
3      Q. And when you say, "He said, 'There it is,'"
4  it was sort of confirmatory, like he knew what he
5  was looking for?
6      A. I -- yeah, you would say that. I -- like I
7  said, I can't remember exact words, but it was
8  pretty much, you know, there's -- There's something
9  right there, or something like that. I don't know
10  exactly what he said.
11      Q. And let me ask this. When you -- when you
12  approached in your car, was this on the side of the
13  road?
14      A. Yes.
15      Q. And where did you pull up in relation to
16  Spencer's car and Mr. Kifer's car?
17      A. Behind Spencer's car.
18      Q. Okay. And just so I understand -- I'm
19  trying to create a visual for myself here so I
20  understand.
21          Was it Mr. Kifer's car first and then it was
22  Spencer's car and then your car all in a row?
23      A. Yes.
24      Q. Okay.
25      A. I believe so.

Page 60

1      Q. All right. So when you approached, you came
2  up to Spencer's car. You didn't even go up to
3  Mr. Kifer's car at that point. You just stopped
4  and stood at Mr. -- at -- at Spencer's patrol car?
5      A. Yes.
6      Q. Okay. And then he sort of motions to you
7  and -- and says, "It's in the trunk," or something
8  thereabouts, and then what do you do?
9      A. I walked over to look at what he had
10  indicated.
11      Q. And what did you see?
12      A. I remember seeing a plastic -- I want to say
13  it was like a folder-type pouch of some kind and it
14  had a bunch of different stuff inside of it.
15      Q. Could you make out what any of that stuff
16  was just upon first seeing it?
17      A. I knew that it looked like there might be
18  some smaller packages of something inside, maybe
19  some kind of powder or something like that.
20      Q. Do you remember what color it was?
21      A. I -- I really don't at this point remember
22  exactly what color. It was -- it was a darker, but
23  still a clear-ish color. I don't -- don't recall.
24      Q. Did you, like, smell marijuana or anything?
25      A. I didn't, no.

Page 61

1      Q. Okay. And -- and so then you had mentioned
2  earlier taking a photograph?
3      A. Yeah. When I saw the packaging and what
4  could possibly be in there, that's when I contacted
5  my brother to see if they wanted to come up there
6  and take a look at it.
7      Q. Uh-huh.
8      A. And I did send him a picture to show him
9  what we had.
10      Q. Okay. So Spencer calls you over, you see
11  this pack, you think it looks like it might be
12  drugs, you already have this call with Burroughs,
13  seems like thing to do is call the drug folks, you
14  take a picture, you send it to your brother, right?
15      A. Yes.
16      Q. At what point is Ray Kifer arrested?
17      A. I believe at that point, we did -- advised
18  him he was being detained. I don't know if we used
19  the word "arresting." If somebody did, it wasn't
20  me.
21      Q. Well, I'll represent to you that David
22  Spencer had said he was told he was being arrested.
23      A. Okay.
24      Q. And that's what he also told Agent Blackman.
25      A. Okay.

Page 62

1    Q.  And as I read in your report, you also say
2  that he was arrested.  If we turn to Page 5 -- Page
3  3, Paragraph 5, we ask about the duration of time.
4  Are you with me there?
5    A.  Yeah.
6    Q.  Okay.  You say, "Williams and Josh Beam
7  arrived ten minutes after Mr. Kifer was placed
8  under arrest."  Okay?
9    A.  Okay.
10    Q.  All right.  So we can agree he was placed
11  under arrest, right?
12    A.  Yes.
13    Q.  Now, when he was placed under arrest, he
14  asked a number of times why he was being placed
15  under arrest.  Do you remember that?
16    A.  I did not have a conversation with
17  Mr. Kifer.  I don't remember anything that he said.
18  I never...
19    Q.  Who placed the handcuffs on him?
20    A.  That would have been David Spencer.
21    Q.  And where were you when David Spencer put
22  the handcuffs on him?
23    A.  Probably just standing by the vehicle.  I
24  don't remember exactly what side of the vehicle,
25  but I would have been standing there.

Page 63

1    Q.  But you were close enough because,
2  obviously, you just found a lot of drugs in
3  somebody's trunk.  And even if you're not a
4  narcotics detective, you know that you want to
5  stand there by the person you're with just for
6  safety, right?
7    A.  Yeah.
8    Q.  So is it your testimony that you didn't hear
9  Mr. Kifer asking why he was being put under arrest?
10    A.  Yeah.  I don't remember hearing him saying
11  anything.
12    Q.  Do you remember him being patted down?
13    A.  I don't recall that, either.  I don't
14  remember when that hap- -- when that occurred.
15  That may have been when I was on the phone with my
16  brother.
17    Q.  Okay.  Well, Mr. Spencer testified that
18  Kifer did ask multiple times why he was under
19  arrest, and neither one of you responded to that.
20        Can you think of any reason why he wouldn't
21  be told why he was being put under arrest?
22    A.  I cannot -- I cannot answer for Deputy
23  Spencer, but if I -- I don't remember hearing him,
24  so I wouldn't respond to something I don't remember
25  hearing.

Page 64

1    Q.  But if you're placing somebody under arrest,
2  you know that there's actually statutory
3  requirements what you need to do, right?
4    A.  Yes.
5    Q.  I mean, you need to identify yourself as a
6  law enforcement officer if it's not obvious, right?
7    A.  Yep.
8    Q.  And -- and you need to -- you need to inform
9  the suspect they're under arrest, right?  You can't
10  just put handcuffs on somebody and say "you're
11  good, right"?  You got to say, "You're under
12  arrest," right?
13    A.  Yes.
14    Q.  And then you're required to tell them why
15  they are under arrest, right?
16    A.  Yes.
17    Q.  Can you think of any reason why an officer
18  who was putting somebody under arrest in handcuffs
19  in the back of their car would not tell them why
20  they were under arrest?
21    A.  I cannot think of one.
22    Q.  So let's -- let's go back to your decision
23  to call your brother and Jimmy Williams.
24        Why did you decide to call them?
25    A.  Because of the way the narcotics appeared to

Page 65

1  be packaged.  It seemed like something that just
2  didn't fit the mold of a normal drug thing for
3  Anson County.
4    Q.  What do you mean by that?
5    A.  Our -- I'll just be honest.  Our drug deals
6  are real sloppy.  Most of their stuff is just in
7  plastic baggies and grocery bags and anything they
8  can stick it in.  This just seemed a little too
9  organized for something around here.
10    Q.  And so when you say that it was too
11  organized, it didn't seem like what you normally
12  have, what --
13    A.  Yeah.
14    Q.  -- was your concern about that?  What --
15  what --
16    A.  It -- I'm just going to be honest with you,
17  I don't know.  It just didn't feel right.
18    Q.  Were you at that point putting together the
19  call from Burroughs and now this, and were you
20  thinking to yourself, This is odd?  I mean, was it
21  sort of everything coming together at that point?
22  I mean, look, at this point, right, you've got 18
23  years of experience, right?  Like, were you --
24        (Indiscernible crosstalk.)
25  BY MS. PFEIFFER:

