**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**Case No.: 3:21-CV-00039**

| | |
|---|---|
| RAY KIFER, JR.,<br><br>                    Plaintiff,<br><br>v.<br><br>SHERIFF SCOTT HOWELL , in his official capacity as the acting Sheriff of Anson County, HARRY B. CROW, JR., as Administrator of the Estate of SHERIFF LANDRIC REID, in his individual capacity, DAVID SCOTT BURROUGHS, in his individual capacity, DAVID SPENCER in his individual capacity, KYLE BEAM in his individual capacity, JOSH BEAM in his individual capacity, and JIMMY WILLIAMS in his individual capacity<br><br>                    Defendants. | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff RAY KIFER, JR., by and through his attorneys Pfeiffer Rudolf, hereby complains of defendants and alleges as follows:

<u>**INTRODUCTION**</u>

1.      The facts of this case are a nightmare for any law-abiding citizen of Anson County. In an extraordinary abuse of power, an Anson County Sheriff's Deputy, David Scott Burroughs ("Burroughs"), used his position as a sworn law enforcement officer to fabricate a crime and frame Ray Kifer, Jr. ("Ray Kifer" or "Kifer") for a felony drug offense that he did not commit.

2.      As a result of Burroughs' conduct, Ray Kifer was arrested, handcuffed, interrogated by three law enforcement officers, and threatened with years in prison. He has suffered from PTSD and other serious emotional distress ever since this event.

3.    The motivation behind this shocking story is simple: jealousy. Kifer was dating Burroughs' ex-girlfriend, Yajyuam Lela Vang. Burroughs wanted Vang back. Stoked by envy, Burroughs tried to eliminate Kifer by having him arrested and convicted of a serious drug offense that would require him to serve prison time.

4.    The other Defendants either assisted Burroughs in carrying out his plan, or intentionally and/or recklessly failed to intervene to stop it.

5.    Although the Sheriff's Department's Policy and Procedure Manual had an explicit section that required the reporting of official misconduct (or even the suspicion of official misconduct) to supervisors or directly to the Sheriff, employees of the Sheriff's Department were not required to read or review the Manual, and no training was conducted regarding this critical policy.  The Anson County Sheriff's Department instead adopted an "anything goes" culture.

6.    Burroughs has since been arrested, after an investigation by the SBI, and charged with making a false police report, obstructing justice, breaking and entering a motor vehicle, possession of heroin, possession of marijuana, and possession of methamphetamine for his role in this travesty.

7.    Ray Kifer is still struggling to recover from the nightmare.

## PARTIES

8.    Plaintiff Ray Kifer is an individual who lives in North Carolina.

9.    On information and belief, at all times relevant to this Complaint, Defendant David Scott Burroughs was a resident of Anson County, North Carolina, was employed as a deputy with the Anson County Sheriff's Department, and was acting under color of law. Defendant Burroughs is sued in his individual capacity, and is a

"person" as that term is used in the text of 42 U.S.C. § 1983.

10.    On information and belief, at all times relevant to this Complaint, Defendant David Spencer was a resident of Anson County, North Carolina, was employed as a deputy with the Anson County Sheriff's Department, and was acting under color of law. Defendant Spencer is sued in his individual capacity and is a "person" as that term is used in the text of 42 U.S.C. § 1983.

11.    On information and belief, at all times relevant to this Complaint, Defendant Kyle Beam was a resident of Anson County, North Carolina, was employed as a deputy with the Anson County Sheriff's Department, and was acting under color of law. Defendant Kyle Beam is sued in his individual capacity and is a "person" as that term is used in the text of 42 U.S.C. § 1983.

12.    On information and belief, at all times relevant to this Complaint, Defendant Josh Beam was a resident of Anson County, North Carolina, was employed as a deputy with the Anson County Sheriff's Department, and was acting under color of law. Defendant Josh Beam is sued in his individual capacity and is a "person" as that term is used in the text of 42 U.S.C. § 1983.

13.    On information and belief, at all times relevant to this Complaint, Defendant Jimmy Williams was a resident of Anson County, North Carolina, was employed as a deputy with the Anson County Sheriff's Department, and was acting under color of law. Defendant Williams is sued in his individual capacity and is a "person" as that term is used in the text of 42 U.S.C. § 1983.

14.    On information and belief, at all times relevant to this Complaint, Defendant Landric Reid was the Sheriff of Anson County, and as such was the final

policymaker with regard to all personnel issues within the Anson County Sheriff's Department. At all times relevant to the Complaint, he was acting under color of law in his individual and official capacities within the scope of his employment.

15.     Upon the death of Defendant Landric Reid, current acting Anson County Sheriff Scott Howell in his official capacity has been substituted as a Defendant in place of Sheriff Reid in his official capacity.

16.     Upon the death of Defendant Landric Reid, Harry B. Crow was substituted as a Defendant in place of Sheriff Reid in his individual capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

18.     This Court has jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a).

19.     Venue in the Western District of North Carolina is proper pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

20.     Pursuant to the Seventh Amendment to the Constitution of the United States, Plaintiff hereby requests a jury trial on all issues and claims set forth in this Complaint.

## Factual Overview

### David Burroughs and Lela Vang

21.     In January 2018, Yajyuam Lela Vang broke off a three-year relationship with then Anson County Sheriff's Deputy David Scott Burroughs. Soon after, Vang

began dating Ray Kifer.

22. Burroughs was distraught over the break-up. He was vocal at work and shared his despair widely within the Sheriff's Department, including with his colleagues on A-Squad: Sergeant Alex Willoughby, Sergeant Kyle Beam, Deputy David Spencer, and Deputy Darius Ellison.

23. Burroughs was particularly close with Ellison and Spencer. He went on fishing trips and shared meals with them, including, at times, with Vang cooking for all of them.

24. Burroughs at times broke down in tears at work, lamenting the loss of Vang.

25. Burroughs began obsessing about the breakup of his relationship with Vang, speaking not only to his work colleagues, but to their wives and relatives, about the breakup.

**Burroughs and Ray Kifer, Jr.**

26. Burroughs did not know Ray Kifer, Jr. before Kifer began dating Lela Vang.

27. Once Burroughs learned of Kifer's relationship with Vang, however, he could focus on little else.

28. Burroughs would repeatedly pull up Kifer's photograph on the North Carolina Offender Database, CJLEADS (Criminal Justice Law Enforcement Automated Data Services), while on duty with Deputy Darius Ellison, and at times, according to Ellison, Burroughs "ran his mouth" about Kifer, stating that if he was not in law enforcement, he would "beat Kifer's ass."

29. Burroughs spoke so frequently about Kifer and Vang, and about his

anger over the situation, that Defendant Jimmy Williams believed "everyone and their brother" at the Anson County Sheriff's Department knew about Burroughs' outrage at that relationship.

30.     Burroughs' obsession with the relationship between Vang and Kifer was so apparent and concerning to his fellow officers that his supervisor, Sgt. Willoughby, literally ordered Burroughs not to go around the area where Lela Vang lived.

31.     Undeterred, Burroughs did surveillance on Vang and Kifer while on duty, in his patrol car.

32.     Eventually, Kifer noticed Burroughs driving around Vang's neighborhood in his marked Sheriff's car, although Burroughs lived in a different part of Anson County, nearly 20 minutes away from Vang and Kifer's neighborhood.

33.     On one occasion in February 2018, just a month before the events in this case, Burroughs showed up outside Vang's parents' home in his patrol car. Vang was having a get-together with friends and noticed Burroughs' car as she was preparing food inside.

