UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CASE NO. 3:21-CV-39 DCK

RAY KIFER JR.

          Plaintiff,

vs.

HARRY B. CROW JR., et. al.

          Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO USE SPECIAL INTERROGATORIES**

## I.    <u>INTRODUCTION</u>

Plaintiff asserts claims under 42 U.S.C. § 1983 against Deputies Spencer, Kyle Beam, Josh Beam, and Williams in their individual capacities for unlawful stop in violation of Plaintiff's Fourth Amendment rights, unlawful arrest, and failure to intervene. Plaintiff also alleges state-law claims against Spencer, Kyle Beam, Josh Beam, Williams, and the Estate of Landric Reid ("Estate") for false arrest, gross negligence, and intentional infliction of emotional distress.

Defendants asserted entitlement to qualified immunity for the federal claims and public official's immunity for the state-law claims. [Document 97, p. 34].

Defendants now move this Court to submit, in accordance with Fourth Circuit precedent, special interrogatories to the jury so it can find the facts necessary for the Court's determination of whether these immunities apply. Pursuant to Local Rule 7.1(b), Defendants have consulted with Plaintiff, who does not consent to this notion.

1

## II.    STATEMENT OF FACTS

Defendants anticipate that the following evidence will be presented at trial through either witness testimony, stipulations, or exhibits.

### A.    DAVID BURROUGHS AND LELA VANG STOP DATING AND BURROUGHS PLANTS DRUGS IN KIFER'S CAR WHEN KIFER BEGINS DATING VANG

Lela Vang and Burroughs stopped dating in January 2018, and Vang began dating Ray Kifer Jr. in February 2018. On March 4, 2018, Burroughs contacted a local drug dealer, James Sims, and paid him to buy drugs, and then broke into Kifer's car, and planted the drugs in the trunk of Kifer's car. Burroughs attempted to get Polkton Police Office employees Matt Norris and Tim Hutchinson to stop the car, but was unsuccessful in doing so.

On March 6, 2018, Burroughs contacted ACSO deputy Naji Mario El Kobersy in an attempt to have El Kobersy stop Kifer's car. Burroughs told El Kobersy that the driver's girlfriend was his ex-girlfriend, Lela Vang. When El Kobersy heard this information, he contacted ACSO drug detective Jimmy Williams about Burroughs' tip. Williams told El Kobersy to not stop the car, and that Williams would deal with it in the morning. Williams thought the information was too specific, and sounded "fishy". Williams planned to talk with fellow ACSO drug detective Josh Beam in the morning and look into the tip.

B. **BURROUGHS ATEMPTS TO GET OTHER ACSO DEPUTIES TO STOP KIFER'S CAR**

On the morning of March 7, Josh Beam received a note in his mailbox from ACSO deputy Darius Ellison with Kifer's name and a description of Kifer's car, indicating that drugs were in the car. Josh Beam showed Williams the note, and Williams recognized it as the same tip that El- Kobersy informed him about the prior evening. Williams told Beam about his conversation with El – Kobersy, and Williams and Beam decided to contact Ellison.

Josh Beam called Ellison and asked him to meet at the Citgo. At this meeting, Ellison told them that the source for the tip was Burroughs, and he apologized for not telling them earlier. Williams and Josh told Ellison not to stop the car. Williams and Beam took their directive to Ellison to be an order and that no other ACSO deputy would stop the car. Williams and Josh then went to Morven, a town in Anson County, to conduct a gang investigation into a gang called Nine Trey.

At 2: 30 pm, ACSO deputies Vance Bennett and David Spencer were at the Anson County child support office when Spencer received a call from Burroughs, Spencer's corporal. Burroughs told Spencer that there was a car coming through with drugs, and he provided the tag number, and told Spencer to pay close attention to the trunk. He also told Spencer that there was a strong possibility that Vang and her boyfriend would be in the car. Burroughs gave Spencer the make and model of the car, and told Spencer the car would be coming back and forth on Ansonville- Polkton Road between 3: 15 pm. and 4 p.m. This information threw up "red flags" to Spencer because the tip involved Burroughs' ex-

3

girlfriend. Despite these red flags, Spencer looked for the car because Burroughs was his superior, and Spencer thought that Burroughs was simply staying away from the situation. Spencer asked Burroughs the identity of the confidential informant who provided the information, and Burroughs did not tell him. Spencer also called Kyle Beam because Beam was his supervisor and he wanted to let Beam know what he was doing.