Page 66

1    Q.  -- on you?
2    A.  I -- I just -- I really can't put a finger
3  on it.  Something just felt like I needed more
4  people involved than what we had at that point.
5    Q.  And it sounds like it was pretty easy to
6  reach Josh Beam and Jimmy Williams, right?
7    A.  Yeah.
8    Q.  I mean, they were there within ten minutes?
9    A.  Yeah.
10    Q.  So if somebody needed to have the drug unit
11  look into something, they -- they could have called
12  them pretty quickly, right, particularly if that
13  person was a deputy?
14    A.  Hmm, yeah.
15    Q.  And in that ten minutes that Ray was
16  arrested and asked -- you know, he asked about why
17  he was being put under arrest, what do you remember
18  happening during that ten-minute period of time?
19  Where were you?  Where was Spencer?  What do you
20  remember about that, if anything?
21    A.  At that point, I believe after I called them
22  and they said, "Just sit tight, we're on the way,"
23  I -- I believe I just went back and sat in my car
24  and just waited.
25    Q.  And then --

Page 67

1    A.  I don't remember exactly.
2    Q.  Okay.  Sorry.
3      When Jimmy Williams and -- and -- and Josh
4  showed up, what did you tell them when they
5  arrived?
6    A.  At that point, I just told them what we had
7  found.  And they said, "Okay, we'll -- we'll look
8  into it," and then they kind of just took over.
9    Q.  That was it?  You -- they just said, "Okay,
10  we'll -- we'll deal with it"?
11    A.  Yeah.
12    Q.  And when you say "we told them what we
13  found," how much detail did you give them?
14    A.  At that point, I believe the item was still
15  in the trunk, and I just told them there's a
16  package in the trunk, looks like it's got drugs,
17  and they went and looked at it.
18    Q.  Had you already told them about your call
19  with David Burroughs that day?
20    A.  Not at that particular point, no.
21    Q.  When did you tell them about your call with
22  David Burroughs?
23    A.  I believe it was later on that afternoon
24  after everything had come out.  I was just, like,
25  well, that makes sense now.

Page 68

1    Q.  What do you mean "that makes sense now"?
2  What makes sense?
3    A.  When he -- when they called me and said that
4  he admitted to what he did and that they were
5  taking it further into internal investigation, I
6  said, well, that makes sense why I tried to get --
7  get us to stop the car.
8    Q.  And was that the first time it started to
9  make sense to you?
10    A.  I'm not going to lie to you.  That was --
11  yeah, that was the minute it was just kind of,
12  like, a light bulb.  Like, yeah, okay.
13    Q.  And when they showed up and you said,
14  "Here's the drugs, this is where I found them," is
15  it your testimony that you didn't, at that point in
16  time, think it would be wise to tell them what
17  David Burroughs had said to you earlier in the day?
18    A.  At that point, I just thought that they were
19  going to take it over as a drug investigation and I
20  let them have it.
21    Q.  Well, if they're taking it over as a drug
22  investigation, the first place they start is with
23  who originated the stop, right?
24    A.  Yeah.
25    Q.  I mean, the detectives' job is to gather all

Page 69

1  of the information that relates to the
2  investigation.
3    A.  Yeah.
4    Q.  And this investigation started with David
5  Burroughs calling you and giving you a story about
6  Lela's family giving him a tip about her current
7  boyfriend, right?
8    A.  I believe he had talked to other people
9  before that.
10    Q.  I'm just talking about what you knew at that
11  point in time.
12    A.  Yes.
13    Q.  And you had been a law enforcement officer
14  for 18 years at this point, right?
15    A.  Yes.
16    Q.  You knew it would be important to give them
17  information that you had that related to a drug
18  investigation, didn't you?
19    A.  I told them if they had any questions they
20  could call me.
21    Q.  So it's your testimony they should have to
22  ask you the questions, even though you had
23  information from just a few hours before?
24    A.  (Indicating.)
25      I don't know what to tell you on that one.

Page 70

1  I just didn't -- I don't remember giving them any
2  information until later that day.
3      Q.  Wouldn't you expect your deputies to provide
4  you all the underlying information if they were
5  about to case -- pass a case off to you?
6      A.  Yes, I would.
7      Q.  Why would it be any different for you
8  handing a case off to the drug unit?
9      A.  I -- I don't know.
10     Q.  So after they take Ray and they put him in
11 what I understand is a black unmarked Ford F-150
12 with a federal agent inside, what did you
13 understand was going to happen next?
14     A.  I -- the way I understood it, they were
15 going to go take him and see if he wanted to answer
16 any questions about what they had found.
17     Q.  I want to try to get an idea of -- about
18 what time this was now.  So I'm happy to show you
19 the citation or the incident report if you want to
20 see it, but what I'll represent to you is that
21 David Spencer shows the citation being issued at
22 3:46 in the afternoon.
23         MS. PFEIFFER:  Do you have that there,
24     Sean?
25         MR. PERRIN:  I do.  Give me one second.

Page 71

1         MS. PFEIFFER:  Yeah, if you want to
2     take a look at it, just so -- so we're --
3         MR. PERRIN:  All right.  I'm showing it
4     to him.
5         MS. PFEIFFER:  Pull it up, too, if
6     it's -- just let me know if you want me to
7     pull it up on the screen.
8         THE DEPONENT:  Yeah, that's -- that's
9     what's on there.
10 BY MS. PFEIFFER:
11     Q.  All right.  So then if it takes about ten
12 minutes for those guys to show up.  We're probably
13 at about 4:00 by now.  Did they stay very long once
14 they arrived?
15     A.  I don't know.  I left shortly after they
16 took over.
17     Q.  Okay.  So when they came and they took Ray,
18 did you see them put Ray in the truck?
19     A.  I don't recall them taking him out while I
20 was there, or taking him out of Spencer's car and
21 putting him in there while I was there.
22     Q.  Okay.
23     A.  I don't recall.
24     Q.  What time do you think you left them?  Were
25 they still there when you left?  You drove off and