34.     Vang walked outside and approached Burroughs. Burroughs made disparaging remarks about Kifer. As Vang and Burroughs were engaged in a back-and- forth discussion, Kifer showed up for the get-together. Burroughs threatened to beat up Kifer while sitting inside of his patrol car before leaving.

35.     Later that evening, Burroughs snuck up on Vang's home while Kifer was spending the night. Burroughs made an audio recording of Vang and Kifer having sex.

36.     When Burroughs told his partner, Darius Ellison, about the recording,

Ellison reported the incident to Sergeant Willoughby. Burroughs was then re-assigned to another zone so that he would have no reason to be near Vang and Kifer.

37.     Burroughs' obsession with Vang's relationship with Kifer nonetheless continued to intensify, reaching its climax just a few weeks later.

**Burroughs Formulates a Plan to Get Rid of Ray Kifer, Jr.**

38.     Despite Ray Kifer Jr.'s clean record, Burroughs began to refer to Kifer as a "drug dealer" in conversations with his colleagues at the Anson County Sheriff's Department.

39.     None of his colleagues – some of whom were very familiar with Kifer, having known him for years – had ever heard of Kifer being involved in drugs.

40.     On the afternoon of March 4, 2018, as he began to enact his plan to frame Kifer, Burroughs called Anson County Sheriff's Department Sergeant Vance Bennett, and told Bennett he had locked himself out of his car. Burroughs wanted to know if he could use Bennett's lock-out kit.

41.     A lock-out kit is used by police to gain entry into locked vehicles without causing damage or creating any visible signs of force.

42.     Bennett told Burroughs he was on his way to a funeral at the time, but he might be able to get back to Burroughs later on.

43.     Impatient, Burroughs repeatedly called Bennett that afternoon.

44.     In the early evening of March 4, 2018, Burroughs finally connected with Bennett again, and Bennett told Burroughs he could stop by Bennett's mother's house to pick up the lock-out kit.

45.     Immediately upon walking into Bennett's mother's home, Burroughs

began talking about his break-up with Vang. Burroughs began referencing a confidential informant whom, Burroughs claimed, told him that Kifer was selling drugs. He told Bennett's wife the same story.

46.     Bennett never knew Burroughs to have any confidential informants.

47.     Bennett repeatedly told Burroughs to move on with his life.

48.     Late on the evening of March 4, 2018, Bennett gave Burroughs the lock-out kit.

49.     Around that same time, Burroughs contacted James Sims, a local Anson County man whom Burroughs knew was connected to the local drug trade, and paid Sims to buy heroin, marijuana and methamphetamine.

50.     Burroughs also gave Sims money to buy drug paraphernalia, including a scale, grinder and baggies.

51.     On or about March 5, 2018, in the late evening or early morning, Burroughs and Sims drove to the home shared by Vang and Kifer.

52.     While Sims waited in the car, Burroughs walked up to Kifer's car, broke into the trunk, and planted the baggie of drugs and drug paraphernalia under the trunk's tire storage compartment.

**Burroughs Enlists the Help of Others**

53.     On or about March 6, 2018, Burroughs told Deputy Darius Ellison that Kifer would be driving through a specific part of Anson County at a specific time and there would be drugs in the car. Burroughs asked Ellison to stop the car and arrest Kifer for the drugs.

54.     Concerned about the fact that Burroughs might be setting up Ray Kifer,

Ellison told Burroughs he didn't want to stop the car. Ellison suggested Burroughs call the Polkton Police Department instead. But despite his concern about what Burroughs was trying to do, Ellison did not report Burroughs' request to any supervisor or to the Sheriff.

55.     On or about March 6, 2018, Burroughs called Polkton Police Chief Matthew Norris and told him about the drugs in Kifer's car and asked him to stop the car.

56.     Norris also declined to stop Kifer's car.

57.     Burroughs then called Polkton Police Officer Timothy Wayne Hutchinson multiple times. Burroughs told Hutchinson he had information from a confidential informant about someone coming through Polkton around midnight with heroin and marijuana in his car.

58.     Hutchinson described the calls from Burroughs as "shady."

59.     Hutchinson told Burroughs he would not be working at the time and suggested Burroughs reach out to Anson County Deputy Mario El Kobersy.

60.     On or about March 6, 2018, Burroughs called Deputy El Kobersy and told him that Vang and Kifer would be driving through Anson County and there would be drugs in their car. Burroughs provided specific information about the location of the drugs and the time the car would be driving along Ansonville-Polkton Road.

61.     Suspicious of Burroughs' story because of the relationship between Burroughs, Vang and Kifer, El Kobersy told Burroughs to text him the information, for the purpose of creating a written record of the request.

62.     At 7:45 p.m. on March 6, 2018, Burroughs texted details to El Kobersy:

he provided Kifer's license plate number along with two photographs of a Toyota Corolla, nearly identical to the car Kifer drove.

63.     Burroughs proceeded to send a rapid series of a dozen text messages to El Kobersy with details about where drugs would be found in the car, what specific window of time the car would be passing through various streets in Anson County and "predicting" that Kifer might act like he knew nothing about the drugs.

64.     El Kobersy responded to Burroughs' texts but did not attempt to stop Kifer's car because the information was "obviously fishy."

65.     Instead, El Kobersy reported the information to Defendant Jimmy Williams, who was one of two detectives in the narcotics department at the Anson County Sheriff's Department.

66.     El Kobersy provided all of the details Burroughs gave him, then advised Williams that he was uncomfortable investigating the allegations because of who it involved.  El Kobersy said his concern was that Burroughs was "trying to cause the guy a problem because he's dating this girl."

**Defendant Williams Fails to Act**

67.     Williams had been a drug detective in Anson County for several years at the time he learned this information from El Kobersy.

68.     Williams was not aware of David Burroughs ever working with, or having, any confidential informants.

69.     Williams was not aware of David Burroughs ever working any drug investigations, nor had he worked any drug investigations with Burroughs.

70.     Williams had known Ray Kifer, Jr. since Kifer was a child.  Williams did

not know Kifer to ever be involved in drugs or illegal activity of any kind.

71.     Williams was aware of Burroughs' break-up with Lela Vang and believed that "everyone and their brother" in the Anson County Sheriff's Office knew about Burroughs outrage over the breakup and Lela's current relationship with Kifer.

72.     Deciding the information Burroughs provided to El Kobersy "seemed too good to be true," and sounded like a "set up," Williams told El Kobersy: "don't stop that fucking car."

73.     Williams told El Kobersy that he would handle the matter in the morning.

74.     Williams took no other action that evening or the next morning.

   a.     He did not call Burroughs.

   b.     He did not attempt to contact Ray Kifer Jr.

   c.     He did not report the situation to his supervisor, Chief Deputy Scott Howell, or to the Sheriff.

**Defendant Josh Beam Fails to Act**

75.     On the morning of March 7, 2018, Deputy Darius Ellison wrote a note containing the information he had received from Burroughs the day before, including Ray Kifer Jr.'s name.   But Ellison concealed the fact that the information had been provided to him by Burroughs.

76.     Ellison then put the note in Josh Beam's mailbox.

77.     Josh Beam was the other drug detective in Anson County and was Jimmy Williams' partner.

78.     Josh Beam had known Ray Kifer Jr. since Kifer was a child.  Josh Beam did not know Kifer to ever be in involved in drugs or illegal activity of any kind.

79.     At the start of their shift on March 7, 2018, Josh Beam shared Ellison's

note with Jimmy Williams.

80.    Williams recognized the information was the same as the information Williams had learned the night before from Mario El Kobersy.