At 2: 59 pm., Burroughs contacted Kyle Beam and asked Kyle if Kyle knew anything about somebody bringing drugs into Anson County, and Kyle said no. Burroughs stated that the guy was his ex-girlfriend's new boyfriend and the tip came from her family. Kyle said that he might drive to that area and see if he saw the car.

After this call with Burroughs, Spencer began looking for the car in the area Burroughs described. According to Vang, at around 3: 30 pm., she drove to work at Premier Fiber with Kifer in the passenger seat. Prior to reaching the intersection of Highway 742 and Ansonville -Polkton Road, Vang noticed a black Charger driven by Spencer behind her car. Vang told Kifer that Spencer was on David Burroughs' shift. Spencer took a right on 742 and did not follow them to Premier Fiber because there were cars in between his car and the car Burroughs described. Spencer then got something to drink at his parents' home, and went back and patrolled the same area. Vang and Kifer arrived at Premier Fiber, and Kifer Jr. drove away, only to come back to Premier Fibers after Vang told him that she forgot her house keys.

4

C.  **DAVID SPENCER STOPS KIFER'S CAR AT 3: 43 P.M FOR SPEEDING AND DRIVING LEFT OF CENTER AND DRUGS ARE FOUND AFTER KIFER CONSENTS TO A SEARCH**

After Kifer left Premier Fiber the second time, Spencer observed the car turning onto Ansonville-Polkton Road from Highway 52. Spencer observed the car travelling over the posted speed, and cross the center line, so he initiated his blue lights at 3: 43 pm. Kifer pulled off the road, and Spencer pulled behind him.

Spencer got out of the car, asked Kifer if he knew why he was pulled over, and Kifer replied "No." Spencer told him that he was speeding. Spencer also told Kifer he stopped him for crossing the center line, and wrote him a ticket for crossing the center line at 3: 46 pm. Spencer did not cite him for speeding because Spencer was not radar certified. At his deposition, Kifer admitted speeding but not going left of center. Spencer contacted Kyle Beam and informed Kyle that he stopped someone for crossing the center line, that Burroughs informed him that the car had drugs, and Kyle agreed to go to the scene. Kyle recognized this as the same tip given to him by Burroughs earlier in the day.

Spencer came back to Kifer's car five minutes later with the ticket, and told Kifer that he smelled marijuana in Kifer's car, and Kifer said that Spencer could not because Kifer did not have any marijuana. Spencer then asked to search the car and Kifer agreed. After Kifer consented to the search of his car, Spencer asked Kifer if Kifer could sit in the back of Spencer's patrol car. Kifer contacted Vang and told her that Spencer was looking in his trunk and asked Vang to call his sister who could then call his father. Kifer also informed her that Spencer wanted to search the car because Spencer smelled marijuana. In

response, Vang called Burroughs and asked Burroughs what Spencer was doing. Burroughs said he didn't know what anyone else was doing. Vang told Kifer to watch Spencer carefully.

Kyle Beam arrived on the scene, and Kyle and Spencer started searching the passenger area of Kifer's car, and then moved to the trunk area. At the trunk, Spencer smelled chemicals and marijuana, popped the spare tire compartment cover and found a plastic envelope with drugs, and a debit card with Kifer's name on it. From the patrol car, Kifer watched Spencer search his car. Spencer and Kyle came back to Spencer's patrol car and told Kifer that he was being arrested. Kifer asked why and Spencer said that he would tell Kifer later. Neither Spencer nor Kyle Beam showed Kifer what they found.

On the police radio, Josh Beam and Williams heard that Spencer performed a traffic stop, and Kifer's name was mentioned. Williams thought that nobody was going to stop the car based on the instructions to Ellison. Williams and Josh Beam arrived ten minutes after Kifer was placed under arrest.