Page 72

1  they were still there?
2      A.  Yes, they were still there, and David
3  Spencer was still there.  I was scheduled to get
4  off work earlier that day, so...
5      Q.  Okay.  What time were you scheduled to get
6  off?
7      A.  I believe I was getting off anywhere between
8  4:00 and 4:30.  I had a baseball game I had to
9  coach for my son.
10     Q.  Okay.  Do you -- did you clock out that day?
11     A.  Yes, but I don't remember exactly what time
12 I left.
13     Q.  Do you --
14     A.  I know it was enough time to go home, change
15 clothes, and get to the ball field to start the
16 game by 6:00.
17     Q.  Okay.  Do you -- do you think that you left
18 between 4:00 and 4:30, like intended?
19     A.  It was probably closer to 4:30, if I had to
20 guess, but I can't remember exactly.
21     Q.  Okay.  So, as I understand it then, Jimmy
22 Williams and Josh Beam show up.  Spencer is still
23 there.  Ray is in the backseat.  You -- you're,
24 like, this is under control, I got to get to my
25 kid's game, and -- and you leave, you're off the

Page 73

1  clock, right?
2      A.  Yes.
3      Q.  Okay.  Did you have any further involvement
4  with the incident that day?
5      A.  No.
6      Q.  At some point, did you understand that an
7  internal investigation was underway?
8      A.  Yes.
9      Q.  When did you learn that?
10     A.  I believe it was -- it was later on that
11 evening.  It was after the ball game, maybe.  My
12 brother called me and said that Burroughs had
13 admitted to what he did.
14     Q.  So your brother, Josh, called you?
15     A.  Yeah.
16     Q.  Do you remember what else he said in that
17 call?
18     A.  Just that they were going to be calling the
19 SBI to open an investigation and that I needed to
20 be ready in case they had any questions.
21     Q.  But then you were never contacted by the
22 SBI?
23     A.  No.
24     Q.  Did Josh let you know that there was an
25 Internal Affairs investigation going on within the

Page 74

1  department, though?  Setting aside the SBI
2  investigation, did you --
3         (Indiscernible crosstalk.)
4         THE DEPONENT:  Yes.
5  BY MS. PFEIFFER:
6     Q.  What did he say about that investigation?
7     A.  Just that Brian Tice and Lieutenant Little
8  would be looking into that part.
9     Q.  And did he tell you that you might want to
10  expect to hear from them?
11    A.  Yes.
12    Q.  But you didn't hear from them?
13    A.  No.
14    Q.  Did that surprise you?
15    A.  Not really.  I -- I -- I just figured they
16  got enough of what they needed from everybody else,
17  that they didn't need me.
18    Q.  Well, if you were doing a thorough
19  investigation, wouldn't you want to hear from
20  everybody who was involved in -- in sort of, like,
21  the critical event?
22    A.  Yeah, I probably would.
23    Q.  If you weren't surprised, is that because
24  you view Internal Affairs as not always doing a
25  very thorough and effective job?

Page 75

1         MR. PERRIN:  Objection.
2         THE DEPONENT:  I've -- I've never done
3     an internal investigation, so I don't know
4     what it entails.  I've never been a part of
5     an internal investigation, so I didn't know
6     what they needed.
7  BY MS. PFEIFFER:
8     Q.  Yeah, I understand.  I'm asking about your
9  opinion about the internal investigations at Anson.
10  I mean, you said you weren't surprised they didn't
11  talk to you.  I'm surprised.  So, I mean...
12    A.  This is -- this is the first one I had ever
13  heard of in this detail, so I don't know what their
14  standards were.
15    Q.  But if you were doing it, you certainly
16  would want all the information you could get from
17  everybody involved in the critical events, right?
18    A.  That would be me, yes.
19    Q.  Were you aware that David Spencer was called
20  by Lieutenant Little?
21    A.  I believe I found that out some days later.
22  I don't think I knew it that day.
23    Q.  So you weren't aware that he got that call
24  on his way to the magistrate from the stop?  You
25  didn't know that?

Page 76

1     A.  Not that day.
2     Q.  You learned that --
3         (Indiscernible crosstalk.)
4         THE DEPONENT:  Seems like I -- seems
5     like I learned it a few days later, yeah.
6  BY MS. PFEIFFER:
7     Q.  Do you remember how you learned that?
8     A.  I can't -- I really can't recall.  Talking
9  to somebody somewhere.
10    Q.  Did Spencer talk with you about it in the
11  days that followed?
12    A.  I don't remember him talking to me about it,
13  but I'm not going to say he didn't.
14    Q.  You don't recall?
15    A.  I mean, just don't recall.
16    Q.  Okay.  Were you aware that David Spencer was
17  asked to write a statement about what happened for
18  the Internal Affairs guys, for Tice and Little?
19    A.  I believe I found that out later on, yes.  I
20  didn't know he had to, but I can't remember if
21  that's something I found out then or something I
22  found out here recently.  I can't remember.
23    Q.  I got it.
24         You mentioned that your brother, when he
25  called you, he said that Burroughs had admitted to

Page 77

1  what he did.  So you were aware he was interviewed
2  by Internal Affairs, right?
3     A.  I knew he was interviewed by several
4  members.  I don't remember who they said all was
5  there when he -- when he did it, but yes.
6     Q.  And are you aware that David Burroughs wrote
7  out a statement for Internal Affairs?
8     A.  I was not aware at the time, but I am now,
9  yes.
10    Q.  Have you reviewed that statement, the
11  handwritten statement that he did for Internal
12  Affairs?
13    A.  I have not seen it, that I recall.
14    Q.  But you --
15         (Indiscernible crosstalk.)
16         THE DEPONENT:  I would remember that.
17         (Reporter asks for clarification.)
18         THE DEPONENT:  I think I would remember
19    that.
20  BY MS. PFEIFFER:
21    Q.  At what point did you find out that the SBI
22  was going to be involved?
23    A.  I -- when they told me that night, he said
24  that they were going to -- the sheriff was going to
25  be contacting the SBI to look into it.

Page 78

1    Q.  And, again, that was what you learned from
2  your brother?
3    A.  Yes.
4    Q.  Okay.  Okay.  If you still have those
5  interrogatories nearby, I want to flip to Page 5,
6  and let's take a look at Number 12.  I'll just give
7  you a minute to read through that.  This is our
8  question asking about any phone, texts or other
9  communications between you and anyone else.
10    A.  (Reviewing.)
11      Okay.
12    Q.  Now, you talked earlier about the phone call
13  from Burroughs earlier in the day, that morning.
14    A.  Yes.
15    Q.  I don't see that mentioned here.  I'm
16  wondering why you didn't include that in this
17  response?
18            (Reporter asks for clarification.)
19            THE DEPONENT:  Yeah.  It says "Upon
20        information and belief, I believe Burroughs
21        contacted me shortly prior to Spencer
22        stopping the car."
23  BY MS. PFEIFFER:
24    Q.  Right.  Shortly prior to stopping the car is
25  not the same thing as the morning, right?