81.    Williams shared the information he learned from El Kobersy with Beam.

82.    The two detectives agreed the information was suspicious.

83.    Williams told Beam they needed to do some checking into the information *before* the car was stopped.

84.    Willliams and Josh Beam then called Ellison to get more information.

85.    Around 9:30 a.m. on March 7, 2018, Williams and Beam met with Ellison at a Citgo gas station.

86.    Williams and Beam pressed Ellison on the source of the information about Kifer, and Ellison finally told them the source of the information was Burroughs.

87.    Once they confirmed this information, Williams and Beam had "alarms going off" in their heads.

88.    They ordered Darius Ellison not to pursue the tip.

89.    Beam then told Ellison he would take care of the situation.

90.    Despite the alarm bells going off, neither Beam nor Williams reported their concerns about the information they had learned from El Kobersy or Ellison to their supervisor, Chief Deputy Howell, or to the Sheriff.

**William and J. Beam Fail to Act**

91.    Williams and Beam left the meeting with Ellison at the Citgo in the late morning, sometime before noon.

92.    They did not call David Burroughs.

93.    They did not visit David Burroughs.

94.    They did not try to investigate David Burroughs' alleged informant.

95.    They did not go to Ray Kifer's house for a knock-and-talk.

96.    They did not go to Ray Kifer's house and ask for consent to search his car.

97.    They did not try to contact Ray Kifer in any manner at all.

98.    They did not order any of the other patrol deputies on patrol duty that day not to stop a car that matched the description Burroughs gave to Ellison and El Kobersy.

99.    They did not report anything they learned to their supervisor or to the Sheriff.

100.    Instead, Williams and Josh Beam drove nearly 20 miles away from the location where Burroughs wanted Kifer's car to be stopped, in order to conduct "some routine gang investigation" by trying to identify homes in Morven, North Carolina where suspected gang members were living.

**Ellison and Kyle Beam Refuse to Stop Kifer's Car**

101.    About the same time that day, David Burroughs was becoming frantic.

102.    He had been tracking Kifer's car's whereabouts, and at some point lost the location of the car.

103.    Burroughs called Ellison in a panic and told him that he (Burroughs) had lost track of Kifer's car. Adamant that the car needed to be found and stopped, Burroughs made seven calls to Ellison between 1:00 p.m. and 2:21 p.m. trying to reach Ellison for assistance in locating the car.

104.    Ellison refused to look for the car.

105.   Ellison refused to participate in the stop of the car.

106.   Burroughs then called Sergeant Kyle Beam ("K. Beam") and told him about the alleged tip.

107.   K. Beam had never known Burroughs to work with drug informants.

108.   Upon information and belief, K. Beam did not act on the alleged tip because he did not believe Ray Kifer was knowingly transporting drugs.

109.   Although he refused to act on the tip himself, K. Beam did not alert his supervisor or the Sheriff about what he had been told by Burroughs.

110.   Burroughs eventually found the car and told Ellison that he was going to ask Deputy David Spencer to stop it.

**Deputy David Spencer Agrees to Stop Kifer's Car**

111.   Around the same time, Deputy David Spencer was at the child support office with Sgt. Bennett (who had provided the lock out kit to Burroughs two days earlier) on a routine assignment.

112.   At 2:47 p.m. Burroughs called Spencer on Spencer's personal cell phone. Spencer answered on speakerphone, but quickly took it off speaker once Burroughs started giving him information. Upon information and belief, Spencer took his phone off speaker to hide the conversation from Sgt. Bennett.

113.   Burroughs gave Spencer the car model and license plate of Kifer's car, then told Spencer the car would be coming back and forth on Ansonville-Polkton Road between 3:15 and 4 p.m.

114.   Burroughs told Spencer specifically where he would find drugs in the trunk of Kifer's car.

115.    Burroughs then explained that Vang and Kifer would be in the car.

116.    For Spencer, what Burroughs told him "threw up red flags."

117.    Despite the red flags, Spencer left his assignment at the child support office in search of Ray Kifer's car. He did not inform any supervisor, including Sgt. Bennett, who was with him at the Child Support Office, or the Sheriff.

118.    Spencer did not ask Sgt. Bennett if he could leave his assignment at the Child Support Office. Nor did he tell Bennett what Burroughs had asked him to do.

119.    As Spencer rushed off, Sgt. Bennett called Burroughs to find out where Spencer was going and what the call was about; Burroughs told Bennett that a confidential informant gave him information about a car coming through Anson with drugs. Burroughs did not tell Bennett that Kifer was in the car.

120.    Bennett never knew Burroughs to have a confidential drug informant.

121.    Meanwhile, Vang and Kifer were getting into Kifer's car to head to Vang's place of work.

**David Spencer Pursues Kifer**

122.    Around 3:00 p.m. Spencer located Kifer's car driving along Ansonville-Polkton Road and began to tail the car while in his marked Anson County Sheriff's vehicle.

123.    At this point, Vang was driving the car. Spencer was close enough to the back of the car that Vang recognized Spencer in the rear-view mirror.

124.    Once Spencer realized Vang was in the car with Kifer, he called Kyle Beam and told him that Vang was driving the car.

125.    Kyle Beam did not tell Spencer not to stop the car. Instead, he told

Spencer to call Burroughs. Despite the suspicious nature of Spencer's call, Kyle Beam did not call his supervisor or the Sheriff to report what Spencer had told him.

126.     Spencer called Burroughs. Burroughs told him not to stop the car with Vang in the car because she would be arrested. Burroughs told Spencer the car would be headed back along the same route shortly without Vang.

127.     Despite this suspicious request, Spencer did not call his supervisor or the Sheriff to report what Burroughs had asked him to do.

128.     Spencer then turned off at the intersection of Ansonville-Polkton Road and 742 South and let the car allegedly containing the illegal drugs go on its way.

129.     Spencer waited around the area for Kifer's car to return along Ansonville-Polkton Road.

130.     Within less than a half hour, Kifer's car returned along Ansonville-Polkton Road.

**Ray Kifer is Stopped, Searched and Arrested**

131.     Immediately upon seeing Kifer's car, Spencer turned onto the road, activated his blue lights and raced to get behind Kifer's car.

132.     Kifer pulled over as soon as Spencer raced up behind him. Kifer asked Spencer why he pulled him over.

133.     Spencer told Kifer that he was speeding.

134.     Kifer was not speeding.

135.     Upon information and belief, Spencer knew that Kifer had not been speeding.

136.     Spencer then told Kifer he had crossed the center line.

137.     Kifer had not crossed the center line.

138.     Upon information and belief, this stop was pretextual and part of Spencer's desire to help Burroughs' frame Kifer for a drug offense he did not commit.

139.     Spencer then told Kifer he smelled an odor of marijuana coming from the vehicle.

140.     Kifer told him that was impossible because he didn't touch marijuana and there was no odor of marijuana coming from the vehicle.

141.     Upon information and belief, Spencer knew there was no odor of marijuana coming from Kifer's car.

142.     Upon information and belief, this allegation was false and part of Spencer's desire to help Burroughs frame Kifer for a drug offense he did not commit.

143.     Spencer asked for consent to search the vehicle.  Kifer agreed.

144.     Spencer placed Kifer in the back of his patrol car.

145.     Kifer called Vang from the back of the patrol car. He also called his sister and his father to tell them what was going on.

146.     Spencer called Kyle Beam again, this time to tell him he made the stop and needed K. Beam's assistance.

147.     Upon information and belief, Kyle Beam knew or reasonably should have known the stop was not a legitimate traffic stop and that there was no need for assistance. Despite this, he did not inform his supervisor or the Sheriff.  Instead, he went to assist Spencer.

**Kyle Beam Arrives on the Scene**

148.     Once Kyle Beam arrived, Spencer and Kyle Beam began to search the

trunk of Kifer 's car.