Meanwhile, Sheriff Reid was in Chesterfield, South Carolina when he received a call from Ray Kifer, Sr., a church acquaintance, who told Sheriff Reid that his son, Ray Kifer Jr., was pulled over for drugs and still on the side of the road. Kifer Sr. informed Reid that his son didn't do drugs. Reid contacted ACSO lieutenant Brian Tice and asked him to find out what was going on. Tice contacted Kifer Sr. and met with him and his wife, Lorraine, at the Sheriff's Office at 4:45 pm. After talking with Kifer Sr. and Kifer's stepmother Lorraine, Tice talked with Spencer. Spencer told Tice that he stopped a car for

going left of center, got consent to search and found drugs, and said that Burroughs gave him the tip that drugs would be in the car.

     D.      **KIFER IS TAKEN TO THE SHERIFF'S OFFICE, INTERVIEWED, AND RELEASED, AND BURROUGHS IS TERMINATED, CRIMINALLY CHARGED, AND CONVICTED**

Williams, Josh Beam, and United States Homeland Security officer Jose Manolito "Monty" Dugger, who rode with Williams and Josh occasionally, decided to take Kifer from the scene of the stop to the Sheriff's Office and interview him. Josh and Williams put the evidence in the car and drove to the Sheriff's Office. Williams and Josh decided to proceed like a normal drug investigation because even though the information seemed too good to be true, there was still a possibility that it could have been credible information. They drove to a building with an airstrip attached and Kifer asked if that was the Sheriff's department. Williams stated that Josh Beam had to pick something up. The drug unit was located at the airport so drug investigators could talk to informants without having people being able to identify them. Josh went inside the drug office and got his notebook, and they proceeded to the main Sheriff's Office.

In the interview room at the main Sheriff's Office, Kifer waived his Miranda rights, consented to a search of his phone, and agreed to be interviewed. Dugger asked most of the questions, and Kifer repeatedly told them he had no part in the drugs being found in his car. Kifer asked why he was arrested, and the officers put the drugs in front of him. Throughout the interview, Kifer consistently denied knowledge of the drugs. Beam left the interview room at 5:03 p.m. because he had reason to believe that they needed to let

Kifer go and pursue a further investigation. Josh informed the Sheriff that they needed to let Kifer go and that the drugs may involve Deputy Burroughs. Sheriff Reid ordered Tice to have Kifer Jr. taken before the magistrate and "unarrested" and the traffic ticket voided.

Josh then told Spencer that they needed to release Kifer. At 5: 39 pm, Williams, Dugger, and Kifer left the interview room and went to the magistrate's office. Spencer provided testimony before Magistrate Joshua Leviner and told Leviner what happened and that he didn't want to pursue the drug charges. Magistrate Leviner found no probable cause on the drug charge. Magistrate Leviner told Kifer that he wasn't going to be charged, but might in the future if new information develops. Kifer was never charged with anything related to this case.

After Kifer's release, Tice began investigating the incident and interviewed Burroughs on March 7 and 8 as part of the internal investigation. In the March 8th interview, Burroughs admitted to planting the drugs in Kifer's car, so Reid contacted the SBI to perform a criminal investigation. Reid terminated Burroughs on March 8, 2018.

In April 2019, Burroughs was charged with making a false police report, obstructing justice, breaking and entering a motor vehicle, possession of heroin, possession of marijuana, and possession of methamphetamine. He was convicted of possession of heroin and obstruction of justice on May 12, 2023.

## III. <u>ARGUMENT</u>

### A. <u>INTRODUCTION</u>

In the Fourth Circuit, in a trial involving a law enforcement officer's assertion of qualified immunity, the jury must first answer special interrogatories about the facts of the

case and then, based on those factual findings, the court must determine whether the officer is entitled to qualified immunity.