Page 79

1    A.  I mean, I guess it's your opinion on what
2  "shortly" is.  Same day would be shortly to me.
3  Anything within 12 -- I mean, I don't know.  I
4  mean, just -- I can't -- I can't -- I can't recall
5  why I worded it that way, but anything -- it all
6  kind of runs together.
7    Q.  Okay.  So your testimony is that that last
8  paragraph "Upon information and belief, I believe
9  Burroughs contacted me shortly prior to Spencer
10  stopping the car," that's the call in the morning
11  where he told you that he was contacted by Lela's
12  family; is that correct?
13    A.  Yes.
14    Q.  Okay.  And then shortly after, Mr. Kifer was
15  arrested concerning the stop, right?
16    A.  Yes, that's what I have here.
17    Q.  Okay.  Tell me about that second phone call
18  after Mr. Kifer was arrested.  When did Burroughs
19  call you?
20    A.  I believe he called me -- and I'm just --
21  I'm -- I do remember talking to him that afternoon
22  and him trying to ask me what we found, and I
23  remember telling him that he could talk to Josh and
24  Jimmy about that because they're the ones looking
25  into it.  Because at that time, they had told me

Page 80

1  that -- that they would just take care of
2  everything and to just let it go.
3    Q.  About what time do you think that phone call
4  was?
5    A.  I don't recall.
6    Q.  Do you think it was a short call?
7    A.  I don't remember how long it was.
8    Q.  Do you remember providing David Burroughs
9  with any significant information about the stop
10  that day?
11    A.  Not that I recall.
12    Q.  Back up to that first paragraph, same one,
13  Number 12, "David Spencer called and informed me he
14  was attempting to locate a call" -- sorry, "locate
15  a car."  Couldn't get close enough to confirm.  "I
16  told him I would meet him, and told him to call
17  Burroughs again."
18      Did I read that right?
19    A.  Yes.
20    Q.  Okay.  So, as I read this, you were already
21  on your way to meet him, meaning David Spencer, as
22  soon as he called you just to say he spotted the
23  car and couldn't get close; is that correct?
24    A.  I told him I would meet with him, but I
25  don't know if I was already on the way to meet him

Page 81

1  or if I just meant we would meet and discuss what
2  he saw.  I don't remember.
3    Q.  Okay.  But you remember that he called you
4  and he hadn't stopped the car yet.  You remember
5  that?
6    A.  Yes.
7    Q.  Okay.  And at that point, you already have
8  the call from David Burroughs in the morning
9  shortly before, right?
10    A.  Yes.
11    Q.  And now Spencer calls you and says he's
12  identified this car that Burroughs says is carrying
13  narcotics, but he couldn't stop it, right?  So you
14  know this at this point, right?
15    A.  I know he said he thought he -- he saw a
16  car, but couldn't tell if it was the one he was
17  looking for, yeah.
18    Q.  And you say you're going to head on over,
19  right?
20    A.  Yes.
21    Q.  And then you told him to call Burroughs
22  again?
23    A.  Yeah.  I believe that was just to confirm
24  one more time what he was trying to tell us was up
25  with the -- the car.

Page 82

1    Q.  Well, what do you remember specifically
2  about why you asked him to call Burroughs again?  I
3  mean, by this point in time you had a conversation
4  with Burroughs in the morning, Spencer has called
5  you, and it sounds like given you similar
6  information, and then you say call Burroughs again.
7         What else did you need from Burroughs at
8  that point?
9    A.  I don't remember.  I really don't.
10    Q.  Were you concerned about the situation at
11  this point?  Was it feeling a little fishy?
12    A.  I wouldn't say -- no, because, again, we get
13  tips from family members of family members of
14  family members all the time.  It was nothing that I
15  hadn't come across several times in my career.
16    Q.  It's your testimony that this situation is
17  common in Anson County, the one that we're talking
18  about here today?
19    A.  This particular situation is not common.
20  But we do get calls from ex-girlfriends of drug
21  dealers who want to get them arrested, or
22  somebody's cousin saw something that they want us
23  to check out.  So it's not uncommon in a small
24  community for people that know people to -- to give
25  information.

Page 83

1    Q.  That's not what these tips were, though.
2    A.  I didn't get the tips, so I don't know what
3  they were.
4    Q.  You talked to David Burroughs that morning?
5    A.  He told me it was a family member of his
6  ex-girlfriend concerned about the boyfriend and his
7  activities.
8    Q.  And it's your testimony that that's typical,
9  that an Anson County deputy who has a romantic
10  relationship with someone that's broken off would
11  normally get a tip from that person's family and
12  would then report that tip to his fellow deputies
13  when the tip is about his ex-girlfriend's current
14  boyfriend?  That, you're telling me, is typical,
15  typical day in Anson County; is that right?
16        MR. PERRIN:  Objection to form.
17        You can answer.
18        THE DEPONENT:  It's -- I wouldn't say
19     romantic relationships.  This would be the
20     first one I knew to be romantic, but there
21     are people who's family members of family
22     members.
23  BY MS. PFEIFFER:
24    Q.  We're talking about this situation.  We can
25  agree --

Page 84

1    A.  Okay.
2    Q.  -- that this situation is unique, correct?
3    A.  Yes.
4    Q.  Second paragraph back on Number 12, your
5  response, "After Mr. Kifer was stopped, Spencer
6  called me again and advised me of the situation."
7         What do you remember about that, "advised me
8  of the situation"?  Is this the same call we talked
9  about earlier?
10    A.  I think what I -- what I meant in that one
11  would have been that he called me and told me that
12  he had the vehicle stopped and why he stopped it,
13  and that he was going to talk to the driver about
14  consent to search the vehicle.  That's the
15  situation at that point.
16    Q.  All right.  I'm going to share my screen
17  here.  And give me a second.
18        Okay.  I'm showing you what has previously
19  been marked as Exhibit 12, and I'm sure your
20  attorney will stipulate that these are David
21  Burroughs's phone records provided by the SBI that
22  they received in the context of their investigation
23  into this matter, okay?
24    A.  Okay.
25    Q.  You can see David Burroughs' name up here,

Page 85

1  his phone number just below.  All right?
2    A.  Okay.
3    Q.  And your -- your phone number that you
4  provided to us in your interrogatories that you
5  were using that day is 704.690.0951, right?
6    A.  I don't believe -- okay.  Yes.
7    Q.  Is that right?  Okay.  I want to make sure.
8         I'm just going to scroll down here and then
9  I'm going to show you a subset.  So this phone
10  record we have here, what I'm scrolling through --
11  and I don't know if your attorney has it.  We're
12  not going through all these calls, but I'll
13  represent to you these are from January 1st, 2018
14  all the way through to April 8th, 2018.  Okay?
15    A.  Okay.
16    Q.  But I'm going to zero in on March 7th here,
17  okay?
18    A.  Okay.
19    Q.  All right.  Now, you talked about a phone
20  call from David Burroughs in the morning.  I've
21  created a few subsets of calls between you and
22  David Burroughs and also David Burroughs and David
23  Spencer.  And what I'm going to do is I'm going to
24  stop sharing this record here and then let me pull
25  up a subset for you.