149.    Beam testified that he did *not* smell the odor of marijuana coming from the car.

150.    Within a few minutes of searching the trunk of the car, Spencer pointed to a package under the spare tire storage compartment and said to K. Beam in a confirmatory manner, "there it is."

151.    Beam then pulled a black envelope containing narcotics out of the trunk of the car, from underneath the tire storage.

152.    The black envelope contained neatly divided individual packets of various narcotics. The individual packets were arranged in an orderly manner and sealed in a larger baggie.

153.    Kyle Beam believed the package of drugs was "a little too organized."

154.    Despite "red flags" about the legitimacy of Burroughs' extremely detailed tip, the well-known relationship between Burroughs and Lela Vang, Burroughs' outrage at Lela's relationship with Kifer, and the drug packet that was "too organized," Spencer and Beam decided to arrest Kifer.

155.    After a short conference, Spencer and Kyle Beam approached Kifer with handcuffs and told him he was being arrested.

156.    Kifer asked why.

157.    Neither Spencer nor Kyle Beam gave a reason for Kifer 's arrest.

158.    Neither Spencer nor Kyle Beam called the two officers assigned to the drug unit, Lt. Williams and Josh Beam, before arresting Kifer. Neither did they call their supervisor, or the Sheriff.

159.    Upon information and belief, Spencer and Kyle Beam knew or reasonably should have known that there was no probable cause for this arrest.

160.    Upon information and belief, Spencer and K. Beam's knowingly or recklessly assisted Burroughs' in framing Kifer.

**Jimmy Williams and Josh Beam Learn About the Stop**

161.    The stop of Ray Kifer's car was broadcast over the Anson County dispatch system to all Anson County Sheriff's Department radios.

162.    Jimmy Williams and Josh Beam were 20 miles away, riding along the streets of Morven checking on addresses they thought might be associated with gang activity.

163.    By this time in their shift, a federal agent named Jose Manolito Dugger had joined them in their vehicle.

164.    Dugger was an agent with the Department of Homeland Security who would occasionally ride with Williams and Beam and assist in gang or narcotics investigations.

165.    Dugger was in the car with Williams and Beam when information about the stop of Ray Kifer, Jr. was broadcast.

166.    As soon as Jimmy Williams heard that the car has been stopped, he said "Oh, shit."

167.    Josh Beam told Williams they needed to hurry and get to the scene.

168.    Beam and Williams told Agent Dugger they had heard a tip earlier that a car like the one just stopped might be carrying drugs.

169.    They did not tell Agent Dugger they were skeptical about the tip.

170.    They did not tell Agent Dugger the source of the tip.

171.    They did not call their supervisor or the Sheriff before heading to the scene.

**Jimmy Williams and Josh Beam Participate in the False Arrest**

172.    On the way to the scene, Kyle Beam called Josh Beam to tell him they found drugs in the car. He described what he found and texted a photograph of the neatly organized packet to Josh Beam.

173.    Within about 20 minutes, Williams, J. Beam and Agent Dugger arrived at the scene.

174.    All three men were in plain clothes.

175.    They arrived in a black, unmarked Ford Explorer.

176.    Upon arrival, they saw Kifer in handcuffs in the back of Spencer's patrol car.

177.    Despite believing the information from Burroughs sounded "like a set up" and "too good to be true," despite never receiving a tip as detailed as this alleged tip in their combined decades of experience as drug investigators, despite having no information that Ray Kifer had ever engaged in, or was connected to, any drug trade of any kind, despite a neatly packaged envelope of drugs that looked "too organized," and despite "alarm bells going off," Williams and J. Beam decided to treat the situation no differently than any other drug arrest.

178.    Despite all of these red flags, neither one called a supervisor.

179.    Neither one called the Sheriff.

180.    Neither one called David Burroughs to inquire about the alleged source of the tip.

181.    Neither one asked Ray Kifer, Jr. any questions at the scene.

182.    Instead, Williams and J. Beam took Ray Kifer Jr., in handcuffs, out of the back of a deputy vehicle into their black, unmarked Ford Explorer where Agent Dugger was sitting in back.

183.    Frightened and confused, Kifer asked Williams and Josh Beam why he was being arrested.

184.    Neither one responded.

185.    As Kifer was driven away from the scene, his car was seized by Spencer and Kyle Beam and impounded.

186.    Upon information and belief, Spencer and Kyle Beam knew or reasonably should have known that there was no legal basis to seize Kifer's car.

187.    As Kifer was driven away from the scene, Spencer wrote a citation for crossing the center line (not for speeding) and filed a report on the stop and search of the car.

**Williams and Beam Exacerbate Kifer's Fear**

188.    Kifer was placed in the back seat next to Agent Dugger. He silently watched as the SUV took turn after turn until Kifer was no longer familiar with his location.

189.    The SUV eventually turned onto an unfinished road off Route 54 to a secluded area where Kifer could see a small air strip and a nondescript building.

190.    Kifer was terrified.  He believed he was about to be killed.

191.    Kifer asked if this was the Sheriff's Department.  He was told that Josh Beam needed to pick something up.  He was not told what Beam allegedly needed to pick up.

192.    Josh Beam then left the SUV to go inside the building.  Jimmy Williams

and Dugger remained in the car with Kifer. Kifer remained handcuffed, and terrified.

193. After a few minutes, Beam returned to the SUV with something in his hands. Kifer could not see what was in his hands.

194. The SUV then left the air strip. Neither Williams nor Josh Beam told Kifer why he had been arrested or where they were going.

195. When the SUV arrived at the sheriff's department, Kifer was taken into an interrogation room by Josh Beam, Jimmy Williams and Dugger. Agent Dugger patted down Kifer before ordering him to sit at a table.

196. Jimmy Williams sat down across from Kifer. Agent Dugger was to the right of Kifer, Josh Beam sat to his left.

197. Josh Beam handed Kifer papers and read him his Miranda rights.

198. Kifer asked what he was being charged with before signing the papers.

199. The officers refused to provide Kifer with an answer.

200. Panicking, Kifer signed the papers and waived his Miranda rights.

**Agent Dugger Interrogates Kifer**

201. Dugger began asking Kifer questions. Among other things, Dugger asked Kifer to "work" with him and to reveal who his supplier was.

202. Kifer adamantly denied any involvement in drug activity. In response, Dugger told him he was looking at a mandatory minimum prison sentence.

203. Heart racing, Kifer begged to be polygraphed. He repeatedly denied any knowledge of the drugs found in his car.

204. Agent Dugger told Kifer that he hears these kinds of denials all the time in situations like this, and the best thing Kifer could do was tell the truth.

205.     About twenty minutes into the interrogation, Josh Beam passed a pair of handcuffs to Jimmy Williams.

206.     Jimmy Williams began to play with handcuffs as he sat across the table from Kifer, slowly opening and then closing them as Kifer watched.

207.     About 30 minutes into the interrogation, Josh Beam told Kifer they were going to seize his phone.

208.     Kifer agreed to let them seize his phone and signed his name on a waiver.

209.     Josh Beam and Jimmy Williams then left the room together.

210.     A few minutes later only Williams returned.

211.     Dugger asked Jimmy Williams if the seized evidence had arrived. Williams then left the interrogation room.

212.     Williams returned without the evidence, and the questioning of Kifer continued.

213.     As Williams settled into his chair across the table from Kifer, Williams pulled out his handcuffs, propped both elbows up on the table, then began opening and closing the handcuffs repeatedly, as Kifer watched and tried to answer questions.

214.     Kifer continued to deny the allegations, and at one point suggested he might have been set up by David Burroughs.

215.     Soon after this, Agent Dugger left the room.

216.     Jimmy Williams stayed in his chair, across from Kifer, and continued clicking his handcuffs open and shut. Kifer attempted to make small talk with Williams, whom he had known since childhood.