The division of labor between finding facts and applying the law based on those facts was set out in *Willingham v. Crooke*, 412 F.3d 553 (4th Cir. 2005), where the court said that, when the facts are in dispute, the jury "must" determine the facts, but only the court can determine the " 'essentially legal' nature" of whether the officer is entitled to qualified immunity. *Id*. at 559. Thus, whether an officer is "entitled to qualified immunity under the facts found by the jury – i.e.., whether a reasonable officer would have known that his actions violated the law – should not [be] . . . submitted to the jury." *Id*. at 559.

Since it is clear that the jury must be the fact-finder in any such trial, and the court makes the immunity determination, this process makes logical sense. Unless the court has facts from which to base its decision on qualified immunity, it cannot make the immunity determination.

## B. <u>OVERVIEW OF QUALIFIED IMMUNITY AND PUBLIC OFFICIAL'S IMMUNITY</u>

Law enforcement officers sued under 42 U.S.C. § 1983 may assert qualified immunity, "which is more than a mere defense to liability" but rather "is immunity from suit itself." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Officers performing discretionary duties are entitled to this immunity as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 Ct. 2727, 2738 (1982). In addition, "qualified immunity protects officers who commit constitutional violations but

9

who, in light of clearly established law, could reasonably believe that their actions were lawful." *Cooper,* 735 F.3d at 158.

An officer is immune "if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir. 1991). That is, unless "every reasonable official would have understood that what he [was] doing" violated the law, the officer is immune. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violated the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986).

Similarly, public official immunity is available to officers sued in their individual capacities under North Carolina law. The Fourth Circuit has said that it "is functionally identical to . . . qualified immunity," *Cooper*, 735 F. 3d at 160, and district courts in North Carolina have said that "the analysis for this type of immunity is essentially the same as the § 1983 qualified immunity analysis." *Massasoit v. Carter*, 439 F. Supp. 2d 463, 480 (M.D.N.C. 2006) (citing *Lea v. Kirby*, 1717 F. Supp. 2d 579, 584 (M.D.N.C. 2001)).

Under this immunity, a public official who is "engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence," but may be held liable only if his actions "were 'corrupt or malicious' or 'outside of or beyond the scope of his duties.' " *State ex. rel. Stein v. Kinston Charter Academy*, 379 N.C. 560, 587-88, 866 S.E.2d 647, 666 (2021) (*quoting Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952)). Law enforcement officers are considered public officials. *Isenhour v. Hutto*, 350 N.C. 601, 610, 517 S.E.2d

10

121, 127 (1999). To prove malice, a plaintiff must meet an objective standard, similar to with qualified immunity, and show that the officer engaged in conduct " 'which a man of reasonable intelligence would know to be contrary to his duty,' i.e., when he violates a clearly established right." *Cooper*, 735 F.3d at 160 (*quoting Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003)).

## C. <u>THE REQUIREMENT TO USE SPECIAL INTERROGATORIES</u>

As noted above, it is clear that whether the defendant officers are entitled to qualified immunity and/or public official's immunity is a question of law for the court to determine. However, as the Fourth Circuit has said, the jury must first determine the facts before the court has the information available to make a qualified immunity determination.

The Fourth Circuit addressed this in *Willingham*, in which the plaintiff sued a police officer under 42 U.S.C. § 1983, and "the facts [were] sharply disputed." *Id*. at 555. The court submitted the qualified immunity question to the jury over the plaintiff's objection, and the jury found for the officer. *Id*. at 558. On appeal, the plaintiff argued that the jury should have only determined the facts, not whether qualified immunity applied to the officer, and he asserted that the trial court "should have given the jury [plaintiff] Willingham's proposed interrogatories." *Id*. at 558 and n.6. The Fourth Circuit agreed. It said that "juries are ill-suited to make the determinations of law required by the qualified immunity analysis." *Id*. at 560. However, it said, when the facts are disputed, "the district court <u>should</u> submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Id*. (emphasis added).

Thus, the law in this Court is that the jury finds the facts and then the trial court determines, based on those facts, whether an officer is entitled to immunity. As was later explained in another Fourth Circuit case:

> Whether an officer's conduct was objectively reasonable, and hence protected by qualified immunity, is a question of law solely for the court. Only disputed issues of fact material to the court's objective reasonableness decision are submitted to the jury. The court then uses the jury's factual findings, typically communicated in the form of answers to special interrogatories, to decide whether to grant qualified immunity.