Page 86

1  The first one I want to show you is your
2  calls with Burroughs. Okay. Let me show my screen
3  here. I just want to understand when this phone
4  call was that you say Burroughs called you in the
5  morning.
6  Okay. So I will represent to you that this
7  subset here is all of the calls between you and
8  David Burroughs on March 7, 2018. Now, I do have
9  the times there.
10  Have you looked at phone records before in
11  the context of an investigation?
12  A. No.
13  Q. I will represent to you that when it says
14  one minute -- see my cursor circling here "one
15  minute"?
16  A. Okay.
17  Q. Okay. When it says "one minute," that's a
18  missed call. It doesn't mean that anything
19  connected. If it's a voicemail, it says VM for
20  voicemail. But one minute is -- nothing happened.
21  So the only calls in the morning of March
22  7th, 2018 are at 6:50 a.m., Burroughs tries to call
23  you. It's a missed call. 9:30 a.m. Burroughs
24  tries to call you. It's a missed call. You tried
25  to call him at 1:20. That's a missed call.

Page 87

1  A. Got it.
2  Q. 2:46, he tries to call you, and that's a
3  missed call. So I don't see any call in the
4  morning between you and David Burroughs.
5  A. Again, I -- I could not remember when
6  everything happened. I mean, my time frames on
7  everything is running together right now. I don't
8  remember exactly what the times were.
9  Q. Got it. Well, in your interrogatories you
10  said there was a call shortly before the stop, and
11  here at 2:59, there's a four-minute call from
12  Burroughs to you. Do you think it's possible that
13  is the call you are remembering, it wasn't in the
14  morning?
15  A. It could be.
16  Q. Okay. All right. Let me see if I can call
17  up this other record. Are you still seeing my
18  screen when I just shut that down?
19  A. Yes.
20  Q. Okay. Great. Let me just pull up this
21  other record real quick then.
22  I lost it. I'll have to share again.
23  MR. PERRIN: Sonya, I have a copy of
24  the phone records if that makes it easier.
25  MS. PFEIFFER: You can have the phone

Page 88

1  records there in case he wants to
2  double-check.
3  MR. PERRIN: Yeah.
4  MS. PFEIFFER: Just for ease of putting
5  this together, I created another subset just
6  to ask him some questions, because there's
7  so many calls on there.
8  MR. PERRIN: Sure.
9  BY MS. PFEIFFER:
10  Q. Yeah. If you want to have it there,
11  Sergeant Beam, just to make sure that what I'm
12  showing you is accurate, that's fine with me.
13  A. Okay.
14  Q. And I'm going to -- I'm going to mark what I
15  had just showed you. We'll mark that as -- I think
16  we're up to Exhibit 16; is that right?
17  MS. WOOLSEY: 16 will be the subset.
18  (EXHIBIT 16, Subset of calls between K.
19  Beam and D. Burroughs, was marked for
20  identification.)
21  MS. PFEIFFER: Okay. That's the first
22  subset.
23  Now, this next one I'm going to mark as
24  Exhibit 17. This is another subset here.
25  (EXHIBIT 17, Subset of calls between

Page 89

1  D. Burroughs, K. Beam, D. Spencer, was
2  marked for identification.)
3  BY MS. PFEIFFER:
4  Q. So let me -- let me share my screen again.
5  Okay. So what I have here is a subset that
6  shows the calls between you and David Burroughs,
7  between Spencer and Burroughs. So anyway, it's
8  calls among all of you. Okay? And I started with
9  that first call at 2:36, which is the first time
10  there's any conversation between Spencer and
11  Burroughs.
12  And if you've got that phone record in front
13  of you, you'll see at 2:36 there's a call between
14  Burroughs and Spencer. And Spencer's number is
15  704.695.6956. And it will show you right there how
16  long that call was. So you'll see that it was a
17  six-minute phone call. So it's from 2:36 to 2:42.
18  Okay?
19  And if we just run through this subset,
20  which I think is a little easier to understand,
21  2:36 to 2:42, Burroughs is talking to Spencer.
22  He immediately calls -- tries to call you.
23  Well, four minutes later, he tries to call you, and
24  he doesn't.
25  He talks to Spencer again from 2:47 to 2:56.

Page 90

1      Then he has this connected call with you
2  from 2:59 to 3:03. And you recall the conversation
3  where he tells you about Lela's family, right?
4      A. Yes.
5      Q. And we agree it might be this conversation?
6      A. Yes.
7      Q. Okay. Twenty minutes after that, he has a
8  five-minute conversation with David Spencer.
9      And then at 3:43, that's when the stop is
10 first noted on the incident report.
11     And then at 4:20, there's a two-minute
12 conversation between you and David Burroughs. You
13 said you remember him calling you to get
14 information about the stop. You think it was 4:20,
15 that soon after the stop, and it was two minutes?
16         (Indiscernible crosstalk.)
17         THE DEPONENT: That -- that could be,
18     yes.
19 BY MS. PFEIFFER:
20     Q. Okay. Okay. And then I'll represent to you
21 that there's a video of Ray being interviewed, and
22 that starts at 4:43 in the afternoon, okay?
23     A. Yes.
24     Q. At 4:40, there's a 15-minute conversation
25 between you and David Burroughs. What do you

Page 91

1  recall about that conversation with David
2  Burroughs?
3      A. I don't recall the meat of the conversation.
4  It's more than likely going to be me and him
5  talking about what he needs to pass on to the next
6  shift since I was getting off work early, being the
7  second in command, but I don't -- I don't remember
8  the details of the call.
9      Q. At that point in time, were you aware that
10 there was an investigation going on?
11     A. No.
12     Q. At that time, 4:40, were you probably
13 already on your way home?
14     A. Yeah, I would say.
15     Q. All right, sir.
16         MS. PFEIFFER: If you have -- did you
17     say you have Burroughs' handwritten
18     statement there, Sean?
19         MR. PERRIN: Yes.
20         MS. PFEIFFER: Okay.
21         MR. PERRIN: Well, I don't think it's
22     handwritten by him. It's handwritten by
23     someone else.
24         MS. PFEIFFER: Hold on. Let me pull up
25     what I have and let's see if it's the same