217.     Williams refused to engage in any conversation with Kifer.

218.     Dugger eventually returned to the interrogation room with a bag marked "evidence." He confronted Kifer with the bag, placing it right in front of Kifer at the end of the table.  Dugger told him it contained marijuana, heroin, and cocaine.

219.     Kifer repeated his denial and said he did not even know what the items in the bag were used for, or what they were at all.

220.     At this point in the interrogation, Agent Dugger began to believe Kifer had nothing to do with the drugs found in the trunk of his car.

221.     Dugger left the interrogation room and talked to Josh Beam.

222.     According to Dugger, this was the first time Josh Beam told Dugger that the source of the tip was Burroughs, the same person Kifer had told Dugger he thought had set him up.

223.      Upon learning from Josh Beam that David Burroughs was the source of the tip, Agent Dugger told Beam and Williams that an investigation of the entire incident should be launched by an independent agency such as the North Carolina State Bureau of Investigation ("SBI") or the Federal Bureau of Investigation ("FBI").

224.     Williams and/or Beam asked Dugger if he could do the investigation.

225.     Dugger said he should not do the investigation since he had taken part in the interrogation of Kifer.

226.     Dugger then spoke with Sheriff Landric Reid about the interrogation and what he had learned about who provided the tip that led to the stop of Kifer.

227.     Dugger told Reid that an investigation of the entire incident should be launched by an independent agency such as the SBI or FBI.

228.     Reid asked Dugger if he could do the investigation.

229.     Dugger said he should not do the investigation since he took part in the interrogation of Ray Kifer, Jr.

**Kifer is Released**

230.     At this point, based upon the recommendation of Agent Dugger, a decision was made to release Kifer while an investigation of the entire incident was conducted.

231.     Before Kifer was released from the interrogation room, Kifer's father and stepmother arrived at the Sheriff's Office.  They were put into a waiting room.

232.     Dugger and Jimmy Williams took Kifer from the interrogation room and brought him to the same waiting room that his father and stepmother were in.  At the sight of his dad, Kifer broke into tears.

233.     Soon thereafter, and without any explanation, Josh Beam and David Spencer entered the waiting room and told Kifer the charges were being dropped and his impounded car would be released.

234.     Beam and Spencer then took Kifer into the magistrate.

235.     The magistrate advised Kifer there was an ongoing investigation, but *at this point* Kifer was not going to be charged with anything.

236.     Before releasing Kifer, the magistrate told him he was *still a main suspect and he could be re-arrested as the agents would continue investigating the case.* This left Kifer in a legal limbo.

237.     Shaken, Kifer left with his father.

238.     About a month later, Kifer received a call from an SBI agent asking to interview him.  Kifer agreed.

239.     The SBI agent informed Kifer that Burroughs had devised a plan to plant drugs in Kifer 's car, and Kifer did not have to worry about the investigation anymore.

**The Internal Investigation**

240.     Rather than call in the SBI or FBI to investigate the entire incident, as Agent Dugger had recommended, Sheriff Reid kept the investigation internal. He asked Lieutenant Brian Tice to lead an internal affairs investigation into what occurred.

241.     Despite the direct involvement of Jimmy Williams and Josh Beam in the stop, arrest and interrogation of Ray Kifer, Jr., and their failure to intervene to stop the illegal arrest, the Sheriff allowed both Williams and Josh Beam to be involved with the internal affairs investigation. Williams and Josh Beam actually sat in on the interrogation of Burroughs.

242.     No officers from the Polkton Police department were interviewed as part of the internal affairs investigation.

243.     Neither Williams nor Josh Beam were interviewed as part of the internal affairs investigation.

244.     Kyle Beam was not interviewed as part of the internal affairs investigation.

245.     Vance Bennett was not interviewed as part of the internal affairs investigation.

246.     Mario El Kobersy was not interviewed as part of the internal affairs investigation.

247.     David Spencer was not interviewed as part of the internal affairs investigation.

248.    Tice initially asked David Spencer to write a report about the stop of Ray Kifer, Jr.

249.    Spencer wrote a short, bare-bones account of the stop. His report for Tice conflicted with details of his incident report written at the scene. His report for Tice conflicted with phone records.

250.    Spencer also wrote "VOID" across the citation for crossing the center line he wrote for Kifer, and testified that he did so in his "officer's discretion."

251.    No further investigation of Spencer's role in the arrest of Kifer was done.

252.    Tice, Williams and Josh Beam interviewed Darius Ellison and took notes during the interview.

253.    Tice, Williams and Josh Beam called in David Burroughs for an interview.

254.    After initially denying any wrongdoing, Burroughs eventually told Tice, Williams, and Josh Beam that he planted the drugs, although he lied about the specific details.

255.    Only then, once Burroughs admitted to his role, did Sheriff Reid call in the SBI.

256.    SBI Agent Brandon Blackmon was assigned the investigation.

**The SBI Investigation**

257.    The only information Blackmon received from the Anson County Sheriff's Department was Spencer's bare-bones account of the stop, Burroughs' partially false confession, and the notes from the interview of Darius Ellison.

258.    Once these things were turned over to Agent Blackmon, no further internal investigation was done within the Anson County Sheriff's Department.

259.     The only action Sheriff Reid took was to fire David Burroughs.  None of the other deputies involved - Spencer, Kyle Beam, Williams and Josh Beam - were ever disciplined or even admonished in any way.

260.     Sheriff Reid did not require or even encourage the officers involved in the stop, arrest or interrogation of Ray Kifer to write reports about their involvement, nor did he require them to speak with Agent Blackmon.

261.     Any other information about the stop that later became known was a result of word spreading within the department about the SBI investigation of Burroughs.

262.     Sgt. Vance Bennett saw a report on the news about Burroughs being fired and realized Burroughs' had likely used his lock-out kit for the crime. He volunteered that information to Agent Blackman.

263.     Mario El Kobersy heard about the firing within the department and made sure Agent Blackmon knew he had text messages from the exchange with Burroughs.

264.     Jimmy Williams never offered any information to Agent Blackman.

265.     Josh Beam never offered any information to Agent Blackman.

266.     Kyle Beam never offered any information to Agent Blackman.

265.     More than a year later, on April 5, 2019, Agent Blackman put enough information together through his own investigative initiative to charge Burroughs' with several crimes.

266.     Burroughs was arrested and charged with making a false police report, obstructing justice, breaking and entering a motor vehicle, possession of heroin,

possession of marijuana, and possession of methamphetamine.

267.    On May 12, 2023 Burroughs was convicted by a jury of obstruction of justice and possession of heroin.

**Damages**

268.    As a direct and foreseeable consequence of being falsely stopped, arrested and interrogated, Kifer has suffered physical injury and emotional trauma. Kifer is under medical care for anxiety, depression and post-traumatic stress disorder. He suffers regular anxiety attacks and has also been diagnosed with a sleeping disorder, both of which have made it difficult to maintain employment.

## CAUSES OF ACTION

## FEDERAL CLAIMS

### COUNT I
### 42 U.S.C. § 1983

### FABRICATION OF EVIDENCE

**DENIAL OF DUE PROCESS IN VIOLATION OF THE 14th AMENDMENT**

**(Against Defendant Burroughs in his individual capacity)**

269.    Ray Kifer, Jr. incorporates paragraphs 1-268 of this Complaint as if fully restated herein and further alleges:

270.    In March 2018, Defendant Burroughs devised and implemented a scheme to use his position as a law enforcement officer to knowingly and intentionally frame Ray Kifer with a drug crime he did not commit.