*Mazuz v. Maryland*, 442 F.3d 217, 232 (4th Cir. 2006) (Kelley, J., concurring) (*citing Willingham and Knussman v. Maryland*, 272 F. 3d 625, 634 (4th Cir. 2001)). The decision in *Willingham* "fully and finally settled the issue in the Fourth Circuit." *Id.*

Federal district courts in North Carolina have followed this approach. *See e.g., Tarlton v. Sealey*, 2021 WL 1762098, *2 (E.D.N.C. 2021) (unpublished) ("The Court agrees that the use of special interrogatories will provide it with specific facts found by the jury upon which to base its determination of whether all or any of the defendants are entitled to qualified immunity."); *Scarbro v. New Hanover County*, 2011 WL 2550969 (E.D.N.C. 2011) (unpublished) (ordering submission of special interrogatories to jury in special verdict form under F.R.Civ.P. 49).

### D. USE OF SPECIAL INTERROGATORIES IN THIS CASE

In this case, in deciding on qualified immunity, this Court must determine whether Defendants' stop of Plaintiff was reasonable, whether Defendants' arrest of Plaintiff was reasonable, and whether Defendants' failure to intervene was reasonable. That "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8 (2007).

However, "[t]he first step in assessing the constitutionality of [an officer's] actions is to determine the relevant facts." *Id*. at 378, 127 S. Ct. at 1774. That is the job of the jury.

In deciding qualified immunity, the Court must determine whether Defendants' actions were reasonable. That "is a pure question of law." *Scott*, 550 U.S, at 381 n.8, 127 S. Ct. at 1776 n.8 (2007). However, "[t]he first step in assessing the constitutionality of [an officer's] actions is to determine the relevant facts." *Id*. at 378, 127 S. Ct. at 1774. That is the job of the jury.

Certain facts in this case are undisputed, and the jury will not need to address them. For instance, there are no disputes that 1) Spencer stopped Kifer's car; 2) Spencer placed Kifer under arrest; 3) Josh Beam and Jimmy Williams took Kifer to the Sheriff's Office and interrogated Kifer along with United States Homeland Security Office Monty Dugger; and 4) Kifer was released.

Defendants propose the following special interrogatories to resolve factual issues surrounding their respective entitlement to qualified immunity and public official immunity. Defendants acknowledge that when the evidence is presented at trial, additional interrogatories may become evident. Defendants also recognize that the Court may desire to add interrogatories that the Court believes would be helpful in its resolution of the qualified immunity issue.

## 1. SPECIAL INTERROGATORIES RELATED TO THE UNLAWFUL STOP

Plaintiff's unlawful stop claim is based upon the allegation that Spencer stopped his car unlawfully. Spencer will testify that there were two bases for the stop of Kifer's car:

13

1) speeding in excess of the speed limit, and 2) going left of center. Both are traffic offenses which allow an officer to stop a car. *See* N.C.G.S. §§ 20-141, 146. This Court, in denying summary judgment on the unlawful stop claim, found issues of fact on why Spencer was stopped. [Document 74, pp. 12-13 n. 4]. These disputed facts include whether (1) whether Plaintiff was speeding, *id*., and (2) whether Plaintiff crossed the center line, *id*. In light of this evidence, Defendants propose the following special interrogatories on the stop issue:

1) Was Plaintiff speeding in excess of the speed limit when Spencer initiated Plaintiff's stop?

2) Was Plaintiff going left of center when Spencer initiated Plaintiff's stop?

## 2. SPECIAL INTERROGATORIES RELATED TO THE UNLAWFUL ARREST

Plaintiff's unlawful arrest claim is based upon the allegation that there was not probable cause for his arrest. Defendants will testify that 1) Kifer was driving a car, and 2) drugs were found in the trunk area of Kifer's car. This Court, in denying summary judgment on the unlawful arrest claim, found issues of fact on whether there was probable cause to arrest Kifer. [Document 74, pp. 14-16, n. 5]. These disputed facts include "what these deputies knew at the time of the arrest." *Id*. at p. 15. In light of this evidence, Defendants propose the following special interrogatories on the unlawful arrest issue:

1) Did Plaintiff have illegal drugs in his car?