Page 92

1      thing. Hold on.
2          MR. PERRIN: Is it Bates -- is it
3      Bates-stamped 9 and 10?
4          MS. PFEIFFER: It is Bates-stamped --
5      Burroughs' handwritten -- I have it
6      Bates-stamped 11 --
7          MR. PERRIN: Okay.
8          MS. PFEIFFER: -- 11 through --
9          MR. PERRIN: 13?
10         MS. PFEIFFER: Through 14, I think.
11     Let me share my screen.
12         MR. PERRIN: Ah. 15. Yeah, I have
13     that.
14         MS. PFEIFFER: Got it? Okay.
15         (EXHIBIT 18, D. Burroughs IA interview,
16             was marked for identification.)
17 BY MS. PFEIFFER:
18     Q. If you could just have that in front of you,
19 Sergeant Beam?
20     A. Okay.
21     Q. Okay. You got it there? So I want to turn
22 to what's Bates-stamped as ACSO-0013, okay? And
23 looking towards the bottom of the page, you'll see
24 a number 3 in the middle, and then you scroll down
25 1, 2, 3, 4. I'll call these paragraphs 3 and 4.

Page 93

1  "Stated that he told David Spencer around 1:00 or
2  2:00 all the details about travel and where the
3  drugs would be." Do you see that?
4      A. Yes.
5      Q. And that would correspond to one of the
6  calls on that call log.
7      And then says "around 3:00," the next
8  paragraph, "that David called him and said he has
9  PC to stop but Lela was driving. Stated that he
10 told Burroughs that if he stopped her and there
11 were drugs in the car, she would be arrested,"
12 turning the page.
13     Do you see that?
14     A. Oh, yes. Sorry. I was reading it.
15     Q. Yep. That's okay. And then if we turn the
16 page, and we're on Page 14 here, and go to the --
17 we could call it the third paragraph, but it's
18 really the second dash. "Stated that he informed
19 Sergeant Beam." Do you see that?
20     A. Yes.
21     Q. So what he writes is -- or what someone
22 wrote, "Stated that he informed Sergeant Beam of
23 the incident and that his instructions were for
24 someone -- to get someone to stop them, but you
25 don't need to be any where around."

Page 94

1      Do you see that?

2   A.   Yes.

3   Q.   Do you remember making that statement to

4 David Burroughs?

5   A.   No, I don't remember making that statement.

6   Q.   Do you think that he's inaccurate that you

7 made that statement?

8   A.   I would say more than likely.  That doesn't

9 sound like anything I would normally say.

10   Q.   Well, you knew that there was a personal

11 connection to Burroughs as it relates to this car,

12 right?

13   A.   Yes.

14   Q.   And it would be inappropriate, given that

15 personal connection, for Burroughs to have anything

16 to do with the stop, right?

17   A.   Yes.

18   Q.   And you were the sergeant in charge of that

19 unit, correct?

20   A.   Yes.

21   Q.   And your job was to make sure everybody was

22 doing what they're supposed to be doing, right?

23   A.   Yes.

24   Q.   So it would make sense if there was a

25 personal relationship with Corporal Burroughs and

Page 95

1 the person whose car was being stopped that you

2 would tell him he ought not be near that car when

3 it gets stopped, right?

4   A.   That would make sense.  I don't remember

5 saying it, but it would make sense.

6   Q.   So I want to go back to -- you can take a

7 look at the phone record, but I will also just pull

8 up this subset here, which is Exhibit 17.

9      So we talked about the calls on March 7th.

10 That's all of the events that happened.  And then

11 on March 8th, and you can see it there on the full

12 record in front of you, there are four calls from

13 you to David Burroughs, all missed calls, two in

14 the morning and two in the afternoon.

15      Do you remember why it was that you were

16 calling David Burroughs the next day?

17   A.   I don't recall unless I was looking for some

18 papers he might have took home with him that we

19 needed for work.

20   Q.   At that point, you knew there was an

21 Internal Affairs investigation going on, right?

22   A.   Yes.

23   Q.   And at that point, were you aware that he

24 had been fired?

25   A.   I was not aware he had been fired at that

Page 96

1 time, no.

2   Q.   Had you been told not to have contact with

3 him?

4   A.   No.  Not that I recall.

5   Q.   So let's switch gears and talk a little bit

6 more about training.  We've been talking about

7 BLET, but I want to ask about any additional

8 training you've had since then within the

9 department.

10      Have you taken other courses, other

11 certifications?

12   A.   Yes.

13   Q.   You don't have to give me a whole laundry

14 list, but give me an idea of how many and in what

15 areas.

16   A.   Throughout the years, I've had

17 certifications in radar; intox, Intoxilyzer

18 certifications; crash investigations; different

19 traffic -- traffic courses.  We've had in-service

20 training every year for different things.  I've

21 been to SWAT school.  Just different stuff along

22 those lines.

23   Q.   And does most of it relate to patrolling for

24 the most part?

25   A.   Yes.

Page 97

1   Q.   Okay.  Are you familiar with the policy and

2 procedural manual at the Anson County Sheriff's

3 Office?

4   A.   I know we have one, yes.

5   Q.   Do you know where it is in the office?

6   A.   I'm not exactly sure.

7   Q.   Okay.  Have you read it?

8   A.   Not in detail, no.

9   Q.   Have you had any specific training about

10 what to do if you suspect a fellow law enforcement

11 officer is engaged in misconduct?

12   A.   Yes.  It's usually included in in-service

13 from time to time.

14   Q.   Okay.  What do you recall you're supposed to

15 do?

16   A.   If you have evidence that they might be

17 involved, you contact your superiors.

18   Q.   I'm not talking about evidence, because

19 rarely do you have evidence, right?  I'm talking

20 about suspicion.  If you have suspicion, if you've

21 got reason to believe or suspect that a law

22 enforcement officer is engaged in misconduct, what

23 are you supposed to do?