271.    oDefendant Burroughsdeprived Ray Kifer of his liberty without due process of law, and of his right to a fair criminal proceeding, by fabricating evidence

implicating Kifer in a crime, planting incriminating evidence against Kifer, and falsely reporting criminal conduct by Kifer.

272.    Defendant Burroughs'' conduct, as described above, shocks the conscience, contravenes fundamental principles and canons of decency and fairness, and violated Ray Kifer's constitutional right to due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution.

273.    Defendant Burroughs' conscience-shocking misconduct in March 2018 directly and proximately caused Ray Kifer physical and emotional suffering.

274.    Defendant Burroughs knew, or reasonably should have known, that fabricating and causing the fabrication of false evidence violated Ray Kifer's constitutional right to due process and a fair criminal proceeding.

275.    Defendant Burroughs knew, or reasonably should have known that fabricating and causing the fabrication of false evidence was likely to lead to a false arrest and severe psychological damages whether or not the conscious-shocking conduct resulted in a false conviction.

276.    Any reasonable law enforcement officer would have known — and Defendant Burroughs did know — that fabricating and causing the fabrication of false evidence was improper and highly likely to lead to a false arrest and severe psychological damages.

277.    No reasonable law enforcement officer would have engaged in the conduct set forth above or believed it to be lawful.

278.    Defendant Burroughs' conduct proximately caused Ray Kifer to be stopped, arrested, handcuffed, detained, and interrogated about a crime he did not

commit.

279.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully, intentionally and/or in reckless disregard for Kifer's clearly established constitutional rights.

280.     Absent Defendant Burroughs' misconduct, the arrest of Kifer could not and would not have occurred.

281.     The arrest of Ray Kifer was deliberately and purposefully brought about by Defendant Burroughs and was the obvious and intended result of his conduct.

282.     All the foregoing acts and omissions were committed under color of state law and violated clearly established law of which any reasonable officer would have known.

283.     All the foregoing acts and omissions were committed deliberately, intentionally, in bad-faith, and/or with reckless disregard for the rights and safety of Ray Kifer.

284.     As a direct and proximate result of Defendant Burroughs' deliberate, reckless, deliberately indifferent and/or bad-faith acts and omissions, Ray Kifer was deprived of his Fourteenth Amendment rights to a fair criminal proceeding and to not be deprived of his liberty without due process of law.

285.     As a direct and foreseeable consequence of being unjustly arrested, detained and interrogated, Ray Kifer has suffered emotional and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages to be determined at the trial of this matter.

**COUNT II**

**42 U.S.C. § 1983**

**UNLAWFUL STOP**

**VIOLATION OF THE 4TH AND 14TH AMENDEMENTS**

**(Against Defendants David Spencer and Kyle Beam in their individual capacities)**

286.     Ray Kifer incorporates paragraphs 1-287 of this Complaint as if fully restated herein and further alleges:

287.      On March 7, 2018, Defendant Spencer stopped the car being driven by Ray Kifer under the pretext that he had been speeding and/or crossing the center lane of travel.

288.     When Spencer first located Kifer's car, he prepared to pull the car over, but turned away once he realized Vang was in the car.

289.     Spencer called Kyle Beam to ask for instructions on what to do next, since Kifer was the only person Burroughs wanted arrested.

290.     Kyle Beam directed Spencer to receive instructions from Burroughs, who advised Spencer to wait until the car returned, which Burroughs knew would occur since Kifer was taking Vang to work and then returning home.

291.     Prior to being stopped by Spencer, Kifer had not been speeding, nor did he cross the center line, and his stop by Spencer was pretextual.

292.     There was no reasonable basis or suspicion to stop Ray Kifer's car on March 7, 2018.

293.     Spencer did not smell the odor of marijuana coming from the vehicle when he stopped Kifer.

294.     Spencer called Kyle Beam and asked Beam to assist him in searching Kifer's car.

295.     There was no reasonable basis or suspicion for Spencer to request help in searching Ray Kifer's car.

296.     When Kyle Beam arrived at the scene, he did not smell the odor of marijuana coming from Ray Kifer's car.

297.     There was no reasonable basis or suspicion to ask Ray Kifer for consent to search his car.

298.     Spencer's conduct in stopping Ray Kifer's car was objectively unreasonable and violated Kifer's constitutional right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

299.     The misconduct of Defendants Spencer and K. Beam was undertaken intentionally, maliciously and/or willfully, or in reckless disregard and indifference to Kifer's clearly established constitutional rights.

300.     As a direct and foreseeable consequence of being stopped and detained, Ray Kifer has suffered emotional and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages to be determined at the trial of this matter.

## COUNT III

## 42 U.S.C. § 1983

## UNLAWFUL ARREST

## VIOLATION OF THE 4TH AND 14TH AMENDMENTS

**(Against Defendants Burroughs, Spencer, Kyle Beam, Josh Bean and
Jimmy Williams in their individual capacities)**

301.    Ray Kifer incorporates paragraphs 1-303 of this Complaint as if fully restated herein and further alleges:

302.    In March 2018, Defendants Burroughs, Spencer, Kyle Beam, Josh Beam and Jimmy Williams acting individually and/or in concert with each other, caused, instituted or participated in the arrest of Ray Kifer.

303.    The arrest of Ray Kifer for a drug offense was based upon evidence planted by Defendant Burroughs and was therefore not supported by probable cause.

304.    Defendants Spencer, Kyle Beam, Josh Beam and Jimmy Williams knew or reasonably should have known that the drugs in Kifer's car did not belong to him.

305.    Defendants Spencer, Kyle Beam, Josh Beam and Jimmy Williams knew or reasonably should have known that probable cause did not exist to institute, advance or continue Ray Kifer's prosecution.

306.    Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Ray Kifer's constitutional rights.

307.    Defendants' conduct occurred in the course and scope of their employment as law enforcement officers and under color of state law.

308.    As a result of the wrongful acts of Defendants, Kifer was arrested on March 7, 2018 for a drug offense he had not committed and was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

309.    The misconduct of Defendants was objectively unreasonable and was undertaken intentionally, maliciously and/or willfully, or in reckless disregard and

indifference to Kifer's clearly established constitutional rights.

310.     As a direct and foreseeable consequence of being arrested, handcuffed, detained and interrogated for a drug offense he had not committed, Ray Kifer has suffered emotional and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages to be determined at the trial of this matter.

## COUNT IV

## 42 U.S.C. § 1983

## FAILURE TO INTERVENE

**(Against Defendants Josh Beam and Jimmy Williams
in their individual capacities)**

311.     Ray Kifer incorporates paragraphs 1-313 of this Complaint as if fully restated herein and further alleges:

312.     Defendants Spencer, Kyle Beam, Josh Beam and Jimmy Williams each had a duty to intervene on behalf of a citizen whose constitutional rights were being violated by another officer.

313.     From the first day in January 2018 when defendant Burroughs arrived at work crying and upset over his breakup with Lela Vang, up until March 7, 2018, Defendants Spencer, Kyle Beam, Josh Beam and Jimmy Williams were aware of Burroughs' unstable emotional state.

314.     None of the Defendants knew Ray Kifer to be involved in, or connected to, the drug trade.

315.     All of the Defendants knew or should have known that (a) Burroughs did

not have any confidential informant and/or (b) that the information about Ray Kifer transporting drugs was not true.

316. Defendants Josh Beam and Jimmy Williams were each in a position to intervene to prevent the arrest and interrogation of Ray Kifer, Jr. but failed to do so.

317. Defendants Josh Beam and Jimmy Williams were in a position to intervene even after the initial arrest of Kifer and to thereby stop the interrogation and unnecessary, prolonged seizure of Ray Kifer Jr., but failed to do so.