2) At the time they arrested Plaintiff, did Defendants know that David Burroughs planted those drugs?

14

### 3. **SPECIAL INTERROGATORIES RELATED TO THE FAILURE TO INTERVENE**

Plaintiff's failure to intervene claim is based upon the allegations that Jimmy Williams and Josh Beam should have intervened to prevent Plaintiff's allegedly unlawful arrest. Jimmy Williams and Josh Beam will testify that they were not aware that David Burroughs planted drugs in Kifer's car. This Court, in denying summary judgment on the failure to intervene claim, found issues of fact about "whether they had sufficiently specific knowledge to warrant liability on Plaintiff's failure to intervene claim. [Document 74, pp. 17-18 n. 6]. In light of this evidence, Defendants propose the following special interrogatories on the failure to intervene issue:

1) Before they arrived at the scene of Plaintiff's stop, did Jimmy Williams and Josh Beam have actual knowledge that David Burroughs planted drugs in Plaintiff's car?

2) At the time Plaintiff was arrested, did Jimmy Williams and Josh Beam have actual knowledge that David Burroughs planted drugs in Plaintiff's car?

### 4. **SPECIAL INTERROGATORIES RELATED TO PLAINTIFF'S STATE CLAIMS OF GROSS NEGLIGENCE, RECKLESSNESS, AND INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS**

Plaintiff also brings state tort claims against the Estate, Spencer, Kyle Beam, Josh Beam, and Williams. North Carolina's public official immunity doctrine "involves a determination of the subjective state of mind of the governmental actor." *Andrews v. Crump*, 144 N.C. App. 68, 547 S.E.2d 117, 123 (2001). Under this framework, "a public

15

official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox v. City of Asheville*, 222 N.C. App. 285, 730 S.E.2d 226, 230 (2012).

This Court, in denying Defendants' motion for summary judgment on Plaintiff' state tort claims, held that there was a "genuine issue of material fact about whether [they] were grossly negligent and or reckless with respect to their conduct as it affected Plaintiff" and whether "there is a sufficient showing of malice." [Document 74 pp. 23, 24].

Defendants anticipate that the evidence at trial will show that Spencer was acting on orders from his superior. He had consent to search the vehicle and found drugs. He had no specific knowledge that the drugs were, in fact, planted prior to arresting Plaintiff. Kyle Beam responded to the call that Plaintiff had been stopped and went to assist Spencer, who was a new and inexperienced deputy. Kyle Beam did not know that the drugs were planted, generally, let alone by Burroughs. And, while they had suspicions about the tip, Josh Beam and Jimmy Williams were not present at the time of the stop, or the arrest, nor did they personally witness the drugs being found in Plaintiff's car, and therefore did not have independent information sufficient to justify overturning the decision of the arresting officer. Sheriff Reid released Burroughs less than an hour after he was brought in for questioning upon concluding that he was not the proper suspect and developing suspicion that Burroughs may have framed him.

Based on this evidence, Defendants propose the following special interrogatories on Plaintiff's state tort claims:

1) Were Defendants reasonable in investigating the circumstances of the drugs found in Plaintiff's car?

2) Did Defendants harbor ill will toward Plaintiff and want to punish him?

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' Motion and provide the jury with the special interrogatories set forth in this Brief in order to resolve the facts that remain in dispute and facilitate a determination on Defendants' entitlement to qualified and public official immunity.

This the 14TH day of March, 2025.

s/Sean F. Perrin
s/Mike Ingersoll
*Attorneys for Defendants Anson County, Estate of Landric Reid, David Spencer, Jimmy Williams, Josh Beam, and Kyle Beam*

## <u>CERTIFICATION</u>

I hereby certify, the following: 1) No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources West Law, Lexis, FastCase, and Bloomberg; 2) Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his direction as to the accuracy of the proposition for which it is offered in the citation to authority provided.

/s/ Sean F. Perrin