24   A.   Inform your superiors.

25   Q.   What about if you suspect that a fellow law

Page 98

1  enforcement officer's breaking the law?  What are
2  you supposed to do?
3      A.  Inform your superiors.
4      Q.  Why is it that you're supposed to inform
5  your superiors?
6      A.  Let them handle it.
7      Q.  And in a situation where an officer is
8  potentially breaking the law, you would want to
9  make sure that if it could be stopped, it is
10 stopped, right?
11     A.  Yes.
12     Q.  And that's something that a superior should
13 do if they have that information, right?
14     A.  Yes.
15     Q.  And it's something that they should
16 investigate if they have suspicions, correct?
17     A.  Yes.
18     Q.  And if they've been provided information
19 that leads them to believe or suspect that a law
20 enforcement officer is involved in misconduct or
21 potentially breaking the law, they have a
22 responsibility to investigate it and stop it if
23 they can, don't they?
24     A.  Yes.
25     Q.  I'm going to share my screen again with you

Page 99

1  here.  And this is marked ACSO 38.  This is
2  something that was produced to us in discovery.
3  It's the written warning to Sergeant Kyle Beam from
4  February 2020.  Have you had a chance to read
5  through this?
6      A.  No.
7          MS. PFEIFFER:  Sean, do you have a copy
8      of that there?  If not, we can just read it
9      here.
10         MR. PERRIN:  I -- what's the Bates
11     stamp number?
12         MS. PFEIFFER:  It is Number 38,
13     ACSO 38.
14         MR. PERRIN:  Yes, I do.  Give me one
15     second.
16         MS. PFEIFFER:  Okay.
17 BY MS. PFEIFFER:
18     Q.  Okay.  And, Sergeant Beam, if you want to
19 take a read through the hard copy that Sean has,
20 that might just be easier.  I'll -- I'm happy to
21 scroll to the bottom just so you know we're looking
22 at the same thing.  So just go ahead and take a
23 read of that and let me know when you're --
24         MR. PERRIN:  I put a copy in front of
25     him.

Page 100

1          MS. PFEIFFER:  Okay.  Perfect.
2          THE DEPONENT:  I have it.
3          (EXHIBIT 19, K. Beam reprimand, was
4             marked for identification.)
5  BY MS. PFEIFFER:
6      Q.  Okay.  Did you read through it?
7      A.  Yes.
8      Q.  Okay.  And so this is from February of 2020,
9  right?
10     A.  Yep.
11     Q.  Okay.  So tell me about what happened that
12 led to this written reprimand.
13     A.  Just this online system we have that we're
14 supposed to use to clock in and out.  It's just --
15 I went through a stretch where I was having trouble
16 keeping up with it, and I would go home and forget
17 to clock out, and by the time I remembered, it
18 would be too late.  Didn't want to add time I
19 didn't earn.
20     Q.  And what do you mean you were having a hard
21 time with it?
22     A.  I just -- I don't know.  I don't know how to
23 explain it.  I just went through a stretch where I
24 would get home and start doing something else and
25 forget to clock out.

Page 101

1      Q.  Okay.  So it was -- it wasn't that the
2  system was difficult, it was just your mind was
3  elsewhere.
4      A.  Yes.
5      Q.  Okay.  So I'm -- I'm interested in knowing
6  why a failure to clock in and clock out was
7  something that was taken so seriously that you got
8  a written reprimand.
9      A.  I don't know.  You would have to talk to
10 Lieutenant Tice.  He's the one that initiated this.
11     Q.  Yeah.  I notice that at the bottom it does
12 say that -- I guess it's the second to last
13 paragraph, "Sergeant Beam has been counseled about
14 the Violation in the past by Lieutenant Tice and
15 Lieutenant Little and he continues to Violate this
16 Memorandum."
17         You see that, right?
18     A.  Yep.
19     Q.  What does that mean, they had counseled you
20 about it?
21     A.  They had just told me to make sure I keep up
22 with it better than I had been.
23     Q.  And so were Tice and Little the guys who
24 would follow up if people weren't doing what they
25 were supposed to do, like following procedures?

Page 102

1      A.  Yes.
2      Q.  And I see that Lieutenant Little signed it
3  as a witness, right?
4      A.  Yes.
5      Q.  You signed it?
6      A.  Yep.
7      Q.  Sheriff Reid signed it?
8      A.  Yep.
9      Q.  Do you remember being given this written
10  reprimand?
11     A.  Yes, I remember it.
12     Q.  Were y'all in the same room?  Like, was it a
13  meeting and -- like, what happened?
14     A.  They just called me into the office and sat
15  me down and told me that they had already warned me
16  one time and that they were going to have to do
17  this, and I said okay.  I'd told them when we had
18  the -- the verbal counseling that, you know, I'd
19  take responsibility.  I'm the one who made the
20  mistake.
21     Q.  Does it strike you as odd that this much
22  emphasis is paid by the sheriff's department on a
23  failure to clock in and clock out versus nobody
24  following up with you about what happened on March
25  7th in 2018?

Page 103

1          MR. PERRIN:  Objection to form.
2          You can answer.
3          THE DEPONENT:  I would -- yeah, I would
4       personally think that was a little strange.
5  BY MS. PFEIFFER:
6      Q.  So let's just -- let's sort of go back to
7  what I'll call the aftermath of March 7th.
8          So at some point did you find out that David
9  Burroughs had been arrested for planting drugs?
10     A.  Yes.
11     Q.  Do you remember when you found that out?
12     A.  No, I do not recall.
13     Q.  Do you remember how you found out?
14     A.  I really don't remember, no.
15     Q.  Separate and apart from the talk within the
16  department back in 2018, like around the time of
17  the Internal Affairs investigation, SBI, setting
18  that aside, after the arrest, which was much later,
19  do you recall any talk within the department about
20  the arrest?
21     A.  Not specifically, no.
22     Q.  Have you had any contact with David
23  Burroughs since March 7th or March 8th of 2018?
24     A.  Once or twice I've run into him at the
25  store, and it was never more than just him saying

Page 104

1  hey and me nodding my head.
2      Q.  So no significant interaction to speak of?
3          COURT REPORTER:  Did you answer?
4          THE DEPONENT:  I said no.  No
5       significance.  Sorry.
6  BY MS. PFEIFFER:
7      Q.  All right.  I just want to show you one more
8  thing here.  Okay.  Share my screen again.  Okay.
9          (EXHIBIT 20, Blue Line post, was marked
10          for identification.)
11  BY MS. PFEIFFER:
12     Q.  So I was looking through some of the posts
13  on your Instagram and found this one here.  Can you
14  see my screen?
15     A.  Yes.
16     Q.  So it's a blue line in the middle.  It's got
17  two, what appears to be pretty heavily armed guys
18  with, appears to be, machine guns and helmets, and
19  it says, "I will never apologize for defending this
20  line," right?
21     A.  Yes.
22     Q.  What is this?
23     A.  It's just a post about the Thin Blue Line.
24     Q.  What does it mean to you?
25     A.  I would have -- I posted that in --

Page 105

1  basically in response to the world events and
2  everybody turning their backs on law enforcement at
3  the time.
4      Q.  What do you mean by that?
5      A.  Or it's that -- when people were basically
6  trying to call us all criminals, and I knew we
7  weren't.
8      Q.  And when was that?
9      A.  All of us.  There's bad apples.
10         I don't remember when I posted that exactly.
11     Q.  And did you create this?
12     A.  No.
13     Q.  Where did you download it from?
14     A.  I really don't remember.
15     Q.  And what are -- what are your limits on
16  this, if any?
17         MR. PERRIN:  Object to the form.  I
18      don't know if I understand the question.
19         But if you do --
20         THE DEPONENT:  I don't, either.
21         MR. PERRIN:  -- you can answer.
22  BY MS. PFEIFFER:
23     Q.  Okay.  So -- so what I read this as saying,
24  "I will never apologize for defending this line" --
25  explain to me what that means, "defending this