318. Defendants Josh Beam and Jimmy Williams' failure to intervene in the stop, arrest and interrogation of Ray Kifer, Jr. violated Mr. Kifer's clearly established Fourth and Fourteenth Amendment rights.

319. In the manner described above, by their conduct and under color of law, during the constitutional violations herein, Defendants stood by while Burroughs "sold and delivered" his scheme without intervening to prevent the violation of Kifer's constitutional rights, although each of them had the opportunity to do so.

320. Indeed, Defendants Josh Beam and Jimmy Williams, in the manner described above, by their conduct and under color of law, during the constitutional violations herein, not only stood by while Burroughs "sold and delivered" his scheme without intervening to prevent the violation of Kifer's constitutional rights, although each of them had the opportunity to do so, but also actively participated with reckless disregard of the scheme through the stop, arrest, search and interrogation of Kifer.

321. The misconduct described in this Count was objectively unreasonable and was undertaken in bad faith, intentionally, recklessly, and/or with willful indifference to Kifer's clearly established constitutional rights.

322. As a direct and proximate result of the acts and omission described herein, Mr. Kifer suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

323. Punitive damages are available against Defendants and are hereby claimed as a matter of federal common law under *Smith v Wade,* 461 U.S. 30 (1983).

324. As a direct and foreseeable consequence of Josh Beam and Jimmy Williams' failure to intervene to prevent the violation of Plaintiff's clearly established constitutional rights, Ray Kifer has suffered emotional and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages to be determined at the trial of this matter.

## COUNT V

## 42 U.S.C. § 1983

## MONELL LIABILITY
**CLAIM UNDER *MONELL v. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977)**
**(Against SCOTT HOWELL, in his official capacity as**
**the acting Sheriff of Anson County)**

325. Ray Kifer incorporates paragraphs 1–327 of this Complaint as if fully restated herein and further alleges:

326. The Sheriff of Anson County has the final policymaking authority with regard to personal matters including, but not limited to, establishing and enforcing written policies and training programs governing the conduct of Anson County Sheriff Department law enforcement officers performing law enforcement functions on behalf of the county.

327. Sheriff Landric Reid became Sheriff of Anson County in 2015.

328.    Sheriff Reid adopted the written policies and procedures governing the conduct of Anson County Sheriff Department law enforcement officers performing law enforcement functions on behalf of the county that had previously existed under Sheriff Allen.

329.    The written policies and training adopted by Sheriff Reid's predecessor, Sheriff Tommy Allen, constituted the official policy of Anson County.

330.    Before Reid was elected Sheriff, Sheriff Allen required all law enforcement officers to read the Anson County Policy and Procedure Manual, then sign an affirmation that they had read and understood the policies and procedures.

331.    Former Sheriff Tommy Allen also required all law enforcement officers to read every update to the manual, then sign and affirm they had done so.

332.    Sheriff Reid stopped those requirements.

333.    Between 2014 and 2018, the Anson County Policy and Procedure Manual was only available in the office of Sheriff Landric Reid.

334.    Between 2014 and 2018, Sheriff Reid did not require the Defendants to even know the location of the Anson County Policy and Procedure Manual.

335.    Defendants had not reviewed the manual after Sheriff Reid took office in 2014.

336.    Once Sheriff Reid took office, there was no yearly training on the Anson County Policy and Procedure Manual.

337.    There was no mandatory training on ethics.

338.    There was no regular training on how to respond if an Anson County

Deputy Sheriff suspected wrongdoing by another Anson County officer.

339.    If there had been training, then all of the Defendants in this matter would have been familiar with Section 105 of the Anson County Policy and Procedure Manual, which imposed *a duty* upon *all employees* of the office to report suspected or known violations of laws, ordinances, rules and directives.

340.    In 2018, Section 105 of the Anson County Policy and Procedure Manual provided as follows:

> 1.05 - Duty to Report Violations of laws, Ordinances, Rules and Directives
> Employees knowing of *or suspecting* other employees of violating laws, ordinances, Sheriff's Office rules, directives, special orders, or standard operating procedures *shall* report the same to their supervisor.  If an employee believes the information is of such a nature or gravity, official channels may be bypassed and the information may be reported directly to the Sheriff.

341.    The lack of training resulted in the failure of the Defendants to intervene to protect Ray Kifer from Burroughs by reporting their suspicions to their supervisors or to the Sheriff.

342.    Darius Ellison wrote a note to his superior, Lt. Josh Beam, reporting that Kifer would be transporting drugs, but withheld the fact that Burroughs was the source of the tip that Ellison himself believed to be suspicious.

343.    Deputy David Spencer arrested Ray Kifer Jr. although he knew or reasonably should have known that Burroughs provided false information about Kifer.

344.    Lt. Kyle Beam did not report his suspicions to his supervisor or to the Sheriff, as required by Section 105 of the Anson County Sheriff's Department's Policy and Procedures Manual, and instead assisted in the illegal arrest of Ray Kifer.

345.    Lt. Jimmy Williams did nothing to prevent the stop of Ray Kifer, then

participated in the false arrest. He did not report his suspicions to his supervisor or to the Sheriff, as required by Section 105 of the Anson County Sheriff's Department's Policy and Procedures Manual.

346.    Lt. Josh Beam did nothing to prevent the stop of Ray Kifer, then participated in the false arrest. He did not report his suspicions to his supervisor or to the Sheriff, as required by Section 105 of the Anson County Sheriff's Department's Policy and Procedures Manual.

347.    Even after the truth began to emerge, not a single law enforcement officer involved in the stop, arrest or interrogation of Ray Kifer, Jr. offered SBI Agent Brandon Blackmon any information about their suspicions before the false arrest of Ray Kifer, Jr., nor any information about their actions – or inactions.

348.    Because Sheriff Reid ended the internal affairs investigation after Burrough's confession, not a single law enforcement officer involved in the stop, arrest, or interrogation of Ray Kifer, Jr. was held accountable for their actions – or inactions.

349.    Sheriff Reid's failure to require that Anson County Sheriff's Deputies be familiar with the Policy and Procedures Manual, and his failure to provide or require training on the requirements of Section 105 of the Policy and Procedures Manual, led directly to the illegal stop and arrest of Ray Kifer.

350.    Scott Howell, in his official capacity as acting Sheriff of Anson County is the successor Defendant to the late Sheriff Reid.

## STATE COMMON LAW CLAIMS

## COUNT VI

## False Arrest

### (Against Defendants Burroughs, Spencer, Kyle Beam, Josh Beam and Jimmy Williams in their individual capacities)

351.     Ray Kifer incorporates paragraphs 1-353 of this Complaint as if fully restated herein and further alleges:

352.     Any applicable governmental immunity has been waived by the Anson County Sheriff's Department purchase and maintenance of insurance or its participation in a municipal risk pool to cover liability for Defendants' conduct.

353.     Defendants' conduct, as set forth in this Complaint, was reckless and malicious, and public officer immunity therefore does not apply to their conduct.

354.     In March 2018, Defendants Burroughs, Spencer, Kyle Beam, Josh Beam, and Jimmy Williams, acting individually and/or in concert with each other, under color of state law, caused, instituted or participated in the arrest of Ray Kifer.

355.     The arrest of Ray Kifer was based upon false information provided by Burroughs in Kifer's car and was therefore not supported by probable cause.

356.     Defendants Spencer, Kyle Beam, Josh Beam, and Jimmy Williams knew or reasonably should have known, or were willfully blind to the fact that, that Burroughs provided false information about the drugs in Kifer's car.

357.     Defendants knew or reasonably should have known that in the absence of the false information , probable cause did not exist to arrest Ray Kifer's.