Page 106

1  line."
2    A.  It just means that I stand behind law
3  enforcement in general.
4    Q.  And so when I say "what are your limits,"
5  are there any limits on that?  Is there a time when
6  you wouldn't stand behind law enforcement?
7    A.  If it's proven that they are in the wrong.
8  I mean, we -- we want to weed out the bad apples
9  just like everybody else.
10    Q.  As far as you're concerned, would -- would
11  this "never apologize for defending the blue line,"
12  would this include supporting an officer who's
13  accused of framing an innocent person?
14    A.  No.
15    Q.  Why not?
16    A.  I mean, if you're intentionally framing an
17  innocent person, that's just wrong.  That, to me,
18  just means when people are out here saying that law
19  enforcement's the Gestapo and that we're the ones
20  out here beating people up when we know we're not
21  or just -- just the overall defense of the -- the
22  profession in general.
23        MS. PFEIFFER:  If we could take maybe a
24      five -- you know what?  If we can take a
25      break till 2:30, I might not have any more

Page 107

1      questions.  I just want to review my notes.
2      Is that all right with everybody if we go
3      off the record until 2:30?  I have it as
4      2:22.
5        MR. PERRIN:  Yep.  Sound goods.
6        MS. PFEIFFER:  Okay, great.
7        VIDEOGRAPHER:  This is the end of Media
8      Unit Number 1 in the deposition of Sergeant
9      Kyle Beam.  The time is 2:22 p.m.  We are
10      now off the record.
11        (A recess transpired from 2:22 p.m.
12          through 2:30 p.m.)
13        VIDEOGRAPHER:  This is beginning of
14      Media Unit Number 2 in the deposition of
15      Sergeant Kyle Beam.  The time is 6:30 --
16      2:30 p.m.  We are back on the record.
17  BY MS. PFEIFFER:
18    Q.  Sergeant Beam, I have just a short follow-up
19  with you.
20        We were talking earlier about your call with
21  David Burroughs and him giving you information
22  about the car that was going to be coming through.
23  Remember that?
24    A.  Yes.
25    Q.  And you had said "I know he had called other

Page 108

1  people, too."  Remember that?
2    A.  Yes.
3    Q.  So you were aware that he had been reaching
4  out to many people about this car?
5    A.  Yes.  Well, a few people, yeah.  He told me
6  he had tried to give the information to some other
7  people.
8    Q.  Do you remember who he told you he had
9  already reached out to?
10    A.  I don't think he gave me any particular
11  names.
12    Q.  Did you know he reached out to Mario
13  Elkobersey?
14    A.  I found out sometime later, yes.
15    Q.  Did you know he reached out to Tim Hutchison
16  at Polkton PD?
17    A.  Again, I found out sometime later.
18    Q.  Okay.  What about Darius Ellison, his own
19  partner?  You found out he reached out to him?
20    A.  Sometime later, yes.
21    Q.  Chief Norris of Polkton Police?  You found
22  out he reached out to them, too?
23    A.  I don't recall if I heard that name
24  specifically.
25    Q.  Did he say to you on the phone when he spoke

Page 109

1  to you -- whether it was in the morning or shortly
2  before the stop, when he gave the information, what
3  did he tell you about contacting other people at
4  that point in time?
5    A.  If I recall correctly, he just told me that
6  it had come through a few times before and nobody
7  was able to get it stopped.
8    Q.  So you understood that he had attempted to
9  have it stopped but nobody was successful yet?
10    A.  Yes.
11    Q.  And did you have any understanding of what
12  time frame he was talking about?
13    A.  No.
14    Q.  You just knew that it had been unsuccessful
15  in the past?
16    A.  Yes.
17    Q.  And it was the same information he shared
18  with you about who was going to be in the car and
19  what allegedly was in that car?
20    A.  Yes.
21        MS. PFEIFFER:  All right.  I don't have
22      anything further for you.  Thank you very
23      much for your time, Sergeant Beam.  Your
24      attorney or Mr. Ferlan may have some
25      questions, though.

Page 110

1       MR. PERRIN: This is Sean. I have no
2   questions. Thank you.
3       MR. FERLAN: Nothing from me. Thank
4   you.
5       VIDEOGRAPHER: Okay. This is the end
6   of Media Unit Number 2 in the deposition of
7   Sergeant Kyle Beam. The time is 2:32 p.m.
8   We are now off the record.
9       COURT REPORTER: I need y'all to state
10  your orders, please, for the record.
11      MS. PFEIFFER: Standing order for us,
12  please.
13      MR. PERRIN: This is Sean. Just eTran
14  with exhibits would be great.
15      MR. FERLAN: And this is Christian. I
16  do not need a copy. I'll get it from Sean.
17  Can you actually make that my order for the
18  prior deposition, too, for Bennett?
19      COURT REPORTER: And I was told it may
20  be a rough draft. Is it?
21      MS. PFEIFFER: For who?
22      COURT REPORTER: Anybody.
23      MS. PFEIFFER: Suzette?
24      MS. WOOLSEY: No. We don't -- I don't
25  think we need a rough draft. Do you?

Page 111

1       MS. PFEIFFER: No.
2       MS. WOOLSEY: We have a turnaround
3   time, I think, of five business days.
4       (The deposition concluded at 2:33 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 112

1           CERTIFICATE OF REPORTER
2       I, Madonna M. Farrell, Registered
3   Professional Reporter and Notary Public in and for
4   the State of South Carolina, do hereby certify that
5   the deponent, KYLE BEAM, was remotely sworn by me
6   to testify to the truth, under the penalty of
7   perjury and that the above deposition, Pages 1
8   through 112, inclusive, was recorded
9   stenographically by me and transcribed through
10  computer-aided transcription by me to the best of
11  my ability.
12      I FURTHER CERTIFY that the foregoing
13  transcript is a true and correct transcript of the
14  testimony given remotely by the said witness at the
15  time and place specified.
16      I FURTHER CERTIFY that I am neither attorney
17  or counsel for, nor related to or employed by any
18  of the parties to the action in which this
19  deposition is taken, or financially interested in
20  this action.
21      IN WITNESS WHEREOF, I have set my hand and
22  seal this 17th of May, 2022.
23      _Madonna Farrell_
        Madonna M. Farrell
24      Registered Professional Reporter
        Notary Public
25      My commission expires August 20, 2025