358.     Defendants' actions were malicious and evidenced a reckless and callous disregard for, and deliberate indifference to, Ray Kifer's constitutional rights.

359.     Defendants' conduct occurred in the course and scope of their

employment as law enforcement officers and under color of state law.

360. As a result of the wrongful acts of Defendants, Kifer was wrongfully arrested on March 7, 2018 for a drug offense he had not committed and was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

361. Defendants acted with malice as a matter of law, and with reckless disregard for the rights of Ray Kifer.

362. The misconduct of Defendants was objectively unreasonable and was undertaken intentionally, maliciously and/or willfully, or in reckless disregard and indifference to Kifer's clearly established constitutional rights.

363. As a direct and foreseeable consequence of being arrested, detained and interrogated, Ray Kifer has suffered emotional and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages to be determined at the trial of this matter.

## COUNT VII

## GROSS NEGLIGENCE/RECKLESSNESS

**(Against Defendants Scott Howell in his official capacity as acting Sheriff of Anson County, Harry B. Crow as Administrator of the Estate of Landric Reid, Spencer, Kyle Beam, Josh Beam and Jimmy Williams in their individual capacities)**

364. Ray Kifer incorporates paragraphs 1-367 of this Complaint as if fully restated herein and further alleges:

365. Any applicable governmental immunity has been waived by the Anson County Sheriff's Department purchase and maintenance of insurance or its participation in a municipal risk pool to cover liability for Defendants' conduct.

366.     Defendants' conduct, as set forth in this Complaint, was reckless and malicious as a matter of law, and public officer immunity therefore does not apply to their conduct.

367.     At the time of the events that occurred in March 2018, Defendants owed Ray Kifer a duty of due care with respect to their involvement in his arrest for an alleged drug offense.

368.     The duty of due care owed to Ray Kifer included, but was not limited to, the following duties:

    a.    To ensure that citizens were not wrongfully arrested and charged with crimes they did not commit;

    b.    To ensure that only reliable and trustworthy evidence was used in making an arrest;

    c.    To intervene to prevent a fellow law enforcement officer from planting evidence or otherwise fabricating probable cause to arrest an innocent person;

    d.    To conduct criminal investigations professionally and with the goal of finding the truth; and

    e.    To follow proper law enforcement procedures and the United States Constitution in conducting all criminal investigations and arrests.

369.     Defendants Spencer, Kyle Beam, Josh Beam, and Jimmy Williams' conduct in March 2018 was grossly negligent and reckless, and breached their duty of due care to Ray Kifer by participating in the unlawful arrest and detention of Ray Kifer Jr. and by failing to intervene to prevent the unlawful arrest and detention of an innocent person for a crime he had not committed.

370.     Defendants Spencer, Kyle Beam, Josh Beam, and Jimmy Williams were acting in the course and scope of their employment as law enforcement officers,

and were negligent, grossly negligent and or reckless in failing to recognize that Ray Kifer was not guilty of any drug offense and was being framed for a drug offense by defendant Burroughs through the provision of false information to the other defendants.

371.    Defendant Harry B. Crow  was acting in the course and scope of his employment as the Sheriff of Anson County, and was grossly negligent and or reckless in failing to require the officers of the Anson County Sheriff's Department to read the Policy and Procedures Manual and in failing to require that they be trained with regard to how to proceed if they suspected that a fellow officer was planning to frame  an innocent person.

372.    Defendant Scott Howell in his official capacity as the acting Sheriff of Anson County is liable for the actions of Defendants Harry B. Crow as administrator of the Estate of Landric Reid, Spencer, Kyle Beam, Josh Beam and Jimmy Williams through the doctrine of *respondeat superior*.

373.    Defendants acted with malice as a matter of law, and with reckless disregard for the rights of Ray Kifer.

374.    As a direct and foreseeable consequence of Defendants' negligence, gross negligence and recklessness, Ray Kifer has suffered personal physical injury, emotional and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages to be determined at the trial of this matter.

## COUNT VIII

### INTENTIONAL/RECKLESS INFLICTION OF EMOTIONAL DISTRESS

**(Against Defendants Scott Howell, in his official capacity as the acting Sheriff of Anson County, Harry B. Crow as Administrator of the Estate of Landric Reid, Spencer,**

**Kyle Beam, Josh Beam and Jimmy Williams in their individual capacities)**

375.     Plaintiff incorporates the allegations made in paragraphs 1-378 above and further alleges as follows:

376.     The acts and omissions of Defendants Howell, Crow, Spencer, Kyle Beam, Josh Beam and Jimmy Williams, as set forth above, constituted extreme and outrageous conduct towards Ray Kifer.

377.     Defendant Scott Howell in his official capacity as the acting Sheriff of Anson County is liable for the actions of Defendants Spencer, Kyle Beam, Josh Beam and Jimmy Williams through the doctrine of *respondeat superior*.

378.     Defendants' acts and omissions as set forth above were intended to cause severe emotional distress to Ray Kifer or, in the alternative, evidenced a reckless indifference to the likelihood that such acts and omissions would cause severe emotional distress to Ray Kifer.

379.     As a direct and foreseeable consequence of Defendants' acts and omissions, and the severe emotional distress that these acts and omissions caused, Ray Kifer suffered damages in an amount to be determined at the trial of this matter. These damages include, but are not limited to, mental suffering, severe mental anguish, humiliation, indignities and embarrassment and degradation, as well as anxiety, depression, post-traumatic stress disorder, regular anxiety attacks, and a sleeping disorder - emotional conditions which are generally recognized and diagnosed by professionals trained to do so as well as other damages to be determined at the trial of this matter.

## PUNITIVE DAMAGES

380.    Ray Kifer incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

381.    The acts of the individual defendants alleged above were willful and wanton as a matter of law and evidenced a reckless disregard for and indifference to the rights and safety of the public, including Ray Kifer, who as a result, was stopped, arrested, detained and questioned for a crime he did not commit.

382.    The willful and wanton acts alleged above proximately caused the injuries suffered by Ray Kifer. Mr. Kifer is therefore entitled to recover punitive damages from the individual defendants.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ray Kifer respectfully requests that the Court enter judgment in his favor against defendants on all counts of the Complaint, and award relief as follows:

1.    Compensatory damages against the Defendants, jointly and severally, in an amount to be determined at trial.

2.    Punitive damages against the individual Defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar prohibited behavior by Defendants and other officials and law enforcement officers in the future.

3.    Pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42

46

U.S.C. § 1920, against all Defendants, jointly and severally, and

4.      Any and all other relief to which he may be entitled.


 Respectfully submitted, this 12th day of July, 2024.


                                        /s/ Sonya Pfeiffer
                                        Sonya Pfeiffer, NC Bar No.: 37300
                                        Joseph P. Lattimore, NC Bar No.: 46910
                                        David S. Rudolf, NC Bar No.: 8578
                                        **Pfeiffer Rudolf**
                                        225 East Worthington Avenue Suite 100
                                        Charlotte, NC 28203
                                        Telephone: (704) 333-9945
                                        Fax: (704) 335-0224
                                        dsr@pr-lawfirm.com
                                        spf@pr-lawfirm.com
                                        jpl@pr-lawfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Second Amended Complaint was served this date upon the following counsel of record via use of the CM/ECF system, which will send a notification of such filing and a copy thereof:

Scott MacLatchie
SMacLatchie@hallboothsmith.com
Attorney for Defendant Burroughs

Sean Perrin
Sean.perrin@wbd-us.com
Attorney for Defendants Beam, Beam, Spencer, and Williams

This 12th day of July, 2024.

/s/ Sonya Pfeiffer
Sonya Pfeiffer